UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No.: 05-11211JLT

NEIGHBORHOOD ASSOCIATION OF THE
BACK BAY, INC., and THE BOSTON
PRESERVATION ALLIANCE, INC.
     Plaintiffs,

v.

FEDERAL TRANSIT ADMINISTRATION
and MASSACHUSETTS BAY
TRANSPORTATION AUTHORITY,
     Defendants.

**PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT
OF THEIR MOTION FOR PRELIMINARY AND FINAL INJUNCTION**

I.    **Introduction**

Section 106 of the National Historic Preservation Act (NHPA)[1] requires heads of federal agencies to involve and consult with interested parties and to take into account the effect of an undertaking on historic districts and buildings before approving the expenditure of federal funds, while section § 110[2] requires that other particular action be taken for any Federal undertaking that may affect any National Historic Landmark (NHL). Section § 4(f) of the Department of Transportation Act of 1966[3] allows the approval of a transportation project on land of a historic site of national, state or local significance *only if* there is no feasible and prudent alternative to using that land and the project includes all possible planning to minimize harm to the historic site from the use.

The plaintiffs Neighborhood Association of the Back Bay, Inc. (NABB) and Boston Preservation Alliance (BPA) submit that the defendants have failed to comply

---

[1]    16 U.S.C. § 470f.
[2]    16 U.S.C. § 470h-2.
[3]    49 U.S.C.§ 303.

with these statutes and others, including MGL c. 161A, § 5 (k),[4] with respect to changes they propose be made to the Copley T Station in an effort to comply with the American with Disabilities Act (ADA).   As a result, the defendants improperly and inconceivably found "no adverse effect on historic resources" from, and no significant impact in connection with, the Copley Station project even though it includes the construction of elevator entrances to the station on the site of the NHL Boston Public Library (BPL) and in front of the NHL Old South Church (OSC), as well as significant alterations to and impact on other places listed with the National Register of Historic Places, and even though various parties, including the plaintiffs, object to the same.[5]

Plaintiffs wholeheartedly support making the station accessible under the ADA, but they submit that the defendants failed to properly include and consult with interested parties in the development and design of the project, as required, and that the design resulting from this deficient process will adversely impact these sites and will negatively alter proposed historic sites, view corridors and streetscapes in a preservation district.  They urge this Court to set aside the finding of no significant impact and the determination of no adverse effect in the proposed construction for Copley Station, and declare the same unlawful and invalid.  By this motion, the plaintiffs seek preliminary and final injunctions prohibiting the disbursement and use

---

[4]    This section requires defendant Massachusetts Bay Transportation Authority (MBTA) provide organizations a "timely opportunity to participate in the development of major transportation projects."

[5]    The plaintiff have standing where they and their members will suffer the kind of injury that the statutes at issue protect, the interests they are seeking to protect are germane to the organization's purposes, and neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.  Amended Complaint, ¶¶ 1,2, 5-7.  See Hunt v. Washington State Apple Advertising Comm'n, 432 U.S. 333, 343 (1977) (discussing standing of an association).

of federal funds for the project and otherwise preventing further work in connection
with the project as currently designed including the award of any construction contract.

II.     **Background**

In 1992, the MBTA sent the FTA a "Key Station Plan" for light rail and heavy rail
in connection with the ADA. AR2-012.[6] The MBTA designated Copley Station, along
with other stations, as a "key station" upon which work needed to be done.[7] AR29.
Defendants have acknowledged that the Copley Station "project lies in an area of high
historical significance, with two NHLs at the intersection of Boylston and Dartmouth
Streets: the Boston Public Library (BPL) and the Old South Church." AR694. It also lies
in the area of the Back Bay Historic District, a district listed on the National Register of
Historic Places. Amended Complaint and MBTA Answer, ¶¶ 5, 26.[8]

According to the Key Station Plan, Copley Station would require two new
elevators. AR50. The Copley inbound and outbound platforms are separately entered
on either side of Boylston Street. A 1995 Schematic Design Report prepared for the
MBTA identified various options for locating the inbound and outbound elevators and
headhouses. AR858; 1995 Schematic Design Report, p. 6-19, **Attachment 10**. It identified
four options for the outbound side elevator (A-D):

• Option A proposed locating the elevator along the Old South Church façade on
the west side of Dartmouth Street.

---

[6]     The page references are to the FTA administrative record, which the FTA has
submitted to the District Court.
[7]     The MBTA plans to pay for the proposed changes to Copley Station in whole or
in part with federal funds from the FTA. Amended Complaint and MBTA Answer, ¶
13, attached as **Exhibit 1.**
[8]     Copley Square itself is also listed on the National Register. 1995 Schematic
Design Report, **Attachment 10 to Hurwitz Affidavit**, attached as **Exhibit 2.**

• Option B proposed locating it behind the existing open stairs on the east side of Dartmouth Street across from the Church.

• Option C proposed incorporating the elevator into the existing retail building on the east side of Dartmouth Street across from the Church.

• Option D placed the elevator closer to Boylston Street than Option B, in front of the existing open stair also on the east side of Dartmouth street.

Of the outbound options, Option A "has the most serious historic adjacency issues." Id., p. 6-25. It was the only option that sited the elevator on the OSC side.

The Report identified two options (E and F) pertaining to the inbound side elevator:

• Option E located the elevator next to an existing historic wrought iron headhouse. The Report states:

> "Since the historic headhouse is centrally located on the façade of the Boston Public Library, locating a new structure only on one side will seriously compromise the explicit symmetry of the composition. Therefore Option E also includes a similar structure that could be a bus stop, automated fare collection kiosk or information kiosk on the other side of the wrought iron headhouse.

Report, p. 6-32. The Report noted that "[t]his option is problematic because it not only creates the very difficult task of imposing new structures along side the intricately detailed wrought iron headhouse, but also creates many interface problems with the Boston Public Library." The Report stated that this option would require negotiations with the BPL for the use of their property and would involve modifications to the Library's plaza steps and other open space elements. It suggested that any attempt to integrate new structures be done either by creating similar wrought iron structures or introducing more monumental stone bases with statutes. Report, p. 6-32. The Report also "underlined that any attempt to add a structure in this location will be highly controversial…." Report, p. 6-33.

4

• Option F located the inbound elevator in front of the new Johnson addition to the Boston Public Library. Of the two, this option "has the least streetscape and urban design impacts, but places the entrance in a remote location from the main entry to the station." Id., p. 6-34.

The Report acknowledged that interested parties, including neighborhood groups and associations, were to be given the opportunity to review the project; "[e]arly and continuous liaison with appropriate parties is crucial throughout the entire design process to ensure that all voices are heard and properly addressed." 1995 Schematic Design Report, p. 9-1. It specifically stated that "[a]ll surface changes at Copley Square would have to be reviewed and approved by the Back Bay Architectural Commission."

The administrative record does not contain this Report. It does not contain any records relating to Copley Station from December 1993 to October 2000. It does indicate, however, that a designer was selected for the project in Spring 2001 and that design began in December 2001. AR174, 187, 202. It also indicates that the MBTA held an "internal meeting" in May 2002 to discuss and resolve "conceptual issues." AR202. During this time, it appears, the MBTA selected Options A and E as the locations for the two elevators – two location which presented the most serious historic interface issues.

In October 2002, the MBTA had a meeting where representatives from the FTA and the Massachusetts Historical Commission ("MHC") were presented with a "15% schematic design" which showed these two options; the outbound elevator headhouse located along the OSC façade (Option A) and two new inbound headhouses located next to the existing historic wrought iron headhouse (Option E), although the MBTA told those at the meeting that one of the two kiosks shown on inbound design had been "dropped from the project" due to its location. AR225-232, 272. See also AR410 (confirming that MBTA has selected location options). There was no discussion as to

5

alternate locations for the elevators at this meeting. Rather, the purpose of this meeting simply was to "gain approval for the current design of the proposed new headhouse structures" themselves. AR271. Jane Carolan, identified as a preservation consultant, gave a presentation at this meeting, but the focus of her comments appeared to center on the existing wrought iron kiosk. AR256-259. Meanwhile, the FTA indicated at this meeting that its concern simply "was in the timing of the project." AR272. Yet, this is what is indicated as the initiation of the "Section 106 submittal process." AR225. The MBTA said it would set up a public meeting for January 2003. AR272. It never did.

A 30% design package was prepared by the next month. AR281. The MBTA had a meeting with BPL and OSC in January 2003. AR297-304. Alternate locations for the headhouses likewise were not presented or discussed at this meeting. Hurwitz Affidavit, ¶ 26. Only the design of the headhouses was discussed, but it appears that input wasn't really desired even in that respect; i.e. when the BPL remarked that the inbound headhouse design was "stark," it was informed that the design concept had already been reviewed and approved and that it would "serve as the basis for advancing the design to the 100% level." AR328.

By May 2003, the MBTA was concerned about the schedule for the Copley Station project and its consultant implemented an accelerated schedule for its design. AR319, 340, 326. That schedule showed a public meeting in June 2003 with a 75% design issuing thereafter in July 2003. AR327-328.

A 75% design was submitted in July 2003, but no public meeting preceded it. AR344. A public meeting was held thereafter, on July 21, 2003. AR 344, 870. A 75% design, however, is identified as "Phase III - Final Design" (AR927) and is basically a completed design. Hurwitz Affidavit, ¶ 18. NABB objected to the design by letter in August 2003. AR657-659. Among other things, it specifically stated that the

headhouses proposed for the front of the BPL would seriously interfere with its existing historic façade and suggested that the proposed elevator structure be more appropriately located in front of the new Johnson addition so as not to interfere with the symmetry of the old building. Id.

Meanwhile, also in August 2003, the MBTA sent the FTA a draft Section 106 and 4F Review for the Copley Station Project ("Carolan Review"). AR376-444. This Review does not contain or discuss other locations options for the elevators, only the options for placement and design of the headhouses or kiosks. The focus of this Section 106/4F Review is on the existing historic kiosk on the inbound side, described simply as being "next to the Boston Public Library." AR402. This Review depicts this kiosk as the only "significant historical structure " for consideration. Further, the Review states, erroneously, that "[t]he primary effect of this project will be a visual one. No actual work will be undertaken on any structure in the immediate project area except for the inbound kiosk" and that the existing steps will not be disturbed. AR412-413. It then concludes that "[t]he project will have an impact on the project area and on the inbound headhouse but it will be one of no adverse effect." AR413. But, it then states that "[d]ue to the complexity of the design, fabrication and fragileness of the inbound headhouse further research is being conducted to find out as much information as possible about the original fabrication and assembly of the headhouse." Id. It recommended that a Conservator be appointed to oversee the headhouse refurbishing and that a Memorandum of Agreement be entered. Attaching this Review, the MBTA opined to the FTA that "the project will have 'No Adverse Effect' on any historic resources" and requested a determination of the same by the FTA. AR376-377.

The 100% design package was completed in October 2003. AR504. In January 2004, in apparent response to an inquiry, the MBTA sent the FTA a letter regarding the project, stating that it had

> "reviewed many alternative locations for the above ground elements of the project. However, none of these locations were feasible due to the physical constraints of the existing fixed setting of the below grade subway platforms, emergency stairs, equipment rooms and the existing at grade headhouses. Further limitations are imposed because of the need to comply with ADA regulations."

AR513-514.

Relying on such representation and attaching the MBTA's letters and its Carolan Review, the FTA relayed a finding of "no adverse effect on historic resources" to the State Historic Preservation Office ("SHPO") in January 2004. AR516-589. Like the Carolan Review, however, the primary focus of the FTA's determination was upon the inbound kiosk, and it too identified the project site simply as "adjacent to" the BPL and OSC. Also, like the Carolan Review, the determination states that the "primary effect of this project will be a visual one." AR516. The SHPO concurred with the FTA's determination on January 29, 2004 by stamping it. AR589-A.

In February 2004, the FTA referred the Department of the Interior to the Carolan Review and stated that FTA had determined that "there is no prudent and feasible alternative to the proposed project and that all possible measures to minimize harm have been included in the project planning." AR595-644. The FTA asked the DOI to concur. AR595.

Thereafter, however, in March 2004, the FTA informed the MBTA that it had to complete an Environmental Assessment (EA) for the Copley Station project. AR647. The plaintiff NABB had informed the FTA that same month that the lack of an EA

8

would be problematic given the historically sensitive nature of Copley Square, the BPL and the Old South Church. AR655, 669, 674.

While the EA was ongoing, and unaware it was ongoing, the DOI responded to the FTA's earlier request for concurrence as to § 4(f). AR680-681. The DOI noted that measures to minimize harm to resources were only "implied" in one section of the Carolan Review, section 6.b. AR680. (This section addressed only the recommended design alternatives for the elevator headhouses. AR558-559). The DOI understood there to be " a commitment to the implied measures" in that section and said that it would state agreement to the second proviso of section 4(f) "conditional upon such commitment." Id. The letter also states that "it is unfortunate that the National Park Service (NPS) was not notified as to the effect determination on the National Historic Landmark designation of this Green Line Copley Station." Id.

In June 2004, the MBTA issued a draft EA for Copley Station and it held a public hearing on it in July 2004. AR692-724, 870. The draft references the various options that had been identified in the 1995 Schematic Design Report and sets out the MBTA's "preferred option," but does not state why the other options were rejected. AR 697-700. In somewhat circular fashion given that the FTA had relied on the MBTA's documentation in finding no adverse effect, the draft EA makes reference to the FTA's determination of "no adverse effect" in stating that the MBTA had met the requirements under § 106 of NHPA and § 4(f). AR704-705.

Various persons and organizations, including NABB, provided comments to the draft EA. AR848, 872-897. NABB sent a six page letter, noting its objection to the presented design and the process used to arrive at the same. AR734, 878-883. The MBTA responded that it would not provide specific responses to each commenter but

would provide them with a copy of the Final EA so they could see how their issues were addressed. Hurwitz Affidavit, ¶ 22.

The MBTA submitted the EA to the FTA in September 2004, asking that it issue a Finding of No Significant Impact (FONSI) for Copley Station project. AR826, 848-849. The plaintiffs did not receive a copy of the EA until January 6, 2005. See letter dated January 6, 2005 from MBTA to NABB, **Attachment 4** to Hurwitz Affidavit. In the meantime, on December 30, 2004, the FTA had issued a document to the MBTA entitled "Finding of No Significant Impact" ("FONSI") regarding the Copley Square project. Amended Complaint, Exhibit E (FONSI). Under "Section 106 Compliance," the FTA references its earlier determination of "no adverse effect on historic resources." Id. This section of the FONSI is discussed further infra.

Under "Section 4(f) findings", the FTA references its May 2004 letter to the DOI but it concedes that the alternative elevator location (Option F), which would have located it 150 feet away from the station entrance and in front of a new Johnson addition to the BPL, avoiding NHL property, was not presented to the DOI. Id. The FTA says this alternative was presented in the EA and dismissed.[9] This section of the FONSI is also discussed further infra.

By letter to the FTA dated February 11, 2005, NABB expressed its disagreement with the FONSI and the process used in designing the project, as discussed further below. **Attachment 5** to Hurwitz Affidavit, ¶ 25.

Significantly, the FONSI made no mention of or determination regarding Section 110 of NHPA. Amended Complaint, ¶ 27. It also did not mention or acknowledge that the Back Bay Historic District is on the National Register of Historic Places, or that the

---

[9]     In fact, as noted above, the MBTA had rejected this option on its own in 2001 or 2002.

existing wrought iron headhouse is on or eligible to be on the National Register, and it made no findings under section 106, 110 or 4(f) regarding the same. Id., ¶¶ 29, 30. Further, the Advisory Council of Historic Preservation ("ACHP") was never consulted or even informed with respect to this project and the issues and effects it presents until June 2005 simultaneously with the time bids were being submitted by contractors to construct the project. **Exhibit 4 – Affidavit of Laurence E. Hardoon.**

The project area contains a unique cluster of historic sites and landmarks. Indeed, the BPL, OSC and Trinity Church, which is just east of the project, comprise the three closest National Historic Landmarks in the country. [10] Hurwitz Affidavit, ¶ 10. As discussed further below, the project as currently designed presents serious and adverse impacts to this important area. The design simply is incompatible with and adverse to the historic character of the NHLs and National Historic sites upon which it is to sit and otherwise impact, and there are readily available more suitable alternative options for accessibility that would preserve and maintain the historic integrity of these sites.

Additional facts are stated infra.

## III. Argument

## A. Standard for Injunctive Relief

A preliminary injunction is designed to preserve the status quo pending a hearing or determination. In deciding whether to issue injunctive relief, a court weighs: (1) the likelihood of the movant's success on the merits; (2) the potential for irreparable harm to the movant; (3) a balancing of the relevant equities, i.e., the hardship to the nonmovant

---

[10] There are almost 83,000 listings on the National Register of Historic Places. Of these, about 2300 are NHLs. Hurwitz Affidavit, ¶ 10. Landmark designation is an official recognition by the Federal government of a property's national significance. Id.

if the injunction issues as contrasted with the hardship to the movant if interim relief is withheld; and (4) the effect on the public interest of a grant or denial of the injunction. Gately v. Massachusetts, 2 F.3d 1221, 1224 (1st Cir.1993). These factors weigh heavily and undeniably in plaintiffs' favor, and warrant the grant of injunctive relief here.

**B.    The Plaintiffs are Likely to Succeed on the Merits.**

The Court's duty is to ensure that the agency followed the applicable procedure, "considered the relevant factors and articulated a rational connection between the facts found and the choice made." Baltimore Gas & Elec. Co. v. Natural Res. Def. Council, Inc., 462 U.S. 87, 105, 103 S.Ct. 2246 (1983). The defendants have failed in such respects here. The resulting conclusions are arbitrary and capricious, an abuse of discretion and not in accordance with the law.

**1. The National Historic Preservation Act**

**A. The Defendants Failed to Comply with Section 106 of NHPA**

At the heart of NHPA's preservation scheme is § 470f, referred to as the "section 106" review process, the purpose of which is to promote and provide opportunity for exchange of information and consultation between federal agencies and parties with an interest in the effects of an undertaking on historic properties, commencing at the early stages of project planning. 36 C.F.R. § 800.1. The FTA, as lead agency, had the statutory obligation to undertake this process. 36 CFR § 800.1(a). It had the responsibility to (1) determine whether an undertaking "is a type of activity that has the potential to cause effects on historic properties," 36 CFR § 800.3(a), defined as properties included in or which meet the criteria and are eligible for inclusion in the National Register; (2) "[d]etermine and document the area of potential effects …"; (3) [r]eview existing information on historic properties within the area of potential effects…"; (4) "[s]eek information … from consulting parties, and other individuals and organizations likely

12

to have knowledge of, or concerns with, historic properties in the area, and identify issues relating to the undertaking's potential effects on historic properties …". 36 CFR § 800.4(a). From there, the FTA was to assess whether and what historic properties present and whether and how they might be affected by the undertaking. 36 CFR § 800.4(b)(d). It was to consider ways to reduce or avoid any adverse effect on historic property, and permit review and comment by the ACHP on the procedures and conclusions of the Agency Official and SHPO. The FTA failed to conduct an appropriate § 106 review here.

### (i). The FTA Failed to Conduct A Proper § 106 Review and Failed to Provide the Required Documentation to Support its Finding of No Adverse Effect.

NHPA requires that the determinations of effect, adverse effect, or no effect by the appropriate federal agency official be an independent one, and not simply a "rubber stamp" of a state authority. Hall County Historical Society, Inc. v. Georgia Dep't of Transp., 447 F.Supp. 741, 751-52 (N.D.Ga.1978). There is no indication that the FTA's determination here was an independent one. The record contains nothing which shows that the FTA independently documented the area of potential effects, that it reviewed existing information on historic properties within the area of potential effects, or that it sought information from individuals and organizations likely to have knowledge of, or concerns with, historic properties in the area, and identified issues relating to the undertaking's potential effects on historic properties. 36 CFR § 800.4. Instead, the record reveals that the FTA relied upon the MBTA's representations and reviews and that it rubber-stamped the MBTA's conclusion.[11] Indeed, the FTA in its FONSI states that its determination was based on the MBTA analysis. AR991.

---

[11]    The record shows the MBTA viewed the FTA's role as simply approving its § 106 package. AR327.

The FTA mirrored the language of the MBTA's Carolan Review when it sought concurrence from the SHPO as to its no adverse effects determination. As did the Carolan Review, the FTA's "potential effects analysis" focused really only upon the inbound kiosk. It mentions that two elevator headhouses were to be constructed, but omits any "potential effects analysis" regarding the fact that (1) one elevator is to be constructed on the site of the BPL and the other in front of the OSC or (2) the entire site lies within the Back Bay Historic District and Copley Square which themselves are on the National Register of Historic Places. The absence of a real potential effects analysis as to these sites is a serious omission and a dereliction of the FTA's duties and responsibilities under §106.

Moreover, that Review incorrectly stated that "[n]o actual work will be undertaken on any structures in the immediate project area except for the inbound kiosk." AR610. This undisputedly is erroneous in terms of the BPL and the Back Bay Historic District (both National Register sites covered by § 106) where the inbound elevator entrance is to be on the actual physical site of the BPL. Amended Complaint and MBTA Answer, ¶¶ 16, 24.[12] It is to occupy part of the stone plaza of the library building, id., ¶¶ 16, 18, and the MBTA has acknowledged that the project will require changes to the existing stone steps and other open space elements of the BPL. AR859-860. In any event, "actual work" does not even have to be taken on a particular structure or site for an undertaking to have a "potential effect" upon it.

The record thus reveals an improper delegation of FTA responsibilities under NHPA. By virtue of the same, the FTA simply did not comprehend and did not

---

[12]    The NHL BPL is also a designated City of Boston Landmark and is on the National and State Register of Historic Places. Amended Complaint and MBTA Answer, ¶¶ 20, 21.

consider the full scope of the project and its impact on various National Register of Historic Places covered by § 106 when it made its determination of no adverse effect. It certainly did not fully consider ways to reduce or avoid any adverse effect on historic properties, as it was required to do, where it apparently never even considered alternative locations for the inbound and outbound elevator headhouses, such as those identified in the MBTA's 1995 Schematic Design Report or those it might have otherwise considered had it conducted an independent review. The record does not show that the FTA, at any time prior to its no adverse effect determination, even reviewed the 1995 options. The MBTA had dismissed these options of its own accord early in the process, without discussion with or involvement of interested parties.

Also, the FTA was required to support its determination of no adverse effect with sufficient documentation, including a description (1) of the undertaking, (2) of the steps taken to identify historic properties, (3) of the affected historic properties, including information on the characteristics that qualify them for the National Register, and (4) of the undertaking's effects on historic properties, as well as an explanation of why the criteria of adverse effect were found inapplicable. 36 CFR § 800.11(e). It appears, however, that there is no documentation as to the effect upon the National Register of Historic Places Back Bay Historic District, Copley Square, the OSC and the BPL, nor certainly any explanation as to why the criteria of adverse effect were found inapplicable to these places, as required. 36 CFR § 800.11(e)

Had the FTA undertaken the required independent review of the effects of the undertaking on historic properties, it would have understood the greater and actual implications of the project upon the multiple historic sites and National Register of Historic Places in the area and, plaintiffs submit, a different § 106 course would have resulted that would, at a minimum, have included meaningful participation by the

ACHP as Congress intended.   16 U.S.C. § 470f; 36 CFR §§ 800.4-800.7  As it stands, however, the process followed was deficient and the resulting determination is inaccurate and incomplete.

Moreover, in light of the foregoing, and the FTA's incomplete representation of the "potential effects" analysis in its determination letter, it would appear that the SHPO cannot be said to have concurred in anything more than the determination there was no adverse impact in the work to be performed on the inbound kiosk.  Even that analysis, however, is suspect or at least conditional given that the Carolan Review indicated that (1) further research was to be conducted on the kiosk, (2) that a Memorandum of Agreement between the MBTA, the BLC and the MHC was to be entered on it, and (3) that a Conservator was to be used to oversee the kiosk refurbishing. [13]  AR410, 611.  There is no evidence that these steps have been taken. [14]

The defendants' section 106 review thus falls far short of NHPA requirements and should be declared incomplete and invalid. [15]  They should be ordered and required to complete a full and accurate § 106 review (including consulting with all consulting parties and the ACHP, and consideration of alternative locations) as to all National Historic Register of Places in the project area, before the approval, disbursement or use of any funding for the Copley Station project.

**(ii). The Defendants Failed to Provide the Advisory Council, the SHPO, the Plaintiffs and Others, Including Representatives of Local Governments, With Sufficient Opportunity to Comment.**

---

[13]    In December 2004, the MBTA tried to revise the Carolan Review so that it referenced an "Agreement" rather than a "Memorandum of Agreement" to "avoid any confusion with the requirements under Section 106" of NHPA.  AR1053.

[14]    Without a complete and final decision of the SHPO, the project cannot continue. M.G.L. c. 9,  §§ 26B, 27C.

[15]    In its EA, the MBTA states that it's § 106 compliance rests on the FTA's determination.  It thus suffers the same deficiencies.

According to the regulations, the FTA "shall involve ... consulting parties in findings and determinations made during the section 106 process." 36 CFR § 800.2(a)(4). Consulting parties include the SHPO, representatives of local government, and individuals and organizations with "a demonstrated interest in the undertaking" due to the nature of their legal or economic relation to the undertaking or affected properties, or their concern with the undertaking's effects on historic properties." 36 CFR § 800.2(c).

It is undisputed that the undertaking had "the potential to cause effects" on historic properties.[16] According to the regulations, "[i]f the agency official finds that there are historic properties which may be affected by the undertaking, the agency official shall notify all consulting parties ..., invite their views on the effects and assess adverse effects, if any." 36 CFR § 800.4(d)(2). In assessing whether there would be adverse effects to any historic properties, the FTA was required to consider "any views concerning such effects which have been provided by consulting parties and the public." 36 CFR § 800.5(a). It is the responsibility of the federal agency to identify parties entitled to be consulting parties and to ask them to participate as such in the section 106 process. 36 CFR § 800.3 (f). This process is supposed to be initiated early in the planning of the undertaking, so that a broad range of alternatives may be considered. 36 CFR § 800.1(c). This simply was not done here.

First, the MBTA selected the location for the elevators on its own, even though these options it selected were specifically identified as presenting historic adjacency issues with the OSC and creating interface problems with the BPL. Neither the FTA or

---

[16]     The 1995 Schematic Design Report, for example, references to the project asinvolving "serious historic adjacency issues" and "interface problems with the landmark Boston Public Library" and the possible compromise of its symmetry..

the MBTA had invited any representative of the local government or other interested parties to participate as a consulting party in the section 106 review that should have encompassed consideration of this range of alternatives. It certainly at no time invited the plaintiffs to so participate – either when considering the range of alternative locations or even later when other elements of the design of the project were determined – even though they certainly were aware of their interest. See Amended Complaint and MBTA Answer, ¶ 62 (NABB informed the MBTA it was interested in participating in design of the project); Hurwitz Affidavit, ¶¶ 17, 32.[17]

Moreover, the defendants effectively stymied any party's attempt at participation or consultation. For example, when the OSC asked to be kept apprised of the project, the MBTA responded that all community concerns would be addressed and coordinated through the BLC and that a public meeting/hearing would be scheduled during the 30% design effort. AR218. But, the involvement of the BLC and the MHC was limited. As noted, they were simply presented with a design already in progress. When the BPL commented on that design, it was told that the design was the one they were going with for the 100% design.

Further, no public meeting was held at the 30% phase. Indeed in direct contravention of section 106 and its regulations, the plaintiffs, station abutters, the public, and other parties were not involved in the project until its planning was 75% complete (the final construction drawings phase), and even then it was in terms of the environmental assessment, not the § 106 determination. By that time, the FTA had

---

[17]    Indeed, NABB participates in reviewing almost all proposals for both public and private exterior modifications and constructions in the Back Bay Architecture District and this is exactly the type of project that NABB would participate in developing. Hurwitz Affidavit, ¶¶ 15, 16.

already found "no adverse effect on historic resources." As discussed further <u>infra</u>, however, criteria of adverse effects as stated in 36 CFR § 800.5 are present in the project as proposed. Had the FTA fulfilled its obligations and invited all consulting parties to participate early in the process as required, such parties, including the plaintiffs, would have had the opportunity to express their views on the same. Had it then found no adverse effect, the plaintiffs – and likely other consulting parties who were omitted from the process – could have notified the FTA that it disagreed with such finding, as permitted. 36 CFR § 800.5(c)(2). The FTA would have then been required to either consult with the party to resolve the disagreement or request the ACHP to review the finding.

By not involving all consulting parties in the manner required, the FTA circumvented the section 106 review process. It eclipsed the ability of such parties, including the plaintiffs, to be aware of, let alone disagree with, its finding of no adverse effect. It likewise eclipsed the role of the ACHP in reviewing and resolving potential adverse effects. As a result, the defendants were able to issue a determination of no adverse effects even though such effects are, in fact, presented by the project per the specific criteria set out in the regulations.

### (iii). The Undertaking Meets the Criteria of Adverse Effect and There Are Alternatives to Avoid, Minimize or Mitigate the Same that have Not Been Adequately Considered.

An adverse effect is found when a project may alter, directly or indirectly, any of the characteristics of a historic property in a manner that would diminish the integrity of the property's setting, location, feeling or association. 33 C.F.R. §800.5(a)(1). A non-exclusive list of examples of adverse effects on historic properties include

(1)    "[p]hysical destruction of or damage to all or part of the property";
(2)    "[a]lteration of a property, including restoration, rehabilitation ... and provision of handicapped access";

(3)    "[c]hange of the character of the property's use or of physical features within the property's setting that contribute to its historic significance"; and the

(4)    "[i]ntroduction of visual, atmospheric or audible elements that diminish the integrity of the property's significant historic features."

36 C.F.R. § 800.5(a)(2). As discussed below, the project here precisely involves these very types of effects and represents a per se "adverse effect". A determination of "no adverse effect" is thus incomprehensible. It is arbitrary and capricious, is an abuse of discretion, and is contrary to the law.

### The New Inbound Elevator Headhouse

The BPL is one of the greatest buildings in the country. Affidavit of Richard Guy Wilson, ¶ 7, attached as **Exhibit 3.** Its great classical design, the formality and symmetry of the structure especially on the exterior, and its great decorative program have had a tremendous and unique impact on American library design. Id. On the exterior, Charles McKim, the lead architect, carefully sited the building with relation to Copley Square and the surrounding streets. He designed with great care how the building met the ground, the plaza, the number of steps, the bollards and its entire relationship to the street. Id., ¶ 8. Extreme care must be taken when altering a building of such fame and magnitude as the BPL. Id., ¶ 12. It is a world-class structure and it should not be grossly disfigured by a design and placement currently proposed. Id., ¶ 15. This would be a significant loss to the architectural history of Boston and the country. Id.

The location of the inbound elevator, as proposed, will require destruction of this historic BPL property, including the removal of existing stone steps and parts of the plaza to accommodate access to the elevator. The proposed elevator thus will undeniably result in physical destruction of the property and will unquestionably alter the historic site. That such alteration is done for the "provision of handicapped access"

does not exempt it from NHPA and, indeed, alteration done for such purposes is specifically referenced as an adverse effect in the regulations.

The defendants' own reviews and reports confirm the existence of an adverse effect. Specifically, Option E as originally designed included structures on either side of the existing inbound entrance so as not to "compromise the explicit symmetry of the composition" of the building, a significant historic feature. AR859; Wilson Affidavit. Even with the second headhouse, the option was considered "highly problematic." Although the MBTA was aware of this and acknowledged that a design that locates a new structure on only one side "will seriously compromise the explicit symmetry of the composition," AR859-860, it decided to go with "Option E (minus the east headhouse)." AR860. The placement of a lopsided, modern structure as proposed on the BPL site, however, would represent a change to the property's setting that contributes to its historic significance, and would introduce visual elements that would seriously diminish the integrity of the property's historic features. Wilson Affidavit, ¶ 12.

The MBTA indicated that it selected the modified Option E after learning that a second headhouse "would block and make inoperable an active below ground access point for the BPL" and was "infeasible from an engineering perspective." AR860. According to the MBTA's Carolan Review, however, "it was *quickly decided* … to just have the [one] structure on the west side of the headhouse, leaving the east side open to retain the important view corridor between the wrought iron structure and Copley Square." AR553. More thought could have been given to the actual feasibility of altering the hatchway, if necessary. The issue of the historic importance and impact of the symmetry issues were discounted and discarded.

Option F would have sited the new elevator in front of the new Johnson addition to the BPL, and, of the two inbound options, it had the least streetscape and urban

design impact. AR860; Wilson Affidavit, ¶ 14 (alternative is to move entire new
elevator headhouse to the front of modern annex to the BPL). That option ostensibly
was rejected because it placed the entrance in a "remote location" from the main entry
and because of "the impacts to the Boston Public Library, a National Register
Landmark." AR860. This analysis simply does not make sense given the impacts
presented by the modified Option E.

    Defendants also claim that Option F would bring a customer into an area beyond
the fare collection area and that they'd either have to (1) construct a tunnel to the fare
area or (2) create a "caged gate system" where the passenger would have to wait for
someone collect their fare. The former point, however, was not considered a problem at
the Arlington Street Station (which is a part of the Copley Station bid package) that is
pending wherein the MBTA proposes to excavate an entirely new tunnel that will be
substantially more isolated than Option F. The distance there is a comparable length to
that presented by Option F and the Arlington tunnel impacts an historic site. Hurwitz
Affidavit at ¶35. Yet, here, the defendants rejected the construction of a passageway
that would help avoid impacting an historic site.

    The second point meanwhile ignores the potential of automated fare machines
scheduled to be operational at Arlington and Copley in 2006. Using this new
technology, Option F could deposit passengers directly onto the platform with no need
for any passageway at all. Hurwitz Affidavit at ¶37. Significantly, by letter dated May
31, 2005, the SHPO wrote the FTA specifically with regard to a new automated system,
the Charlie Card, and asking for the opportunity to discuss "new alternatives that are
feasible as a result of the implementation of the Charlie Card." Letter from Cara Metz
to FTA dated May 31, 2005, **Attachment 6** to Hurwitz Affidavit.

Alternatives to the current location and design of the inbound elevator structure thus exist that would avoid, minimize, or mitigate adverse effects, have not been adequately considered and were otherwise eliminated without adequate consultation and evaluation as contemplated under § 106.[18]

**The Existing Historic Inbound Headhouse**

The existing headhouse was added to the Boylston Street side in 1915, with the architects using the same classical vocabulary as the main building and placed it symmetrical with the building. Wilson Affidavit, ¶ 9. That wrought iron wrapped structure is itself an historic feature. Amended Complaint and MBTA Answer, ¶ 25. Yet, the current design provides for the removal and alteration of this historic wrought iron headhouse. AR860. It is to be "rehabilitated," which means that alterations are allowed as are the use of materials and features different from those used in the original inbound entrance. AR411, 557. "Rehabilitation," however, is itself a type of adverse effect specifically identified in § 106.

Moreover, the Carolan Review had indicated that further research was needed as to the inbound headhouse given the "complexity of the design, fabrication and fragileness" of it. AR558.[19] It is not clear that such research was conducted. The EA provides no details as to the nature of the "rehabilitation," saying only that "details will

---

[18]    Also, it has been indicated that the new headhouse will be made of modern glass and steel. Any new headhouse though should be constructed in a style compatible with the BPL and in a style similar to the existing 1915 subway headhouse. Wilson Affidavit, ¶ 13. The existing subway headhouse illustrates how the construction of a new elevator headhouse would be better approached. Wilson Affidavit, ¶ 13. Indeed, the MBTA's own 1995 Schematic Design report noted as much.

[19]    This head house of bronze and iron was added to the Boylston Street side in 1915. Sensitively sited and symmetrical with the building, the architects used the same classical vocabulary as the main building. Wilson Affidavit, ¶ 8.

be provided" -- and then only to the MHC and BLC. AR549. It is unclear whether such details were provided or what they were.

The Review also recommended that a Conservator be appointed to oversee its refurbishing and an Agreement between the MBTA, the BLC, the MHC and Conservator be implemented. Id. Neither the EA nor the FONSI makes any reference to a Conservator being part of the project, even though others raised the same concern in response to the draft EA. There likewise is no indication that an Agreement was entered. It thus does not appear then that the defendants have sufficiently considered and evaluated the project and possible alternatives to avoid, minimize or mitigate adverse effects in terms of the existing inbound headhouse as well.

**The Outbound Structures**

The project's adverse impact is not limited to its significant and devastating effect on the BPL. Across the street, the project contemplates three new headhouse structures in connection with outbound entrance. All three are within the Back Bay Historic District and two of the three are adjacent to the Old South Church. That Church is also a NHL, is listed in the National and State Register of Historic Places, and is a designated City of Boston Landmark. Amended Complaint and MBTA Answer, ¶¶ 20, 21. It too lies within the Back Bay Historic District, id., and the area on the north side of Boylston Street lies within the Back Bay Architectural District. Hurwitz Affidavit, ¶ 14.

The project calls for the addition of an elevator headhouse along the Church's façade, behind and in addition to the existing stair headhouse. AR858. It contemplates the redesign of the existing stair headhouse. The MBTA had been informed that "of the outbound options, this location has the most serious historic adjacency issues." 1995 Schematic Design Report. Indeed, the combined effect of these two structures will be to block much of the Church's façade along that street, as well as views of the BPL's

24

Dartmouth Street façade and views to and from the Dartmouth Street Mall. Also, importantly, and as discussed further _infra_, the project as designed will require excavation in this area which may seriously impair the integrity of the Church. Any damage to the Church would be unacceptable. This building is essentially priceless in the same way that any significant work of art is priceless. Letter from Jean Carroon dated June 30, 2005, attached to **Attachment 9** to Hurwitz Affidavit. This building occupies a pivotal position in the design of the Back Bay and the City and is a rich and significant architectural example and should be protected and preserved. _Id._

Meanwhile, Options B, C, and D which located the elevator headhouse on the east side of Dartmouth Street opposite the façade of the Church, were eliminated, apparently because they would require negotiations with a private owner or construction issues. But, certainly there is precedence for the same throughout the city. These options would clearly have avoided, minimized or mitigated any adverse impact NHL property at all and should have been given serious consideration. They, too, were dismissed without appropriate consultation and evaluation.

Meanwhile, neither the Finding nor the EA present adequate reasons for enclosing the existing open stair entrance to the station on the east side of Dartmouth Street. This structure will block important pedestrian views to and from Copley Square and further tighten an already narrow sidewalk. In combination with the two proposed headhouses on the west side, the vistas on both sides of Dartmouth Street will be permanently obstructed, creating a negative effect of visual barrier separating Back Bay and the Dartmouth Street Mall from Copley Square. Further, enclosing the existing stair is not consistent with design decisions for other stations, including Arlington where five stairs are being left open. Hurwitz Affidavit at ¶36.

There are alternatives to the current design that do not impact OSC and that are equally desirable from accessibility perspectives. These options were not properly considered and were eliminated without adequate evaluation.

**(iv).      The FTA Should Be Required to Consult to Resolve Adverse Effects Based on New Information Arising After its Section 106 Review.**

Even if an agency official has approved the undertaking under 106, that official must still make reasonable effort to avoid, minimize, or mitigate adverse effects found after that approval. The plaintiffs submit that the FTA did not conduct a proper section 106 review, in part, because it failed to consider the full scope of the National Register of Places properties involved.[20] It should be required to conduct a proper section 106 review as to the same. In addition, there are other adverse effects that warrant a post-review discovery consultation. 36 CFR § 800. 13.

One of these issues is the matter of the impact of subterranean excavations. As noted above, OSC recently had an engineering firm assess the impact of the excavations that would be necessary to add the elevator headhouse proposed by the MBTA. That firm concluded that the risk of soil settlement and of lowering the groundwater table could cause the cracking of masonry or stained glass windows, as well as the deterioration of timber piles that support the Dartmouth Street wall. See Email from Nancy Taylor of Old South Church to Cara Metz, dated June 3, 2005, **Attachment 7** to Hurwitz Affidavit. The SHPO forwarded this to the FTA, requesting that it review the matters and advise of new impacts to historic sites. [21] Moreover, by letter dated July 1,

---

[20]      Indeed, the full scope of the plan wasn't even determined then inasmuch as further research was to be conducted as to the wrought iron headhouse, for example, and the exact number of headhouses involved on the project had not been determined.
[21]      The Church also forwarded information to the MBTA, attesting that it would be impossible to evaluate the potential risk to it from the construction. **Attachment 9** to Hurwitz Affidavit. Indeed, it would be an extremely difficult risk to even insure.

2005, the Old South Church informed the MBTA that "the risks to [the] building from the proposed excavations for the elevator on Dartmouth Street are unacceptable." **Attachment 9** to Hurwitz Affidavit.   This issue clearly presents a question of a severe adverse effect from the current design of the project; one that must be properly reviewed and evaluated before the design is put into effect.

Another new development is the availability of the Charlie Cards, discussed above.  The SHPO agrees that this new development warrants taking a look at alternatives it presents.  **Attachment 6** to Hurwitz Affidavit.  Certainly, it presents a potential avenue by which to avoid, minimize, or mitigate adverse effects.

The project should not be allowed to proceed in the absence of a complete and effective review.

> b.    **The Defendants Violated Section 110 of NHPA.**

When an undertaking may negatively affect a NHL, even greater protection is accorded.  Section 110 of NHPA requires that, when NHLs are involved, like here, federal agencies undertake, to the maximum extent possible, "such planning and actions as may be necessary to minimize the harm to such landmark" and "shall afford the Advisory Council on Historic Preservation a reasonable opportunity to comment on the undertaking."  16 U.S.C.A. § 407h-2(f). Thus, when a project might directly and adversely affect a NHL, the ACHP "shall" be afforded a reasonable opportunity to comment on "the undertaking." Id. So, too, the Secretary of the Department of the Interior "shall" be notified of "any consultation involving a National Historic Landmark" and invited to participate in the consultation where there may be an

adverse effect. 36 C.F.R. § 800.10(c). Defendants failed to conduct an adequate NHPA review and failed to comply with § 110 as well.

The defendants acknowledged that the project area was one of "high historical significance," adjacent to two NHLs. AR856. They also acknowledged that the undertaking "might" directly and adversely affect these Landmarks in noting that the project required efforts to "mitigate potential impacts" to these Landmarks. Id. Indeed, the elevator option the defendants chose admittedly implicates the Boston Public Library and the explicit symmetry of its composition. AR858. Yet, neither defendant made any effort to comply with, and have made no reference to, section 110 of NHPA in any of its letter, evaluations or reports. As discussed above, the FTA did not "to the maximum extent possible, undertake such planning and actions as may be necessary to minimize harm to such landmark."

Moreover, the FTA, as with its § 106 review, at no time afforded the ACHP a reasonable opportunity to comment on the undertaking pursuant to § 110, as required. The FTA likewise failed to involve the Secretary of the Department of the Interior in the manner required. According to 36 CFR § 800 .10(c), the agency official "shall notify the Secretary of any consultation involving a National Historic Landmark and invite the Secretary to participate in the consultation where there may be an adverse effect." The DOI notes this failing in its letter to the FTA. It goes on to state that it "considers the requirement regarding National Historic Landmark status as being satisfied" based on the "dialogue" regarding the project, as presented by the FTA in its request for review and comment on its Section 4(f) evaluation. As referenced above, and as discussed further below, however, that section 4(f) evaluation rested upon the FTA's deficient section 106 analysis and was itself deficient. Thus, unbeknownst to the DOI, the

"dialogue" it referenced as satisfying the requirement concerning NHL status was incomplete and misleading.   The requirement regarding NHL status was not satisfied.

### c.  Defendants Violated Section 4(f) of the Department of Transportation Act

Section 4(f) of the Department of Transportation Act is considered the strongest preservation law at the federal level.  It provides substantive protection for historic properties by prohibiting federal approval or funding of transportation projects that require the use of any historic site, public park, recreation area or wildlife refuge, unless (1) there is no feasible alternative to using that land and (2) the project includes all possible planning to minimize harm to the historic site. 49 U.S.C. § 303(c).  The term "use" includes direct physical use of the property as well as indirect effect that would "substantially impair" the value of the protected site.

Notably, under §4(f), the review required is even more stringent than under the NHPA.  Under 4(f), to proceed with a project, "*no* prudent and feasible alternatives" can exist and "*all* possible planning" must be done to minimize harm. 49 U.S.C. § 303 (emphasis added).  Further, "[a]ny use of lands from a section 4(f) property shall be evaluated early in the development of the action when alternatives to the proposed action are being considered." 23 C.F.R. § 771.135  Again, as discussed, prudent and feasible alternatives are available and apparent and the plaintiffs submit that additional planning can and must be done to minimize harm.  Discussion and consultation regarding the same was not undertaken or permitted with respect to any such alternatives – whether early on as required or at any other time; rather, they were dismissed out of hand, without the involvement of the DOI, ACHP, SHPO, BLC, MHC, the plaintiffs, or any other interested parties.  These alternatives have not been properly considered and evaluated.

Again, a prudent and feasible option regarding the inbound elevator headhouse is to locate it in front of the new Johnson addition to the BPL (Option F). This would avoid use of § 4(f) property. The FTA admits in its FONSI that it did not include this alternative in its § 4(f) evaluation. The regulations, however, require that such information be presented. 23 CFR § 771.135. Where it wasn't included in the evaluation, the DOI obviously could not comment on the same, as required. The FTA tries to skirt this matter by stating that the alternative was presented in the EA and dismissed. But, it remains that the DOI should have, but wasn't, given the chance to comment on it. The FTA then goes on to reference the DOI's "concurrence" with the its §4(f) evaluation in its FONSI. However, a "concurrence" with an incomplete evaluation really is without import.[22]

Although not having complied with § 4(f), the FTA, in its FONSI, states that Option F was not a prudent and feasible alternative, because it would not coincide with the "general circulation path" of the general public and because it would require either a tunnel or a caged gate system. As already discussed above, these contentions are without merit and certainly do not render this alternative imprudent or unfeasible by the strict standard under § 4(f) requiring unusual factors in the use of alternatives or costs or disruption of "extraordinary magnitude."[23]

In its FONSI, the FTA also states that there is no § 4(f) use of the Old South Church because "compliance with Section 106 for proximity impacts resulted in a

[22] It also bears note that the DOI's concurrence was, in fact, "conditional" upon the commitment to the implied measures mentioned in the Carolan Review and it is not clear that such commitment was made here.
[23] "Supporting information must demonstrate that there are unique problems or unusual factors involved in the use of alternatives that avoid these properties or that the cost, social, economic, and environmental impacts, or community disruption resulting from such alternatives reach extraordinary magnitudes."23 C.F.R. § 771.135(a)(2).

finding of 'no adverse effect.'"  As discussed, however, the section 106 determination was deficient and really pertained only to the existing inbound kiosk.  Moreover, the proximity impact to the Church is adverse.  The proximity of the proposed project "substantially impairs" the visual or esthetic qualities of the OSC.  23 CFR § 771.135(p)(4).  In fact, examples of substantial impairment include

> "the location of a proposed transportation facility in such proximity that it obstructs or eliminates the primary views of an architecturally significant historic building, or substantially detracts from the setting of a park or historic site that derives its value in substantial part due to its setting."

As discussed in detail above, this is the very problem presented here in terms of the Old South Church, the Back Bay Historic District, and indeed all of the historic structures in this very unique triangle of historic sites.  The issue is not just one of proximity to the OSC but the alterations are located within the Historic District which itself is protected by §4(f).

The last component of the § 4(f) analysis in the FONSI is the FTA's assertion that § 4(f) does not apply to the rehabilitation of the historic inbound headhouse "because the SHPO concurred in the FTA's determination that the project will not adversely affect" it.  As discussed above, however, that determination was deficient and, indeed, was premature as to the inbound kiosk as discussed.  The extent of the SHPO's concurrence is thus in question.  In any event, the § 4(f) regulation required that both the SHPO and the ACHP have been consulted and have not objected to the FTA's finding that the work will not adversely affect the historic qualities of the facility. 23 CFR § 771.135(f). The ACHP was not so consulted.

In light of the foregoing, this Court should declare the FTA's Finding of No Significant Impact and determination of no adverse effect invalid and should enjoin federal funding of the MBTA's project, as proposed and approved.

**(d) The Defendant MBTA violated M.G.L. c. 161A § 5(K).**

Section 5(k) of G.L. c. 161A, a section of the MBTA's enabling act, states:

"The board of directors is hereby authorized and directed to promulgate such rules, regulations and procedures, including public hearing, as are necessary and appropriate to provide the following parties the timely opportunity to participate in the development of major transportation projects designed by the authority, as defined by the directors, and to review and comment thereon: (i) state, regional and local agencies and authorities affected by said projects (ii) elected officials and riders or potential riders from cities and towns affected by the projects; (iii) other public and private organizations, groups and persons who are affected by, and who have provided the board with reasonable notice of their desire to participate in the development of the design of such projects. *In this section, the words 'timely opportunity' shall mean sufficiently early in the design process so as to permit comments to be considered prior to the final development of or commitment to any specific design for such project."* (emphasis added).

The MBTA failed to provide such designated persons, groups and organizations, including the plaintiffs, with sufficient and "timely opportunity" to participate in the development of the project, even though the MBTA was on notice that they wanted to participate in it and even though its own 1995 Report expressly stated that such input should be sought at the outset and was "crucial." Amended Complaint and MBTA Answer, ¶ 62; Hurwitz Affidavit, ¶ 16; 1995 Schematic Design Report, p. 9-1. They certainly did not permit such participation "early in the design process." Instead, it permitted their participation and comment only after the design was 75% complete, a design considered as "Phase III – Final Design" by the MBTA and one which it considered as ready to go out to bid. The MBTA clearly was committed to the design by that point.[24]

By not involving state, regional and local authorities, elected officials and other interested groups early in the design process as statutorily required, the MBTA denied

---

[24]    The MBTA did meet with the BLC and the MHC prior to the 75% design but, as discussed, even by then the MBTA was already committed to locating the elevators in particular locations and had a design for the headhouses for those elevators that it wanted to see through to the 100% design phase.

the full community process envisioned and mandated by § 5(k). The process was thus invalid and improper and the MBTA should be enjoined from proceeding in any way with the project until a complete and appropriate public design process is followed.

### C.    There is Great Potential of Irreparable Harm and Hardship if the Injunction is Not Allowed, While The Defendants Would Suffer No Similar Harm and Hardship If the Injunction Issues.

There is great potential of irreparable harm if the project is not enjoined.  The project has already gone to bid and the MBTA is going to review those bids and award a construction contract on October 6th. If they are permitted to select a bid and proceed with construction, there is great potential of harm to the Boston Public Library, Old South Church, the Back Bay Historic District, and other National Register of Historic Places such as the existing inbound kiosk. The steps and plaza of the historic BPL will be cut into and forever altered, and the wrought iron inbound kiosk built in 1915 will be dismantled and moved off site.  Also, the Old South Church will be possibly irreparably damaged by subterranean excavation and its impact on soil settlement and groundwater tables.  Further, the views of significant historic buildings like the Old South Church will be blocked as will views throughout this unique triangle of historic sites in the Back Bay Historic District.  This unique cluster of historic venues and its streetscape will be irrevocably altered. It would be a significant loss to the architectural history of the City of Boston and the Country.

The defendants will not suffer similar harm and hardship if the injunction is allowed.  They will simply experience a delay; a delay resulting from their own failure to comply with the state and federal laws pertaining to important historic preservation issues.  The plaintiffs are not insensitive to the accessibility issues involved in this case but, they submit, a proper consideration of the preservation issues presented in this

unique triangle of historic sites ultimately will inure to the benefit of all persons who live in and who visit this City. In any event, it appears that the delivery of the light rail vehicles intended to be used to provide handicapped access to the trains themselves is on hold, a factor independently delaying the project. Hurwitz Affidavit, ¶ 34.

These circumstances warrant protecting the rights of the parties and preserving the status quo pending a full trial on the merits of their controversy.

**D.    An Injunction Would Serve the Public Interest By Confirming that Officials Must Properly Notice and Account for, and Take Appropriate Action Regarding, Historical Considerations and Conditions Before Altering Historic Landmarks and Districts.**

When a party seeks to enjoin governmental action, a judge is "required to determine that the requested order promotes the public interest, or, alternatively, that the equitable relief will not adversely affect the public." Commonwealth v. Mass. CRINC, 392 Mass. 79, 89, 466 N.E.2d 792 (1984). An injunction here will serve the public interest because the public's interest lies in agency compliance with the laws in general and here, particularly, with the laws enacted to protect and preserve architecturally, culturally, and historically significant properties. Certainly, the public interest lies in ensuring that government officials have taken appropriate action, have involved the appropriate parties, and have given appropriate consideration to conditions and concerns before altering NHLs and National Register of Historic Places and other historic venues in the City of Boston. Indeed, Boston's distinct architectural heritage is a national treasure, contributing to the quality of life for Boston's residents and visitors as well as the economic health of the city. Effort must be made to preserve this heritage.

IV.    **Conclusion**

In light of the foregoing, the plaintiffs request that this Court allow this motion,

grant injunctive relief including enjoining disbursement and the use of federal funding

for the Copley Station project and enjoin the project from proceeding at this juncture.

Respectfully submitted,
The Plaintiffs,
Neighborhood Association of the Back Bay, Inc. and
The Boston Preservation Alliance, Inc.
By their attorneys,

Laurence E. Hardoon, Esq., BBO# 221360
Deidre Regan Esq., BBO# 552432
Brody, Hardoon, Perkins & Kesten, LLP
One Exeter Plaza
Boston, MA 02116
(617) 880-7100


John R. Devereaux Esq., BBO# 122200
Neighborhood Association of the
Back Bay, Inc
337 Newbury Street
Boston, Massachusetts 02115
(617) 267-0377

DATED: September 12, 2005

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

NEIGHBORHOOD ASSOCIATION )   CIVIL ACTION
OF THE BACK BAY, INC., et al. )   NO. 05cv11211-JLT
          Plaintiffs )
                          )
                          )
                          )
FEDERAL TRANSIT )
ADMINISTRATION and )
MASSACHUSETTS BAY )
TRANSPORTATION AUTHORITY )
          Defendants )

**ANSWER OF DEFENDANT MASSACHUSETTS BAY TRANSPORTATION
AUTHORITY TO FIRST AMENDED COMPLAINT FOR DECLARATORY RELIEF**

Defendant Massachusetts Bay Transportation Authority ("MBTA") hereby answers the

numbered paragraphs of the First Amended Complaint for Declaratory Relief ("Complaint") of

plaintiffs Neighborhood Association of the Back Bay, Inc. ("NABB") and Boston Preservation

Alliance, Inc. ("BPA") as follows:

    1.     The MBTA admits the allegations of paragraph 1 of the Complaint.

    2.     The MBTA admits the allegations of paragraph 2 of the Complaint.

    3.     The MBTA admits the allegations of paragraph 3 of the Complaint.

    4.     The MBTA admits the allegations of paragraph 4 of the Complaint.

    5.     Answering paragraph 5 of the Complaint, the MBTA states that 337 Newbury

Street, Boston, Massachusetts is located in the Back Bay Historic District and admits the

remaining allegations of the paragraph.

-1-

6.     The MBTA is without sufficient information to permit it to admit or deny the allegations of paragraph 6 of the Complaint.

7.     The MBTA is without sufficient information to permit it to admit or deny the allegations of paragraph 7 of the Complaint.

8.     Paragraph 8 contains a conclusion of law to which no response is required. To the extent a response is required, MBTA denies the allegations of the paragraph.

9.     The MBTA is without sufficient information to permit it to admit or deny the allegations of the first sentence of paragraph 9 of the Complaint. The MBTA denies the allegations of the second sentence of paragraph 9 of the Complaint.

10.     The MBTA admits the allegations of paragraph 10 of the Complaint.

11.     The MBTA admits the allegations of paragraph 11 of the Complaint.

12.     The MBTA denies the allegations of paragraph 12 of the Complaint.

13.     The MBTA admits the allegations of paragraph 13 of the Complaint.

14.     Answering paragraph 14, the MBTA says that certain views of Old South Church and the Boston Public Library will be partially obstructed by the completed Copley Station accessibility project.

15.     Answering paragraph 15, the MBTA admits that the proposed handicap accessible entrances to Copley Station are in the Back Bay Historic District and denies the remainder of the paragraph.

16.     The MBTA admits the allegations of paragraph 16 of the Complaint.

17.     The MBTA denies the allegations of paragraph 17 of the Complaint.

-2-

18.     The MBTA admits that one of the elements of the accessibility improvements to Copley Station will be located on the stone plaza at the front of the Boston Public Library and denies the remainder of paragraph 18 of the Complaint.

19.     The MBTA denies the allegations of paragraph 19 of the Complaint.

20.     The MBTA admits the allegations of paragraph 20 of the Complaint.

21.     The MBTA admits the allegations of paragraph 21 of the Complaint.

22.     Answering paragraph 22 of the Complaint, the MBTA says that Old South Church is within the Back Bay Historic District.

23.     Paragraph 23 contains a conclusion of law to which no response is required.

24.     The MBTA admits the allegations of paragraph 24 of the Complaint.

25.     The MBTA admits the allegations of paragraph 25 of the Complaint.

26.     The MBTA admits the allegations of paragraph 26 of the Complaint.

27.     Answering paragraph 27, the MBTA says that the document described there speaks for itself.

28.     Answering paragraph 28, the MBTA says that the document described there speaks for itself.

29.     The MBTA denies the allegations of paragraph 29 of the Complaint.

30.     The MBTA denies the allegations of paragraph 30 of the Complaint.

31.     The MBTA denies the allegations of paragraph 31 of the Complaint.

32.     The MBTA denies the allegations of paragraph 32 of the Complaint.

33.     The MBTA denies the allegations of paragraph 33 of the Complaint.

34.     The MBTA denies the allegations of paragraph 34 of the Complaint.

35.     The MBTA denies the allegations of paragraph 35 of the Complaint.

36.    The MBTA denies the allegations of paragraph 36 of the Complaint.

37.    The MBTA repeats and incorporates its responses to paragraphs 1 through 36 as if set forth fully herein.

38.    Paragraph 38 contains a conclusion of law to which no response is required.

39.    The MBTA admits the allegations of paragraph 39 of the Complaint.

40.    The MBTA denies the allegations of paragraph 40 of the Complaint.

41.    Answering paragraph 41, the MBTA says that the June 23, 2004 letter speaks for itself and denies the remaining allegations of the paragraph.

42.    The MBTA denies the allegations of paragraph 42 of the Complaint.

43.    The MBTA denies the allegations of paragraph 43 of the Complaint.

44.    The MBTA denies the allegations of paragraph 44 of the Complaint.

45.    The MBTA denies the allegations of paragraph 45 of the Complaint.

46.    The MBTA repeats its responses to paragraphs 1 through 45 and incorporates them here.

47.    Paragraph 47 contains a conclusion of law to which no response is required.

48.    The MBTA denies the allegations of paragraph 48 of the Complaint.

49.    The MBTA denies the allegations of paragraph 49 of the Complaint.

50.    The MBTA denies the allegations of paragraph 50 of the Complaint.

51.    Paragraph 51 contains a conclusion of law to which no response is required.  To the extent that a response is require, the MBTA denies the allegations of the paragraph.

52.    The MBTA repeats its responses to paragraphs 1 through 51 and incorporates them here.

53.    Paragraph 53 contains a conclusion of law to which no response is required.

54.    The MBTA admits that the Copley Station accessibility improvements occupy a part of the site of the Boston Public Library and partially obstruct certain views of Old South Church, the Boston Public Library and the exiting inbound Copley Station headhouse, and it denies the remaining allegations of paragraph 54.

55.    The MBTA denies the allegations of paragraph 55 of the Complaint.

56.    The MBTA denies the allegations of paragraph 56 of the Complaint.

57.    The MBTA denies the allegations of paragraph 57 of the Complaint.

58.    The MBTA denies the allegations of paragraph 58 of the Complaint.

59.    The MBTA denies the allegations of paragraph 59 of the Complaint.

60.    The MBTA repeats its responses to paragraphs 1 through 59 and incorporates them here.

61.    Paragraph 61 contains a conclusion of law to which no response is required.

62.    Answering Paragraph 62, the MBTA says that it was aware that NABB, as well as other groups and individuals, were interested in commenting on the design of the Copley Station accessibility improvements and that it provided such groups and individuals an opportunity to do so, and it denies the remaining allegations of the paragraph.

63.    The MBTA denies the allegations of paragraph 63 of the Complaint.

64.    The MBTA denies the allegations of paragraph 64 of the Complaint.

65.    The MBTA denies the allegations of paragraph 65 of the Complaint.

66.    The MBTA denies the allegations of paragraph 66 of the Complaint.

## **AFFIRMATIVE DEFENSE**

Plaintiffs' entitlement to equitable relief is barred by the doctrine of laches.

Respectfully submitted,
**Massachusetts Bay Transportation Authority**
By its attorneys,


/s/ Stephen M. Leonard
Stephen M. Leonard (BBO #294080)
Jennifer M. Ryan (BBO # 661498)
BROWN RUDNICK BERLACK ISRAELS LLP
One Financial Center
Boston, MA 02111
(617) 856-8200
Dated: July 26, 2005

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was filed electronically and served by mail on anyone unable to accept electronic filing. Notice of this filing will be sent by e-mail to all parties below by operation of the court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing. Parties may access this filing through the court's CM/ECF System.

John R. Devereaux
Neighborhood Association of the Back Bay, Inc
337 Newbury Street
Boston, MA 02115

Laurence E. Hardoon
Brody, Hardoon, Perkins & Kesten
One Exeter Plaza
Boston, MA 02116

Barbara Healy Smith
United States Attorney's Office
John Joseph Moakley Federal Courthouse
1 Courthouse Way
Suite 9200
Boston, MA 02210


Dated: July 26, 2005

/s/ Stephen M. Leonard
Stephen M. Leonard

# 1375530 v1 - RYANJM - 020445/0007

-6-

COPY

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No.: 05-11211JLT

|  |  |
|---|---|
| NEIGHBORHOOD ASSOCIATION OF THE BACK BAY, INC., and THE BOSTON PRESERVATION ALLIANCE, INC. | ) ) ) ) ) ) ) |
| Plaintiffs | ) ) |
| v. | ) ) |
| FEDERAL TRANSIT ADMINISTRATION and MASSACHUSETTS BAY TRANSPORTATION AUTHORITY | ) ) ) ) ) |
| Defendants | ) ) ) |

**FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF**

## PARTIES

1.     Plaintiff Neighborhood Association of the Back Bay, Inc. ("NABB") is a charitable corporation with a principal place of business at 337 Newbury Street, Boston, Massachusetts.

2.     Plaintiff Boston Preservation Alliance, Inc. ("BPA") is a non-profit preservation organization with a principal place of business at 45 School Street, Boston, Massachusetts.

3.     Defendant Federal Transit Administration ("FTA") is an administration within the United States Department of Transportation, with a principal place of business at 400 7th Street SW, Washington, D.C. and with a

regional office for Region I, which includes Boston, at the Transportation Systems
Center, Kendall Square, 55 Broadway, Suite 920, Cambridge, Massachusetts.

4.     Defendant Massachusetts Bay Transportation Authority ("MBTA") is
a body politic and corporate and a political subdivision of the Commonwealth of
Massachusetts, with a principal place of business at 10 Park Plaza, Boston,
Massachusetts.

5.     Plaintiff NABB is located in the same Back Bay Historic District
(see exhibit A attached) as the National Historic Landmarks (NHL) Boston Public
Library and Old South Church (see exhibit B attached) and in which the MBTA's
Copley Station is located.  The Back Bay Historic District is on the National
Register of Historic Places. Based on information in the report of preservation
consultant Jane Carolan, a contractor to the MBTA, the inbound stairway entrance
kiosk to Copley Station is on the National Register of Historic Places.  Even if the
inbound stairway entrance kiosk to Copley Station is not on the National Register
of Historic Places, that inbound entrance kiosk is eligible for the National Register
of Historic Places.

6.     NABB incorporated in 1955 as a charitable corporation (see exhibit
C attached). Its members are about 2500 residents of the Back Bay Historic
District who will suffer that kind of injury against which 16 U.S.C., §470f, 16
U.S.C. §470h-2 and 49 U.S.C. §303 protects.  NABB has as a primary purpose
preserving and protecting the architectural beauty of the Back Bay.  Plaintiff
NABB maintains an Architecture Committee which reviews and comments on

projects that have an impact on the architectural and historic interests and streetscapes of Back Bay, including preservation of the historic nature of Back Bay and its buildings.

7.    The Boston Preservation Alliance, founded in 1978 (see exhibit D attached) as a non-profit preservation organization, provides advocacy, leadership, and education to preserve Boston's historic places. With more than 50 organizations and hundreds of individuals as members, the Alliance believes that Boston's distinct architectural heritage is a national treasure, that contributes greatly to the economy of the city and the quality of life for its residents and visitors.

## JURISDICTION

8.    The action arises under 5 U.S.C. §701-§706, 16 U.S.C. §470f, 16 U.S.C. §470h-2, 42 U.S.C. §1983 and under 49 U.S.C. §303, as hereinafter more fully appears. In addition to jurisdiction for the existence of a federal question under 28 U.S.C. §1331, this is a civil action against the United States founded upon Acts of Congress and regulations of executive departments, providing jurisdiction under 28 U.S.C. §1346. The remaining claims are so related to the claims under federal law that they form part of the same case or controversy, providing supplemental jurisdiction under 28 U.S.C. §1367(a).

## PROPOSED MBTA PROJECT AT COPLEY STATION

9.    Plaintiffs support making Copley Station accessible by elevator and ADA compliant and seek to achieve this accessibility without adversely affecting

3

the historic and architectural character of the Back Bay Historic District, the National Historic Landmark buildings Boston Public Library and Old South Church, or other historic structures. The MBTA's proposed entrances to Copley Station are in the Back Bay Historic District and will negatively alter historic sites, view corridors and streetscapes in that district.

10. The MBTA plans to add two new elevator entrances to its underground Copley Station in Boston, Massachusetts. The proposed elevator entrances are intended to provide access to and from Copley Station to comply with the Americans With Disabilities Act of 1990. One of the elevators proposed for Copley Station is to provide access to the inbound side of Copley Station; the other elevator is proposed to provide access to the outbound side of Copley Station.

11. In addition to the elevator headhouses, the MBTA plans to replace an existing stairwell/escalator headhouse with a new structure and add a new stairwell headhouse over an existing stairwell at the outbound entrances to the Copley Station.

12. As presently proposed, the MBTA's project will adversely impact the architectural and historical character of the National Historic Landmark Old South Church, the National Historic Landmark Boston Public Library, the existing historic inbound entrance to Copley Station and the Back Bay Historic District, despite the availability of prudent and feasible alternatives that would not

4

adversely impact any historic interests, or impact the historic interests less adversely and at the same time provide elevator access to Copley Station.

13.    Upon information and belief, the MBTA plans to pay for its proposed new entrances to Copley Station in whole or in part with federal funds from the Federal Transit Administration of the U.S. Department of Transportation. The MBTA also receives other federal funds.

14.    The MBTA's proposed entrances to Copley Station will partially obstruct views of the National Historic Landmark Old South Church and the National Historic Landmark Boston Public Library.

15.    The MBTA's proposed entrances to Copley Station are in the Back Bay Historic District. The three proposed outbound headhouses will negatively alter historic view corridors and streetscapes in that district, especially the Dartmouth Street Mall and the view and pedestrian corridors connecting the Back Bay with Copley Square and the National Historic Landmark Boston Public Library and National Historic Landmark Old South Church.

16.    The MBTA's proposed inbound elevator entrance to Copley Station will be on the site of the National Historic Landmark Boston Public Library, occupying part of the stone plaza surrounding the library building.

17.    The MBTA's proposed elevator on the site of the National Historic Landmark Boston Public Library located to one side of the existing historic wrought iron inbound entrance will adversely affect the historic symmetry of the north façade of the building, alter and diminish the significance of the existing

5

historic wrought iron entrance centrally located on that façade, and alter the historic stone plaza of the library.

18.    The MBTA's proposed inbound elevator will permanently alter the historic stone plaza surrounding the National Historic Landmark Boston Public Library by removing existing stone steps and parts of the plaza to accommodate access to the elevator.  These are not only permanent changes to the historic fabric, but will also alter the symmetrical relationship of the steps and plaza to the library behind.

19.    The MBTA's proposed project will remove the headhouse for the existing inbound entrance to Copley Station, which is either on or eligible for inclusion on the National Register of Historic Places, but this headhouse will neither be preserved in its present state nor restored to its historic condition. Rather, it will be "rehabilitated" in a way which allows alterations and additions and allows the use of materials and features different from those used in the original inbound entrance.

## HISTORIC STATUS OF OLD SOUTH CHURCH, THE McKIM BUILDING OF THE BOSTON PUBLIC LIBRARY, THE INBOUND ENTRANCE TO COPLEY STATION AND THE BACK BAY HISTORIC DISTRICT

20.    The Old South Church and the McKim Building of the Boston Public Library are designated National Historic Landmarks and are listed in the State Register of Historic Places.  Both buildings are within the Back Bay Historic District, and are listed on the National Register of Historic Places.

6

21.   Both the National Historic Landmark Boston Public Library and the National Historic Landmark Old South Church are designated City of Boston Landmarks by the Boston Landmarks Commission, a commission within the City of Boston Environment Department.

22.   The area on the north side of Boylston Street encompassing the Old South Church lies within the Back Bay Architectural District, an historic district designated and protected by Massachusetts statutes, St. 1966, c. 625, as amended.

23.   The Back Bay of Boston is particularly protected as an architecturally significant historic district by Massachusetts statute, St. 1966, c. 625, as amended.

24.   The National Historic Landmark Boston Public Library and the National Historic Landmark Old South Church are significant historic sites.

25.   Upon information and belief, the headhouse for the existing inbound entrance to Copley Station is a wrought iron wrapped structure included on the National Register of Historic Places or eligible for inclusion on the National Register. Upon information and belief, it is on and part of the site of National Historic Landmark Boston Public Library. The inbound entrance to Copley Station is within the Back Bay Historic District.

26.   The Back Bay Historic District is a historic district listed on the National Register of Historic Places.

## FEDERAL AGENCY ACTION

27.    On December 30, 2004, Richard Doyle, the FTA's Regional Administrator for Region I, issued a document entitled "Finding of No Significant Impact" ("FONSI") for the MBTA's proposed new entrances to its Copley Station. Mr. Doyle issued the FONSI both under §106 of the Federal Historic Preservation Act (16 U.S.C. §470f) ("§106") and §4(f) of the Department of Transportation Act of 1966 (49 U.S.C. §303) ("§4(f)"). (A copy of the FONSI is hereto annexed as Exhibit E.) The FONSI does not mention §110 of the National Historic Preservation Act (16 U.S.C. §470h-2) or analyze the MBTA's proposed project as an undertaking which may directly and adversely affect National Historic Landmarks or mention any opportunity the Advisory Council on Historic Preservation was afforded to comment on the undertaking, as required by that statute.

28.    Regional Administrator Doyle's FONSI states that the proposed changes to the Copley Station will have no adverse effect on historic resources, namely the National Historic Landmark Boston Public Library, and that there would be no Section 4(f) use of the Old South Church, also a National Historic Landmark, because compliance with Section 106 resulted in a finding of "no adverse effect".

29.    Regional Administrator Doyle's FONSI failed to identify the MBTA's proposed project as a project within the Back Bay Historic District, an historic district on the National Register of Historic Places.

8

30.    Regional Administrator Doyle's FONSI failed to identify the MBTA's proposed project as including the removal and rehabilitation of the existing headhouse for the inbound entrance to Copley Station, with such work potentially allowing additions, alterations and the use of materials and features different from those on this headhouse, despite

(a)    the inclusion of this headhouse on the National Register of Historic Places or the eligibility of this headhouse for inclusion on the National Register and

(b)    the location of this headhouse on the site of the National Historic Landmark Boston Public Library.

31.    Regional Administrator Doyle's FONSI failed to identify the MBTA's proposed project as including the removal and altering of portions of the historic stone steps and plaza that are part of the National Historic Landmark Boston Public Library site and that is included on the National Register of Historic Places.

32.    Regional Administrator Doyle made his findings of a lack of adverse effect on the historical interests of the proposed Copley Station entrances despite the following:

(a)    The proposed entrances will partially block the view of the National Historic Landmark Boston Public Library, the National Historic Landmark Old South Church and the historic headhouse at the inbound entrance to Copley Station.

9

(b)     Other feasible and prudent alternative sites are available, both

mentioned in the FONSI and not mentioned in the FONSI, which do

not obstruct the views of the National Historic Landmark Boston

Public Library, National Historic Landmark Old South Church, or

the existing inbound headhouse, which do not alter the existing

inbound headhouse or the existing stone plaza and steps and which

do not adversely affect or less adversely affect any historic sites.

(c)     The FONSI attempts to justify its determination of a lack of adverse

impact by citing the MBTA's planned design of the elevator

headhouses and associated stairwell headhouses which, although

glass (and supposedly transparent), will appear as opaque objects

and do not eliminate the obstruction of view caused by the proposed

entrances to the Copley Station.  In addition, their modern design

constitutes further adverse impact on the historic fabric of the Old

South Church, the Boston Public Library, the Copley Station

inbound headhouse, and the Back Bay Historic District.

(d)     Several proposed but rejected entrance locations, which would less

adversely impact historic interests, would fulfill the §4.3.2(1) of the

ADA Accessibility Guidelines for Buildings and Facilities which

state "the accessible route shall, to the maximum extent feasible,

coincide with the route for the general public."

10

(e)     Several prudent and feasible sites were rejected even though the Massachusetts Building Code, 521 CMR, 3.9 states that "An Historic building or facility that is listed or is eligible for listing in the National or State Register of Historic Places or is designated as historic under appropriate state or local laws may be granted a variance by the Board to allow alternative accessibility."

(f)     The MBTA has refused to assure that it would prohibit posting of advertising on its currently proposed new entrances to Copley Station, which partially obstructs the view of the National Historic Landmark Boston Public Library and National Historic Landmark Old South Church, negates the benefit of supposed transparent structures, and adds otherwise unallowed advertising within the Back Bay Architectural District.

(g)     Not only do the proposed surface structures occupy and change the National Historic Landmark site of the Boston Public Library, block the view of National Historic Landmark Boston Public Library and Old South Church, occupy and block views within the Back Bay Historic District which is listed on the National Register of Historic Places and block the view of the Copley Station Inbound headhouse which is listed on the National Register or eligible for listing on the National Register, but the MBTA project also proposes that these new surface structures will be modern structures not in keeping with

11

the design of the surrounding and obstructed historic structures, but of modern design that are claimed to match the historic character of their surroundings only in the inclusion of stone, glass and metal in a modern design.

(h)    Most of the buildings within the National Historic Landmark District are supported on timber piles including the National Historic Landmark Library and the National Historic Landmark Old South Church. The MBTA has not adequately responded to groundwater issues and has not adequately surveyed existing conditions or effects on existing adjacent structures. Additionally the MBTA states in the Environmental Assessment, in response to a letter from the Groundwater Trust dated July 26, 2004, that it will seek the advice of the Groundwater Trust before finalizing the bid documents. On information and belief, according to the Groundwater Trust, this did not occur.

(i)    The MBTA failed to act according to their own enabling act that requires that it provide an opportunity for a range of affected individuals and groups to be involved early in the design process, as per Section 5(k) of Chapter 161A of the Massachusetts General Laws .The Neighborhood Association of the Back Bay was not afforded the opportunity to see the Project until it was 75% complete, not allowing for input at the planning phase. On

12

information and belief, The Boston Preservation Alliance was never
included in any public process by the MBTA.

33.    Regional Administrator Doyle's Finding that the MBTA's proposed
project has no adverse impact on the historic qualities of National Historic
Landmarks, sites, districts and buildings on the National Register of Historic
Places and structures eligible for inclusion on the National Register is arbitrary,
capricious, not based upon substantial evidence, an abuse of discretion and not in
accordance with law.

34.    Regional Administrator Doyle's finding that no feasible alternative
exists to locating the proposed inbound elevator entrance to Copley Station on the
National Historic Landmark Boston Public Library site is inconsistent with his
approval in the same year (2004) of an elevator entrance for Arlington Station (the
closest MBTA stop to Copley Station). The elevator entrance for Arlington
Station is proposed to be 120 feet from the station to avoid opposition from the
owner of a relatively new, non-historic building. The proposed tunnel to the
Arlington Station would be more isolating for elevator users than any of the
feasible alternatives at Copley Station.

35.    Regional Administrator Doyle's finding that no feasible alternative
exists to locating an elevator entrance to Copley Station on the National Historic
Landmark Boston Public Library site is inconsistent with the MBTA's existing
and projected technological and automated fare collection system that would allow
for a separate entrance away from the National Historic Landmark Boston Public

13

Library, and directly onto the platform below. Such separate platform entrances are found in other parts of the MBTA's subway system (in the Central Square Station, for example) and the MBTA's goals are for future stations to have unstaffed automated fare collection. The MBTA is planning to augment the number of unmanned entrances with this new technology thereby eliminating the reason for placing the elevator on the National Historic Landmark site.

36.    Regional Administrator Doyle's finding that no feasible alternative exists to covering an existing open stair on the east side of Dartmouth Street, within the Back Bay Historic District, that will block views and alter the streetscape within the district is inconsistent with his approval in the same year (2004) of leaving two existing open stairs and one rerouted stair uncovered for Arlington Station (the closest MBTA stop to Copley Station)

## COUNT I
## VIOLATION OF NATIONAL HISTORIC PRESERVATION ACT §106, 16 U.S.C. §470f
### (Defendants FTA and MBTA)

37.    The plaintiffs incorporate the previous paragraphs into this count.

38.    Section 106 of the National Historic Preservation Act, 16 U.S. C. §470f, provides, in pertinent part, as follows:

> The head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State ... shall, prior to the approval of the expenditure of any Federal funds on the undertaking ... take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register. The head of any such Federal agency shall afford the Advisory Council on Historic Preservation established under part B of this subchapter

14

a reasonable opportunity to comment with regard to such undertaking.

39.     The MBTA's proposed new entrance to Copley Station is a federally assisted undertaking.

40.     Regional Administrator Doyle's failure to identify the Back Bay Historic District as a district included on the National Register of Historic Places is arbitrary, capricious, not based upon substantial evidence, an abuse of discretion and not in accordance with law.

41.     Regional Administrator Doyle wrote a June 23, 2004 letter identifying the existing inbound headhouse for Copley Station as on the National Register of Historic Places and describing the work to be done on this headhouse. This letter is inconsistent with his failure in the FONSI to identify the existing inbound entrance to Copley Station as a historic object included in the National Register of Historic Places, a historic object eligible for inclusion in the National Register of Historic Places or a historic object on the site of the National Historic Landmark Boston Public Library. It is also inconsistent with the FONSI's failure to describe or evaluate the removal of this historic object, the work to be done on this historic object and the latitude allowed for changes to this historic object. Regional Administrator Doyle has not described or evaluated the effect of the proposed inbound elevator structure in obstructing the view of the existing historic inbound headhouse. His determination that the proposed MBTA Copley Station project will have no adverse effect on historic resources was arbitrary, capricious,

not based upon substantial evidence, an abuse of discretion and not in accordance with law.

42.    Regional Administrator Doyle's determination that the construction of a new elevator entrance upon the site of the National Historic Landmark Boston Public Library has no adverse effect on historic resources, but which obstructs the view of that building and adversely affects the historic architectural symmetry of that building and the historic stone plaza and steps, was arbitrary, capricious, not based upon substantial evidence, an abuse of discretion and not in accordance with law.

43.    Regional Administrator Doyle's determination that the construction of a new stair/escalator enclosure and a new elevator entrance has no adverse effect on historic resources, but which obstruct the view of the Old South Church, was arbitrary, capricious, not based upon substantial evidence, an abuse of discretion and not in accordance with law.

44.    Regional Administrator Doyle's failure to include a determination concerning the construction of a new stair enclosure on the east side of Dartmouth Street that obstruct the views and alters the streetscape within the Back Bay Historic District was arbitrary, capricious, not based upon substantial evidence, an abuse of discretion and not in accordance with law.

45.    Regional Administrator Doyle's rejection of alternative designs as neither prudent nor feasible was arbitrary, capricious, not based upon substantial evidence, an abuse of discretion and not in accordance with law.

16

## COUNT II
## VIOLATION OF NATIONAL HISTORIC PRESERVATION ACT §110, 16 U.S.C. §470h-2
## (Defendants FTA and MBTA)

46.    The plaintiffs incorporate the previous paragraphs into this count.

47.    Section 110 of the National Historic Preservation Act, 16 U.S. C. §470h-2(f), provides, in pertinent part, as follows:

> Prior to the approval of any Federal undertaking which may directly and adversely affect any National Historic Landmark, the head of the responsible Federal agency shall, to the maximum extent possible, undertake such planning and actions as may be necessary to minimize harm to such landmark, and shall afford the Advisory Council on Historic Preservation a reasonable opportunity to comment on the undertaking.

48.    The MBTA's Copley Station project directly and adversely affects the National Historic Landmarks Old South Church and Boston Public Library.

49.    Regional Administrator Doyle's finding that the MBTA's proposed Copley Station project does not adversely affect historic properties was arbitrary, capricious, not based upon substantial evidence, an abuse of discretion and not in accordance with law.

50.    The FTA did not undertake, to the maximum extent possible, such planning and actions necessary to minimize harm from the MBTA's proposed Copley Station project to the National Historic Landmarks Old South Church and Boston Public Library, and the National Historic Back Bay District.

17

51.     Upon information and belief, the FTA did not afford the Advisory

Council on Historic Preservation a reasonable opportunity to comment on the

MBTA's Copley Station project.

## COUNT III
## VIOLATION OF DEPARTMENT OF TRANSPORTATION ACT §4(f)
## (Defendants FTA and MBTA)

52.     The plaintiffs incorporate the previous paragraphs into this count.

53.     Section 4(f) of the Department of Transportation Act, 49 U.S.C.

§303(c), in pertinent part provides as follows:

> The Secretary may approve a transportation program or project …
> requiring the use of … land of an historic site of national, State, or
> local significance (as determined by the Federal, State, or local
> officials having jurisdiction over the … site) only if –
>
> (1)     there is no prudent and feasible alternative to using that land;
> and
>
> (2)     the program or project includes all possible planning to
> minimize harm to the … historic site resulting from the use.

54.     The MBTA's proposed project for its Copley Station

(a)     occupies part of the site of the National Historic Landmark

Boston Public Library

(b)     partially obstructs the view of and adversely affects the

design of the National Historic Landmark Boston Public

Library

(c)     removes the inbound entrance headhouse to the MBTA's

Copley Station, which is part of a National Historic

18

Landmark, included in the National Register of Historic

Places, or eligible for inclusion in the National Register of

Historic Places

(d)     anticipates "rehabilitation" on the historically significant

inbound headhouse to the MBTA's Copley Station in a way

which allows alterations and additions and allows the use of

materials and features different from those used in the

original inbound entrance

(e)     removes portions of and asymmetrically reconfigures the

historic Library plaza and steps which are part of the National

Landmark site

(f)     obstructs the view of the historic inbound entrance headhouse

to the MBTA's Copley Station

(g)     obstructs the view of the National Historic Landmark Old

South Church

(h)     obstructs the views and alters the streetscape within the Back

Bay Historic District

(i)     places architecturally inconsistent enclosures in the Back Bay

Historic District.

55.     Regional Administrator Doyle's finding that the MBTA's proposed

Copley Station project would have no adverse effect on the Old South Church,

Boston Public Library , or the historic inbound entrance headhouse to Copley

19

Station was arbitrary, capricious, not based upon substantial evidence, an abuse of discretion and not in accordance with law.

56.     Regional Administrator Doyle's rejection of alternative designs to placing the elevator entrance on the site of National Historic Landmark Boston Public Library as inappropriate and unfeasible was arbitrary, capricious, not based upon substantial evidence, an abuse of discretion and not in accordance with law.

57.     Regional Administrator Doyle made no finding on whether the MBTA's proposed Copley Station project would have an adverse effect on the Back Bay Historic District.

58.     All possible planning was not done in the MBTA's Copley Station project to minimize harm to historic sites.

59.     Regional Administrator Doyle failed to adequately or thoroughly examine all prudent and feasible alternatives that would minimize harm to the historic sites as required by Sec. 4(f)., and such prudent and feasible alternatives exist.

## COUNT IV
## VIOLATION OF MASS. GEN. LAWS C 161A S 5(k)
## (Defendant MBTA)

60.     The plaintiffs incorporate the previous paragraphs into this count.

61.     Section 5(k) of Mass. Gen Laws 161A, in pertinent part provides as follows:

> The board of directors is hereby…directed to promulgate such rules, regulations and procedures, including public hearings, as are necessary

20

and appropriate to provide the following parties the timely opportunity to participate in the development of major transportation projects designed by the authority, as defined by the directors, and to review and comment thereon: …(iii) other public and private organizations, groups, and persons who are affected by, and who have provided the board with reasonable notice of their desire to participate in the development of the design of said projects. In this section, the words "timely opportunity" shall mean sufficiently early in the design process so as to permit comments to be considered prior to the final development of or commitment to any specific design for such project.

62.     NABB is a private organization who provided the MBTA with reasonable notice of its desire to participate in the development of the design of the Copley Station project.

63.     The MBTA's proposed project for its Copley Station

    a.  is a major transportation project

    b.  was 75% complete and on information and belief may have already entered the working drawings phase when presented for comment to the NABB and the public

    c.  was not presented sufficiently early in the design process to provide any meaningful opportunity for NABB's comments to be considered or implemented by the MBTA

    d.  constituted a violation of the MBTA's own enabling legislation

21

## NEED FOR INJUNCTIVE RELIEF

64.    The construction of the proposed permanent entrance structures to Copley Station, modifying the existing historic plaza and steps, removing the existing inbound entrance headhouse to Copley Station and the rehabilitation of that headhouse in a way which allows alterations and additions and allows the use of materials and features different from those used in the original inbound entrance, will cause irreparable harm to plaintiffs NABB and the BPA and their members.

65.    The injury caused by the construction of the proposed permanent entrance structures in the Back Bay Historic District and on the site of a National Historic Landmark, blocking views of National Historic Landmarks and blocking views of the historic inbound entrance headhouse will outweigh the harm to any defendant if injunctive relief is granted.

66.    An injunction serves the public interest by protecting the National Historic Landmark Boston Public Library, by protecting the historic inbound entrance headhouse to Copley Station, by protecting the historic stone plaza of the Library, by protecting the views of and design of the National Historic Landmark Boston Public Library, by protecting the views of the National Historic Landmark Old South Church and by protecting views and streetscapes of the Back Bay Historic District.

Wherefore the plaintiffs demand

(1)    that the District Court set aside the FTA Regional Administrator's December 30, 2004 Finding of No Significant Impact in the MBTA's proposed construction for Copley Station and declare it unlawful and invalid;

(2)    that preliminary and final injunctions be issued prohibiting the FTA from disbursing federal funds to the MBTA for use in

    (a)    construction on the site of the National Historic Landmark Boston Public Library;

    (b)    construction obstructing the view of and adversely affecting the design of the National Historic Landmark Boston Public Library;

    (c)    construction obstructing the view of National Historic Landmark Old South Church;

    (d)    the removal of the existing headhouse at the inbound entrance to Copley Station;

    (e)    alterations or modifications to the existing headhouse at the inbound entrance to Copley Station;

    (f)    alterations or modifications to the existing stone plaza and steps at the inbound entrance to Copley Station;

    (g)    construction obstructing the view of the existing headhouse at the inbound entrance to Copley Station;

(h)    construction unnecessarily obstructing the views and altering the streetscape within the Back Bay Historic District.

(3)    that a preliminary and final injunction be issued prohibiting the MBTA from accepting or using any federal funds for use in

(a)    construction on the site of the National Historic Landmark Boston Public Library;

(b)    construction obstructing the view and adversely affecting the design of the National Historic Landmark Boston Public Library;

(c)    construction obstructing the view of National Historic Landmark Old South Church;

(d)    the removal of the existing headhouse at the inbound entrance to Copley Station;

(e)    alterations or modifications to the existing headhouse at the inbound entrance to Copley Station;

(f)    alterations or modifications to the existing stone plaza and steps at the inbound entrance to Copley Station;

(g)    construction obstructing the view of the existing headhouse at the inbound entrance to Copley Station;

(h)    construction unnecessarily obstructing the views and altering the streetscape within the Back Bay Historic District.

(4)    that the Court award costs to the plaintiffs including attorney fees

(5)    that the Court order such other relief as it deems just.

24

Respectfully submitted,
The Plaintiffs,
Neighborhood Association of the Back
Bay, Inc. and The Boston Preservation
Alliance, Inc.
By their attorney,

John R. Devereaux Esq., BBO# 122200
Neighborhood Association of the
Back Bay, Inc
337 Newbury Street
Boston, Massachusetts 02115
(617) 267-0377

Laurence E. Hardoon, Esq., BBO# 221360
Brody, Hardoon, Perkins & Kesten, LLP
One Exeter Plaza
Boston, MA 02116
(617) 880-7100

DATED: July 6, 2005

"Exhibit E"



**U.S. Department
of Transportation**

**Federal Transit
Administration**

REGION I
Connecticut, Maine,
Massachusetts,
New Hampshire,
Rhode Island ,Vermont

Volpe Center
55 Broadway  Suite 920
Cambridge, MA  02142-1093
617-494-2055
617-494-2865 (fax)

DEC 3 0 2004

Mr. Michael H. Mulhern
General Manager
Massachusetts Bay Transportation Authority
Ten Park Plaza
Boston, MA 02116

Re: Copley Station Environmental Assessment
    Finding of No Significant Impact

Dear Mr. Mulhern:

Based upon a review of the environmental documentation, the Federal Transit Administration
(FTA) has issued a Finding of No Significant Impact (FONSI) for the Copley Station Light Rail
Accessibility Improvement Project. The purpose of this project is to make the station compliant
with the American's with Disabilities Act (ADA) of 1990 through the construction of a safe,
barrier-free pedestrian access to the station and platforms.

Please be advised that in accordance with 23 CFR 771.121, the Massachusetts Bay Transportation
Authority (MBTA) is required to transmit a notice of availability of this FONSI to all affected
Federal, state and local governmental entities. In addition, under Section 106 of the National
Historic Preservation Act, the FTA has determined that this project will have no adverse effect on
historic resources. Furthermore, FTA has determined that there is no prudent and feasible
alternative to the use of Section 4(f) property (Boston Public Library, a National Historic
Landmark) and that the action includes all possible planning to minimize harm.  Moreover, FTA
determined there would be no Section 4(f) use of the Old South Church, a National Historic
Landmark because compliance with Section 106 for proximity impacts resulted in a finding of "no
adverse effect." (23 CFR 771.135(p)(5))

Please let me know if you have any questions regarding this matter. The FTA looks forward to
continuing to work with the MBTA on this important transit improvement.

Sincerely,

Richard H. Doyle
Regional Administrator

Attachment

# FEDERAL TRANSIT ADMINISTRATION
## REGION I

### Finding of No Significant Impact

**Project: Copley Station Accessibility Improvement**

**Applicant: Massachusetts Bay Transportation Authority (MBTA)**

**Project Location: Boston, Massachusetts**

### Purpose and Need

The Americans with Disabilities Act (ADA) of 1990 requires public transit agencies to identify key stations and develop a plan to implement accessibility improvements at these stations. The Copley Station has been determined to be a key station based on ADA criteria. The primary purpose of this project is to make the station compliant with the ADA.

### Alternatives Considered

Since the existing station has no accessible entrance, the No Build alternative does not meet the project purpose and need to make the station compliant with the ADA.

Beyond the No Build Alternative, the MBTA identified several options for locating elevators at Copley Station (originally identified in the 1995 Schematic Design Report for the MBTA's Light Rail Accessibility Program). The MBTA conducted an alternative analysis to assess the impacts of the project against the transportation, construction, accessibility, operational and pedestrian/customer needs of the station. The consideration of alternatives is further limited by the ADA's requirement that the accessible route and entrance shall, to the maximum extent practicable, coincide with the circulation path of the general public (ADA – 49 CFR Part 37, Appendix A sections 10.3.1 and 10.3.2).

### Proposed Project

The primary purpose of the Copley Station accessibility project is to meet the federally mandated key station plan objectives of accessibility to individuals with disabilities. Making this station accessible will require new work or renovations at surface and platform levels. At the surface level, new elevators to gain entry to the inbound (Boston Public Library) and outbound (Old South Church) platforms will provide access from the street to the fare mezzanine.

Other accessibility improvements include raising the entire platforms to 8 inches above top-of-rail to allow individuals in wheelchairs to enter the new low-floor trains and installation of a public address system with LED signs. New lighting, accessible fare collection, emergency exit stairs and a new electrical service from Arlington Station are also included.

### Agency Coordination and Public Opportunity to Comment

The MBTA has involved a number of agencies, local officials and the public in the planning and design of the Copley Station project. The EA was made available to the public on June 28, 2004 with the comment period closing on July 28, 2004. A public hearing was held on July 15, 2004.

Page 2

## Determinations and Findings
### National Environmental Policy Act (NEPA) Finding

FTA served as the lead agency under NEPA for the project. The MBTA prepared an Environmental Assessment (EA) in compliance with NEPA, 42 U.S.C. 4321 et. seq. and with FTA's regulations, 23 CFR Part 771. The EA analyzes and describes the project's potential significant impacts.

After reviewing the EA and supporting documents and public comments, the FTA finds under 23 CFR 771.121 that the proposed project will have no significant adverse impacts on the environment. The record provides sufficient evidence and analysis for determining that an Environmental Impact Statement (EIS) is not required.

### Section 106 Compliance

Section 106 of the National Historic Preservation Act requires the review of federally assisted projects for impacts to districts, sites, buildings, structures and objects listed in, or eligible for inclusion in the National Register of Historic Places. Federal agencies must coordinate with the State Historic Preservation Officer (SHPO) and potentially affected Tribes to make this determination. The Advisory Council on Historic Preservation (ACHP) has established procedures for the protection of historic and cultural properties in, or eligible for the National Register (36 CFR Part 800).

The project site is immediately adjacent to the Old South Church and the Boston Public Library, National Historic Landmarks. In preparation of a Section 106 determination the FTA and the MBTA coordinated with the Massachusetts Historical Commission (MHC) and the Boston Landmarks Commission (BLC) to ensure the surface elements of the Copley Station accessibility improvements are compatible with these historic structures.

Based on this consultation and analysis prepared by the MBTA, the FTA submitted a determination of effect to the SHPO on January 23, 2004. On January 29, 2004 the MHC concurred with FTA's determination that the proposed project will have no adverse effect on historic resources.

### Section 4(f) Findings

According to Section 4(f) of the Department of Transportation Act of 1966, codified as 49 U.S.C. 303, the Secretary of Transportation may not approve the use of land from a significant publicly owned public park, recreation area, or wildlife and waterfowl refuge or any significant historic site unless a determination is made that: there is no feasible and prudent alternative to the use of land from the property; and the action includes all possible planning to minimize harm to the property resulting from such use (23 CFR 771.135). An element of the proposed project, construction of a new elevator at the inbound Copley Station, will use land from the Boston Public Library, a National Historic Landmark (NHL). The FTA submitted to the Department of Interior (DOI) a Section 4(f) evaluation that was prepared by the MBTA that analyzed alternatives to the proposed action to ensure that all possible planning had been undertaken to minimize harm to the historic resources.

Page 3

An alternative not presented in the 4(f) evaluation was to locate the elevator 150 feet away from the station entrance in front of the recent library addition and thereby avoid NHL property. FTA did not consider this alternative to be prudent and feasible since it would not coincide with the circulation path of the general public (ADA – 49 CFR Part 37, Appendix A sections 10.3.1 and 10.3.2). Although not identified in the 4(f) evaluation, this alternative is presented in the EA as an option considered and dismissed during the NEPA process. Beyond considerations of the ADA, the EA presented two design options for this alternative. The first option would involve significant engineering issues such as the need to construct a new tunnel for fare collection purposes that would conflict with a 30' sewer line. In lieu of the tunnel, the second design option involves the construction of a caged gate system which would isolate the passenger and create operational impediments. Neither of these two designs for this alternative (tunnel or caged gate system) is appropriate nor feasible.

Moreover, FTA determined there would be no Section 4(f) use of the Old South Church, a National Historic Landmark because compliance with Section 106 for proximity impacts resulted in a finding of "no adverse effect." 23 CFR 771.135(p)(5).

By letter dated May 10, 2004, DOI concurred with FTA's 4(f) determination that there is no prudent and feasible alternative to the proposed action.

Finally, it is FTA's position that Section 4(f) requirements do not apply to the rehabilitation of the historic inbound headhouse because the SHPO concurred in FTA's determination that the project will not adversely affect the historic qualities of that transportation facility. 23 CFR 771.135(f).

Approved: _____    Date: _____
    Richard H. Doyle
    Regional Administrator
    FTA, Region I

Concur: _____ Date: _____
    Margaret E. Foley
    Regional Counsel

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No.: 05-11211JLT

NEIGHBORHOOD ASSOCIATION )
OF THE BACK BAY, INC., and )
THE BOSTON PRESERVATION )
ALLIANCE, INC. )
)
    Plaintiffs, )
)
        v. )
)
FEDERAL TRANSIT )
ADMINISTRATION and )
MASSACHUSETTS BAY )
TRANSPORTATION AUTHORITY, )

    Defendants

## AFFIDAVIT OF JANET HURWITZ

I, Janet Hurwitz, hereby depose and state based upon personal knowledge or
upon information and belief which I believe to be true and accurate:

1.      I am a registered architect in the state of Massachusetts and have been

the sole proprietor of an architecture firm located in the Back Bay since

1984. During that time I have completed over 65 projects including

over 25 projects within the Back Bay Architectural District. I live on

Commonwealth Avenue in the Back Bay.

2.      I received a Master of Architecture and a Master of Social Work, from

Washington University in St. Louis in 1975, with a focus on

participatory design strategies for urban areas. An article I wrote on

this topic entitled "Participatory Planning in an Urban Neighborhood,

Soulard, St. Louis Missouri: A Case Study," was published in the

1

DMG-DRS Journal: DesignResearch and Methods, vol. 9 No. 4, Oct-Dec 1975. Based on this focus I believe that involving all interests groups early on in a project, when alternatives and the impacts of those alternatives are openly evaluated, is the most effective way to insure the best project and to receive a timely consensus. This was not done by the MBTA in this project.

3.    I have been involved in two major urban design plans, setting architectural guidelines for the historic neighborhoods of Fells Point in Baltimore and Soulard in St. Louis.

4.    I was mayoral appointee on the Strategic Design Study Committee, Massachusetts Turnpike Air Rights Development from 1998 to 2000, and have been a mayoral appointee on the Citizens Action Committee, Fenway Air Rights Development since 2003.

5.    Working for Stull and Lee, between 1977 and 1981 I was in charge of the Urban Design Guidelines for the Southwest Corridor Project, a combined MBTA (Orange Line) and Amtrak right-of-way traversing seven miles through the city of Boston.

6.    Working for Stull and Lee, between 1994 and 1995, I was one of the architects that prepared the Schematic Design Report for the MBTA's Light Rail Accessibility Project and the the Light Rail Accessibility Program, Green Line, Project Design Manual. This report provides the basis for all later design stages for the current accessibility program.

7.  I am currently the Chair of the Architecture Committee for the Neighborhood Association of the Back Bay, Inc. ("NABB").

8.  I have held this position since 1998, first as co chair, then as chair.

9.  NABB is an organization that was founded in 1955 for the purpose of preserving and protecting the architectural beauty of the Back Bay. It currently has about 2500 members, both business and individuals residing in the Back Bay. NABB is located on Newbury Street in the Back Bay.

10. The Back Bay is a National Historic District and is listed on the National Register of Historic Places. It is protected as an architecturally significant historic district. All components of this project lie within the Back Bay Historic District.

11. The proposed Copley inbound elevator headhouse is located on the site of the National Historic Landmark, Boston Public Library.

12. A proposed outbound elevator structure and an existing escalator/stair enclosure are located adjacent to the National Historic Landmark Old South Church.

13. Of the almost 83,000 listings on the National Register of Historic Places, there are less than 2300 National Historic Landmarks. Landmark designation is an official recognition by the Federal Government of a property's national significance. I believe the Boston Public Library, Old South Church and Trinity Church, just east of the

3

project, comprise the 3 closest National Historic Landmarks in the country.

14. The area on the north side of Boylston Street encompassing the Old South Church lies within the Back Bay Architectural District, a state designation.

15. The MBTA Copley Square Light Rail Accessibility Project is exactly the type of project that NABB takes an interest in and would have an interest in participating in developing.

16. NABB through its Architecture Committee and association with the Back Bay Architectural Commission participates in reviewing most proposals for both public and private exterior modifications and construction in the Back Bay Architectural District.  Additionally other Committees within NABB participate in many proposals concerning public or private development in and adjacent to the neighborhood. NABB has been an active participant for the entire time of its incorporation.

17. Based on a previous project, the Arlington Station Project, where NABB voiced strong concern, it is my belief that the MBTA was aware of NABB's desire to participate in any projects within the neighborhood.

18. On July 21, 2003, the MBTA held its first public meeting regarding the Copley project's plans and informed those present that the design was

4

75% complete.   A 75% design is basically a completed design and may even include construction drawings.

19.     At NABB's request, on August 5 2003, a second presentation of the plans was made at the NABB Architecture Committee meeting. The MBTA again stated that the design process for the project was 75% complete.

20.     I helped draft a letter on behalf of NABB to the MBTA dated August 26, 2003, informing them of our opposition with and concerns regarding the project, as well as suggesting options. **Attachment 1** contains a true and accurate copy of that letter.

21.     The MBTA issued a draft Environmental Assessment (EA) for the project in July 2004 and a public hearing was held on it. The proposed project remained unchanged from the presentation the previous year.

22.     I helped draft a letter on behalf of NABB to the MBTA, dated July 28, 2004, in which NABB stated its concerns with the presented design and the process used to arrive at the same.  **Attachment 2** contains a copy of that letter.

23.     The MBTA responded that it would not provide specific responses to each commenter but would provide them with a copy of the final EA so they could see how their issues were addressed. **Attachment 3** contains a copy of that letter.

24.     Although the MBTA apparently sent the FTA the final EA in September 2004, it did not provide NABB with a copy until January

5

2005. **Attachment 4** is a copy of the letter from the MBTA to NABB dated January 6, 2005 when they also included a copy of the Environmental Assessment and the FTA's Finding of No Significant Impact ("FONSI").

25.    I helped draft a letter to the FTA dated February 11, 2005, in which NABB expressed its disagreement with the FONSI and feeling that prudent and feasible options were not adequately explored. **Attachment 5** is a copy of that letter.

26.    I was present at a meeting with members of Old South Church, on February 16, 2005 when they said that, although they had met with the MBTA, they were never presented options of locating the headhouses in any other locations. They were only shown design options having to do with what the headhouse could look like. According to the members present, options for other locations away from the Church, for example on the east side of Dartmouth Street, were not discussed in the earlier meetings with the MBTA.

27.    NABB received a copy of a letter from Cara Metz, the State Historic Preservation Officer (SHPO), to the FTA dated May 31, 2005 in which she asked that they discuss new alternatives in the project's design that are feasible given implementation of the MBTA's Charlie Card. **Attachment 6** is a copy of that letter. I am not aware of any response to that letter.

6

28.   On June 15, 2005, NABB received a copy of a letter dated June 9th that the SHPO sent to the FTA, with an email from the Old South Church attached regarding the results of an engineering survey of the Church property. **Attachment 7** is a copy of the same. I am not aware of resolution of this issue.

29.   I helped draft a letter to Don Klima, of the Advisory Council in Washington, D.C.   The letter was sent on June 16, 2005.  **Attachment 8.** NABB has not received a response to this letter.

30.   **Attachment 9** contains additional correspondence from the Old South Church regarding the dangers presented by the excavation for an elevator next to it on Dartmouth Street.

31.   It is NABB's position shared by The Boston Preservation Alliance that the current project is detrimental to the historic character of the National Historic Landmark Buildings and National Historic Site upon which it impacts and that there are prudent and feasible alternative options for accessibility that would preserve and maintain the historic integrity of these very important sites.

32.   It is NABB's position that other options such as those presented in the 1995 Light Rail Accessibility Program Schematic Design Report were not adequately studied or were dismissed without adequate reason. **Attachment 10** contains a copy of that report as it pertains to Copley Station.

7

33.   It is NABB's position that the MBTA knew that NABB existed as a active and concerned community group and that the MBTA should have involved NABB early on in the decision making process, when there was still the ability to explore alternatives that would create an overall solution that best respects this historic site and Landmarked buildings.

34.   Upon information and belief, the delivery of the light rail vehicles to be used to provide handicapped access to the trains has been postponed for a substantial length of time.  This aspect of the project thus has been delayed.

35.   From my familiarity with the Arlington Street plans, I am aware that the tunnel proposed for that project is substantially more isolated and is of a comparable length to the passageway alternative of Option F and that the Arlington Street tunnel and headhouses impacts an historic site.  Option F, on the other hand, avoids an historic site and presents a direct access alternative that eliminates any passageway entirely.

36.   From my familiarity with the Arlington Street plans, I am aware that five stairways at that station are to be left open.

37.   Upon information and belief, automated fare machines are to be in place in 2006.

8

Signed under the pains and penalties of perjury this 12th day of September

2005.

JANET HURWITZ

**EXHIBIT 1**

# NEIGHBORHOOD ASSOCIATION OF THE BACK BAY, INC.

*Mailed 8/26/03*
*JJH*

August 26, 2003

**Officers:**
Marianne M. Castellani
    *Chair*
Susan D. Prindle
    *President*
Manya Chylinski
    *Vice Chair*
Daniel K. Hardenbergh
    *Vice President*
Karen A. Young
    *Secretary*
Nancy A. Hubeck
    *Treasurer*

**Directors:**
Brenda Adams
Dorothy B. Bowmer
John R. Boreske
Karen Carper
Mark Cohen
Roseann M. Colot
John R. Devereaux
Fran Duffly
William L. Elsbree
Peter Y. Flynn
Michael E. George
Frederick C. Gleason
Jack W. Gregg
Janet Hurwitz
Warren A. Johnson
Ed Johnston
Kathleen S. Kolar
Gail Korn
Shirley L. Kressel
Rosanne Kumins
Elliott Laffer
Jennifer R. Lowe
Nancy A. Macchia
Fred Mauet
Jacquelin McBride
Christopher Mitchell
Tim Ian Mitchell
Molly Mosier
Nancy Nottonson
Jeryl Oristaglio
Margaret Pokorny
Luanne Pryor
Patricia Quinn
Ellen E. Rooney
Maureen E. Rooney
Steven M. Sayers
Sandy Shapiro
Peter M. Sherin
Anne C. Swanson
Stella M. Trafford
Martha M. Walz
Michael P. Ward
Linda A. Zukowski

Lois A. Harvey
    *Office Administrator*

Michael Mulhern, General Manager
Massachusetts Bay Transportation Authority
10 Park Plaza
Boston, MA  02116

RE: ARLINGTON AND COPLEY STATION LIGHT RAIL ACCESSIBILITY PROJECTS

Dear Mr. Mulhern:

On August 5, 2003, the Architecture Committee of the Neighborhood Association of Back Bay (NABB) heard a presentation by Barbara Boylan and several other MBTA staff concerning the Arlington and Copley Station Accessibility Plans.  As co-chairs of the Architecture Committee, we are writing to express the Committee's concerns regarding the proposals for these two stations.

**Arlington Station** –NABB recently submitted detailed comments to the Federal Transit Administration in response to the MBTA's Draft Environmental Assessment, and a copy of the comments was forwarded to you.  Our comments can be summarized as follows:

1. We feel that locating two headhouse structures in front of the National Landmark Arlington Street Church strongly conflicts with the facade of the church, and also blocks critical pedestrian and visual corridors up and down Boylston Street.

2. It was clear at our August 5 meeting that the MBTA would consider placing advertising panels on the " glass structures", thus negating the promise of transparency.

3. The problem of depleting ground water at this location has not been adequately or accurately addressed.

4. The elevator and stair headhouses seem to be sited in the least favorable and most expensive location, requiring both the cost of a new tunnel and the cost of purchasing an easement from the neighboring church. There was previously an entrance to the station in the corner of the Public Garden. Although the entrance has been removed, the tunnel to the mezzanine still remains. Alternative locations on the east side of Arlington street could tie into existing tunnels, would not spend excessive public dollars and would not interfere with the problematic location in front of the Church and on Boylston Street.

**Copley Station** - The Architecture Committee was very concerned with the five new headhouses proposed for Copley Station, making a total of seven headhouses in this area.  Two of these are to be located adjacent to the National Landmark Old South Church and on the Dartmouth Street Mall, a significant visual and pedestrian way leading to and from Copley Square.  Most troubling are the two new headhouses proposed in front of the Boston Public Library, one of which would seriously interfere with the existing historic facade and the much loved wrought iron headhouse.

Visit us on the web @ www.nabbonline.com
337 NEWBURY STREET, BOSTON, MA 02115-2710   TEL. (617) 247-3961   FAX (617) 247-3387   EMAIL: nabb@worldnet.att.net

The Committee's recommendations to reduce the number and impact of these potential structures are as follows:

1. **On the inbound side, adjacent to the Library, the proposed elevator structure would be more appropriately located in front of the new Library, not the historic McKim building.** We are confident that an accessible entrance could be located west of the old Library facade so that it does not interfere with the symmetry of the existing wrought iron headhouse centered on the McKim building. This approach would be similar to what is being proposed at Arlington Station where the accessible entrance is located away from the main corner entrances. In fact, the MBTA Light Rail Accessibility Program Schematic Design Report completed in 1995 shows an elevator entrance in front of the new Library as a viable option.

2. **On the outbound side, every effort should be made to open up the view of the east facade of the Historic Landmark Old South Church and the important visual and pedestrian corridor that connects Copley Square to Newbury Street and the rest of Back Bay.** We are pleased that the existing brick entrance is being replaced, however, we feel that an additional elevator headhouse would be overwhelming at this location. The Light Rail Accessibility Program Schematic Design Report option for placing the elevator within the overhang of the building across the street, on the east side of Dartmouth, would be much preferred.

3. **The existing uncovered stair for the outbound platform should remain uncovered.** This would be similar to the current plan for the existing stair entrance at Arlington Street. The brick surround could be removed and replaced with an open rail similar to the rail that currently exists at Heritage-on-the-Garden, at the corner of Arlington and Boylston Streets.

4. **The two emergency exits should remain hatches, thereby eliminating two of the currently proposed structures.** We feel that replacing hatches with headhouses sets an unreasonable standard and could result in a proliferation of unnecessary sidewalk structures throughout the city. We are confident that a technological solution can be found.

5. **No advertising should be allowed on the facades of the headhouses.** If advertising is allowed, they will no longer be the "transparent structures" promised by the MBTA. It should be underscored that advertising is highly regulated in the Back Bay historic neighborhood so that the buildings and streetscapes are not overshadowed by unnecessary visual clutter. We hope that the MBTA will respect our historic neighborhood by complying with this guideline.

6. **Sidewalk structures should be kept at a minimum and their location and design should be part of a coordinated plan.** The area around Copley Square is an important tourist and local node. Recently two bus stops, a public toilet, and an advertising panel have been installed in front of the Library on Boylston Street between Dartmouth and Exeter. The BRA is also planning streetscape improvements in this area. Without

coordinated planning and design, we are in danger of creating a hodgepodge of structures on one of Boston's most important public blocks.

In addition to the design considerations outlined above, we also have serious concerns about the design process itself. We believe that the MBTA has not followed the mandate of its own enabling act regarding the Arlington and Copley Station improvements. According to M. G. L. Section 5(k), NABB, along with other interested parties and elected officials should have been given an opportunity to participate in these design processes at their outset. Instead, we have were told by Barbara Boylan at our recent meeting that the design process for Copley Station is already at least 75% complete, with Arlington Station even further along.

In order to provide an adequate opportunity to explore viable alternative locations and designs, we strongly request that the design process be slowed down. Then NABB, along with other interested civic groups, officials and appropriate agencies can fully participate, as the MBTA enabling act requires. We welcome the opportunity to work together to create a coordinated plan which will minimize the impact of additional headhouses and create the best possible streetscape at locations as significant to our city as Copley Square and Arlington Street.

Sincerely,

Janet Hürwitz AIA and Dorothy Bowmer
Co-Chairs Architecture Committee


cc: Thomas M. Menino, Mayor of Boston
    Barbara Boylan, Director of Design, MBTA
    Michael P. Ross, Boston City Councilor
    Dianne Wilkerson, State Senator
    Paul Demakis, State Representative
    Brona Simon, Deputy State Historical Preservation Officer
    Antonia Pollak, Director Environmental Department
    Michael Galvin, Chief of Basic City Services
    Harry Collings, BRA Executive Director/Secretary
    Anthony O. Gordon, Chair, Back Bay Architectural Commission
    Ellen Lipsey, Boston Landmarks Commission
    Albert Rex, Executive Director, Boston Preservation Alliance

**EXHIBIT 2**

Ms. Diana C. Parcon,
Manager of Environmental Construction
Massachusetts Bay Transportation Authority
10 Park Plaza, Room 6720
Boston MA  02116

July 28, 2004

RE: Copley Station Light Rail Accessibility Project, Boston, MA

Dear Ms. Parcon:

As you know, the Neighborhood Association of the Back Bay (NABB) was founded in 1955 for the purpose of preserving and protecting the architectural beauty of the Back Bay. It presently has about 2500 members, both business and individuals residing in the Back Bay, an area that is a National Historic District.

We have reviewed the Draft Environmental Assessment (DEA) for the Copley Station Light Rail Accessibility Project, submitted by the Massachusetts Bay Transportation Authority (MBTA). We are very concerned with the five new headhouses proposed for Copley Station, making a total of seven headhouses in this area.  Two of these are to be located adjacent to the National Landmark Old South Church and on the Dartmouth Street Mall, a significant visual and pedestrian way leading to and from Copley Square.  Most troubling are the two new headhouses proposed in front of the Boston Public Library, one of which would seriously interfere with the existing historic facade and the much loved wrought iron headhouse. In addition, at the public briefing on the DEA on July 15, 2004, it became clear that the DEA is not complete since the MBTA is still evaluating the need for headhouses at the stairwells and the possibility of using hatches at the emergency exits.

While we applaud the efforts to minimize the impact of these structures, approval of such an incomplete plan seems premature. Since there is no real plan for the FTA to approve in this DEA, we request that the FTA either abandon this submission until such time that a single consolidated proposal can be issued, or require that a full Environmental Assessment be prepared that represents the final project that the MBTA plans to build.  It certainly seems untimely for either the Massachusetts Historic Commission or the Federal Transit Authority to find that there will be no significant impact on the adjacent landmarked properties, when it has not yet been determined what structures the MBTA proposes to add.

As is discussed in more detail in subsequent sections, we feel that the options reviewed in the DEA are incomplete in that an option which would have the least impact on the church is not considered--i.e., the removal of the headhouse altogether from the west outbound entrance. This could be done by relocating or eliminating the escalator. There certainly is historic precedent for this option, since it must have been the configuration of this entrance prior to the introduction of the escalator and the existing headhouse.

*NABB re Copley, p. 2*

Since minimizing project impact on historic interests is the goal of the Section 106 process, this option should be thoroughly analyzed and assessed.

In addition to the design considerations outlined above, we also have serious concerns about the public process followed in this project. We believe that the MBTA has not followed the mandate of its own enabling act regarding the Copley Station improvements. According to M. G. L. Section 5(k), NABB, along with other interested parties and elected officials, should have been given an opportunity to participate in the design process at its outset. Instead, we were told by Barbara Boylan at an August 5, 2003, meeting that the design process for Copley Station was already at least 75% complete. This DEA is further proof that a single preferred option has gone through a design process without the public process required by law.

Therefore, the process should be reopened with all options submitted to a complete and appropriate public process, with open analysis of all criteria, including: engineering, historic and preservation impacts, and maintaining and reinforcing pedestrian and visual corridors.

We have the following detailed comments on the sections of the DEA listed below:

## 1.2.1 DESCRIPTION OF THE PROPOSED ACTION

In the second paragraph of this section the report implies both review of all options and consent to the Preferred Option by Boston Landmarks Commission and the Massachusetts Historic Commission (MHC). However, other than a stamp on a letter sent to the MHC, no clear documentation as to the Landmarks Commission consent is included. Furthermore, since the underlying data is not included, it is not at all clear what plan MHC is concurring with. Since the 106 process is an assessment of options, it is crucial that the option concurred with be identified. It also would instill confidence in the process if there were some discussion of the rationale underlying the MHC concurrence in the finding of no adverse effect.

## 2.0 ALTERNATIVES

The discussion of the options seems to be taken from the MBTA's 1995 Light Rail Accessibility Program, Schematic Design Report. Although a Preferred Option is presented in the DEA, there is not adequate discussion as to why this option was chosen and the remaining options eliminated. There is also no documentation that all the 1995 options were presented to the abutters, community, and relevant Commissions. In fact, as previously stated, we know that these options were not presented to NABB. At the first meeting that NABB had with the MBTA concerning Copley, on August 5, 2003, no options were presented other than the "Preferred Option." (Please see letter to the MBTA dated August 22, 2003 attached hereto stating NABB's opposition to the Preferred Option.)

The MBTA states in the DEA that the Preferred Option "...provides the best option to minimize impacts to adjacent historic resources..." However, this conclusion directly conflicts with the DEA's own analysis, which supports NABB's contention that the Preferred Option is the most detrimental to the adjacent historic buildings and streetscape.

*NABB re Copley, p. 3*

The Preferred Option adopts Option E for the inbound station without the east headhouse. According to the analysis of Option E, the east headhouse was considered necessary to avoid compromising " ... the explicit symmetry of the composition ... " (of the headhouse in relation to the library building). Thus the Preferred Option would eliminate the measure considered necessary to mitigate the negative impact of the addition of another headhouse next to the historic headhouse, thereby destroying a critical element of its historic and architectural importance, that being its symmetry in relation to the library building. Even with the east headhouse, the analysis of this option considers it " ... highly problematic because it not only creates the very difficult task of imposing new structures alongside the intricately detailed wrought iron headhouse, but also creates many interface problems with the landmark Boston Public Library. It should be emphasized that any attempt to add a structure in this location will be highly controversial ..." (which could only be mitigated by the addition of an east headhouse, designed in a way to blend with the existing architecture of the Library and old headhouse).

In contrast to the problems created by Option E, the DEA finds that of the two inbound options, Option F (which locates the elevator in front of the new library building), " ... has the least streetscape and urban design impacts. Although the DEA states an obviously erroneous reason for rejecting this option ("This Option because of the sensitivity and design consequences of locating the elevator in front of the Old Library was dismissed due to the impacts to the Boston Public Library, a National Register Landmark"), the apparent reason for rejecting it is the distance of the elevator entrance from the toll area. This was not considered a problem in the location of the elevator for the Arlington Street station, where the distance of the elevator entrance is 120 feet from the toll area, about the same as in Option F. The other difficulties described in Option F appear to be no greater and possibly less than those described in Option E. Thus, by the DEA's own analysis, it is Option F and not Option E that would "minimize impacts to the adjacent historic resources" and therefore should be the choice for the location of the inbound elevator.

For the outbound elevator, the preferred option adopts Option A, which locates the elevator north of the present station entrance in front of the Old South Church. This option adds an additional structure in front the landmark church and on the Dartmouth Street mall, which is considered an important contributing element to the National Historic District of Back Bay. The DEA does not acknowledge the importance of this mall and the impact of the station entrance structures on the mall's composition or on the sightlines provided from the mall up and down Dartmouth Street. The present entrance structure obviously egregiously impacts both the Church and the mall. The DEA justifies the introduction of an additional structure in this sensitive location by designing the structures to be "see through". Although they may not have the negative impact of the existing entrance headhouse, the proposed headhouses will nevertheless constitute a negative and unnecessary visual and physical obstruction of this site, thereby causing an adverse effect on the historic interests at this location.

As indicated above this is not a necessary result, since three other options (Options B, C and D) would place the elevator on the other side of Dartmouth Street where neither the Dartmouth Street mall or the Church would be impacted. Of these options, Option C would " ... have the least impact on the streetscape..." and the Church and mall, although the DEA does not acknowledge the latter. The DEA does, however, note as a problem with the two options placing the elevator on the sidewalk-- i.e., the "visual obstruction along Dartmouth Street from Newbury Street to Copley Square and the possible hardship to the retail user directly behind it ...". These impacts are apparently

*NABB re Copley, p. 4*

considered important at this location but not on the Church side. This is completely inconsistent with the historic and architectural importance of these two locations. Other flaws in the DEA analysis of these options include the finding that Option B would eliminate parallel parking spaces. (In fact this option can only eliminate one parking space because that is all that exits between the existing entrance and the alley.) The DEA statement that Options B and D would block an already narrow sidewalk is also erroneous, unless the elevator headhouse is wider than the existing entrance, which does not appear to be the case. In any event no backup data or plans are provided to support this conclusion.

As previously stated, there is an option that would remove the obstruction of the existing headhouse next to the Church and not require replacement with any structure other than the railing necessary for an open stairwell. This option could be achieved by relocating the escalator to the other side of Dartmouth Street or eliminating it altogether. This option would not only have the least impact on the historic interests, but would remove a totally inappropriate and visually obstructive structure that should never have been built in the first place. Although loss of the escalator should be avoided if possible, that should be the choice if it cannot be relocated. The inbound station has no escalator, nor do many other very busy stations, which do not have the historic sensitivities of this location. The option of relocating the escalator to the east side of Dartmouth Street should be thoroughly analyzed, including locating it in the building adjacent to the existing entrance and placing the elevator alongside it, within the adjacent building overhang, or on the sidewalk as in Options B and D.

## 3.2 LAND ACQUISITION AND DISPLACEMENTS

The DEA includes no documentation showing that the City of Boston, the Boston Public Library and Kostitgen LLC agree to the Preferred Option, and therefore are willing to grant easements to the MBTA.

## 3.3 LAND USE AND ZONING

The Preferred Option proposes headhouses within the Back Bay Architectural District. If local land use and zoning regulations are relevant, why has a local Historic Commission been excluded from the process?

## 3.6 WATER QUALITY

To assure maintenance of existing groundwater levels during construction it is important for permit granting authorities, neighboring property owners and the public to be able to evaluate the "detailed measures" that are referenced but described neither here nor in section 3.15 CONSTRUCTION.

We also believe it is incumbent on the proponent to investigate and document existing conditions of groundwater levels in the vicinity. Observations by the Boston Groundwater Trust for one of the mentioned monitoring wells, 23J 2343A, indicate a range of levels from 6' to 3' BCB, which is significantly below the naturally occurring level of 7' to 9' BCB. This is near the Old South Church on Dartmouth and Boylston Streets. Monitoring wells, 22J 0154 and 22J 0188, not mentioned in the Draft Assessment, report levels of 2' to 5' BCB. These are near the tunnel of the Huntington

Ave. line as it branches southwestward from Copley Station along Exeter Street. Further environmental assessments should be made to determine the extent of this existing depletion and to identify construction defects in the existing station and connecting tunnels that may be contributing factors. The threat to stability of neighboring timber pile supported buildings should be considered for mitigation by including appropriate repairs in the scope of the project.

## 3.14 HISTORIC PROPERTIES AND PARKLANDS

As previously stated, there is no documentation in this DEA as to the coordination with the Boston Landmarks Commission. There is a "concurrence" stamp on a letter to the Massachusetts Historic Commission. We would like to see evidence that the options were presented and that the above-mentioned Commissions are in agreement with the Preferred Option in light of the other possible locations that would not interfere with National Historic Landmarks. If in fact the Massachusetts Historic Commission is in "concurrence" with the project as presented in the DEA, and since many elements of the project are still in flux, we would like some assurance of what the MHC is in concurrence with.

We agree that the proposed outbound headhouse that replaces the existing brick entrance adjacent to Old South Church will be a significant improvement over the existing condition, but we do not believe that should be determinative. As noted above, NABB believes that an option that replaces the existing structure with an open stairwell should be the preferred option. Furthermore, the detailed description of the other five new structures will not negate the fact that they block important landmarks, offset the historic symmetry of the Library and block important pedestrian and visual corridors. We feel that five thirteen foot tall elevator and stair structures will not be transparent, and will have an extremely negative impact on the historic buildings and the streetscape.

At a meeting of the NABB Architecture Committee held on August 5, 2003, in which the MBTA presented the Preferred Option, we were told that advertising on the glass headhouse structures would be considered by the MBTA. These structures, being described as light and transparent, could in fact be faced with solid panels that would obscure and belie the promise of transparency. This potential advertising will further disrupt the streetscape and compete with the important adjacent buildings.

## 3.16 AESTHETICS

We do not agree with the statement that the project "…is intended to complement the historic character of the adjacent National Historic Landmarks". It should be noted that when the original wrought iron headhouse in front of the Library was added, many years after the completion of the Library, the MBTA's architects at that time chose a design vocabulary that blended with the forms and materials previously used on that façade of the Library. We do not agree that the proposed glass structures are an appropriate design approach. Moreover, the MBTA's 1995 Light Rail Accessibility Program Schematic Design Report specifically states that any headhouses in front of the historic Library should include two "symmetrically located structures on each side of the existing headhouse within the Boston Public Library property." This requirement is repeated in the DEA analysis. As noted above, the Preferred Option ignores this essential element of this option.

EXHIBIT 3

 **Massachusetts Bay Transportation Authority**

| Mitt Romney | Kerry Healey | Daniel A. Grabauskas | Michael H. Mulhern |
|---|---|---|---|
| Governor | Lt. Governor | Secretary and MBTA Chairman | General Manager |

July 30, 2004

Marianne M. Castellani
Chairman
Neighborhood Association of the Back Bay, Inc.
337 Newbury Street
Boston, MA 02115

Susan D. Prindle
President
Neighborhood Association of the Back Bay, Inc.
337 Newbury Street
Boston, MA 02115

Dear Ms. Castellani and Ms. Prindle:

I am in receipt of your recent comment letter on the Copley Station Accessibility Project Draft Environmental Assessment. I appreciate hearing from you on this matter.

The MBTA will be taking each of the comments received during the comment period and developing a Final Environmental Assessment that is responsive to the comments received. We will not be writing specific letters back to each commenter. We will, however, provide you with a copy of the Final EA so that you can see how your issues were addressed by the MBTA.

Again, I appreciate your interest in this project. If you have any questions, do not hesitate to contact me.

Sincerely,

Diana C. Parcon
Manager of Environmental Construction

cc: Michael H. Mulhern

*Massachusetts Bay Transportation Authority, Ten Park Plaza, Boston, MA 02116-3974*

EXHIBIT 4



# *Massachusetts Bay Transportation Authority*

| *Mitt Romney* | *Kerry Healey* | *Daniel A. Grabauskas* | *Michael H. Mulhern* |
|---|---|---|---|
| *Governor* | *Lt. Governor* | *Secretary and MBTA Chairman* | *General Manager* |



January 6, 2005

Susan D. Prindle
President
Neighborhood Association of Back Bay, Inc.
337 Newbury Street
Boston, MA 02115

Dear Ms. Prindle:

Attached please find a copy of the Final Environmental Assessment for the Copley Station Light Rail Accessibility Project. The Draft EA was prepared in June 2004 and a public hearing was held. This EA was developed in response to comments received during the public comment period on the Draft EA. A Response to Comment Section was also prepared and added and is included in the EA. This EA was submitted to the Federal Transit Administration in September 2004. The FTA issued a Finding of No Significant Impact (FONSI) on December 31, 2004 and is attached.

If you have any questions, do not hesitate to contact me.

Sincerely,

Andrew D. Brennan
Director of Environmental Affairs

ADB/lab
Attachments



**U.S. Department**
**of Transportation**
**Federal Transit**
**Administration**

REGION I
Connecticut, Maine,
Massachusetts,
New Hampshire,
Rhode Island, Vermont

Volpe Center
55 Broadway  Suite 920
Cambridge, MA  02142-1093
617-494-2055
617-494-2865 (fax)

DEC 3 0 2004

Mr. Michael H. Mulhern
General Manager
Massachusetts Bay Transportation Authority
Ten Park Plaza
Boston, MA 02116

Re: **Copley Station Environmental Assessment**
    **Finding of No Significant Impact**

Dear Mr. Mulhern:

Based upon a review of the environmental documentation, the Federal Transit Administration (FTA) has issued a Finding of No Significant Impact (FONSI) for the Copley Station Light Rail Accessibility Improvement Project. The purpose of this project is to make the station compliant with the American's with Disabilities Act (ADA) of 1990 through the construction of a safe, barrier-free pedestrian access to the station and platforms.

Please be advised that in accordance with 23 CFR 771.121, the Massachusetts Bay Transportation Authority (MBTA) is required to transmit a notice of availability of this FONSI to all affected Federal, state and local governmental entities. In addition, under Section 106 of the National Historic Preservation Act, the FTA has determined that this project will have no adverse effect on historic resources. Furthermore, FTA has determined that there is no prudent and feasible alternative to the use of Section 4(f) property (Boston Public Library, a National Historic Landmark) and that the action includes all possible planning to minimize harm. Moreover, FTA determined there would be no Section 4(f) use of the Old South Church, a National Historic Landmark because compliance with Section 106 for proximity impacts resulted in a finding of "no adverse effect." (23 CFR 771.135(p)(5))

Please let me know if you have any questions regarding this matter. The FTA looks forward to continuing to work with the MBTA on this important transit improvement.

Sincerely,

Richard H. Doyle
Regional Administrator

Attachment

## FEDERAL TRANSIT ADMINISTRATION
## REGION I

### Finding of No Significant Impact

**Project: Copley Station Accessibility Improvement**

**Applicant: Massachusetts Bay Transportation Authority (MBTA)**

**Project Location: Boston, Massachusetts**

### Purpose and Need

The Americans with Disabilities Act (ADA) of 1990 requires public transit agencies to identify key stations and develop a plan to implement accessibility improvements at these stations. The Copley Station has been determined to be a key station based on ADA criteria. The primary purpose of this project is to make the station compliant with the ADA.

### Alternatives Considered

Since the existing station has no accessible entrance, the No Build alternative does not meet the project purpose and need to make the station compliant with the ADA.

Beyond the No Build Alternative, the MBTA identified several options for locating elevators at Copley Station (originally identified in the 1995 Schematic Design Report for the MBTA's Light Rail Accessibility Program). The MBTA conducted an alternative analysis to assess the impacts of the project against the transportation, construction, accessibility, operational and pedestrian/customer needs of the station. The consideration of alternatives is further limited by the ADA's requirement that the accessible route and entrance shall, to the maximum extent practicable, coincide with the circulation path of the general public (ADA – 49 CFR Part 37, Appendix A sections 10.3.1 and 10.3.2).

### Proposed Project

The primary purpose of the Copley Station accessibility project is to meet the federally mandated key station plan objectives of accessibility to individuals with disabilities. Making this station accessible will require new work or renovations at surface and platform levels. At the surface level, new elevators to gain entry to the inbound (Boston Public Library) and outbound (Old South Church) platforms will provide access from the street to the fare mezzanine.

Other accessibility improvements include raising the entire platforms to 8 inches above top-of-rail to allow individuals in wheelchairs to enter the new low-floor trains and installation of a public address system with LED signs. New lighting, accessible fare collection, emergency exit stairs and a new electrical service from Arlington Station are also included.

### Agency Coordination and Public Opportunity to Comment

The MBTA has involved a number of agencies, local officials and the public in the planning and design of the Copley Station project. The EA was made available to the public on June 28, 2004 with the comment period closing on July 28, 2004. A public hearing was held on July 15, 2004.

Page 2

## Determinations and Findings
### National Environmental Policy Act (NEPA) Finding

FTA served as the lead agency under NEPA for the project. The MBTA prepared an Environmental Assessment (EA) in compliance with NEPA, 42 U.S.C. 4321 et. seq. and with FTA's regulations, 23 CFR Part 771. The EA analyzes and describes the project's potential significant impacts.

After reviewing the EA and supporting documents and public comments, the FTA finds under 23 CFR 771.121 that the proposed project will have no significant adverse impacts on the environment. The record provides sufficient evidence and analysis for determining that an Environmental Impact Statement (EIS) is not required.

### Section 106 Compliance
Section 106 of the National Historic Preservation Act requires the review of federally assisted projects for impacts to districts, sites, buildings, structures and objects listed in, or eligible for inclusion in the National Register of Historic Places. Federal agencies must coordinate with the State Historic Preservation Officer (SHPO) and potentially affected Tribes to make this determination. The Advisory Council on Historic Preservation (ACHP) has established procedures for the protection of historic and cultural properties in, or eligible for the National Register (36 CFR Part 800).

The project site is immediately adjacent to the Old South Church and the Boston Public Library, National Historic Landmarks. In preparation of a Section 106 determination the FTA and the MBTA coordinated with the Massachusetts Historical Commission (MHC) and the Boston Landmarks Commission (BLC) to ensure the surface elements of the Copley Station accessibility improvements are compatible with these historic structures.

Based on this consultation and analysis prepared by the MBTA, the FTA submitted a determination of effect to the SHPO on January 23, 2004. On January 29, 2004 the MHC concurred with FTA's determination that the proposed project will have no adverse effect on historic resources.

### Section 4(f) Findings
According to Section 4(f) of the Department of Transportation Act of 1966, codified as 49 U.S.C. 303, the Secretary of Transportation may not approve the use of land from a significant publicly owned public park, recreation area, or wildlife and waterfowl refuge or any significant historic site unless a determination is made that: there is no feasible and prudent alternative to the use of land from the property; and the action includes all possible planning to minimize harm to the property resulting from such use (23 CFR 771.135). An element of the proposed project, construction of a new elevator at the inbound Copley Station, will use land from the Boston Public Library, a National Historic Landmark (NHL). The FTA submitted to the Department of Interior (DOI) a Section 4(f) evaluation that was prepared by the MBTA that analyzed alternatives to the proposed action to ensure that all possible planning had been undertaken to minimize harm to the historic resources.

Page 3

An alternative not presented in the 4(f) evaluation was to locate the elevator 150 feet away from the station entrance in front of the recent library addition and thereby avoid NHL property. FTA did not consider this alternative to be prudent and feasible since it would not coincide with the circulation path of the general public (ADA – 49 CFR Part 37, Appendix A sections 10.3.1 and 10.3.2). Although not identified in the 4(f) evaluation, this alternative is presented in the EA as an option considered and dismissed during the NEPA process. Beyond considerations of the ADA, the EA presented two design options for this alternative. The first option would involve significant engineering issues such as the need to construct a new tunnel for fare collection purposes that would conflict with a 30' sewer line. In lieu of the tunnel, the second design option involves the construction of a caged gate system which would isolate the passenger and create operational impediments. Neither of these two designs for this alternative (tunnel or caged gate system) is appropriate nor feasible.

Moreover, FTA determined there would be no Section 4(f) use of the Old South Church, a National Historic Landmark because compliance with Section 106 for proximity impacts resulted in a finding of "no adverse effect." 23 CFR 771.135(p)(5).

By letter dated May 10, 2004, DOI concurred with FTA's 4(f) determination that there is no prudent and feasible alternative to the proposed action.

Finally, it is FTA's position that Section 4(f) requirements do not apply to the rehabilitation of the historic inbound headhouse because the SHPO concurred in FTA's determination that the project will not adversely affect the historic qualities of that transportation facility. 23 CFR 771.135(f).


Approved: _____     Date: _____ 30, 2004
          Richard H. Doyle
          Regional Administrator
          FTA, Region I


Concur: _____ Date: _____ 30, 2004
        Margaret E. Foley
        Regional Counsel

Neighborhood
Association *of the*
**Back Bay**



N · A · B · B

**50**th ANNIVERSARY

**Officers:**
Peter M. Sherin
  *Chair*
Jolinda K. Taylor
  *President*
Jacquelin S. McBride
  *Vice Chair*
Steven M. Sayers
  *Vice President*
Thomas W. High
  *Secretary*
Roseann M. Colot
  *Treasurer*

**Directors:**
Brenda Adams
Nancy Amer
Susan Ashbrook
John R. Boreske
Dorothy B. Bowmer
Marianne M. Castellani
Manya S. Chylinski
Mark Cohen
John R. Devereaux
Fran Duffly
Daniel P. Fickes
Peter Y. Flynn
Frederick C. Gleason
Jack W. Gregg
Daniel K. Hardenbergh
Suzanne L. Heywood
Janet Hurwitz
Warren A. Johnson
Ed Johnston
Kathleen S. Kolar
Shirley L. Kressel
Rosanne Kumins
Elliott Laffer
Jennifer R. Lowe
Nancy A. Macchia
Fred C. Mauet
Myron Miller
Tim Ian Mitchell
Molly H. Mosier
Jeryl Oristaglio
Margaret Pokorny
Susan D. Prindle
Luanne W. Pryor
Patricia M. Quinn
Gordon Richardson
Ellen E. Rooney
Sandy Shapiro
Anne C. Swanson
Stella M. Trafford
Sandi Underwood
Michael P. Ward
Mark Yessian
Linda A. Zukowski

Lois A. Harvey
*Office Administrator*

**EXHIBIT 5**

February 11, 2005

Richard H. Doyle, Regional Administrator
Federal Transit Administration, Region I
Volpe Center
55 Broadway, Suite 920
Cambridge, MA 02142-1093

Re:    Copley Station Environmental Assessment
       FTA Finding of No Significant Impact

Dear Mr. Doyle:

   We have received your Finding of No Significant Impact (Finding) for the Massachusetts Bay Transportation Authority's (MBTA's) Environmental Assessment (EA) for the Copley Station Light Rail Accessibility Project in Boston. The Neighborhood Association of the Back Bay (NABB) disagrees with this Finding for the following reasons:

   The proposed project includes the construction of structures that will obstruct two important National Historic Landmarks (NHLs): the Boston Public Library and the Old South Church. The proposed project is inappropriate not only because of the adverse impact on these historic structures, but because other suitable alternatives were rejected or not adequately considered which would have provided accessibility and at the same time mitigated the impact on historic interests.

   The EA and the process leading to it are defective because the primary neighborhood organization for the location of the Copley Station, i.e. NABB, was not included in the review process until the proposed design was "at least 75% complete" whereas Massachusetts law specifically requires the MBTA to give organizations such as NABB "timely opportunity" to participate in major transportation projects. ("Timely opportunity" is defined as sufficiently early in the design process so as to permit comments to be considered prior to the final development of or commitment to any specific design of such project. MGL c.161A, § 5k) We have stated our concerns about the process and the project, first after meeting with the MBTA, followed by an August 22, 2003 letter (included in the EA, to which there was no response from the MBTA) and then about the project itself in great detail in a July 28, 2004 letter to the MBTA to which they responded in the Environmental Assessment. However, we do not agree with and/or are confused by many of their responses. Therefore, we feel that the MBTA has both failed to comply with the Massachusetts requirements for such reviews and has not responded adequately to the input that they did get. This is especially the case where the historic properties are as significant as those involved here as set forth below.

   We also feel, as we stated in our July 28, 2004 letter, that since all of the components of the project have not been clearly determined (for instance, the open stairs are now to be hatches), a Finding is premature. It could be construed more as blanket approval than a serious reflection of the impacts that the total project will have on the streetscape, in general, and the National Historic properties, specifically.

   We outline below some of our specific concerns with the EA and this Finding:

## Section 106 Compliance

According to the National Park Service, "National Historic Landmarks are nationally significant historic places designated by the Secretary of the Interior because they possess exceptional value or quality in illustrating or interpreting the heritage of the United States. Today, fewer than 2,500 historic places bear this national distinction."

The NHL Boston Public Library, completed in 1895, was designed by McKim Mead and White as a "palace for the people." Both the interior with its grand staircase, reading room, and John Singer Sargent murals, and the exterior expression of symmetry and grandness make this building a truly significant structure. Twenty years after it was built, around 1915, the historic wrought-iron entrance to the subway was added to the Boylston Street façade. It is our belief that the Library's symmetrical façade, with its wrought-iron detailing, is enhanced and reflected by the central location and materials of the 1915 subway headhouse. The current proposal, to add a headhouse asymmetrically to one side, designed without attention to the architecture of the Library, can only permanently diminish its historic architectural integrity.

Old South Church is another National Landmark Building which will be severely compromised by the current proposal of two headhouses in front of its Dartmouth Street façade. Constructed between 1872 and 1875, Old South Church is considered an outstanding example of Northern Italian Gothic architecture. When Old South Church moved to the current Back Bay site in 1875, the Boston Transcript described the New Old South Church as "the most beautiful basilica in North America." The two proposed headhouses will permanently block many of the carved stone details and the Dartmouth Street façade of this building. The contention that one of the proposed glass and steel headhouses will be not obscure as much of the church's detail as the existing brick headhouse may be true. However, the two proposed headhouses encompass much more volume than the existing headhouse, thus interfering with much more of the church's façade than the existing headhouse. It is also erroneous to believe that the proposed headhouses will be transparent since the reflectivity of the glass will present the headhouses as solid objects. Furthermore, the materials of which the proposed headhouses will be built should not be the controlling criteria pertaining to the decision to minimize the impact on the historic structure. The basis for that determination should be to preserve the Church façade without any interference by headhouse structures. If feasible, this should be the preferred solution. If it is not feasible, then the next solution with the minimal impact on the NHL property should be the choice. As shown below, this was not done in this case and the EA and Finding are flawed accordingly.

Because of the extraordinary importance of both the Boston Public Library and the Old South Church to the city, state and nation, the MBTA should have taken extraordinary measures to make sure that the façades of these structures be preserved and respected. Since the preferred project does not do this, the Finding that the proposed project will have no adverse effect on the historic resources is erroneous on its face.

## Alternatives Considered

We disagree that alternatives were adequately considered that would have provided accessibility and at the same time mitigated the impact on historic interests.

<u>Inbound/ Library Entrance</u>. Alternatives that would either provide two symmetrical structures or provide an accessible entrance to the west of the McKim façade were not adequately considered.

The Environmental Assessment states that it eliminated Option E, two headhouses symmetrically located on the library's façade, because of the underground access needs of the Library east of the wrought-iron entrance. However, a structure located east of the existing headhouse need not protrude into the Library's below ground space, but could rather be a surface structure used as a kiosk or bus shelter. Therefore, it is clear from the stated reason for eliminating option E that the option was not adequately evaluated.

Similarly, alternative design options to the modern glass box and steel architectural vocabulary were not considered. It should not be assumed that a modern intrusion on the old façade is the only appropriate architectural solution. There are certainly other architectural solutions that might better blend with the façade of the Library. The MBTA's architects managed to do this in 1915, 20 years after the library was built. It is incumbent upon the MBTA to at least present alternative design options in light of the historic significance of the Library, that respond to its specific architecture, rather than a dressed-up, system-wide elevator that could be placed anywhere in any city.

Option F, which locates an accessible entrance in front of the new library addition so as not to interfere with NHL property, was eliminated, according to the Finding and the EA, because it would bring the customer down to the platform beyond the unpaid lobby and it would not coincide with the circulation path of the general public. Again, it would seem possible, especially in light of the MBTA's movement toward automatic tolls, that a customer could pay with a token or card at the street entrance to the elevator and end up directly on the platform, without having to go to the unpaid lobby. This would eliminate the need for a tunnel, or a caged gate system. A technological solution to the problem should at least be evaluated where such a solution could preserve the historic interests. This rationale is completely inconsistent with the solution chosen for the Arlington Station where a tunnel was selected despite the fact that its entrance will be 120 feet from the entrance for the general public. Locating the entrance closer to the Boylston Street entrance to the Library that puts the customer directly on the platform is an option worthy of serious consideration not given in either the EA or the Finding.

<u>Outbound/Old South Church Entrances</u>. Options that would preserve and enhance the Dartmouth Street façade of Old South Church as well as the important pedestrian views to and from Copley Square were not adequately considered and unjustifiably eliminated.

The EA shows a picture of an original 1915 entrance stair at Old South Church, partially covered, but low to the ground so as not to obscure the ornate carvings on the wall of the NHL Old South Church or the pedestrian views up and down Dartmouth Street. An option to eliminate the headhouse structure at this location and to provide a low covered or open stair was not considered. Instead two headhouses are being proposed at this location.

A solution, similar to the original 1915 design, would eliminate the existing and proposed visual blockage at Dartmouth Street, thereby reinforcing the recent expansion

of the Library's plaza on Dartmouth Street by reopening the vista down the Dartmouth Street Mall, connecting the Library Plaza with the North/South axis from the Charles River to the newly expanded Library plaza. This option was not adequately explored.

Options B and C, to locate the elevator headhouse on the east side of Dartmouth Street opposite the façade of the Church, were eliminated. Losing one parking space or having to negotiate with the property owner to place the elevator in his property (a solution that there is certainly precedence for throughout the city and is clearly our preferred option) seems justified in light of the positive effect of freeing up the visual aspects of the NHL Church and the vistas to and from Copley Square. These solutions would clearly eliminate the need to interfere with a NHL property and should be given more serious attention.

The EA states that there would not be direct sight lines from the lobby if an elevator were located on the east side of Dartmouth Street. This would be true also for the proposed west side location. Neither would provide direct site lines to the fare collection booth. Site-line obstruction is not an adequate reason for eliminating the east side location.

Outbound/East Side Stair. Neither the Finding nor the EA presents adequate reason for enclosing the existing open stair entrance to the station on the east side of Dartmouth Street. Such a structure will block important pedestrian views to and from Copley Square and further tighten an already narrow sidewalk. In combination with the two proposed headhouses on the west side of the street, the vistas on both sides of Dartmouth Street would be permanently obstructed, creating a negative effect of a visual barrier separating Back Bay and the Dartmouth Street Mall from Copley Square.

Enclosing this existing stair is not consistent with design decisions for other stations. The current design for Arlington Station, for example, has the two existing stairs and one rerouted stair left open. There is no adequate explanation in the EA for this inconsistency.

Advertising. The approved EA is not clear where advertising would be allowed. The EA states, "The existing structure has an advertising space above the transom that is currently leased out by the MBTA. The new headhouse will be designed to accommodate this type of advertising. It is limited to the entrance to the main outbound headhouse." However, when reviewing the design of this headhouse, there does not appear to be space above the entrance as the proposed structure is lower than the existing. Also, in response to Representative Demakis's letter, the MBTA refers to selling "advertising space above the station entrance on the transom in a manner that does not block or reduce the transparent nature of the structures." This states "structures," not just one "structure." The structures referred to are not identified. Finally, the fact that the MBTA specifically states that it intends to place advertising on the headhouses, even if only above the transoms, compromises its claim that the headhouses will not adversely impact the NHL properties because of their translucent design.

As previously stated, many of our comments were detailed in our August 2003 and July 2004 letters. We do not feel that the MBTA adequately responded to our comments, nor does the EA present adequate reasons for elimination of options that would provide the least interference with NHL properties. The process itself did not allow an opportunity for NABB or possibly other commenters to respond to the MBTA's

responses. In effect, the EA illustrates a set design, presented in August of 2003, without incorporating community concerns or further protecting the National Historic Landmarks.

Sincerely,

Peter M. Sherin, Chairman

Jolinda K. Taylor, President

cc:     Thomas M. Menino, Mayor, City of Boston
        Mitt Romney, Governor, Commonwealth of Massachusetts
        Senator Edward Kennedy, United States Senate
        Senator John Kerry, United States Senate
        Congressman Michael Capuano, United States House of Representative
        Michael Mulhern, MBTA General Manager
        Michael P. Ross, Boston City Councilor
        Dianne Wilkerson, Massachusetts State Senator
        Marty Walz, Massachusetts State Representative
        Byron Rushing, Massachusetts State Representative
        Cara Metz, Deputy State Historical Preservation Officer
        Harry Collings, BRA Executive Director
        William Young, Chair, Back Bay Architectural Commission
        Ellen Lipsey, Executive Director, Boston Landmarks Commission
        Susan Park, President, Boston Preservation Alliance
        Steven Spinetto, Commissioner of Disabled Persons
        Helen Hendrickson, Boston Center for Independent Living
        Elisa Blanchard, The Old South Church in Boston
        Bernard Margolis, The Boston Public Library
        Francine Shron, Friends of Copley Square
        P. A. D'Arbeloff, Boston Public Library Foundation
        Meg Mainzer-Cohen, Back Bay Association

bcc: Tony Gordon

**EXHIBIT 6**

JUN 0 3 2005



# The Commonwealth of Massachusetts
### William Francis Galvin, Secretary of the Commonwealth
### Massachusetts Historical Commission

May 31, 2005

Richard H. Doyle
Regional Administrator
Federal Transit Administration
55 Broadway, Suite 929
Cambridge, MA 02142

Re:    Accessibility Improvements, Copley Station/Green Line
       Boston, MA, MHC #31902

Dear Mr. Doyle:

On January 29, 2004, the Massachusetts Historical Commission (SHPO) concurred with your finding that the referenced project would have No Adverse Effect on Historic Resources in accordance with Section 106 of the National Historic Preservation Act of 1966, as amended. Recently, it has come to our attention that the MBTA is exploring technology that would streamline the need for token booths at MBTA system stations (i.e. Charlie Card). In light of this new technology, we request that you consider if this would allow a reduction in the number of head houses required as part of this project.

If there are new alternatives that are feasible as a result of the implementation of the Charlie Card, we request the opportunity to discuss these with you further.

I look forward to hearing from you.

Sincerely,

Cara H. Metz
State Historic Preservation Officer

cc:    Andrew Brennan, MBTA
       Representative Marty Walz
       Cristina Prochilo, BPA
       Sue Prindle, NABB
       Ellen Lipsey, BLC

bcc: John Devereaux, Esq.
     Janet Hurwitz

220 Morrissey Boulevard, Boston, Massachusetts 02125
(617) 727-8470 • Fax: (617) 727-5128
www.state.ma.us/sec/mhc



**EXHIBIT 7**

# The Commonwealth of Massachusetts
William Francis Galvin, Secretary of the Commonwealth
Massachusetts Historical Commission

June 9, 2005

JUN 1 5 2005

Richard H. Doyle
Regional Administrator
Federal Transit Administration
55 Broadway, Suite 929
Cambridge, MA  02142

Re:    Accessibility Improvements, Copley Station/Green Line
       Boston, MA, MHC #31902

Dear Mr. Doyle:

Please find attached an email message that I received from Reverend Nancy Taylor of Old South Church.  I have recommended to her that she direct her letter to you.

The letter suggests that there is new information that should be considered in order to evaluate the impact of the project on historic resources.  We request that you review the new information and inform us of new impacts to historic properties in accordance with 36 CFR 800.13(b)(1).

Please contact me if you have any questions or if I can be of further assistance.

Sincerely,

Cara H. Metz
State Historic Preservation Officer

cc:    Andrew Brennan, MBTA
       Representative Marty Walz
       Cristina Prochilo, BPA
       Sue Prindle, NABB
       Ellen Lipsey, BLC
       Rev. Nancy Taylor, Old South Church

220 Morrissey Boulevard, Boston, Massachusetts 02125
(617) 727-8470 • Fax: (617) 727-5128
www.state.ma.us/sec/mhc

## Metz, Cara @ SEC

| | |
|---|---|
| **From:** | Nancy Taylor [nst@oldsouth.org] |
| **Sent:** | Friday, June 03, 2005 1:51 PM |
| **To:** | Metz, Cara (SEC) |
| **Cc:** | 'Makholm, Jeff'; 'Guilliaem Aertsen'; 'Dwight Crane'; 'Thomas Bulkeley'; 'Roger Burke'; operations@oldsouth.org; wmccabe@ropesgray.com; Walz, Marty (HOU ); festival@bostonharborfest.com; jean.carroon@goodyclancy.com |
| **Subject:** | OLD SOUTH & MBTA |
| **Importance:** | High |

Cara H. Metz
State Historic Preservation Officer and Executive Director
Massachusetts Historical Commission

Dear Cara Metz:

I am writing on behalf of Old South Church, a national historic landmarks building located at Boylston and Dartmouth Streets, in Copley Square. We are seriously concerned about the impact of the MBTA Light Rail Accessibility Project on our historic structure.

The Massachusetts Historical Commission signed off on the MBTA's project over a year ago, concluding that it would have "no adverse impact" on the national historic landmarks surrounding it (Old South Church and Boston Public Library). We have *new information*, however, concluding that there is, indeed, the risk of a significant and adverse impact on Old South Church. We are writing, therefore, to ask that the Massachusetts Historical Commission reconsider its earlier assessment.

We recently hired LeMessurier Consultants, an engineering firm, to assess the impact to the church of the subterranean excavations proposed by the MBTA in order to add an additional headhouse for an elevator on Dartmouth Street at the Copley Square T-Stop. LeMessurier Consultants is the same firm the MBTA hired for its peer review of the same project. **Unfortunately, when LeMessurier earlier reviewed the project for the MBTA, they did not take into account the impact of the excavations on any adjacent structures.** They were not asked to. We had to independently hire the same firm to ask them to review the same project from our perspective.

After reviewing the project from the perspective of the Old South Church, LeMessurier Consultants concluded that the work presents a "risk of horizontal and vertical soil settlement and of lowering the groundwater table. Differential vertical settlement of the (church's) Dartmouth Street wall could cause **cracking of masonry or stained-glass windows.** Lowering of the groundwater table could cause **deterioration** of timber piles that support the Dartmouth Street wall." This is an untenable risk. The building is fragile, historic and irreplaceable. Additionally, we find ourselves in the position of bearing the enormous burdens of hiring attorneys, engineers and other consultants, of providing and reading geotechnical instrumentation and seismographs for our wall and stained-glass during and after construction, and of investigating insurance against potential damage.

Let me be clear that we are in favor of accessibility and sensitive to the impatience of persons with disabilities for this long-overdue project. We, too, are impatient for this project. We simply believe the MBTA is placing the elevator in the wrong location. It could and should be placed on the other side of Dartmouth Street.

**EXHIBIT 8**



Neighborhood
Association *of the*
**Back Bay**

N · · A · · · B
50th ANNIVERSARY

**Officers:**
Peter M. Sherin
*Chair*
Jolinda K. Taylor
*President*
Jacquelin S. McBride
*Vice Chair*
Steven M. Sayers
*Vice President*
Thomas W. High
*Secretary*
Roseann M. Colot
*Treasurer*

**Directors:**
Brenda Adams
Nancy Amer
Susan Ashbrook
John R. Boreske
Dorothy B. Bowmer
Marianne M. Castellani
Manya S. Chylinski
Mark Cohen
John R. Devereaux
Fran Duffly
Daniel P. Fickes
Peter Y. Flynn
Frederick C. Gleason
Jack W. Gregg
Daniel K. Hardenbergh
Suzanne L. Heywood
Janet Hurwitz
Warren A. Johnson
Ed Johnston
Kathleen S. Kolar
Shirley L. Kressel
Rosanne Kumins
Elliott Laffer
Jennifer R. Lowe
Nancy A. Macchia
Fred C. Mauet
Myron Miller
Tim Ian Mitchell
Molly H. Mosier
Jeryl Oristaglio
Margaret Pokorny
Susan D. Prindle
Luanne W. Pryor
Patricia M. Quinn
Gordon Richardson
Ellen E. Rooney
Sandy Shapiro
Anne C. Swanson
Stella M. Trafford
Sandi Underwood
Michael P. Ward
Mark Yessian
Linda A. Zukowski

Lois A. Harvey
*Office Administrator*

June 16, 2005

Don L. Klima
Director, Office of Planning and Review
Advisory Council on Historic Preservation
1100 Pennsylvania Avenue NW
Old Post Office Building, Suite 809
Washington, DC 20004

Dear Mr. Klima,

Marilyn Fenollosa from the National Trust for Historic Preservation suggested we write to you concerning Federal Transit Administration (FTA) findings of no significant impact (FONSI) for two proposed projects within the National Register Back Bay Historic District in Boston, MA. She told us that she has already spoken to you about these projects.

The two projects are the Arlington Station and Copley Station Light Rail Accessibility Projects. The FTA issued a FONSI for the Arlington Station Project on May 14, 2004. The Copley Station Project received a FONSI by the FTA on December 30, 2004. Both projects are proposed in order to make these two existing underground transit stations compliant with the Americans With Disabilities Act (ADA) of 1990.

Our organization, the Neighborhood Association of Back Bay (NABB), wholeheartedly supports making both the Arlington and Copley Stations ADA compliant. However, we know that there are prudent and feasible alternatives that would achieve this accessibility and at the same time less adversely affect the historic and architectural character of the Back Bay Historic District, two National Historic Landmark buildings (the Boston Public Library and Old South Church), and the National Register Arlington Street Church.

**Arlington Station**
With regard to the Arlington Station Project, the Massachusetts Bay Transit Authority (MBTA) is proposing a new enclosed stair structure and an elevator enclosure on the sidewalk adjacent to the Arlington Street Church, built in 1861, listed on the National Register of Historic Places, and located within the National Register Back Bay Historic District. The proposed structures will significantly interrupt the view of the historic church and negatively alter streetscapes and views within the Back Bay Historic District. They are also proposing a handicapped ramp within the front yard of the Arlington Street Church to access the Church, designed in a way that is typically not allowed in the Back Bay Architectural District.

As soon as NABB learned about the project we repeatedly urged the FTA and the MBTA to consider other feasible and prudent sites that were not adjacent to historic

interests or would impact historic interests less. Additionally, the Arlington Station Project requires a new 120-foot tunnel to be built partially under the Arlington Street Church property connecting the elevator to the station lobby.

Alternative sites, that would not require a tunnel, that would bring the elevator users almost directly into the station lobby, that would cost less, and that would not impact the Church, were eliminated without adequate evaluation or eliminated for an invalid reason such as to avoid opposition from the owner of two relatively new, non-historic buildings across from the National Register Arlington Street Church.

**Copley Station**
The Copley Station Project includes even more significant historic interests as it directly affects two National Historic Landmarks, The Boston Public Library and Old South Church. Both buildings are also within the Back Bay Historic District, listed on the National Register of Historic Places.

The NHL Boston Public Library completed in 1895, was designed by McKim Mead and White as a "palace for the people." Today both the Library and its wrought-iron subway headhouse are well known and much loved by residents and visitors alike. The Library's exterior expression of symmetry and grandness make this building a truly significant structure. Thirty years after the Library was built, the inbound wrought-iron entrance was added on the Library's Boylston Street plaza. According to a 1925 reference, "The wrought iron and glass subway entrance canopy was constructed in 1925 by the Boston architectural firm of Fox and Gale. Copley Station had been constructed in 1915 and the Boston Transit Department decided that its task was to erect a sidewalk entrance that would meet the high architectural standards set by the Public Library behind it designed by the firm of McKim, Mead and White." The Library's symmetrical façade, with its wrought-iron detailing, is both reflected and enhanced by the central placement and similar materials of this 1925 subway headhouse. This wrought-iron structure is believed to be landmarked as well.

The current proposal to add a modern glass and steel headhouse off to one side of the wrought iron headhouse, designed without attention to the symmetry and detailing of the Library, will permanently disturb the Library's historic architectural integrity. The placement of this elevator would also severely compromise views of the NHL Library and the original wrought-iron headhouse. The project would include permanent alterations to the existing stone plaza of the Library in such a way that would destroy the symmetry of the historic plaza. The MBTA also proposes removing and replacing portions of the existing historic wrought-iron headhouse in a way that would rehabilitate, not restore, the headhouse and would allow alterations of the headhouse.

Alternatives to locate the elevator to the west of the NHL Library, or to design two historically compatible symmetrical structures, both identified in the MBTA's own 1995 Schematic Report, have been eliminated without adequate evaluation.

2

Across the street from the Library the MBTA proposes three new headhouse structures for its outbound entrance. All three structures are within the Back Bay Historic District. Two of the three are adjacent to the NHL Old South Church.

Old South Church, founded in 1669 and numbering many Revolutionary patriots among its congregants, moved to its current site in 1875 at which time it was described as "the most beautiful basilica in North America."

This NHL Church will be severely compromised by the two proposed headhouses adjacent to its Dartmouth Street façade. A new stair/escalator enclosure may appear to be an improvement over an existing brick structure, however, with the addition of a separate elevator structure, the combined volume will block much more of the church's façade than at present. It is erroneous to believe that these glass and steel headhouses will be transparent since the reflectivity of the glass and the opacity of the elevator will cause the headhouses to appear as solid objects, blocking the views of much more of the Library's Dartmouth Street façade than at present, as well as views to and from the Dartmouth Street Mall.

The additional proposed stair enclosure on the east side of Dartmouth Street negatively affects views within the Back Bay Historic District, connecting the area to Copley Square. Covering this existing open stair is also inconsistent with leaving two existing open stairs and one rerouted stair uncovered for the Arlington Station Project.

Alternatives to locate the elevator in one of three locations across the street from the NHL Church, to keep the existing open stair open and to reduce the size of the new stair/escalator enclosure were either not considered or eliminated without adequate evaluation.

We believe that Sections 106, 110, and 4(f) of the National Preservation Act and the Department of Transportation Act of 1966 are being violated by the FTA's finding of no significant impact. Not only was the FTA required to take into account the effect of the undertaking on the historic sites, (Section 106); but it was also to have approved the projects only if there were no prudent and feasible alternatives to using those sites and the program or project included all possible planning to minimize harm to the historic sites, (Section 4(f)). **The FTA was also required to afford the Advisory Council on Historic Preservation a reasonable opportunity to comment on the undertakings, (Section 110).**

Additionally, we believe that the process has been flawed in other respects. For example, NABB and other important interest groups were not given an opportunity to comment on the Copley Project until the project design was 75% complete- well beyond the planning phase. Impacts of the construction on the foundations of

3

adjacent properties which could, for example, undermine the structure of the NHL Old South Church, have recently come to light.

Because of the above, NABB filed a suit in Federal Court in July 2004 concerning the Arlington Street Station FONSI. This last week, on June 9, 2005, NABB along with the Boston Preservation Alliance have filed another suit in Federal Court regarding the Copley Station FONSI. Both suits ask for declaratory and injunctive relief to suspend disbursement of FTA funds to the MBTA, allowing the planning process to be reopened.

Despite the prior existing Arlington Station suit, the MBTA has combined the bid documents to include both the Arlington and Copley Station Projects, and has let the projects out to bid. The bid opening was scheduled for June 15, 2005.

At this time, we urge you to request that the FTA reopen the planning and design phases of both projects so that we can work together to reach a mutually agreed upon solution as quickly as possible. It would benefit us all to avoid a lengthy and costly court case.

Since the bid opening may have already happened, we request your immediate attention to this matter.

Please do not hesitate to contact us for any support materials or questions you might have.

Sincerely,

Peter M. Sherin, Chairman

Janet Hurwitz, Chair/Architecture Committee

cc:    Sen. Edward M. Kennedy, United States Senate
       Sen. John Kerry, United States Senate
       Congressman Michael Capuano, United States House of Representatives
       Richard H. Doyle, Federal Transit Administration
       Rep. Marty Walz, Massachusetts State House
       Daniel Grabauskas, Massachusetts Bay Transportation Authority
       Cara Metz, Deputy State Historical Preservation Officer
       The Rev. Dr. Nancy S. Taylor, Old South Church in Boston
       Bernard Margolis, Boston Public Library
       Marilyn Fenollosa, National Trust for Historic Preservation
       Susan Park, Boston Preservation Alliance

bcc: Larry Hardoon

Enclosed - June 2f 2004 &
Mr Doyle letter
- Feb 11, 2005
Mr Doyle letter

4

**EXHIBIT 9**





FOUNDED IN 1669

# OLD SOUTH CHURCH IN BOSTON

A CONGREGATION OF THE UNITED CHURCH OF CHRIST

645 BOYLSTON STREET, BOSTON, MASSACHUSETTS 02116

PHONE 617-536-1970

AUG 2 3 2005

July 1, 2005

Mr. Daniel A. Grabauskas
General Manager
MBTA
10 Park Plaza
Boston, MA 02116

Dear Mr. Grabauskas:

I am please to provide you with the enclosed materials at the request of Mr. Aaron D'Elia relative to your conversation about the risks to the Old South Church from the proposed MBTA Light Rail Accessibility Project at the Copley Station.

We are as impatient as anyone for improved accessibility. In fact, Old South has spent hundreds of thousands of dollars in recent years to improve accessibility to our facility; this is an area of concern and civil rights we believe in and champion. We are convinced, however, that the risks to our building from the proposed excavations for the elevator on Dartmouth Street are unacceptable. The enclosed materials make that case. Further, we are persuaded that a new elevator and head house can be quite easily accommodated across Dartmouth Street, thus significantly diminishing adverse risks to our Landmark building.

As our architect attests in the enclosed materials, our building is a priceless and irreplaceable work of art. But it is more than that: as the congregation whose former home (the Old South Meeting House), held the mass meetings that led to the Boston Tea Party, Old South is also a vital symbol of our nation's quest for freedom and justice.

Thank you for your attention to this matter.

Sincerely,

*Nancy S. Taylor*

The Rev. Dr. Nancy S. Taylor
Senior Minister
617.425.5150 (direct)
nst@oldsouth.org

Jean C. Carroon AIA

Robert C. Chandler AIA

John M. Clancy FAIA (1930—2004)

David D. Dixon FAIA

James T. Dunn CPA

Roger N. Goldstein FAIA

Joan E. Goody FAIA

Robert J. Pelletier AIA

Ralph H. Tolbert AIA

Geoffrey M. Wooding AIA

# GOODY
# CLANCY

June 30, 2005

Walter R. McCabe III
Ropes & Gray, LLP
One International Place
Boston, MA 02110

Re: Old South Church Architectural Significance

Dear Walter:

As you are aware, I have been professionally involved with Old South Church for almost ten years, working with the church to prioritize the ongoing care that such a significant historic building requires. Old South Church is recognized as one of the most important historic buildings in our county. Designated a National Historic Landmark by the Secretary of the Interior in 1970, Old South is also a Boston City Landmark and is considered one of the most noteworthy buildings within the National Register and Local Historic Districts of Boston's Back Bay.

My professional opinion, as a preservation architect with over twenty years of experience, substantiates what every major preservation agency in Boston, the Commonwealth and the Nation have already made official. Old South Church, constructed in 1874-1875, is one of the country's finest examples of High Victorian Gothic architecture. Designed by the Boston architectural firm of Cummings and Sears it was modeled in the style of Northern Italian Gothic architecture and it is one of three key buildings that define one of Boston's great public spaces, Copley Square. It is a building of both outstanding design and exceptional cultural significance.

The building is an exemplar of Victorian architecture as well as masterful combination of local materials and European design ideals inspired by John Ruskin. Old South's façade, composed of precisely cut alternating buff and brown sandstone arches, rough textured Roxbury Puddingstone, elaborate wrought-iron work, and soaring 246 foot campanile with its extremely ornate copper roof, stands in delightful contrast to McKim Mead and White's monochromatic Neo-Classically styled Boston Public Library. It celebrates texture, color, materials, and design at every opportunity. The interior of the sanctuary is equally elaborate with polychromatic stenciled walls, elegantly carved and molded walnut pews, pulpit, and other furnishings. Its stained glass windows are extremely significant artifacts in their own right.

I understand that the proposed construction work with respect to Copley Station may pose a risk of damage to this building. It would be impossible to evaluate potential risk to Old South Church, since no damage to the building would be acceptable. This building, which occupies such a pivotal position in the urban design of the Back Bay neighborhood and the City as a whole, and which is such a rich and significant example of architecture, should be protected and preserved at all cost. The building is essentially priceless in the same way that any significant work of art is priceless.

Sincerely,

Jean Carroon
Principal for Preservation
Goody Clancy

# MARSH

**Alburn Blankenship**

Marsh USA Inc.
200 Clarendon Street
Boston, MA 02116-5093
617 421 0418  Fax 617 421 0344
www.marsh.com

June 15, 2005

Walter R. McCabe III, Esq.
Ropes & Gray, LLP
One International Place
Boston, MA 02110

Re: Old South Church
645 Boylston Street
Boston, MA 02116

Dear Mr. McCabe:

The Trustees of Old South Church have discussed with me the availability of property insurance that might be purchased to cover any physical damage to their building (located at 645 Boylston Street in Boston, MA.), that might arise out of future expected excavation and construction near the foundation of their church building. Although the Church has existing insurance coverage which includes a number of important types of coverage's and is favorable in its terms to Old South Church the coverage will not necessarily adequately address the risks involved with the contemplated construction. Thus, specialized insurance should be obtained to try and address such risks. Such special insurance would need to be broad enough to bridge gaps and exclusions in the Church's existing property insurance policy. As you know, the inquiry regarding insurance coverage is a result of published reports that the Massachusetts Bay Transportation Authority (the " T") plans to place an elevator and head house in the Copley Station at Boylston and Dartmouth Streets next to the foundation of the Church's building.

Before our firm goes into the market to actually place the proposed coverage we would need to have a detailed engineering report that describes the present conditions of the church building as well as a complete description of the work the "T" expects to perform. Additionally, the report would need to provide guidance, should there be some mishap, on the expected probable maximum loss to the building that could result from the contemplated work.

In the absence of an engineer's report we have made some assumptions and (but without any discussions with potential underwriters) we can express some opinions that are based on the facts as we now understand them:

This will not be an easy risk to insure. Underwriters will see this as an adverse selection process and there are only half dozen or so companies who might provide the requested coverage.

**MMC** Marsh & McLennan Companies

# MARSH

Page 2
June 15, 2005

A limit of at least $3 to $5 Million is likely to be needed and such amount of coverage is likely to be as much as can be placed notwithstanding that major damage to the church building might cost significantly more to remedy.

There is likely to be a minimum premium of $50,000 per underwriter participating in this coverage.

We would expect a premium rate necessary to place this protection to be as high as "Ten Percent on Line". (That is a $3 Million Limit would cost $300,000; and a $5 Million Limit $500,000.)

There will be some "deductible" before coverage is paid. Expect no less that $50,000.

The exact policy form and wording details, as well as cost, will all be subject to negotiation.

Under the best of circumstances it will take some time to locate willing underwriters and to negotiate terms. You should allow at least 60 days for such activity. Please also note that the chances of success in placing this coverage will be greatly affected by the quality and detail of the engineering report mentioned above.

Very truly yours,

Alburn Blankenship

# LeMessurier Consultants

675 Massachusetts Avenue    Cambridge, MA 02139
Tel: (617) 868-1200        Fax: (617) 661-7520

10 May 2005

Rev. Dr. Nancy S. Taylor                              Via Mail & Fax: 617-536-8061
Senior Minister
The Old South Church in Boston
645 Boylston Street
Boston, MA 02116

Reference:    Old South Church MBTA Construction Review
              LeM File No. 25118

Subject:     Construction Documents Review

Dear Rev. Taylor,

As requested, we have reviewed construction documents prepared by STV Incorporated for
renovation of the existing MBTA Copley Station. Proposed renovations include replacement of the
existing outbound headhouse and construction of a new outbound passenger elevator and headhouse
near the Dartmouth Street wall of Old South Church.

## Discussion

Since the new outbound headhouse will be located above grade, approximately 13'-9" from the
property line, and within the plan dimensions of the existing headhouse, this construction presents
a relatively low risk of damage to Old South Church. However, the new passenger elevator will
require excavation of a shaft approximately 18'-8" wide by 20'-4" long by 26'-3" deep. Although the
edge of this shaft will be located approximately 14'-4" from the face of the Church, this construction
presents a greater risk of horizontal and vertical soil settlement and of lowering the groundwater
table. Differential vertical settlement of the Dartmouth Street wall could cause cracking of masonry
or stained-glass windows. Lowering of the groundwater table could cause deterioration of timber
piles that support the Dartmouth Street wall.

The enclosed sketch represents a composite section taken through the existing Dartmouth Street wall
and the proposed elevator shaft. This section is based on MBTA architectural and structural
drawings and from 1932 structural drawings for replacement of the Church tower. 1932 structural
drawings indicate that the elevation of the Ground Floor is 20.30' and that the elevation at the top
of timber piles that supported the original tower is 3.25' and that the groundwater elevation is 5.28'.
We assume that these elevations are representative of conditions at the Dartmouth Street wall in the
absence of original structural drawings. Boring logs from MBTA drawings indicate that
groundwater is approximately 12-feet below grade. This is reasonably consistent with 1932
structural drawings that indicate groundwater is approximately 2-feet above the top of piles,
assuming that the Ground Floor of the Church is approximately 3-feet above existing grade. This

**LeMessurier Consultants**

section illustrates the proximity of groundwater to the top of timber piles that support the Dartmouth Street wall and that the new elevator shaft lies within the zone of influence for Dartmouth Street wall foundations.

Geotechnical Instrumentation

MBTA Drawing G9 specifies geotechnical instrumentation for monitoring the effects of construction. Proposed geotechnical instrumentation in or near Old South Church includes one inclinometer to monitor horizontal soil settlement, one observation well to monitor groundwater levels, three deformation monitoring point (DMP2) instruments to monitor vertical settlement of the Dartmouth Street wall and one seismograph to monitor construction vibrations within Old South Church. This instrumentation seems reasonable, although we do recommend one additional DMP2 instrument near the Boylston Street corner of the Dartmouth Street wall.

MBTA Specifications Section 02015 provides specifications for geotechnical instrumentation. Paragraph 1.07.L.7.c requires pre-construction and post-construction surveys of conditions at Old South Church. We recommend that you request a copy of these conditions surveys for review by your consultants.

Paragraph 3.03.E of Specifications Section 02015 requires readings of observation wells every three days while excavations are above the groundwater table and readings every day while excavations are below the groundwater table. This frequency of observation well readings seems reasonable. Paragraph 3.03.F specifies that groundwater levels shall be maintained with one foot of pre-construction groundwater levels and requires a groundwater recharge system if groundwater levels fall more than one foot below pre-construction levels. Paragraph 3.03.G also requires that the Contractor cease all work except remedial actions if groundwater levels fall by more than one foot. These requirements seem reasonable for preventing deterioration of timber piles.

Paragraph 3.04.C of Section 02015 requires readings of DMP2 instruments every seven days prior to excavation, every three days while excavations are above the groundwater table and twice daily while excavations are below the groundwater table. This frequency of DMP2 readings seems reasonable. Paragraph 3.04.D requires that the Contractor cease all work except remedial actions if DMP2 readings indicate more than ½ inch total settlement and propose remedial actions to limit settlement to 1-inch maximum. We recommend that the MBTA also provide threshold and limiting values for differential vertical settlement between DMP2 instruments since differential vertical settlement presents a risk of cracking masonry walls and stained-glass windows.

Paragraph 3.05.E of Section 02015 requires readings of inclinometers every seven days prior to excavation, every three days while excavations are above the groundwater table and every day while excavations are below the groundwater table. This frequency of inclinometer readings seems reasonable. Paragraph 3.05.F requires that the Contractor cease all work except remedial actions if inclinometer readings indicate more than ½ inch total movement and propose remedial actions to limit movement to 1-inch maximum. These limits seem reasonable.

Paragraph 3.06.C of Section 02015 requires readings of seismographs whenever the Contractor is utilizing equipment that produces vibrations, after monitoring ambient vibrations for a seven-day period prior to construction. This could be construed as requiring continuous monitoring of

# LeMessurier Consultants

seismographs during use of vibration producing equipment which may be difficult to enforce. Paragraph 3.06.D requires that peak particle velocities from seismograph readings not exceed 0.25-inches per second at Old South Church and 0.50-inches per second elsewhere. This is consistent with Swiss Standard SN 640312 Criteria for Construction Vibrations for "buildings which are especially sensitive or worthy of protection".

We recommend that you request that copies of instrumentation readings be sent directly from the Contractor to your consultants so that readings may be reviewed in a timely manner.

## Support of Excavation

MBTA Drawing S300 and Specifications Section 02295 require installation of jet-grouted walls around the perimeter of the excavation for the new elevator shaft. While jet-grouted walls are relatively stiff and may provide an effective seal against inflow of groundwater, the design for the support of excavation system to brace jet-grouted walls and limit soil movement will be submitted by the Contractor. We recommend that you request a copy of submittals for the support of excavation system for review by your consultants.

## Construction Staging

MBTA Drawing CS101 shows a temporary barrier along the Dartmouth Street wall of Old South Church. Paragraph 1.02.E of MBTA Specifications Section 02050 indicates that this will be a solid barrier designed to protect the Church wall. This paragraph requires that the temporary barrier be erected prior to any other demolition or construction activities adjacent to the Church and remain in place until all adjacent construction work is completed. The paragraph requires graphics on the exposed face of the barrier to replicate obscured features of the Church facade. This paragraph also requires Church review and approval of the type of barrier, graphics and any non-destructive attachments of the barrier to the Church facade. Finally, Paragraph 3.05.B.14.b requires that the barrier extend five feet above the working envelope of the largest piece of equipment to be used near the Church. These requirements for the temporary barrier seem reasonable.

## Summary

Excavation for the new outbound passenger elevator shaft may cause vertical and horizontal soil settlement and lowering of the groundwater table adjacent to the Dartmouth Street wall of Old South Church. This presents some risk of cracking for masonry walls and stained-glass windows and deterioration of timber piles.

Pre-construction and post-construction surveys will be performed to document conditions at Old South Church. We recommend review of these surveys by Church consultants.

Geotechnical instrumentation will be provided to monitor the effects of construction. We recommend one additional DMP2 instrument at the Boylston street corner of the Dartmouth Street wall. The frequency for reading geotechnical instrumentation seems reasonable. Although criteria for geotechnical instrumentation are generally reasonable, we recommend establishing limiting and threshold values for differential vertical settlement between DMP2 instruments. We recommend review of geotechnical instrumentation readings by Church consultants.

**LeMessurier Consultants**

Page 4

Relatively stiff and impermeable jet-grouted walls will be installed around the perimeter of the elevator shaft. We recommend review by Church consultants of Contractor submittals for the support of excavation system.

A temporary barrier will be installed to protect the Church facade during demolition and construction, subject to review and approval by the Church.

From our experience with similar projects, we recommend regular meetings with the MBTA, its consultants and the Contractor to discuss construction schedule, instrumentation readings, impact of construction activities on the Church and any mitigation measures that may be required, especially during installation of jet-grouted walls and excavation for and construction of the elevator shaft.

Finally, although MBTA construction documents indicate significant measures to protect the Church, these measures can not eliminate all risk of damage to the Church.

Very truly yours,
LeMessurier Consultants

Richard A. Henige, Jr., P.E., S.E.
Vice President

encl.

xc:    Robert Hoyler, McPhail Associates

S:\2005\25118\Review.wpd

LeMessurier Consultants
Structural Engineers

By RAH    Date 10 May 2005    File No. 2518    Sheet No.

Subject Old South Church

Section @ Dartmouth St.
⅛" = 1 FT

30 by 38 blocks at .25 inches

EXHIBIT  10

COPY



Massachusetts Bay Transportation Authority
MBTA Contract No. S5PS11

# Light Rail Accessibility Program
## Schematic Design Report

Draft Submission
March 1995



**Gannett Fleming, Inc.**
Engineers and Planners



**Stull and Lee, Inc.**
Architects and Planners

Katherine McGuinness & Associates
Paul C.K. Lu & Associates
Robert G. Neiley & Associates
Railway Systems Design, Inc.
Jenny Engineering Corporation
Hygienetics, Inc.
GEI Consultants, Inc.
SAR Engineering, Inc.
ASEC Corportaion

## 6.2  Copley Station

### 6.2.1 Existing Conditions, Constraints and Access Issue

Copley station is, for many of the same reasons as previously described for Arlington, difficult to retrofit with elevators. The state street access stairs to the inbound and outbound platforms are separately enclosed. Additionally, the existing headhouses are historic, and their removal, modification, replacement or construction of new headhouses requires review and approval by the

elevators, possible stair enclosures, curb ramps and crosswalks will all be required at the street level. A thorough understanding of the existing context is key to help station architects make informed design decisions.

#### Urban Design Context

Copley Square is a busy institutional, commercial and tourist area surrounded by buildings and places of urban design and architectural significance, including:

The New Old South Church (1875, National Historic Landmark)

The Boston Public Library (1895, National Register of Historic Places, building, site and existing headhouse)

Copley Square and Trinity Church

The Station itself is also listed on the National Register, notwithstanding that both the interior and exterior have experienced "modernization" phases.

The Square also serves as an important east-west link, connecting the residential Back Bay area, the Esplanade, the Commonwealth Avenue Mall and commercial Newbury Street, to Copley Square, Copley Plaza, Back Bay Station and the South End.

Access to and from the entrances is by means of public sidewalks with existing non compliant curb ramps, crosswalks and pedestrian signals. The public sidewalks are of generous width, except where the bus shelter adjacent to the inbound entrance, and the outbound stair and headhouse severely constrict pedestrian flow. Most of the curb ramps (6 of 7) do not meet accessibility slope requirements (see appendix 1 for access audit). The corner curb ramp at Copley Square although currently compliant, will probably not be allowed in the upcoming MAAB requirements. None of the curb ramps are contained with the marked pedestrian crossings also making them noncompliant.

The primary urban design objectives to be considered throughout the design of the project include:



Figure 6-39: Historic Headhouse

Figure 6-37: [...] Copley Square

Figure 6-40: Boston Public Library



Figure 6-41: Sidewalk at bus shelter

STATIONS

In summary, any streetscape intervention resulting from access improvements to the station should address the importance of the station area as a highly used urban node with special historical adjacencies.

- Reinforce the visual and nodal aspects of Copley Square as a key urban place within the Back Bay Historic District.

- Respect the historic character of landmark buildings & properties adjacent to the station, especially the Boston Public Library with its existing headhouse, and the Old South Church.

- Keep busy corners open for pedestrian usage and minimize blockage of pedestrian flows in the proximity of the Station entrance.

- Minimize visual blockage along street, view corridors and retail frontages.

- Do not block existing commercial users.

**Street Level**

No accessible entrance currently exists to this station. Three separate stair entrances bring people from the street directly to the separate platform levels below. There is one inbound stair entrance in the headhouse fronting the Boston Public Library and there are two outbound entrances; an open stair, and a stair and escalator within a headhouse.

The inbound entrance stairway, centrally located in the facade of the old Boston Public Library, is a landmark wrought iron headhouse. Originally built in 1917, in front of what was a carriage entrance to the Library's courtyard, the headhouse borrows the wrought iron imagery existing in the Library facade. A new bus stop shelter exists along side the old headhouse. It is visually incompatible with the historic headhouse and also blocks the generous sidewalk in front of the Public Library. The Boylston Street Improvements Master Plan Design (Boston Public Works Department, 1991) includes proposals for relocation and image improvements to these bus shelters.

The outbound entrances, rebuilt in the 1960's are brick structures that have no architectural significance. The stair and escalator headhouse adjacent to the new Old South church, blocks key views up the Dartmouth Street corridor and does not relate well to the Old South Church facade. The open stair entrance on the east side of Dartmouth Street with its flayed brick parapet walls is more intrusive than is necessary.



*Figure 6-42: Inbound Historic Headhouse,*



*Figure 6-43: Outbound entrance at church*



*Figure 6-44: Dartmouth St. east entrance*

The Station entrances are currently approached by pedestrians coming from all directions and by a bus stop located in front of the Public Library. The inbound stair entrance is heavily used during the morning rush hour, where as the outbound entrances are more heavily used by deboarders during the evening rush hour. The escalator is always in the exit position.

Although not part of the accessible route, the existing stairs will probably have to be made accessible. (See PDM, Stairs.) The stair risers and treads have recently been upgraded, leveled and covered with "step ease". It is expected that this work will conform to MAAB requirements, however the station architects should verify the final profiles of stair treads and risers, railings, signage, etc. for compliance with those requirements.

In addition to making the existing stairs accessible, the MBTA's current policy is to enclose all open stairs. The east Dartmouth outbound stair entrance would fall into this category. Given the issues of building an enclosure on an already narrow sidewalk blocking the commercial uses behind and constricting important views up Dartmouth Street to Copley Square, covering this stair may create serious problems from an urban design perspective.

**Platform Level**

Whether entering on the inbound or outbound side, one would go directly to the platform level, through an unpaid lobby area. Each unpaid lobby is quite different. The inbound lobby, adjacent to the Public Library, is very small and sometimes experiences congestion when line forms at the ticket counter that interferes with pedestrians using the stairs. However, unlike many stations the ticket booths are built in, giving a well designed appearance. In addition, the

inbound wrought iron headhouse contains a mezzanine level with employee toilets and service spaces not accessible to the public.

The outbound unpaid lobby is very generous, but slopes considerable towards the fare array. This slope has been initially determined to be within the acceptable 5% requirement (See *Access Audit*), but the station architects will be required to verify this through surveys. Neither fare collection arrays comply with present accessibility requirements. (See *Appendix 1, Access Audits*.)

The existing platforms are simple linear corridors of 20'-0" +/- feet and relatively level with a line of columns parallel to the track. They are both approached almost midway from the fare array. The outbound platform has both entrance and egress through the same fare array area. The inbound platform provides a similar arrangement with an additional egress directly from the platform through a separate revolving gate and stair.

The primary access issue at the platform level will be providing accessibility to and from the future Low Floor Vehicles (LFV's). Specifically, the existing platform is too low to permit operation of the LFV's deployable access ramps. (See *PDM, Platforms*.) The existing columns are far enough from the edge of the platform so that they will not interfere with the LFV's operation.

## 6.2.2 Proposed Accessibility Program and Designs

This section delineates the scope of work required to make Copley Station accessible. The scope items are discussed by station levels, except when dealing with vertical circulation elements, such as the elevators, where the issues related to the two levels connected by the elevators will be combined into the presentation. This section also defines other work elements that will either be triggered by the implementation of the accessibility project or have been requested by the MBTA, but not necessarily associated with a particular access requirement. Station wide program elements, not tied to a particular level, are presented at the end of this section. In addition, engineering system upgrades (HVAC, Plumbing, Fire Protection and Electricity) for this particular station are given in Appendix 4.

### Street Level Program

The primary program requirements at the street level, will be to provide an accessible route of travel (curb cuts and crosswalks) and an accessible entrance (elevator) to the station with the appropriate signage. (See the *PDM, Signage and Circulation*.) Since the location of elevator, headhouses and stair enclosures involves review by many community groups and agencies, several options have been kept open for elevator locations at this station. (See *Appendix 2* for options that were previously explored, but eliminated)

**Curb Ramps/Crosswalks:** Figure ___ shows the location of all proposed curb ramps and crosswalks. As per the PDM, it is assumed that even though people approach the station from other directions, the limits of the accessible route to the station include only the Dartmouth/Boylston intersection.



Figure 6-47: Outbound platform



*Figure 6-45: Exit stairs at inbound platform*

*Figure 6-46: Outbound unpaid lobby*



**LEGEND:**

— EXISTING TO REMAIN
‖ ‖ ‖ EXISTING TO BE REMOVED
▬▬ NEW CONSTRUCTION
‑ ‑ ‑ BELOW
▨▨ FACE OF EXISTING BUILDING
▨▨ PROPOSED ACCESSIBLE ROUTE/CROSSWALK
⬭ PROPOSED CURB RAMP
▣ LOCATION OF ELEVATOR OPTION

**ROOM LEGEND:**

1. ELEVATOR MACHINE ROOM
2. ELECTRICAL ROOM
3. STORAGE
4. CONCESSION/VENDOR
5. TOILET
6. INSPECTOR'S ROOM
7. OFFICE
8. PUMP ROOM
9. ABANDONED SPACE

COPLEY SQUARE

DARTMOUTH STREET

NEW OLD SOUTH CHURCH

BOYLSTON STREET

OLD BOSTON PUBLIC LIBRARY

NEW LIBRARY

*Figure 6-48: Copley Station, Street plan*      Scale: 1"=40'

MBTA Light Rail Accessibility Program          Schematic Design Report      Rev. #      March 1995

6-22

inbound wrought iron headhouse contains a mezzanine level with employee toilets and service spaces not accessible to the public.

The outbound unpaid lobby is very generous, but slopes considerable towards the fare array. This slope has been initially determined to be within the acceptable 5% requirement (See Access Audit), but the station architects will be required to verify this through surveys. Neither fare collection arrays comply with present accessibility requirements. (See Appendix 1, Access Audits).

The existing platforms are simple linear corridors of 20'-0" +/- feet and relatively level with a line of columns parallel to the track. They are both approached almost midway from the fare array. The outbound platform has both entrance and egress through the same fare array area. The inbound platform provides a similar arrangement with an additional egress directly from the platform through a separate revolving gate and stair.

The primary access issue at the platform level will be providing accessibility to and from the future Low Floor Vehicles (LFV's). Specifically, the existing platform is too low to permit operation of the LFV's deployable access ramps. (See PDM, Platforms.) The existing columns are far enough from the edge of the platform so that they will not interfere with the LFV's operation.

## 6.2.2 Proposed Accessibility Program and Designs

This section delineates the scope of work required to make Copley Station accessible. The scope items are discussed by station levels, except when dealing with vertical circulation elements, such as the elevators, where the issues related to the two levels connected by the elevators will be combined into the presentation. This section also defines other work elements that will either be triggered by the implementation of the accessibility project, or have been requested by the MBTA, but not necessarily associated with a particular access requirement. Station wide program elements, not tied to a particular level, are presented at the end of this section. In addition, engineering system upgrades (HVAC, Plumbing, Fire Protection and Electricity) for this particular station are given in Appendix 4.

### Street Level Program

The primary program requirements at the street level, will be to provide an accessible route of travel (curb cuts and crosswalks) and an accessible entrance (elevator) to the station with the appropriate signage. (See the PDM, Signage and Circulation.) Since the location of the headhouses and stair enclosures involves review by many community groups and agencies, several options have been kept open for elevator locations at this station. (See Appendix 2 for options that were previously explored, but eliminated)

**Curb Ramps/Crosswalks** Figure ___ shows the location of all proposed curb ramps and crosswalks. As per the PDM, it is assumed that even though people approach the station from other directions, the limits of the accessible route to the station include only the Dartmouth/Boylston intersection.



Figure 6-45: Exit stairs at inbound platform

Figure 6-46: Outbound unpaid lobby

Figure 6-47: Outbound platform

6.2 COPLEY

Existing curb ramps (6 of the 7) will need to be reconstructed in accordance with the latest requirements. (See *PDM Circulation, Curb Ramps/Crosswalk*). The existing corner curb ramp on the corner of Copley Square may have to remain in order to permit the necessary pedestrian movements. Two separate curb ramps at this corner will put the ramp across Boylston Street too far from the crossing. The station architect and the MBTA may have to seek a variance from MAAB at this location.

Final design work at this corner should also be coordinated with the proposed Boylston Street Improvements Master Plan, 1991, by Boston Public Works Department (see *Figure 6-49*). This plan shows paved crosswalks, curb ramps, and other streetscape improvements appropriate to such a prominent location.

**Street to Platform Level Elevator Options:** In order to provide accessible entrances to each platform, 2 new hydraulic elevators will be required. (See *PDM Elevators*.) *Figure 6-48* delineates 4 options for the outbound entrance (Options A, B, C, D) and 2 options for the inbound entrances (Options E and F). The discussion for each option will cover work items affecting both the street and platform levels.



Figure 6-49: Partial plan, Boylston Street Improvements Master Plan

MBTA Light Rail Accessibility Program          Schematic Design Report          Rev. #          March 1995

6-23



Figure 6-50: Elevator Option A, Street level plan          Scale: 1/32" = 1'-0"

Figure 6-51: Elevator Option A, Platform level plan          Scale: 1/32" = 1'-0"

Legend

| | |
|---|---|
| | EXISTING TO REMAIN |
| | EXISTING TO BE MOVED |
| | NEW CONSTRUCTION |
| | BUILDING LINE ABOVE |
| | BELOW |
| | FACE OF EXISTING BUILDING |
| | TRACKS |
| | TACTILE WARNING STRIP |
| | DOWN W/% OF SLOPE |
| | DIRECTION OF TRAVEL |

ROOM LEGEND:

1. ELEVATOR MACHINE ROOM
2. ELECTRICAL ROOM
3. STORAGE
4. CONCESSION/VENDOR
5. TOILET
6. INSPECTOR'S ROOM
7. OFFICE
8. PUMP ROOM
9. ABANDONED SPACE

- **Elevator Option A**, shown in *Figures 6-50 and 6-51*, is located along the New Old South Church facade, behind the existing brick and glass headhouse. This option will require:

  - Minor extension of the passageway below (involving some cut and cover structural work) in order to incorporate the elevator hoistway and associated machine room with a "foyer" area in front. (*See Figure 6-51.*)

  - Dewatering, monitoring and recharging the groundwater in order to protect the existing station and adjacent structures.

  - Sidewalk reconstruction.

  Of the outbound options, this location has the most serious historic adjacency issues. However, for a sidewalk located option, it has the most open space around it, thereby constricting visual and pedestrian flow the least. Location of the elevator in this location would suggest redesigning the existing stair and escalator headhouse to form a matched set that can be more transparent, contextual to the Church, and create a better image at this busy corner.

  *Figure 6-52* suggests an image for the elevator that may work in combination with the redesign of the existing stair and escalator headhouse.

The main advantages of Option A are:

- No major impacts on streetscape elements and infrastructure.

- Minimal tunnel and construction work.

- Location within a wide sidewalk.

- Location along the main path of access.

The main disadvantages of Option A are:

- Its sensitive location adjacent to the New Old South Church and potential for image problems if not designed in conjunction with a new stair and escalator headhouse. Two separate looking structures would be inappropriate at this corner.

- Poor visibility from the fare collection booth.

*Figure 6-52: Option A, elevator image study*



*Figure 6-53: Option A, structural diagram*

# 6   STATIONS

Legend

EXISTING TO REMAIN
EXISTING TO BE REMOVED
NEW CONSTRUCTION
BUILDING LINE ABOVE
BELOW
FACE OF EXISTING BUILDING
TRACKS
TACTILE WARNING STRIP

DOWN H/R% OR SLOPE
DIRECTION OF TRAVEL

ROOM LEGEND:

1. ELEVATOR MACHINE ROOM
2. ELECTRICAL ROOM
3. STORAGE
4. CONCESSION/VENDOR
5. TOILET
6. INSPECTORS ROOM
7. OFFICE
8. PUMP ROOM
9. UNASSIGNED SPACE



*Figure 6-55: Elevator Option B, Platform level plan*          Scale: 1/32" = 1'-0"



*Figure 6-54: Elevator Option B, Street level plan*          Scale: 1/32" = 1'-0"

MBTA Light Rail Accessibility Program          Schematic Design Report          Rev. #          March 1995

6-26

- **Elevator Option B**, shown in *Figures 6-54 and 6-55*, proposes locating the elevator behind the existing open stairs on the east side of Dartmouth Street. This option will require:

  – Reconstruction of the adjacent stairs by removing the existing first flight of stairs at the passageway to the lobby level and rebuilding and extending the existing stairs to the street.

  – Minor extension of the passageway below in order to incorporate the elevator hoistway, machine room and a foyer. (*Figure 6-53* shows similar structural work requirements.)

  – Widening the sidewalk, curb realignment and removing parallel parking spaces.

  – Detailed groundwater monitoring, given the proximity of the adjacent retail structures.

The location of an elevator in front of the retail building has no historic architectural implications but would have to be designed to be as transparent as possible and a positive addition to the architecture of Back Bay.

This option would, however, block an already narrow sidewalk, create a visual obstruction along Dartmouth Street from Newbury street to Copley Square, and may create a hardship to the retail user directly behind it. If the reconstructed stair would have to be enclosed as well, the obstruction issues discussed above would be compounded. This elevator option provides poor visibility from the fare collection booth, notwithstanding its location along a public path of access.



Figure 6-56: View of Copley Square from Dartmouth Street

Figure 6-57: Option B, existing condition

Figure 6-58: Option B, elevator image study

Figure 6-60: Elevator Option C, Platform level plan

Scale: 1/32" = 1'-0"



Figure 6-59: Elevator Option C, Street level plan

Scale: 1/32" = 1'-0"

Legend

EXISTING TO REMAIN
EXISTING TO BE REMOVED
NEW CONSTRUCTION
BUILDING LINE ABOVE
BELOW
FACE OF EXISTING BUILDING
TRACKS
TACTILE WARNING STRIP
DOWN W/% OF SLOPE
DIRECTION OF TRAVEL

ROOM LEGEND:

1. ELEVATOR MACHINE ROOM
2. ELECTRICAL ROOM
3. STORAGE
4. CONCESSION/VENDOR
5. TOILET
6. INSPECTOR'S ROOM
7. OFFICE
8. PUMP ROOM
9. ABANDONED SPACE

6    STATIONS

6-28

MBTA Light Rail Accessibility Program        Schematic Design Report        Rev. #        March 1995

6.2  COPLEY

6-29

- **Elevator Option C**, shown in *Figures 6-59 ans 6-60*, proposes incorporating the elevator into the existing retail building, with its entrance directly off the sidewalk. This option will require:

  - Negotiation of a real estate transaction between the MBTA and a private owner.

  - Modification of the existing commercial building entrance as well as to the basement in order to accommodate the new elevator. This will include breaching several floors of the structure, design of the support system for each level and through

the exterior wall, design the support structure for the hoistway at the lower level including closure walls. (See *Figure 6-62*.)

  - An extension of the unpaid lobby below, to accommodate the elevator hoistway, machine room and a foyer.

  - Reconstruction of the stairs by removing the existing first flight at the lobby level and rebuilding and extending the existing stairs to the street.

  - Reconstruction of the sidewalk and relocation of utilities to allow access to the basement area of the existing commercial building. Some modification, shoring and underpinning of the building foundation and structural system will also be required.

  - Groundwater control.

In this option the elevator entrance should be designed to fit in with the existing facade of the building and for safety reasons, to be as transparent as possible.

Option C has the least impacts on the streetscape (assuming that the MBTA will not require the enclosure of the existing adjacent stairs). But the elevator connection to the unpaid lobby is too remote from the fare array, thus requiring some electronic means of security surveillance. This option will demand delicate negotiations with a private owner and mitigation of the construction issues presented above.



*Figure 6-62: Option C, structural diagram*

*Figure 6-61: Option C, elevator image study*

MBTA, Light Rail Accessibility Program      Schematic Design Report      Rev. #      March 1995

Figure 6-64: Elevator Option D, Platform level plan

Scale: 1/32" = 1'-0"



Figure 6-63: Elevator Option D, Street level plan

Scale: 1/32" = 1'-0"

MBTA Light Rail Accessibility Program    Schematic Design Report    Rev. #    March 1995

Legend

EXISTING TO REMAIN
EXISTING TO BE REMOVED
NEW CONSTRUCTION
BUILDING LINE ABOVE
BELOW
FACE OF EXISTING BUILDING
TRACKS
TACTILE WARNING STRIP
DOWN WITH/OF SLOPE
DIRECTION OF TRAVEL

ROOM LEGEND:

1. ELEVATOR MACHINE ROOM
2. ELECTRICAL ROOM
3. STORAGE
4. CONCESSION/VENDOR
5. TOILET
6. INSPECTOR'S ROOM
7. OFFICE
8. PUMP ROOM
9. ABANDONED SPACE

6    STATIONS

6-30

- **Elevator Option D,** shown in *Figure 6-63 ans 6-64* calls for siting the elevator closer to Boylston Street, in front of the existing open stair. It will require:

  - An extension of the unpaid lobby by tunneling under the street and sidewalk, in order to accommodate the elevator hoistway, machine room and foyer.

  - Reconstruction of the sidewalk and relocation of utilities to allow access to the elevator.

  - Groundwater control.

In this option, the elevator would be located on a busy corner, blocking existing pedestrian and visual corridors up Dartmouth Street and along Boylston Street.

Option D, like Option B, should be designed to be a positive addition to the streetscape, especially because of its prominent location along Copley Square.

At the lobby level, Option D provides good surveillance from the booth, is located on the street along the general path of access, and unlike the other options on this side of Dartmouth Street, would not require rebuilding of the existing stairs. However, if the MBTA requires a stair enclosure, both structures should be built as a pair. There would be serious urban design implications of locating two massive structures on a narrow sidewalk that is so heavily used.



*Figure 6-65: Option D, existing condition*



*Figure 6-66: Option D, elevator image*

# 6  STATIONS

- **Elevator Option E**, shown in *Figure 6-67 and 6-68* locates the elevator serving the inbound platform next to the existing wrought iron headhouse. Since the historic headhouse is centrally located on the facade of the Boston Public Library, locating a new structure only on one side will seriously compromise the explicit symmetry of the composition. Therefore, Option E also includes a similar structure that could be a bus stop, automated fare collection kiosk, or information kiosk on the other side of the wrought iron headhouse. It

will therefore require the implementation of the following:

- Negotiations with the Boston Public Library for use of their property.

- Symmetrically located structures on each side of the existing headhouse within the Boston Public Library property.

- Modifications to the Library's plaza steps and other open space elements, such as the bus shelters.

- Minor extension of the unpaid lobby below, involving minor cut-and-cover structural work.

- Modification of the fare collection booth below and relocation of the existing concession on the platform.

- Attention to the groundwater control and foundation implications of building a new structure adjacent to the existing Library including the relocation of a 30" sewer and the possible underpinning of the Library.

This option is problematic because it not only creates the very difficult task of imposing new structures along side the intricately detailed wrought iron headhouse, but also creates many interface problems with the landmark Boston Public Library. *Figures 6-70 and 6-71* shows concept drawings that attempt to integrate new structures within the site by either creating similar wrought iron structures, or introducing more monumental stone bases with statues (an opportunity for public art to flank the existing headhouse similar to the stat-



*Figure 6-67: Elevator Option E, Street level plan*    Scale: 1/32" = 1'-0"

*Figure 6-68: Elevator Option E, Platform level plan*    Scale: 1/32" = 1'-0"

**Legend**

—— ——  EXISTING TO REMAIN
-- -- --  EXISTING TO BE REMOVED
————  NEW CONSTRUCTION
————  BUILDING LINE ABOVE
- - - -  BELOW
————  FACE OF EXISTING BUILDING
————  TRACKS
▨▨▨  TACTILE WARNING STRIP
⇑  DOWN W/ % OF SLOPE
⇑  DIRECTION OF TRAVEL

**ROOM LEGEND:**

1. ELEVATOR MACHINE ROOM
2. ELECTRICAL ROOM
3. STORAGE
4. CONCESSION/VENDOR
5. TOILET
6. INSPECTOR'S ROOM
7. OFFICE
8. PUMP ROOM
9. ABANDONED SPACE

6.2 COPLEY







*Figure 6-72: Option E, structural diagram, plan*



*Figure 6-73: Option E, structural diagram, Section A*

ues at the east facade of the library). It should be underlined that any attempt to add a structure in this location will be highly controversial, however, if done with a sympathetic contextual emphasis, it could also be an opportunity to provide a focus to the historic headhouse and enrich the quality of the existing streetscape.

As stated above, Elevator Option E has complicated contextual and design implications, however from a access and functional analysis it provides an accessible entrance without blocking existing street level pedestrian movement, close to the main pedestrian path, within the existing unpaid lobby, and with only minor tunneling required.



*Figure 6-69: Sketch of existing stair headhouse*




*Figure 6-70: Option E, elevator image study (1)*

*Figure 6-71: Option E, elevator image study (2)*

- **Elevator Option F**, shown in Figure 6-74 and 6-75 locates the inbound elevator in front of the new Boston Public Library. Even though MBTA policy contradicts MBTA policy by placing the elevator at the end of the platform and thereby bypassing the unpaid lobby, it remains an option because of the extreme political and design consequences of locating the elevator in front of the Old Library. Option F would require the following:

  - Excavation and structural work at the end of the platform, in front of the new Library in order to accommodate the elevator hoistway and machine room.

  - A screened passage from the elevator to the unpaid lobby within the existing platform.

  - Removal of one fare collector's booth and relocation of the benches.

  - Groundwater control and structural considerations adjacent to the exist-

ing library.

  - Reconstruction of the brick sidewalk and relocation of the utilities affected by the construction of the proposed elevator shaft.

In this option the elevator entrance should be located in line with the face of existing wrought iron headhouse, in order to maintain the sidewalk widths and views. It could also be centered in the last bay of the new Library.

Concept diagram (Figure 6-76) shows an image of the headhouse that is transparent, contextual and incorporates a bus shelter within its canopy. (Hoping to replace the badly located existing shelter in front of the old Library).

Option F, of the two inbound options, has the least streetscape and urban design impacts, but places the entrance in a remote location from the main entry to the station. It also compromis-

## Legend

| | |
|---|---|
| ═══ | EXISTING TO REMAIN |
| = = = | EXISTING TO BE REMOVED |
| ▬▬▬ | NEW CONSTRUCTION |
| ▬▬▬ | BUILDING LINE ABOVE |
| ─ ─ ─ | BELOW |
| ════ | FACE OF EXISTING BUILDING |
| | TRACKS |
| ▒▒▒▒ | TACTILE WARNING STRIP |
| ⬆ | DOWN WITH OF SLOPE |
| ⇑ | DIRECTION OF TRAVEL |

### ROOM LEGEND:

1. ELEVATOR MACHINE ROOM
2. ELECTRICAL ROOM
3. STORAGE
4. CONCESSION/VENDOR
5. TOILET
6. INSPECTOR'S ROOM
7. OFFICE
8. PUMP ROOM
9. ABANDONED SPACE



**Figure 6-74: Elevator Option F, Street level plan**

OLD SOUTH CHURCH

BOYLSTON STREET

OLD LIBRARY

BUS SHELTER TO BE RELOCATED

NEW LIBRARY

INBOUND PLATFORM BELOW

PROPOSED TUNNEL BELOW

PROPOSED CANOPY ABOVE

F

Scale: 1/32" = 1'-0"

es the architectural character of the platform level below and creates a potential security problem given the direct connection of the elevator to the paid platform.

**Stairs:** The three existing or modified stairs will need to:

- Incorporate required signage and lighting as per accessibility requirements. (See PDM.)

- Conform to accessible guidelines concerning threads, risers and handrails. (See PDM.)

- Conform, if feasible to the MBTA guidelines requiring enclosures on all stairs. (See PDM.) This would pertain to the

east Dartmouth Street stair that is currently uncovered and also to the west Dartmouth Street headhouse if it is replaced with a more contextual structure. (See Elevator Option A.)

If a decision is reached not to enclosure the east Dartmouth Street stair, it is recommended that the stair be remodeled to remove the flared parapet wall and be replaced with an open rail. (See PDM.)

### Platform Level Program

The access requirements at both inbound and outbound platforms are primarily a function of providing an accessible route from the elevator, through the fare array to the deployable ramps of the future LFV's.

The location of the route will vary depending on the elevator option selected at the street level. (Additional work elements related to the street elevator impacts at the platform level are presented in the previous subsection, *Street Level*.) The program at this level is thus driven by the need to raise the platforms to 8" above the top of rail in order for the LFV's to operate their ramps.

**Outbound unpaid lobby floor:** The lobby floor will need to be partially raised in order to tie into the required raised platform. According to the access audit the existing slope of the unpaid lobby meets the 5% accessibility standard. Station architects will require accurate surveys to verify the exact slope and subsequent program requirements. The material of the



*Figure 6-76: Option F, elevator image study*

LINE OF BUILDING ABOVE TYP.

INBOUND PLATFORM

UNPAID LOBBY

PROPOSED PASSAGE TO UNPAID LOBBY

FARE COLLECTION BOOTH TO BE REMOVED

BENCH TO BE RELOCATED AND RAISED

PROPOSED OPEN SCREEN BARRIER

EMERGENCY EGRESS STAIR

*Figure 6-75: Elevator Option F, Platform level plan*    Scale: 1/32" = 1'-0"

6   STATIONS



LEGEND:

EXISTING TO REMAIN
EXISTING TO BE REMOVED
NEW CONSTRUCTION
BUILDING LINE ABOVE
TRACKS
TACTILE WARNING STRIP
LOCATION OF ELEVATION OPTION
STEEL RAILING
STEEL FENCE
DOWN VIEW OF SLOPE
COLUMN
DIRECTION OF TRAVEL
STOP LOCATION/INBOARD ON CARS
BENCH
TELEPHONE
SIGN
PROPOSED UNISEX TOILET

ROOM LEGEND:

1. ELEVATOR MACHINE ROOM
2. ELECTRICAL ROOM
3. STORAGE
4. CONCESSION/NEWSROOM
5. TOILET
6. INSPECTOR'S ROOM
7. OFFICE
8. PLANT ROOM
9. ABANDONED SPACE

Figure 6-77: Copley Station, Platform plan          Scale: 1"=40'

6-36          MBTA Light Rail Accessibility Program          Schematic Design Report          Rev. #          March 1995

raised unpaid floor should be the same as the platform. How this material ties into the existing grade at the base of the stair and escalators will require further study by the station architects. The existing escalator is not impacted by the accessibility project. The MBTA may require the escalator replaced to conform to new, operational standards.

**Inbound unpaid lobby floor:** The inbound lobby floor should be raised to align with the raised platform. Several doors, stairs and booths will be affected by this raise.

**Fare Array Systems:** The present fare arrays, both inbound and outbound, will need to be modified to make them accessible. This work should be coordinated with the proposed Automatic Fare Collection (AFC) system that the MBTA is presently planning. A preliminary investigation of the impacts of establishing the AFC system at Copley Station was completed as part of this study.

• **Copley Inbound** Concept sketches shown in Figures 6-78 and 6-79 were developed in response to the following preliminary MBTA requirement for:

7  Automatic fare collection gates
1  Accessible egress gate
1  Customer service booth
9  Ticket vending machines

A summary of this study shows that the proposed fare array elements cannot be physically accommodated in the existing unpaid lobby as the space available at this station is very limited, and will create conflicts between queuing and circulation. In order to maximize the space of the unpaid lobby, some modifications are recommended:

1. Remove the stairs to the mezzanine. The existing mezzanine above the lobby includes a toilet and other abandoned spaces. Since a new accessible toilet room is proposed to be located at the platform level as part of this project, the existing stairs that connect the platform with the mezzanine may be able to be removed. If the need to provide access to that area arises in the future, a new entry can be created from the first landing of the main stairs to the street level. In that case, some additional modifications may be required inside the mezzanine in order to match the level of this landing.

2. Once the stairs to the mezzanine are removed, a new access has to be provided to the ejector room under the exit stairs on the eastern side of the lobby.

3. The existing inspector's room and token booth, presently located on both sides of the fare array, can be removed, including all the non-bearing walls around them, thus clearing additional space for the new AFC system.

Figures 6-78 and 6-79, show the proposed layout for this lobby for both elevator Option E and F. For the purpose of this analysis, it is assumed that all the elements required by the program are to be located within the lobby.

(Although if Option E is chosen with its symmetrical structure, some of the ticket vending machines may be located in that structure.)

• For elevator **Option E:** The egress gate and all 7 fare gates required can be located at approximately the same location as the current fare array. The customer service booth can be placed between the elevator and the gates. All 9 TVM's can be placed where the stairs to the mezzanine have been removed. Although the concentration of TVM's in this area may result in some congestion of users at peak hours, this would minimize interference with circulation around the fare gates. The transferal of some of these TVM's to the street level would clearly simplify changes required in the lobby. These should be located within the proposed structure east of the existing headhouse.

**Elevator Option F:** The configuration of the unpaid lobby will be impacted by the location of elevator option F at the western end of the platform, and the screen barrier on the platform.

Given the fact that the booth will occupy part of the area available after the removal of the stair to the mezzanine and the TVM's on option E), some of the TVM's will have to be located on the western side of the unpaid lobby. This produces potential circulation conflicts between the queuing space for the TVM's on this side, the fare gates, and the access from the passage to the elevator.

4. Since some modifications are necessary on the west side of the lobby for either elevator option, the concession structure existing on that area of the platform will have to be relocated. A new concession could be placed on the eastern end wall of this platform, thus minimizing the physical interference, and at the same time allowing for adequate queuing space in front of it. (See Platform Plan, Figure 6-77)



Figure 6-78: Fare array diagram, inbound unpaid lobby, elevator option E



Figure 6-79: Fare array diagram, inbound unpaid lobby, elevator option F

# 6 STATIONS

As a way of providing additional space in this area, the fare array line is move forward toward the platform approximately 3 ft., in line with the existing columns. Providing a custom booth aligned with the fare array, opens more space for the TVM's at the base of the stairs, and provides better surveillance of the platform.

- **Copley Outbound:** Figure 6-80 shows a concept sketch for the following MBTA fare array program:

  | | |
  |---|---|
  | 9 | Automatic fare collection gates |
  | 1 | Accessible egress gate |
  | 1 | Customer service booth |
  | 4 | Ticket vending machines |

According to this preliminary study, fare array elements can be accommodated within the existing unpaid lobby. Both the customer service booth and the ticket vending machines (TVM's) can be centrally located in the unpaid lobby, allowing for circulation along the sides. There seems to be adequate queuing space in front of the TVM's but some interference with general circulation may occur during peak use. The standard customer service booth should be modified, as shown, to adapt to its central location.

This layout eliminates the existing revolving gate. If this gate is required to remain, there seems to be enough space to include it in the fare array line, but one of the fare gates would have to be located in front of an existing column.

As an alternative layout, the TVM's and customer service booth could be shifted one module south, towards the platform, allowing for some more queuing space in front of the TVM's, as well as a better sight lines from the booth to the platform area. In this case, the fare array should be moved about 5 feet towards the edge of the platform area, in line with the existing column.

**Platform Floors:** The platform floor will need to be raised to 8" above top of rail along its entire length and width. (See Figure 6-77.) The materials should be unit pavers or tiles, consistent with the overall station design. A tactile warning strip at the edge will also be required. The design parameters for this work are illustrated in the PDM, Section 2.4 Platforms.

Raising the inbound and outbound platforms will impact several station elements, thus adding the following items to the program:

- **Walls:** The present lower sign band along the platform varies from 7" to 14" above the existing floor. When the platform is raised, the lower sign band will be removed, and a new 1" edge added in order to provide a clean stop for the existing tile and wall panels. A new wall base should be created out of the new floor material. The benches will be mounted on the new floor panels as required. The above program assumes the least amount of intervention, however at the time of the actual implementation, a total refurbishing may be called for by the MBTA, necessitating a total redesign of the wall elements.

- **Benches:** The present cantilevered benches will require removal, refinishing and replacement at the appropriate height. If Elevator Option F is chosen, the outbound benches parallel to the screened barrier will need to be replaced, with post supports, on the vehicle side of the barrier. Half of all the benches should also be provided with arm rests. (See PDM, Section 2.6, Benches.) Benches may be required, if



**Figure 6-81:** Elevation B at platform   Scale: 1/4" = 1'-0"

**Figure 6-80:** Fare array diagram, outbound unpaid lobby

MBTA Light Rail Accessibility Program      Schematic Design Report      Rev. #      March 1995

6-38

there is space, in the unpaid lobby as well.

• **Stairs and Handrails:** The increased platform height will interface with 3 stairways on the inbound platform and unpaid lobby. See the PDM for options at stairs.

**Car Ramp Zones:** Areas defined by the ramp zones in front of every LRV's accessible door will need to be clear of any obstacle, including structural elements. A study was performed in order to evaluate the measures necessary to minimize the potential conflicts between the car ramps zones and the existing row of columns at each platform. No conflicts exist at the Copley Platform. *Figure 6-77* shows the proposed stop lines based on the assumptions presented in *Appendix 1, Ramp Zones Analysis*, of the PDM.

*Figure 6-83: Stair detail*

**Toilet Rooms:** New employee toilets are proposed to be located at the ends of each platform, one unisex facility per platform. (See *Figure 6-77*.) See PDM for accessibility design criteria.

**Passenger Assistance Areas:** The station architect in coordination with the MBTA, should identify at least two Passenger Assistance Areas per platform in order to ensure equal access to safe egress. Although not necessarily separate spaces, these areas should incorporate the appropriate signage and a police callback intercom, among other requirements. (See *MBTA Guide to Access, Emergency Egress Section*.)

**Electric Room:** an expansion of the existing electric room will be required to accommodate the new power requirements

for the station resulting from accessibilities improvements. (See *Engineering Analysis; Appendix 3*.) The existing electric room at the eastern end of the outbound platform could be expanded towards the platform side. (See *Figure 6-77*.)

## Other Program Elements

In addition to the scope of work summarized above (per station level) other elements to be incorporated in the accessibility program are station wide in nature, including:

**Signage:** The station architect, in coordination with the MBTA should propose signage modifications at each level of the station using the visual and tactile means to make the system accessible.



*Figure 6-82: Section A at platform    Scale: 1/8" = 1'-0"*

**Communications:**

- **Public Address System:** The existing audio public address system may be relocated and reused. As part of normal aging, some devices may be required to be replaced to function properly.

- **Readers Boards and Video Monitors:** A new electronic sign system or video monitor is recommended to provide passenger information via LED scrolling bulletin boards throughout the station as a means to convey information to the hearing impaired. Each electronic sign displays a message developed and transmitted from existing computer equipment located at a central MBTA site.

- **Clocks:** If the MBTA decides to provide clocks for this station (presently there are none) they should be designed and located in accordance with accessibility requirements.

- **Emergency Call-Boxes:** Emergency call boxes should be provided in conformance with MBTA Guidelines.

- **Emergency Alarms:** A fire alarm system that meets N.F.P.A., state, local, MAAB and ADA requirements is required as none exists. The fire management panel has a telephone and fan controls for tunnel ventilation only. All stations, smoke and heat detection, monitoring together with new and new audio/visual devices will be required.

- **Telephones, TDD:** Two pay telephones (presently New England Telephone devices) are currently located in the unpaid outbound lobby as well as two on the inbound platform. A TDD (Telecommunications Device for the Deaf) must be added in each location as per the MBTA Guide to Access

*Requirements.* Existing telephones must also be replaced to meet access requirements in respect to operations and mounting heights.

**Vendor/Vending Machines:** The existing concessions, at the inbound and outbound platforms, will need to be relocated (See *Figure 6-77)* and modified per accessibility requirements.

Accessibility Design Criteria for these elements could be found in the *PDM and MBTA Guide to Access.*

### 6.2.3 Constructability

The constructability issues at Copley Station are a result of several specific program areas in the proposed Accessibility Program and Designs. The individual program elements which have the greatest constructability impact include:

o  the construction of the elevator hoist-ways;

o  upgrade of electrical systems;

o  the raising of the platform to accommodate the new LPV; and

o  and the automation of the present fare collection system.

Construction work for each of the items above can be phased and implemented as individual contracts or as a single contract. Secondary items should be combined with the appropriate larger work items if the work is let as individual contracts. For the purpose of discussion each piece will be addressed separately in terms of construction impacts on the station and MBTA service.

There are significant street level construction impacts for most of the elevator options that provide access to the outbound platform at this station. Elevator option A is the least disruptive. This elevator is located on the

sidewalk along Dartmouth Street and would not impact the roadway but will impact pedestrian circulation on the sidewalk. Option B will require the taking of a portion of Dartmouth Street. The construction of Option B will also include a machine room and passageway beneath Dartmouth Street and the adjacent sidewalk. This would require staged construction and the temporary closure of the roadway and the sidewalk. Elevator Option C will also require the construction of a passageway under Dartmouth Street and the sidewalk during construction. Elevator Option D will require temporary closure of the Dartmouth Street sidewalk and pedestrian mitigation at this corner. Like Option A D is also least disruptive but, the adjacent travel lane may be impacted by construction of this elevator hoistway and machine room. This lane may need to be closed during construction. Elevator options E and F for the inbound platform have no significant street level construction impacts on vehicular or pedestrian traffic.

Additional temporary lane closures may be required at times for construction vehicles or delivery of materials. All of the elevator options will require pedestrian traffic to be maintained safely around the site. Traffic maintenance on the city streets must be coordinated with the city of Boston Transportation Department.

At the platform level the major constructability issues associated with the incorporation of the elevators are maintaining continuity of service and maintaining egress. Construction of Options A, E, and F will impede pedestrian traffic in and out of the station requiring some mitigation to assure safe access and nuisance control. Each of these options could be constructed during normal operating hours with some planning. Elevator Options B and C will require off-peak work hours or staged construction to insure

maintenance of the means of egress stairs during reconstruction.

As a consequence of the installation of the elevators the current available power will be exceeded. This will result in the need to upgrade the present electrical systems. Upgrade and conversion from DC to AC power and the addition of a generator will need to be provided when the station is closed. Fire alarm systems, emergency signage and lighting, will need to be maintained operational during the construction period.

Raising the inbound and outbound platforms will also require a staged work sequence to avoid interruption of station usage and service. It may be more advantageous to perform work during off peak hours to minimize station disruption and construction nuisances.

Implementation of the automated fare collecting system will require staged sequencing in order to maintain station operation and circulation to and from the platform.

### 6.2.4 Cost

The total estimated cost is $3,500,000.

For estimating assumptions regarding the above construction cost see section 7.6, Project Cost.

This cost does not include the cost for the automatic fare collection system or the unpredictable cost of taking private property for the public good (elevator option C).

The cost of the most expensive elevator option(s) addressed is considered for this preliminary estimate.

It should be noted that for preliminary estimate purposes, inbound elevator option E and F are considered the same.

## 6.3  Arlington Station

### 6.3.1 Existing Conditions, Constraints and Access Issues

Arlington Station, located at the intersection of Boylston and Arlington Streets, is a grade separated subway station which includes a mezzanine level between the street and platform levels. Separate inbound and outbound platforms share street level entrances and are accessed from the same fare collection mezzanine.



*Figure 6-84: Arlington Street Church*

### Urban Design Context

This station serves a very busy, high density, mixed-use downtown area with a distinct historical character. It supports an important gateway node that marks the beginning of the Back Bay Historic District and fronts onto Boston's showcase park, the Public Garden.

Three of the four corners at the intersection of Arlington and Boylston Streets are important locations from an architectural and urban design perspective, as they incorporate properties with significant historic or landmark status:

- The Arlington Street Church (1861, National Register of Historic Places, City of Boston Landmark)

- Boston Public Garden and the William Ellery Channing Monument (1859, National Register of Historic Places)

- The Shreve, Crump and Low Building (1912, included in the Back Bay Historic District boundaries)

The southeast corner is occupied by a recently completed mixed-use complex, the Heritage on the Garden Building, characterized by its contextual architectural design. In addition, the station itself is listed in the National Register.

The station is currently approached by pedestrians coming from all directions. Three stair entrances are located parallel to Arlington street: one at the Arlington Street Church corner, one next to the Shreve, Crump and Low Building, and the other across the street fronting the Heritage on the Garden Building. Another stair entry existed inside the Public Garden, but its use has been discontinued and the opening sealed off. In addition to these entrances, the station originally included a secondary

(part-time) connection to the Berkeley/Boylston Street intersection, west of the present stations entrances. This alternative entrance has also been closed-off to the public and there are no plans to reopen it in the foreseeable future.

Access to and from the stair entries is by way of public sidewalks, signalized crosswalks and non-compliant diagonal curb ramps, located at the Arlington/Boylston Street intersection. The public sidewalks in the vicinity of the station entrances are generous in width, except where the width of the sidewalks is reduced due to the location of the stair parapet walls or guardrails. (Especially next to the Shreve, Crump and Low Building). Most of the curb ramps (3 of the 4) do not meet accessibility slope minimum requirements (see Appendix 1 for Access Audit information). The curb ramp adjacent to the Heritage on the Garden Building is compliant with present ADA/AAAB requirements. The existing crosswalks are narrow, worn and not in all cases aligned with the curb ramps which they serve.

The main urban design objectives to be considered throughout the design of the project include:

- Respect the historical character of landmark properties adjacent to the station.

- Keep the busy corners open for pedestrian usage and minimize blockage of pedestrian flows in the proximity of the station entrances.

- Minimize visual blockages along important street view corridors.

In summary, any streetscape intervention resulting from access improvements to the station will need to address the special historical character and pedestrian circulation patterns of the Arlington/Boylston Street intersection area.



*Figure 6-85: Boston Public Garden, Channing Statue*

*Figure 6-86: Heritage on the Garden Building*



Figure 6-89: Stair entrance at Church



Figure 6-90: Stair entrances at Heritage

## Street Level

No accessible entrance exists to this station. Presently, the stair entrances are being refinished as part of a station-wide upgrading project. It is expected that this work will conform to MAAB requirements, however the station architects should verify the final profiles of stair treads and risers, railings, etc. for compliance with those requirements.

In addition to providing an accessible station entry at the street level, the MBTA's current policy is to enclose the presently open stairs, in order to minimize weather exposure and potential safety problems. Given the urban design issues discussed above, this may seem more a challenge than an opportunity. (See the PDM, Stairs.)

## Mezzanine Level

All of the existing station street entrances lead to the unpaid lobby of the mezzanine. The unused pedestrian tunnel from the former Public Garden entrance presently provides storage space for a flower vendor. Employee toilet facilities, not currently accessible, and various other support spaces (not requiring conformance to access requirements) are also located along the unpaid lobby.

The fare array system does not comply with present accessibility requirements with respect to the gate and fare collector's booth design parameters. (See Access Audits Forms.)

Beyond the fare array, the paid lobby leads to sets of stairs and escalators connecting the mezzanine to the separate platforms below. In addition, two exit turnstiles are provided for egress towards the street level stairs.



Figure 6-87: Boston Public Garden, Arlington Street



Figure 6-88: Entrance stair at Shrieve bldg.

Access to and from the escalators is through corridors at a higher floor elevation from the mezzanine floor, a small flight of stairs provides a transition between the two levels. The escalators are normally running in the exit direction all the time.

The stairs leading to each platform are being upgraded to MAAB standards, except the lower runs in contact with the plat-forms. These have open risers and railings not in compliance with the above stan-dards.

Currently, there is no accessible vertical cir-culation connecting the mezzanine level with the two platforms below.

**Platform Level**

The existing platforms are simple linear cor-ridors, somewhat narrow (+/- 15'-3") and relatively level with a line of columns close to the edge of the platform. They are presently approached from the eastern ends of the platforms only. Normal egress from the trains is accommodated through the end of platform stairs and the mid-platform

escalators leading to the mezzanine level. As previously mentioned, the stairs at the western end of the platforms (2 per plat-form) are currently closed.

Aside from providing an accessible route connecting the platform to the paid lobby of the mezzanine, the main access issue at the platform involves the boarding/exiting of the future Low Floor Vehicles (LFV's). Specifically, the existing platform levels are too low to permit operation of the LFV's deployable access ramps. Another key design problem is that the existing columns are so close to the platform edges and to each other that they form potential obstruc-tions which will significantly limit the flexi-bility of deploying the LFV's car ramps along the platforms.

*Figure 6-91: Fare array system at mezzanine*

*Figure 6-92: Existing open stair at platform*

*Figure 6-93:*

*Figure 6-94: Platform, general view*





Figure 6-95: Arlington Station, Street plan    Scale: 1"=40'

6-44    MBTA Light Rail Accessibility Program    Schematic Design Report    Rev. #    March 1995

## 6.3.2 Proposed Accessibility Program and Designs

This section summarizes the scope of work required to make Arlington Station accessible. The scope items are discussed by station levels, except when dealing with vertical circulation elements, such as the elevators, where the issues related to the two levels connected by the elevators will be combined into one presentation. This section also defines other work elements that will either be triggered by the implementation of the accessibility project or have been requested by the MBTA, but not necessarily associated with a particular access requirement. Station wide program elements, not tied to a particular level, are presented at the end of this section. In addition, engineering systems upgrades (HVAC, Plumbing, Fire Protection and Electricity) for this particular station are given in Appendix 4.

### Street Level Program

At the street level, the main accessibility program requirements will be to provide an accessible route of travel (i.e. curb ramps and crosswalks) and an accessible entrance (i.e. elevator) to the station with the appropriate signage. Alternative locations for an accessible entrance and proposed accessible route are indicated in Figure 6-95.

The following summarizes the work elements required at Arlington Station street level:

**Curb Ramps/Crosswalks:** 3 of the 4 existing corners and 4 crosswalks at the Arlington/Boylston Street intersection will need to be reconstructed in accordance with the latest accessible route requirements.

The intersection also has many existing infrastructure elements (utilities, light poles, signage, etc.) that will need to be relocated in order to locate the recommended curb ramps and crosswalks.

The proposed street plan shows 3 corner curb cuts that, according to the current draft of MAAB, may not be allowed in the future. However, in order to avoid interference with the existing MBTA stairs; and because of the angled geometry of the curb in front of the Public Garden, these corner cub cuts seem to be necessary. The station architect and the MBTA may have to seek a variance from MAAB for these crossings.

Final design work at this corner should also be coordinated with the proposed *Boylston Street Improvements Master Plan*. This plan shows paved crosswalks and curb ramps, appropriate to such a prominent corner.

### Street To Mezzanine Level Elevator

**Options:** In order to provide an accessible entrance to the station at street level, three potential options for the location of a hydraulic elevator are proposed. (See *Figure 6-95*). The station architect, in coordination with the MBTA, will need to request a variance from MAAB in order to provide only one elevator entrance at this station. The discussion for each option will cover work items affecting both the street and mezzanine levels.

- *Elevator Option A,* shown in Figures 6-97 and 98, located on the edge of the Public Garden, is the most historically sensitive of the 3 siting options. It will provide accessibility to the mezzanine by reopening the existing pedestrian tunnel underneath. This option will require, among other things:



Existing



Proposed

*Figure 6-96: Option A; elevator image study*



Figure 6-98: Elevator Option A, mezzanine level    Scale: 1"=32'



Figure 6-97: Elevator Option A, street level    Scale: 1"=32'

Legend

| | EXISTING TO REMAIN |
| | EXISTING TO BE REMOVED |
| | NEW CONSTRUCTION |
| | BUILDING LINE ABOVE |
| | BELOW |
| | FACE OF EXISTING BUILDING |
| | TRACKS |
| | TACTILE WARNING STRIP |
| | DOWN W/% OF SLOPE |
| | DIRECTION OF TRAVEL |

ROOM LEGEND:

1. ELEVATOR MACHINE ROOM
2. ELECTRICAL ROOM
3. STORAGE
4. CONCESSION/VENDOR
5. HANP TOILET
6. WOMEN'S TOILET
7. SAFE ROOM
8. ERECTOR ROOM
9. COMMUNICATIONS ROOM

MBTA Light Rail Accessibility Program    Schematic Design Report    Rev. #    March 1995

6-46

modification and reopening of the existing tunnel to incorporate the elevator hoistway and associated machine room. The present flower vendor will need to be relocated.

- elimination of the tunnel's existing intermediate steps (between the unpaid lobby level and the sealed-off stair). The tunnel floor will need to be lowered and leveled with a maximum of 5% slope.

- relocation of the previous Public Garden stair to a new location along the sidewalk edge, next to the proposed elevator headhouse, thus improving its safety and public exposure. The new stair will provide an additional entrance to the station as well as a means of egress from the tunnel underneath.

The architectural imagery for the proposed elevator and stair headhouse should blend with the Public Garden setting. This will require skillful distribution of massing and use of materials. Its design should reflect the existing stone architecture used in the Public Garden.

Figure 6-96 suggests an image for the proposed elevator with a stone base and stone corner posts, metal/glass infill, and a copper or translucent roof. A wrought iron guard rail, consistent with the existing Public Garden fence could wrap around the new stair and garden entry.

The entire headhouse structure should be as transparent as possible to provide visual surveillance from both inside and outside the elevator. (See the PDM for cab and elevator guidelines).

The major structural issues for this option will be providing a temporary

earth support system for both the demolition of the existing tunnel egress structure and design of the new hoistway, stairway and corridor extension. (See Figure 6-99). Excavation to a depth beyond the existing foundation will require removal or cut off of the original piles, ground water control (see PDM) and waterproofing details to match existing conditions.

The main advantages of Option A are its location alongside, rather than within the sidewalk, its easy access and visi-

bility from the street, and its potential to be a positive addition to the streetscape through sensitive architecture and landscaping. Also this option has the least impacts on vehicular and pedestrian traffic, tunnel structure and construction.

The main disadvantages of Option A are: its sensitive Public Garden location; complicated review processes; and its remote location through a not visible tunnel to the mezzanine (are array area.



Figure 6-99: Option A; structural diagram

- *Elevator Option B*, shown in *Figure 6-100 and 6-101*, proposes incorporating the elevator within the Heritage Building, fronting on the sidewalk. This option will require:

- negotiation of a real estate transaction between the MBTA and the private owner of the Heritage Building, modifications to the storefront facade of the property as well as to the existing retail space and basement in order to accommodate the new elevator structure.

- an extension of the mezzanine level below.

- reconstruction of the sidewalk and relocation of utilities to allow access to the Heritage Building basement areas where the lower entrance to the street elevator and machine room will be located.

In this option the elevator entrance should be designed to fit in with the existing facade of the building and, for safety reasons, to be as transparent as possible.

The major structural issues that will be encountered in this option include breaching three floors of the Heritage Building, design of the support system for each level and through the exterior wall, design the support structure for the hoistway at the lower level including closure walls. (See *Figure 6-103*.)

In addition, within a cut and cover section between the building structure and the station, design a new corridor to the Mezzanine Level and through the exterior wall of the station. Underpinning of the station stairway is required. Option B, compared to the other options, has the least impacts on the streetscape assuming that the MBTA.



Figure 6-101: Elevator Option B, mezzanine level    Scale: 1"=32'



Figure 6-100: Elevator Option B, street level    Scale: 1"=32'

## Legend

EXISTING TO REMAIN
EXISTING TO BE REMOVED
NEW CONSTRUCTION
BUILDING LINE ABOVE
BELOW
FACE OF EXISTING BUILDING
TRACKS
TACTILE WARNING STRIP
DOWN WK. OF SLOPE
DIRECTION OF TRAVEL

## ROOM LEGEND:

1. ELEVATOR MACHINE ROOM
2. ELECTRICAL ROOM
3. STORAGE
4. CONCESSION/VENDOR
5. MEN'S TOILET
6. WOMEN'S TOILET
7. SAFE ROOM
8. ELECTOR ROOM
9. COMMUNICATIONS ROOM

will not require the enclosure of the existing adjacent stairs), and allows for a good connection to the unpaid lobby level below. But it will demand delicate negotiations with a private owner, approval from various reviewing parties, and mitigation of the architectural and construction issues presented above.

*Figure 6-102: Option B: elevator image study*

*Figure 6-103: Option B: structural diagram*

• *Elevator Option C,* shown in *Figure 6-105 and 6-106,* calls for the siting of the elevator close to the southeast corner of the Arlington/Boylston intersection, adjacent to the Heritage Building. It will require implementation of the following:

- elimination of one of the two flights of stairs that combine in a common landing to form one of the present stair entrances to the mezzanine level. This particular stair was selected for elimination because its location allows for the elevator shaft to be situated in the most direct relationship to the nonpaid lobby below. The remaining stair will need to be widened in order to accommodate the appropriate station egress.

- elimination or modification of the existing retail entrance canopy which will be conflict with the proposed elevator headhouse.

- reconstruction of the brick sidewalk and relocation of the utilities affected by the construction of the proposed elevator shaft.

- minor extension of the mezzanine level below to accommodate access to the elevator, machine room and the widened stair connecting to the street.

- provision of bollards or other safety barriers along the sidewalk curb.

The elevator headhouse should be developed to give a light translucent appearance, with materials and articulations compatible with the Heritage Building. Materials such as steel frame with stone cladding, metal/glass infill, and a copper or translucent roof may be appropriate. (See *Figure 6-104.*)



*Existing*

*Proposed*

*Figure 6-104: Option B: elevator image study*

**6  STATIONS**



Figure 6-106: Elevator Option C, mezzanine level    Scale: 1"=32'



Figure 6-105: Elevator Option C, street level  Scale: 1"=32'

**Legend**

| | |
|---|---|
| ═══ | EXISTING TO REMAIN |
| ═ ═ | EXISTING TO BE REMOVED |
| ▬▬▬ | NEW CONSTRUCTION |
| ‒ ‒ ‒ | BUILDING LINE ABOVE |
| – – – | BELOW |
| ▬▬ | FACE OF EXISTING BUILDING |
| ▭▭ | TRACKS |
| ▨▨ | TACTILE WARNING STRIP |
| → | DOWN WAY OF SLOPE |
| ⇧ | DIRECTION OF TRAVEL |

**ROOM LEGEND:**

1. ELEVATOR MACHINE ROOM
2. ELECTRICAL ROOM
3. STORAGE
4. CONCESSION/VENDOR
5. MEN'S TOILET
6. WOMEN'S TOILET
7. SAFE ROOM
8. ERECTOR ROOM
9. COMMUNICATIONS ROOM

MBTA Light Rail Accessibility Program    Schematic Design Report    Rev. #    March 1995

6-50

The major structural issue for this option will be the design of a hoistway shaft within the constraints of the space provided. (See *Figure 6-107.*)

Underpinning the station and widening of the remaining flight of stairs from street level will require extending the cut (and temporary earth support wall) to include the widened stair.

Elevator Option C is the most obtrusive alternative in terms of its impact at the street level. It creates both visual obstructions to the streetscape and to the retail space behind, as well as narrowing pedestrian flow at a busy corner. In addition, this option will involve major traffic impacts during construc-

tion. However, it does provide a good functional connection to the mezzanine level and involves the least complicated approval process.

The MBTA will need to assist the station architect in the process of narrowing these elevator options at the completion of the schematic design phase. This undoubtedly will involve a complex review process among many participants, as discussed later in this Report.

**Stair Entrances:** Existing and proposed stair entrances will need to:

* incorporate the required accessible signage and lighting. (See *PDM.*)

* conform to Massachusetts State Building Code.

* conform to MAAB regulations concerning treads, risers and handrails. (See *PDM.*)

* conform, if feasible, to the current MBTA policy requiring stair enclosures, (taking into account that this is not an accessibility requirement –See *PDM Stair Section* for specific design criteria.) Given the sensitive historic location and limited sidewalk space surrounding these entrances, further design and circulation studies will need to be developed with the MBTA, the community and other pertinent review groups.

* If a decision is reached not to provide enclosures, it is recommended that the two existing stairs along the western edge of Arlington Street should be remodeled to match the materials and articulation of the open railing stairs adjacent to the Heritage Building. The proposed stair entrance at the Public Garden (as part of elevator Option A) will demand the special treatment discussed above in order to make it contextual with the garden.



*Figure 6-108: Heritage bldg stair detail*

*Figure 6-107: Option C; structural diagram*

## Mezzanine Level Program

At the mezzanine level the primary program requirement is to provide an accessible route from the street elevator, through the fare array, to the elevators going to the platforms. (See Figure 6-109.)

The location of the accessible route connecting the mezzanine to the street will vary depending on the elevator option selected at the street level. Additional work elements related to the Introduction of this elevator at the mezzanine are presented under subsection 3.3.1, Street Level.

The following summarizes the scope of work needed to establish this program requirement, as well as other related access improvements to the fare collection system and employee toilets.

Fare Array System: The present fare array will need to be relocated to accommodate the proposed elevators. The gate and fare collectors booth will also need to be modified to make them accessible. This work should be coordinated with the proposed Automatic Fare Collection (AFC) System that the MBTA is presently planning.

A preliminary investigation of the impacts of establishing the AFC system at Arlington Station was completed as part of this study. The concept sketch, shown in Figure 6-110, was developed in response to the following preliminary MBTA requirement for:

9 automatic fare collection gates
1 accessible egress gate
1 customer service booth
8 ticket vending machines

A summary of this study shows that the new fare gates can be accommodated in the proposed location. Their precise location will be determined by the appropriate alignment of the gates in relationship to the existing columns.



Figure 6-109: Arlington Station, Mezzanine plan        Scale: 1"=40'

**Figure 6-110: Fare array diagram**

The customer service booth will need to be located outside the fare array line in order to accommodate the number of gates. The proposed location for this booth requires the removal of the existing toilets on the south end of the unpaid lobby. The existing toilets would be replaced by two accessible, single occupancy toilets in the same area.

The 8 ticket vending machines can be organized in three groups, against the sides of the lobby. Queuing in front of these vending machines may result in circulation problems in the lobby, and some conflicts may also occur as a result of queuing in front of the customer services booth. Designated vending machines, accessible to people with impediments, will need to be spaced 5'-0" on center, in accordance to MBTA guidelines.

Introduction of the AFC system will require some modification of existing power, data and lighting systems as well as interior finishes, signage, ventilation and plumbing.

In addition, the new booth design will require heating, ventilation and air conditioning. The MBTA should assist in determining actual needs.

**Toilet Rooms:** The two existing employee toilets located adjacent to the unpaid lobby will need to be made accessible in accordance with ADA/MAAB requirements for single occupancy toilet rooms. If the AFC system is implemented as suggested in the concept sketch, the existing toilets will need to be relocated and made accessible and provided with new heating, ventilating, electrical and plumbing. Signage conforming to the PDM will be required in these rooms.

**Mezzanine To Platform Elevators:** The accessible route between the paid lobby and the platform level below is provided by means of 2 hydraulic elevators leading to the separate inbound and outbound platforms. They are located behind the fare array line and adjacent to each of the stairs leading to the platforms. These elevators

reach the eastern end of both platforms. (See figures 6-111 and 6-112.) Several issues result from this proposal:

- The recommended location of the hoistways will necessitate moving the fare array further into the unpaid lobby in order to provide the required access to the elevator. The stations fire management panel will be required to be relocated, as well as some lighting power and pay telephones.

- The street above will require excavation and the station tunnel roof will require structural modifications and support to accommodate the overrun of the elevator. Prior to the preliminary design phase, it will be necessary to complete a finish grade and top of station survey in this area to determine if the minimum hoistway overrun will fit the actual clearance. (Preliminary evaluation show that it will fit.) Utilities within the street may also be affected by this work.

- The major structural issues to the two mezzanine to platform elevators include the following:

  - Temporary support of the mezzanine floor; cut and re-frame structure.

  - Cut base slab; underpin structure at column locations; install elevator pit & hoistway.

  - Additional structural modifications will be required at the platform level.

Each elevator will require a separate vented machine room, at the platform level, in space currently used for high voltage electrical equipment. Modification of the present space, electrical equipment, and construction of the vented hoistway and pit are required.

These elevators should be as transparent as possible and designed in accordance with the Project Design Manual criteria.



*Figure 6-111: Platform partial plan    Scale: 1/16" = 1'-0"*

MBTA Light Rail Accessibility Program          Schematic Design Report          Rev. #          March 1995

6-53

## Platform Level Program

The access program requirements at both inbound and outbound platforms are primarily a function of providing an accessible route between the proposed platform to mezzanine' elevators and the access ramps of the future LPV's. The proposed design reflects the horizontal and vertical adjustments needed in this level in order to achieve these objectives (See *Figure 6-113* and *6-114*)

The following summarizes the scope of work for this level with particular emphasis on the operational impacts of the LPV's in the modifications of the platform elements. For a presentation of other work elements related to the introduction of elevators at this level, see the previous subsection *Mezzanine to*

*Platform Elevators*, under the previous section *3.3.2 Mezzanine Level.*

*Platform Floors:* In order to facilitate barrier free access to the new LPV's the elevation of the platforms will need to be raised approximately 8" along their entire length and width. This platform modification will allow people with disabilities to the LPV's using the deployable ramps. The materials should be unit pavers or tiles, consistent with the overall station design. The design parameters for this work are given in the *Project Design Manual, Section 2.*

Raising the inbound and outbound platforms will impact several station elements, thus adding other items to the platform level program:

*Walls:* The lower zone of the platform wall finishes will need to be replaced. Presently, the bottom of the lower sign band varies 7" to 14" above the existing floor. When the platform is raised, the lower sign band will need to be removed, and a new 1" edge added in order to provide a clean stop for the existing tile and wall panels (See *Figure 6-114.*) A new wall base should be created out of the new floor material. The existing cavity wall system will need to be modified, including replacement of damaged access plates. The benches will be mounted on the existing tile panels as required. This program represents a minimum scope of work, but the MBTA may desire to implement a complete modernization approach, requiring a total refinishing of all the walls.

- *Benches:* The present cantilevered benches (9 per platform) will require removal, refinishing, and replacing at the appropriate height. Half of them should also be provided with arm rests at the ends of the seats (See *Project Design Manual, Furnishings* section for design guidelines.)

- *Doors:* As a result of the raised platforms, both pairs of doors in the rooms located at the easterly end of the inbound and outbound platforms will need to be raised +/- 8" in height.

- *Escalators:* Each of the 2 existing escalators will need to be replaced because of the increased platform height. The existing escalator sump pits will need modifications to accommodate the plat-



LEGEND:

EXISTING TO REMAIN:
EXISTING TO BE REMOVED:
NEW CONSTRUCTION:
TRACKS:
FREE RAILING:
DOWN FLOW OF SLOPE:
COLUMN:
COLUMNS TO BE REMOVED OR ADDED
CONNECTED WITH SCHEMATIC WORK ZONE
FUNCTION OF TRAVEL:
ROOM:
TELEPHONE:

ROOM LEGEND:
ELEVATOR MACHINE ROOM
ELECTRICAL ROOM
PUMP ROOM
CROSSOVER/COMM ROOM
HEAT TOILET
MEZZANINE STOP
SIGN ROOM
MEZZANINE

**Figure 6-112:** *Arlington Station, Platform plan*

Scale: 1"=40'

MBTA, Light Rail Accessibility Program          Schematic Design Report          Rev. #          March 1995

form raising. Even though it is narrow, because of the existing structural limitations, it is recommended that the escalator be replaced in kind (See Figure 6-115). The option of dealing with the new platform height by ramping down to the existing escalator was eliminated as this solution creates an undesirable interruption in the level plane of the platform.

• **Stairs:** The increase in platform height will decrease, if not eliminate, the first riser of each of the 6 metal stairs on both the inbound and outbound platforms. Until a detail grading analysis is completed it is difficult to determine the exact impacts at the first riser. Four of these metal stairs, located at the western end of the platform level, used to serve the Berkeley St. mezzanine (see Figure 6-116). The station architect should explore with the MBTA the possibility of removing at least the two stairs closest to the platforms and retaining the ones beyond (after minimum modifications) for emergency egress. This strategy will allow expansion of the platform at that end and simplify its height adjustment.

At the eastern end of the platforms, the first flight of the two stairs leading to the mezzanine will need modifications to meet the raised platform. This may entail removing the first tread and burying the stringers into the proposed raised platform. (See PDM, Section 2.2.7 Stairs.) Alternatively, the option of replacing the complete flight of stairs may prove more efficient in meeting the new platform level elevation.

In addition, since the stairs currently house open risers, these will have to be closed to provide a continuous uninterrupted step conforming to both MAAB and ADA. Handrails also will require upgrading to conform with these guide-



*Figure 6-115: Escalator at inbound platform*



*Figure 6-116: Stairs to Berkeley mezzanine*



*Figure 6-113: Section A at platform   Scale: 1/8" = 1'-0"*

*Figure 6-114: Elevation B at platform   Scale: 1/4" = 1'-0"*

Figure 6-11B: Reframing strategy diagram

lines. Whether new or remodeled, a perforated riser should be installed in order to maximize transparency to people using the proposed elevator. A railing barrier will also be necessary to prevent head injury at the lower end of the underside of the open stair.

- **Tactile Warning Strip:** A new tactile warning strip will be required in compliance with accessibility requirements along the entire length of the platform when the platform is raised.

**Car Ramp Zones:** Areas defined by the ramp zones in front of every LFV's accessible door will need to be clear of any obstacle, including structural elements. A study was performed in order to evaluate the measures necessary to minimize the potential conflicts between the car ramp zones and the existing row of columns at each platform.

A detailed description of the methodology and operational assumptions used for the ramp zone analysis is given in Appendix 1 of the PDM. For the purpose of this study, it was assumed that each platform in Arlington Station will allow for a maximum of 4 cars to serve the station at one time, in any number of combinations of No. 7 and LFV's. Train consists were assumed to have a maximum of 3 cars each.

The application of the ramp zone "template" to the station platforms showed the columns potentially obstructing the ramp zones (given the proximity of the columns to the centerline of the tracks: 8'-10" instead of the 9'-10" minimum required by the PDM).

Two operational scenarios were then considered in order to identify the specific number of columns in conflict with the LFV's ramp area, each with a set of variations:

- **Scenario A,** based on stated MBTA policy, calls for the driver of the train consist to stop at the designated platform stop location or within a stop range of +/- 5 feet. For a maximum platform capacity of 4 cars operating simultaneously, a total number of 19 columns are impacted. (See *Figure 6-11z.*) This number could be reduced to 12 if only 3 cars are allowed to operate per platform.

- **Scenario B,** based on a tighter stop range of +/- 2 feet yields a reduction of columns impacted: 11 for the 4 cars per platform operation or 7 for the 3 cars per platform option.

The schedule of impacted columns (*Figure 6-11z*) summarizes the above findings. It should be noted that the quantities shown

|  | SCENARIO A +/- 5' STOP RANGE | | SCENARIO B +/- 2' STOP RANGE | |
|---|---|---|---|---|
|  | 4 cars / platform | 3 cars / platform | 4 cars / platform | 3 cars / platform |
| INBOUND PLATFORM | 10 | 6 | 6 | 4 |
| OUTBOUND PLATFORM | 9 | 6 | 5 | 3 |
| TOTAL COLUMNS IMPACTED: | 19 | 12 | 11 | 7 |

Figure 6-11z: Schedule of impacted columns

do not account for column replacements resulting from a particular reframing strategy.

A potential reframing strategy is shown in *Figure 6-118* and *6-119*. The typical column removal scheme shows a two column replacement between the two columns removed. Added top and bottom beams account for the added bending stresses reduced by the increased span. The scheme can be repeated for single column removal when applicable. See *Figure 6-118* showing the plan layout for each stopping zone.

For scenario A / 4 cars, this approach will require the replacement of an additional 26 columns, with a total number of columns to be removed of 45 (only 3 less than the 48 existing columns in the platform level). In summary, a major restructuring of the station platform level will result. This approach also will create an uneven rhythmic distribution of columns and variations on their height. In order to create a consistent soffit, it is proposed to visually extend the new structural beam throughout.

An alternative reframing strategy that could

result in a better architectural resolution is suggested in *Figure 6-119*. This strategy will require further structural analysis of the existing system. This cantelevered approach would relocate every column back from the edge of the platform an additional one foot, creating a consistent column line and a better sense of order.

Removal and replacement of columns at the station will include temporary support of the existing structure which will require bracing and framing in the track area. This precludes a continuous construction schedule, requiring evening work and staged sequencing. New structural members will require rail transport to the site.

A significant reduction of the structural impacts presented above can be achieved by relaxing or modifying some of the operational requirements assumed for this analysis. Possible alternatives include:

- allow for multiple train stopping
- limit ramp deployment to one car per consist

- limit ramp deployment to one side of the train only
- limit the number of cars stopping at the platform at one time

For more information on these operational alternatives, see *Section 3.6, Operational Assumptions.*

**Passenger Assistance Areas:** The station architect, in coordination with the MBTA, should identify at least two Passenger Assistance Areas per platform in order to ensure equal access to safe egress. These areas do not have to be physically separate but should incorporate the appropriate signage and a police callback (intercom), among other requirements (See *MBTA Guide to Access, Emergency Egress Section*.)

**Electrical Rooms:** An expansion of the existing electric room will be required to accommodate the new power requirements for the station. (See *Engineering Analysis, Appendix 4.*) The existing electrical rooms at the eastern end of both platforms could be expanded to include the adjacent storage space. (See *Figure 6-112*.)

**Other Program Elements**

In addition to the scope of work summarized above (per station level) other elements to be incorporated in the accessibility program are station wide in nature, including:

**Signage:** The station architect, in coordination with the MBTA, should propose signage modifications at each level of the station, using the visual and tactile means to make the system accessible.

**Communications:**

- **Public Address System:** The existing audio public address system may be relocated and reused. As part of normal aging, some devices may be required to be replaced to function properly. *More detailed studies will be required during preliminary design phase.*

- **Readers Boards and Video Monitors:** A new electronic sign system or video monitor is recommended to provide passenger information via LED scrolling bulletin boards throughout the station as a means to convey information to the hearing impaired. Each electronic sign displays a message developed and transmitted from existing computer equipment located at a central MBTA site.

**Clocks:** The existing clocks at Arlington Street Station presently are noncompliant with ADA and MBTA Guidelines and therefore it is recommended that they be replaced.

**Emergency Call-Boxes:** Emergency call boxes should be provided in conformance with MBTA Guidelines.

**Emergency Alarms:** A fire alarm system that meets N.F.P.A., state, local, MAAB and ADA requirements is required as none exists. The fire management panel has a telephone and fan controls for tunnel ventilation only. Pull stations, smoke and heat detection, monitoring of sprinkler services and new audio/visual devices will be required.

**Telephones, TDD:** Two pay telephones (presently new England Telephone devices) are currently located in the mezzanine as well as one on each platform. The mezzanine telephones will need to be relocated due to their loca-



BROKEN BEAMS

NEW STL BEAM W/ENCL SUCERROUNDINT

NEW STL COLUMN

NEW STL COLUMN/W/BEAMS PLATE 1'0" O.C.

RAISED PLATFORM

NEW FOOTING W/CONCRETE BEAM

SPLICE TO EXISTING WATERPROOFING

**Figure 6-119:** *Alternative reframing strategy*

tion within the area proposed for the platform. A TDD (Telecommunication Device for the Deaf) must be added at each location as per the *MBTA Guide to Access* requirements. Existing telephones must also meet access requirements in respect to operations and mounting heights.

**Vendors and Vending Machines.** The existing flower vendor will require relocation and storage space in the event the MBTA chooses Option A.

Accessibility Design Criteria for these elements could be found in the *PDM* and *MBTA Guide to Access*.

## 6.3.3 Constructibility

The constructibility issues at Arlington Street Station are a result of the following major program elements :

- the construction of the elevator hoistways,
- upgrade of electrical systems,
- the removal of columns and raising of the platform to accommodate the new LFV technology
- and the installation of the new automatic fare collection system.

Construction work for the above can be phased and implemented under either separate or singular construction contracts. It is recommended that secondary work items be combined with each of the appropriate program element above for the purpose of defining construction contracts.

This section will summarize the constructibility issues for each of the major program elements.

Elevator options A and B are located away from the roadway. Construction of elevator option A has significantly little impact on station operation, vehicular and pedestrian circulation. Option A will require a large staging area within the Public Garden and mitigation of pedestrian traffic on the sidewalks at the corner of Arlington and Boylston streets and within the Boston Common.

Elevator option B is located in the Heritage Building. A new passageway is required to connect the elevator to the lobby. This will have a significant impact on the sidewalk and the roadway at this corner. This option will require pedestrian traffic to be maintained safely around the site. A temporary lane closure may be required at times for construction vehicles or delivery of materials to site. This option will require closure walls for dust protection, security and maintaining the retail use during construction. Additionally, the connector tunnel will need to be staged to maintain egress to the stairs. Option C given its proximity to the adjacent properties, like B above has similar constructibility issues. In addition, because C assumes the loss of 1 egress stair, a staged construction is necessary to maintain present egress capacity during the construction. The mezzanine to platform elevators may require a cut and cover platform. New structural elements will need to be brought in by rail for below grade operations in the intersection of Boylston and Arlington Street resulting in mitigation of vehicular traffic or even off peak work hours. Internally, construction of these 2 elevators will need to be scheduled so as to interface with station usage. This work may need to be done at off peak times to avoid impacts at the fare array and platform. New structural elements will need to be brought in by rail for below grade operations.

As a consequence of the installation of the elevators, the current available power will be exceeded. This will result in the need to upgrade the present electrical system. This upgrade and conversion from DC to AC power and the addition of a generator will need to take place when the station is closed. Fire alarm systems, emergency signage and lighting, will need to be maintained operational during the construction.

Like the electrical work, the removal of columns and raising of the platform may need to be performed on an off peak schedule to avoid interruption of service and station usage. Work areas will require separation from occupied platform areas. The roof of the station will need to be temporarily supported to allow column removals to take place, and new structure to be introduced. Staged construction will include temporary support of the existing structure and may include bracing in the track area. Large structural steel members must be transported to the site by rail. In contrast to the removal of columns raising the platforms could occur in scheduled stages once structural work is complete while the station is in use. Again, passenger safety and egress routes will need to be maintained during construction operations.

Implementation of the automatic fare collection system will require a staged plan in order to maintain continuous uninterrupted service and safe egress to and from the station.

## 6.3.4 Cost

The total estimated cost is $10,100,000.

For estimating assumptions regarding the above construction cost see section 7.6, Project Cost.

This total does not include the cost for the automatic fare collection system or the unpredictable costs of taking private property for the public good (elevator Option B).

The cost of the most expensive elevator option(s) addressed is combined with the cost of providing a five foot stopping zone (when column removal is considered) for the development of this preliminary estimate.

The major structural issue for this option will be the design of a holstway shaft within the constraints of the space provided. (See Figure 6-107.)

Underpinning the station and widening of the remaining flight of stairs from street level will require extending the cut (and temporary earth support wall) to include the widened stair.

Elevator Option C is the most obtrusive alternative in terms of its impact at the street level. It creates both visual obstructions to the streetscape and to the retail space behind, as well as narrowing pedestrian flow at a busy corner. In addition, this option will involve major traffic impacts during construc-

tion. However, it does provide a good functional connection to the mezzanine level and involves the least complicated approval process.

The MBTA will need to assist the station architect in the process of narrowing of the remaining flight of stairs from these elevator options at the completion of the schematic design phase. This undoubtedly will involve a complex review process among many participants, as discussed later in this Report.

**Stair Entrances:** Existing and proposed stair entrances will need to:

- incorporate the required accessible signage and lighting. (See PDM.)

- conform to Massachusetts State Building Code.

- conform to MAAB regulations concerning treads, risers and handrails. (See PDM.)

- conform, if feasible, to the current MBTA policy requiring stair enclosures, (taking into account that this is not an accessibility requirement –See PDM Stair Section for specific design criteria.) Given the sensitive historic location and limited sidewalk space surrounding these entrances, further design and circulation studies will need to be developed with the MBTA, the community and other pertinent review groups.

- If a decision is reached not to provide enclosures, it is recommended that the two existing stairs along the western edge of Arlington Street should be remodeled to match the materials and articulation of the open railing stairs adjacent to the Heritage Building. The proposed stair entrance at the Public Garden (as part of elevator Option A) will demand the special treatment discussed above in order to make it contextual with the garden.



*Figure 6-108: Heritage bldg stair detail*



*Figure 6-107: Option C; structural diagram*

# 6  STATIONS

## Mezzanine Level Program

At the mezzanine level the primary program requirement is to provide an accessible route from the street level, through the fare array, to the elevators going to the platforms.  (See *Figure 6-109*.)

The location of the accessible route connecting the mezzanine to the street will vary depending on the elevator option selected at the street level.  Additional work elements related to the introduction of this elevator at the mezzanine are presented under subsection *3.3.1, Street Level*.

The following summarizes the scope of work needed to establish this program requirement, as well as other related access improvements to the fare collection system and employee toilets.

**Fare Array System:**  The present fare array will need to be relocated to accommodate the proposed elevators.  The gate and fare collectors booth will also  need to be modi-fied to make them accessible.   This work should be coordinated with the proposed Automatic Fare Collection (AFC) System that the MBTA is presently planning.

A preliminary investigation of the impacts of establishing the AFC system at Arlington Station was completed as part of this study.  The concept sketch, shown in *Figure 6-110*, was developed in response to the following preliminary MBTA requirement for:

9   automatic fare collection gates
1   accessible egress gate
1   customer service booth
8   ticket vending machines

A summary of this study shows that the new fare gates can be accommodated in the proposed location.  Their precise location will be determined by the appropriate alignment of the gates in relationship to the existing columns.



**Figure 6-109:** *Arlington Station, Mezzanine plan*          Scale: 1"=40'

MBTA Light Rail Accessibility Program          Schematic Design Report          Rev. #          March 1995

6-52

*Figure 6-110: Fare array diagram*

The customer service booth will need to be located outside the fare array line in order to accommodate the number of gates. The proposed location for this booth requires the removal of the existing toilets on the south end of the unpaid lobby. The existing toilets would be replaced by two accessible, single occupancy toilets in the same area.

The 8 ticket vending machines can be organized in three groups, against the sides of the lobby. Queuing in front of these vending machines may result in circulation problems in the lobby, and some conflicts may also occur as a result of queuing in front of the customer services booth. Designated vending machines, accessible to people with impediments, will need to be spaced 5'-0" on center, in accordance to MBTA guidelines.

Introduction of the AFC system will require some modification of existing power, data and lighting systems as well as interior finishes, signage, ventilation and plumbing.

In addition, the new booth design will require heating, ventilation and air conditioning. The MBTA should assist in determining actual needs.

**Toilet Rooms:** The two existing employee toilets located adjacent to the unpaid lobby will need to be made accessible in accordance with ADA/MAAB requirements for single occupancy toilet rooms. If the AFC system is implemented as suggested in the concept sketch, the existing toilets will need to be relocated and made accessible and provided with new heating, ventilating, electrical and plumbing. Signage conforming to the PDM will be required in these rooms.

**Mezzanine To Platform Elevators:** The accessible route between the paid lobby and the platform level below is provided by means of 2 hydraulic elevators, one for the separate inbound and outbound platforms. They are located behind the fare array line and adjacent to each of the stairs leading to the platforms. These elevators reach the eastern end of both platforms. (See *Figures 6-111* and *6-112*.) Several issues result from this proposal:

• The recommended location of the hoistways will necessitate moving the fare array further into the unpaid lobby in order to provide the required access to the elevator. The stations fire management panel will be required to be relocated, as well as some lighting power and pay telephones.

• The street above will require excavation and the station tunnel roof will require structural modifications and support to accommodate the overrun of the elevator. Prior to the preliminary design phase, it will be necessary to complete a finish grade and top of station survey in this area to determine if the minimum hoistway overrun will fit the actual clearance. (Preliminary evaluation show that it will fit.) Utilities within the street may also be affected by this work.

• The major structural issues to the two mezzanine to platform elevators include the following:

  • Temporary support of the mezzanine floor; cut and re-frame structure.

  • Cut base slab; underpin structure at column locations; install elevator pit & hoistway.

  • Additional structural modifications will be required at the platform level.

• Each elevator will require a separate vented machine room, at the platform level, in space currently used for high voltage electrical equipment. Modification of the present space, electrical equipment, and construction of the vented hoistway and pit are required.

These elevators should be as transparent as possible and designed in accordance with the Project Design Manual criteria.



*Figure 6-111: Platform partial plan    Scale: 1/16" = 1'-0"*

## Platform Level Program

The access program requirements at both inbound and outbound platforms are primarily a function of providing an accessible route between the proposed "platform to mezzanine" elevators and the access ramps of the future LFV's. The proposed design reflects the horizontal and vertical adjustments needed in this level in order to achieve these objectives (See*Figure 6-113* and *6-114*)

The following summarizes the scope of work for this level with particular emphasis on the operational impacts of the LFV's in the modifications of the platform. For a presentation of other work elements related to the introduction of elevators at this level, see the previous subsection *Mezzanine to Platform Elevators*, under the previous section *3.3.2 Mezzanine Level.*

**Platform Floors:** In order to facilitate barrier free access to the new LFV's the elevation of the platforms will need to be raised approximately 8" along their entire length and width. This platform modification will allow people with disabilities to the LFV's using the deployable ramps. The materials should be unit pavers or tiles, consistent with the overall station design. The design parameters for this work are given in the *Project Design Manual, Section 2.*

Raising the inbound and outbound platforms will impact several station elements, thus adding other items to the platform level program:

- ***Walls***: The lower zone of the platform wall finishes will need to be replaced. Presently, the bottom of the lower sign band varies 7" to 14" above the existing floor. When the platform is raised, the lower sign band will need to be removed, and a new 1" edge added in order to provide a clean stop for the existing tile and wall panels (See *Figure 6-114.*) A new wall base should be created out of the new floor material. The existing cavity wall system will need to be modified; including replacement of damaged access plates. The benches will be mounted on the existing tile panels as required. This program represents a minimum scope of work, but the MBTA may desire to implement a complete modernization approach, requiring a total refinishing of all the walls.
- ***Benches***: The present cantilevered benches (9 per platform) will require removal, refinishing, and replacing at the appropriate height. Half of them should also be provided with arm rests at the ends of the seats (See *Project Design Manual, Furnishings section* for design guidelines.)
- ***Doors:*** As a result of the raised platforms, both pairs of doors in the rooms located at the easterly end of the inbound and outbound platforms will need to be raised +/- 8" in height..
- ***Escalators:*** Each of the 2 existing escalators will need to be replaced because of the increased platform height. The existing escalator sump pits will need modifications to accommodate the plat-

LEGEND:
EXISTING TO REMAIN
EXISTING TO BE REMOVED
NEW CONSTRUCTION
TRACKS
TACTILE WARNING STRIP
STEEL RAILING
STEEL FENCE
DOWN W/% OF SLOPE
COLUMN
COLUMN TO BE REMOVED DUE TO CONFLICT WITH CAR RAMP ZONE
STOP LOCATION/NUMBER OF CARS
DIRECTION OF TRAVEL
BENCH
TELEPHONE
ROOM LEGEND:
1. ELEVATOR MACHINE ROOM
2. ELECTRICAL ROOM
3. STORAGE
4. CONCESSION/VENDOR
5. MENS' TOILET
6. WOMENS' TOILET
7. SAFE ROOM
8. EJECTOR ROOM
STAIR TO BERKELEY STREET MEZZANINE (CLOSED), TO BE MODIFIED TO MATCH NEW PLATFORM ELEVATION, TYP.
PLATFORM TO BE RAISED 8" ABOVE TOP OF RAIL, TYP.
ESCALATOR TO BE REPLACED, PIT TO BE ADJUSTED AS REQ., TYP.
STAIR TO BE MODIFIED, TYP.
PROPOSED ELECTRICAL ROOM
OUTBOUND PLATFORM
INBOUND PLATFORM
LIMIT OF RAISED PLATFORM, RAMP DOWN 8%, TYP.
PROPOSED PLATFORM TO MEZZANINE ELEVATOR, TYP.
PROPOSED ELECTRICAL ROOM
PROPOSED GUARD RAIL BELOW OPEN STAIRS TYP.
DOORS TO BE RAISED, TYP.
BENCH TO BE RAISED TYP.
LOW CEILING ABOVE (±7'-6" A.F.F.) TYP.
LIMIT OF RAISED PLATFORM, RAMP DOWN 8%, TYP.
A
A
B TYP.

***Figure 6-112:*** *Arlington Station, Platform plan* Scale: 1"=40'

form raising. Even though it is narrow, because of the existing structural limitations, it is recommended that the escalator be replaced in kind (See Figure 6-115). The option of dealing with the new platform height by ramping down to the existing escalator was eliminated as this solution creates an undesirable interruption in the level plane of the platform.

- **Stairs:** The increase in platform height will decrease. If not eliminate, the first riser at each of the 6 metal stairs on both the inbound and outbound platforms. Until a detail grading analysis is completed it is difficult to determine the exact impacts at the first riser. Four of these metal stairs, located at the western end of the platform level, used to serve the Berkeley St. mezzanine (see Figure 6-116). The station architect should explore with the MBTA the possibility of removing at least the two stairs closest to the platforms and retaining the ones beyond (after minimum modifications) for emergency egress. This strategy will allow expansion of the platform in that end and simplify its height adjustment.

At the eastern end of the platforms, the first flight of the two stairs leading to the mezzanine will need modifications to meet the raised platform. This may entail removing the first tread and burying the stringers into the proposed raised platform. (See PDM, Section 2.2.7 Stairs.) Alternatively, the option of replacing the complete flight of stairs may prove more efficient in meeting the new platform level elevation.

In addition, since the stairs currently house open risers, these will have to be closed to provide a continuous uninterrupted step conforming to both MAAB and ADA. Handrails also will require upgrading to conform with these guide-



Figure 6-115: Escalator at inbound platform

Figure 6-116: Stairs to Berkeley mezzanine



Figure 6-113: Section A at platform   Scale: 1/8" = 1'-0"



Figure 6-114: Elevation B at platform   Scale: 1/4" = 1'-0"

**6 · STATIONS**

lines. Whether new or remodeled, a perforated riser should be installed in order to maximize transparency to people using the proposed elevator. A railing barrier will also be necessary to prevent head injury at the lower end of the underside of the open stair.

* **Tactile Warning Strip:** A new tactile warning strip will be required in compliance with accessibility requirements along the entire length of the platform when the platform is raised.

**Car Ramp Zones:** Areas defined by the ramp zones in front of every LFV's accessible door will need to be clear of any obstacle, including structural elements. A study was performed in order to evaluate the measures necessary to minimize the potential conflicts between the car ramps zones and the existing row of columns at each platform.

A detailed description of the methodology and operational assumptions used for the ramp zone analysis is given in Appendix I of the PDM. For the purpose of this study, it was assumed that each platform in Arlington Station will allow for a maximum of 4 cars to serve the station at one time, in any number of combinations of No. 7 and LFV's. Train consists were assumed to have a maximum of 3 cars each.

The application of the ramp zone "template" to the station platforms showed the columns potentially obstructing the ramp zones (given the proximity of the columns to the centerline of the tracks: 8'-10" instead of the 9'-10" minimum required by the PDM).

Two operational scenarios were then considered in order to identify the specific number of columns in conflict with the LFV's ramp area, each with a set of variations:

* **Scenario A**, based on stated MBTA policy, calls for the driver of the train consist to stop at the designated platform stop location or within a stop range of +/- 5 feet. For a maximum platform capacity of 4 cars operating simultaneously, a total number of 19 columns are impacted. (See Figure 6-112.) This number could be reduced to 12 if only 3 cars are allowed to operate per platform.

* **Scenario B**, based on a tighter stop range of +/- 2 feet, yields a reduction of columns impacted: 11 for the 4 cars per platform operation or 7 for the 3 cars per platform option.

The schedule of impacted columns (Figure 6-117) summarizes the above findings. It should be noted that the quantities shown



Figure 6-118: Reframing strategy diagram

|  | SCENARIO A +/- 5' STOP RANGE | | SCENARIO B +/- 2' STOP RANGE | |
|---|---|---|---|---|
|  | 4 cars / platform | 3 cars / platform | 4 cars / platform | 3 cars / platform |
| INBOUND PLATFORM | 10 | 6 | 6 | 4 |
| OUTBOUND PLATFORM | 9 | 6 | 5 | 3 |
| **TOTAL COLUMNS IMPACTED:** | **19** | **12** | **11** | **7** |

Figure 6-117: Schedule of impacted columns

do not account for column replacements resulting from a particular reframing strategy.

A potential reframing strategy is shown in *Figure 6-118* and *6-119*. The typical column removal scheme shows a two column replacement between the two columns removed. Added top and bottom beams account for the added bending stresses induced by the increased span. The scheme can be repeated for single column removal when applicable. See *Figure 6-118* showing the plan layout for each stopping zone.

For scenario A / 4 cars, this approach will require the replacement of an additional 26 columns, with a total number of columns to be removed of 45 (only 3 less than the 48 existing columns in the platform level). In summary, a major restructuring of the station platform level will result. This approach also will create an uneven rhythmic distribution of columns and variations on their height. In order to create a consistent soffit, it is proposed to visually extend the new structural beam throughout.

An alternative reframing strategy that could

result in a better architectural resolution is suggested in *Figure 6-119*. This strategy will require further structural analysis of the existing system. This cantelevered approach would relocate every column back from the edge of the platform an additional one foot, creating a consistent column line and a better sense of order.

Removal and replacement of columns in the station will include temporary support of the existing structure which will require bracing and framing in the track area. This precludes a continuous construction schedule, requiring evening work and staged sequencing. New structural members will require rail transport to the site.

A significant reduction of the structural impacts presented above can be achieved by relaxing or modifying some of the operational requirements assumed for this analysis. Possible alternatives include:

- allow for multiple train stopping

- limit ramp deployment to one car per consist

- limit ramp deployment to one side of the train only

- limit the number of cars stopping at the platform at one time

For more information on these operational alternatives, see *Section 3.6, Operational Assumptions.*

**Passenger Assistance Areas:** The station architect, in coordination with the MBTA, should identify at least two Passenger Assistance Areas per platform in order to ensure equal access to safe egress. These areas do not have to be physically separate but should incorporate the appropriate signage and a police callback intercom, among other requirements (See *MBTA Guide to Access, Emergency Egress Section*.)

**Electrical Rooms:** An expansion of the existing electric room will be required to accommodate the new power requirements for the station. (See *Engineering Analysis, Appendix A*.) The existing electrical rooms at the eastern end of both platforms could be expanded to include the adjacent storage space. (See *Figure 6-112*.)

### Other Program Elements

In addition to the scope of work summarized above (per station levels) other elements to be incorporated in the accessibility program are station wide in nature, including:

**Signage:** The station architect, in coordination with the MBTA, should propose signage modifications at each level of the station, using the visual and tactile means to make the system accessible.

**Communications:**

- **Public Address System:** The existing audio public address system may be relocated and reused. As part of normal aging, some devices may be required to be replaced to function properly. More detailed studies will be required during preliminary design phase.

- **Readers Boards and Video Monitors:** A new electronic sign system or video monitor is recommended to provide passenger information via LED scrolling bulletin boards throughout the station as a means to convey information to the hearing impaired. Each electronic sign displays a message developed and transmitted from existing computer equipment located at a central MBTA site.

- **Clocks:** The existing clocks at Arlington Street Station presently are noncompliant with ADA and MBTA Guidelines and therefore it is recommended that they be replaced.

- **Emergency Call-Boxes:** Emergency call boxes should be provided in conformance with MBTA Guidelines.

- **Emergency Alarms:** A fire alarm system that meets N.F.P.A., state, local, MAAB and ADA requirements is required as none exists. The fire management panel has a telephone and fan controls for tunnel ventilation and fan controls for tunnel ventilation only. Pull stations, smoke and heat detection, monitoring of sprinkler services and new audio/visual devices will be required.

- **Telephones, TDD.** Two pay telephones (presently new England Telephone devices) are currently located in the mezzanine as well as one on each platform. The mezzanine telephones will need to be relocated due to their loca-



Figure 6-119: Alternative reframing strategy

EXISTING, BEAM

NEW FDG. BEAM W/ LONG. ENCASEMENT

REMOVE COLUMN

NEW STL. COLUMN/W/ENDS PLATE, TOP COL.

RAISED PLATFORM

NEW FOOTING W/ CROSSING BEAM

SPLICE TO EXISTING, UNDERCROSSING,

tion within the area proposed for the elevators connecting to the platform. A TDD (Telecommunication Device for the Deaf) must be added at each location as per the *MBTA Guide to Access* requirements. Existing telephones must also meet access requirements in respect to operations and mounting heights.

**Vendors and Vending Machines.** The existing flower vendor will require relocation and storage space in the event the MBTA chooses Option A.

Accessibility Design Criteria for these elements could be found in the *PDM* and *MBTA Guide to Access.*

### 6.3.3 Constructibility

The constructibility issues at Arlington Street Station are a result of the following major program elements :

- the construction of the elevator hoistway(s),

- upgrade of electrical systems,

- the removal of columns and raising of the platform to accommodate the new LFV technology

- and the installation of the new automatic fare collection system.

Construction work for the above can be phased and implemented independently of each other either under separate or singular construction contracts. It is recommended that secondary work items be combined with each of the appropriate program element above for the purpose of defining construction contracts.

This section will summarize the constructibility issues for each of the major program elements.

Elevator options A and B are located away from the roadway. Construction of elevator option A has significantly little impact on station operation, vehicular and pedestrian circulation. Option A will require a large staging area within the Public Garden and mitigation of pedestrian traffic on the sidewalks at the corner of Arlington and Boylston streets and within the Boston Common.

Elevator option B is located in the Heritage Building. A new passageway is required to connect the elevator to the lobby. This will have a significant impact on the sidewalk and the roadway at this corner. This option will require pedestrian traffic to be maintained safely around the site. A temporary lane closure may be required at times for construction vehicles or delivery of materials to site. This option will require closure walls for dust protection, security and maintaining the retail use during construction. Additionally, the connector tunnel will need to be staged to maintain egress to the stairs. Option C given its proximity to the adjacent properties, like B above has similar constructibility issues. In addition, because C assumes the loss of 1 egress stair, a staged construction is necessary to maintain present egress capacity during the construction. The mezzanine to platform elevators may require a cut and cover within the intersection of Boylston and Arlington Street resulting in mitigation of vehicular traffic or even off peak work hours. Internally, construction of these 2 elevators will need to be scheduled so as to interface with station usage. This work may need to be done at off peak times to avoid impacts at the fare array and platform. New structural elements will need to be brought in by rail for below grade operations.

As a consequence of the installation of the elevators, the current available power will be exceeded. This will result in the need to upgrade the present electrical system. This upgrade and conversion from DC to AC power and the addition of a generator will need to take place when the station is closed. Fire alarm systems, emergency signage and lighting, will need to be maintained operational during the construction.

Like the electrical work, the removal of columns and raising of the platform may need to be performed on an off peak schedule to avoid interruption of service and station usage. Work areas will require separation from occupied platform areas. The roof of the station will need to be temporarily supported to allow column removals to take place, and new structure to be introduced. Staged construction will include temporary support of the existing structure and may include bracing in the track area. Large structural steel members must be transported to the site by rail. In contrast to the removal of columns raising the platforms could occur in scheduled stages once structural work is complete while the station is in use. Again passenger safety and egress routes will need to be maintained during construction operations.

Implementation of the automatic fare collection system will require a staged plan in order to maintain continuous uninterrupted service and safe egress to and from the station.

### 6.3.4 Cost

The total estimated cost is $10,100,000.

For estimating assumptions regarding the above construction cost see section 7.6, Project Cost.

This total does not include the cost for the automatic fare collection system or the unpredictable costs of taking private property for the public good (elevator Option B).

The cost of the most expensive elevator option(s) addressed is combined with the cost of providing a five foot stopping zone (when column removal is considered) for the development of this preliminary estimate.

# 9.0 OTHER ISSUES

## 9.1 Community and Agency Reviews

Achieving full Light Rail Accessibility will require that a significant number of interested parties be given the opportunity to conduct their own reviews of the project. The proposed work at many of the stations may result in impacts to a wide variety of both public and private facilities including, but not limited to, roadways, parking, sidewalks, and traffic signals. The project will create significant opportunities to alter and improve the existing aesthetic characteristics of each station through the incorporation of urban design and architectural elements. Early and continuous liaison with appropriate parties is crucial throughout the entire design process to ensure that all concerns are voiced and properly addressed.

In general, the various interested parties can be broadly classified into three groupings: State agencies and organizations; Municipalities, and community or neighborhood groups. Throughout the design and construction process, a number of Departments within the MBTA will be required to provide reviews and input on the project. They include: Planning, Design, Construction, Transportation Access, Real Estate, Legal, Safety, Revenue, Engineering and Maintenance, Power Distribution, Signals, Communications, Operations, etc.

Other State agencies which may be involved include: The Executive Office of Transportation and Construction (EOTC), the Mass Highway Department (MHD), the Metropolitan Area Planning Council (MAPC), the Access Advisory Committee, etc.

At many stations located adjacent to roadways, coordination with The Massachusetts Highway Department (MHD) will be required. MHD review is typically required if an adjacent project receives funding from the state.

Station construction work is slated for four different municipalities: Boston, Brookline, Cambridge, and Newton. Within each municipality, continuous liaison should be maintained with appropriate departments including but not limited to: Planning, Engineering, Public Works, Traffic and Parking, Street lighting, and Safety. Within the City of Boston, significant involvement by the Public Improvements Commission (PIC) and the Boston Redevelopment Authority (BRA) will be required.

All State and local organizations which control utilities in the station vicinities must be coordinated with.

Many of the stations are located within specific neighborhoods of a community. Relevant parties may include:

- Neighborhood groups and Associations
- Key Property owners
- Local business and merchants
- Institutions (Hospitals, Schools, Museums, etc.)

Certain stations are likely to fall under the jurisdiction of the Massachusetts Historical Commission or Back Bay Architectural Commission as well as local preservation groups. Both historic and environmental issues are discussed in chapter six of this report.

In general, changes to properties listed in the National Register of Historic Places must be reviewed and approved by the Massachusetts Historic Commission. Such properties in the present project include the following:

a) The Tremont Street Subway (Park Street to Copley)

b) Boston Common and Public Garden

c) Back Bay Historic District (Auditorium Stations)

d) Beacon Street (St. Mary's to Cleaveland)

e) Newton Center and Newton Highlands stations

In addition:

1. Changes affecting National Register properties in the City of Boston Landmarks (such as Arlington Street Church) must be reviewed and approved by the Boston Landmarks Commission.

2. All surface changes within one hundred feet of a Boston park must be reviewed and approved through the Boston Parks and Recreation Department.

3. All surface changes at Copley Square would have to be reviewed and approved by the Back Bay Architectural Commission.

4. Changes on Beacon Street would need to be reviewed and approved by the Brookline Preservation Commission.

5. Changes to Newton Center and Newton Highlands stations would have to be reviewed and approved by the Newton Historical Commission.

6. Changes in the vicinity of the Common and Public Garden will need to be reviewed in a public meeting with the Friends of the Common and Public Garden (a vigilant citizens group).

The specific scope of work at each station will ultimately dictate the required Agency and community involvement. As the designs progress, this input will fluctuate considerably. For example, certain neighborhood groups may take no interest whatsoever in the project until they discover that a particular tree must be removed, or that a particular view or sight line is blocked.

In the development of Schematic Design Alternatives, contact has been established with all of the appropriate key parties to ensure that in concept, the project faces no major obstacles. Specific or general issues relating to each station are discussed where appropriate in chapter four of this report.

In terms of advancing the design of the Station Accessibility Improvements, the Authority has established a general framework for continuing the overall liaison effort. First and foremost, it is vital that all exchanges with municipalities or the community be conducted through the MBTA project office. All levels of interaction with state, local, and community based individuals or groups should be thoroughly documented.

The next step in the project is to conduct a general informational meeting with each of the appropriate municipalities to present the current scope of work and status of the project. The following key issues are among those which must be reviewed and updated as necessary.

- Adjacent roadway projects-anticipated or underway
- New or planned development in the station vicinity
- General community concerns
- Recommendations as to how to best approach community
- Identification of interested parties and what likely concerns are
- Possible construction impacts

**9  OTHER ISSUES**

The Authority and the Designer should then develop specific strategies to address the specific needs of each individual or grouping of stations.

In many cases, it will probably be desirable to delay making presentations to particular parties until the preferred design approach at each station has been identified and approved by the Authority.

## 9.2  Future Considerations

Throughout the development of this document, a significant number of issues have arisen, many of which will require additional review by the Authority prior to the completion of final design of each station.

### Fare Collection

Since the Authority is in the process of implementing a new automated fare collection system wide, the new equipment, policies and operational issues must be clearly defined to be compatible with the Access improvements. The potential overlapping of the various design and construction contracts needs to be carefully studied. Consideration must be given to the fact that the new system will be phased in gradually, often requiring a combination of new and old fare collection systems at each station.

### Accessibility Requirements

Since the implementation of the Americans with Disabilities Act (ADA), there seems to be an almost continuous series of revisions and updates to the regulations—both on the State and Federal levels. The point at which the station designers hold fast to the most current regulations will need to be

established at some point. Also, where MBTA policy may differ from other regulations, or where code compliance is deemed not feasible by the Authority, a general approach for resolution need to be established and documented.

### Low Floor Vehicles

The Authority's past experience with acquiring new Light Rail Vehicles is that the actual production vehicle clearances and operational characteristics may deviate from the specifications. Adequate tolerances must be incorporated into the station designs to ensure that fully compliant accessibility will be achievable and that train operations will not be adversely impacted if deviations do occur. It may be preferable to delay certain elements of the project until LFV prototypes arrive in 1997-98 and/or assurances as to actual specifications are obtained.

### Adjacent Projects

A large majority of the Key Light Rail Station designs have the potential to be impacted by either planned or ongoing adjacent projects which include roadway improvements, private developments, and utility projects. Several of these projects could either directly or indirectly assist in the Station accessibility improvements. The major issue relates to project scheduling which is often out of the MBTA's control.

## 9.3  Future MBTA Improvements

There are a relatively large number of projects, all in various levels of development which could affect system wide operations and create station specific issues as well. The status and potential impacts of the following projects and issues should be continuously monitored.

- System wide power, signal and communications improvements

- A new signal system on the Highland Branch

- Improvements to the Lechmere viaduct

- Relocation of the Lechmere Station

- Reconstruction of the North Station-Green Line

- Future service extension north of Lechmere to Medford/Tufts

- Possible major reconstruction of Government Center Station

- Future improvements at non-Key Light Rail Stations

- Possible future Transitway connection at Boylston St. Station

- Possible Light Rail Service on Washington St.

- Possible reactivation of the Arborway Line

- The future configuration of the Mattapan High Speed Line

- Future variations in system ridership

- Circumferential Transit

- North-South Rail link

- Possible Commuter Rail Connection at Riverside

## 9.4  Implementation of Accessibility

Providing an accessible Light Rail System depends upon two major elements. The new accessible Low Floor Vehicles must be operational, and the designated Key Stations must be constructed in compliance with pertinent regulations. Since the new trains will not begin to enter service until 1999, the Authority will, in theory, have several years to complete station reconstruction.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 05-11211JLT

| | |
|---|---|
| NEIGHBORHOOD ASSOCIATION | ) |
| OF THE BACK BAY (NABB), | ) |
| BOSTON PRESERVATION ALLIANCE, INC., | ) |
| Plaintiffs | ) |
| | ) |
| VS. | ) |
| | ) |
| FEDERAL TRANSIT ADMINISTRATION (FTA), | ) |
| MASSACHUSETTS BAY TRANSPORTATION | ) |
| AUTHORITY (MBTA), | ) |
| Defendants | ) |

## AFFIDAVIT OF RICHARD GUY WILSON

I, Richard Guy Wilson, depose under oath and state the following of my own
personal knowledge:

1.  I am chairman of the department of architectural history, Commonwealth
    professor of architectural history and adjunct professor of art history at the
    University of Virginia. I have taught the history of American and modern
    architecture at the graduate level for nearly 35 years. Attached is a brief resume.

2.  I previously taught at Iowa State University and the University of Michigan. I
    received a Bachelor of Arts degree from the University of Colorado, and a Master
    of Arts degree from the University of Michigan. In 1972, I received a doctorate in
    American culture, art and architectural history from the University of Michigan.
    My dissertation was titled, "Charles F. McKim and the Renaissance in America."

3.  I have written, co-written or edited 13 books, including "McKim, Mead & White,
    Architects" and "The American Renaissance." I have published more than 70
    book reviews and more than 60 articles and essays.

4. I have curated eight exhibitions, including "The Arts and Crafts Movement in America" at the Museum of Fine Arts in Boston in 1987. I have participated in videos for the National Trust and other organizations; appeared on PBS' "American Experience," the History Channel and C-Span; and advised 67 programs of A&E's "America's Castles." I have given more than 350 guest lectures at universities, museums and historical societies.

5. I won a Guggenheim Fellowship in 1984 and was named an honorary member of the American Institute of Architects in 1986. I received writing awards from the Western Historical Association, the Decorative Arts Society, the American Library Association, the Southern Library Association, the Southeast Society of Architectural Historians and the Virginia Society of Architects. I received teaching awards from Iowa State University and the University of Virginia Alumni Association.

6. I have been researching and writing about the Boston Public Library for nearly 40 years. The building's history was part of my doctoral dissertation. It is featured in three of my books – "The American Renaissance," "The AIA Gold Medal" and "McKim, Mead & White, Architects" – and in numerous articles. I have lectured at the building several times and I served as the historical consultant for the Historic Structures Report about the library compiled by Building Conservation Associates and Coolidge, Richardson, Bulfinch and Abbott. Others in my field have regarded me as a national authority on the architecture of the Boston Public Library designed by Charles F. McKim.

7.  The Boston Public Library, designed by Charles McKim, is one of the 10 great buildings in all of America. Its great classical design, the formality and symmetry of the structure especially on the exterior, and its great decorative program have had a tremendous and unique impact on American library design.

8.  On the exterior, Charles McKim, the lead architect, carefully sited the building with relation to Copley Square and the surrounding streets. He designed with great care how the building met the ground, the plaza, the number of steps, (or stylobates, podiums, or plinths and platforms on which it rests), the bollards, and its entire relationship to the street. The building does not just stop where it hits the ground; McKim extended it outward, especially on the Dartmouth and Boylston Street elevations. Any alteration to the library's frontage must maintain this symbiotic relationship between the building and its environment.

9.  A subway head house of bronze and iron was added to the Boylston Street side in 1915. Sensitively sited and symmetrical with the building, the architects used the same classical vocabulary as the main building. It was designed by Fox, Jenny and Gale, several of whom were alumni of the McKim, Mead & White office and who had worked on the original building. The location of the 1915 head house on the Boylston side of the building does not diminish its importance.

10. The Boylston street façade shares equal billing with and is of equal strength as the Dartmouth Street façade.

11. I have carefully reviewed the proposed option by the MBTA to construct a new inbound elevator head house of steel and glass to be located on the National Historic Landmark Boston Public Library site.

12. Extreme care must be taken when altering a building of such fame and magnitude. Placing a lopsided, modern structure as proposed on the site of the Boston Public Library must be avoided at all costs. Such a placement would represent a change to the property's setting that contributes to its historic significance and the introduction of visual elements that seriously diminish the integrity of the property's historic features.

13. The existing subway head house illustrates how a new elevator head house might be approached. An additional elevator house must have a balance and be symmetrical with the original, which means one on each side, and it should be constructed in a style compatible with and similar to the existing 1915 subway head house.

14. Another historically desirable alternative is to move the entire new elevator head house down the street a short way to the front of the modern Philip Johnson annex.

15. The Boston Public Library is a world-class structure. It would be a significant loss to the architectural history of the City of Boston and the Country for it to be disfigured by a grossly incompatible design and placement as currently proposed by the MBTA.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY, THE DAY OF ___19 JULY___, 2005.

Richard Guy Wilson

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No.: 05-11211JLT

NEIGHBORHOOD ASSOCIATION OF THE
BACK BAY, INC., and THE BOSTON
PRESERVATION ALLIANCE, INC.

    Plaintiffs,

        v.

FEDERAL TRANSIT ADMINISTRATION
and MASSACHUSETTS BAY
TRANSPORTATION AUTHORITY,

    Defendants

## AFFIDAVIT OF LAURENCE E. HARDOON

I, Laurence E. Hardoon, hereby state as follows:

1.    I am an attorney practicing in Massachusetts and I represent the

      plaintiffs in this action.

2.    During the preparation and investigation of the facts involved, I had a

      telephone conversation towards the end of June 2005 with Ms. Karen

      Theimer Brown.  Ms. Theimer Brown is the historic preservation

      specialist at the Advisory Council in Washington D.C.

3.    The Advisory Council was created by Congress to participate in

      undertakings that adversely affect historic properties such as those

      involved in this matter.  Its role can perhaps be analogized to that of an

      ombudsman or arbiter to address the full range of preservation issues

      presented and help guide the parties in interest in developing a

      mitigation plan that balances historic integrity with project needs.

1

4.    Ms. Theimer Brown informed me during our conversation that the
      Copley Station Project involves precisely the types of historic sites and
      structures that the Council would consult on if they create adverse
      effects.  She further indicated to me that the first notice that the
      Council had of the existence of the project was received by it in mid-
      June 2005.

   SIGNED under the pains and penalties of perjury, this ___12th___ day of
_____September_____, 2005.

                                    _____
                                    LAURENCE E. HARDOON

2