IN THE DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

NEIGHBORHOOD ASSOCIATION OF )
THE BACK BAY, INC., and THE BOSTON )
PRESERVATION ALLIANCE, INC, )
)
Plaintiff(s), )
) Civil Action No. 05-11211-JLT
v. )
)
FEDERAL TRANSIT ADMINISTRATION )
and MASSACHUSETTS BAY )
TRANSPORTATION AUTHORITY )
)
Defendants. )

## DEFENDANT FTA's OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY AND FINAL INJUNCTION

MICHAEL J. SULLIVAN
United States Attorney

Barbara Healy Smith
Assistant U.S. Attorney
John Joseph Moakley U.S.  Courthouse
1 Courthouse Way, Suite 9200
Boston, MA 02210
(617) 748-3263

TABLE OF CONTENTS

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATUTORY AND REGULATORY BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    The NHPA, 16 U.S.C. § 470f, ("Section 106 ") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

    The NHPA, 16 U.S.C. § 470h-2(f)("Section 110(f)") . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

    49 U.S.C. § 303 ("Section 4(f)") . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    The National Environmental Policy Act, 42 U.S.C. § 4332 (NEPA) . . . . . . . . . . . . . . . . 9

AGENCY PROCEEDINGS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        PLAINTIFFS CANNOT MEET THEIR BURDEN FOR JUSTIFYING
        A PRELIMINARY INJUNCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

        A.    PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE
              MERITS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 17

              1.    Plaintiffs Cannot Show That the FTA's Actions
                    Were Inconsistent With the Provisions of
                    Section 106 of the NHPA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

                    a.    The FTA satisfied the procedural
                          requirements of Section 106 . . . . . . . . . . . . . . . . . . . . . . . . . 18

                    b.    The FTA satisfied the administrative
                          requirements of Section 106 . . . . . . . . . . . . . . . . . . . . . . . . . 22

                    c.    Plaintiffs' claim that the FTA merely
                          "rubber-stamped" the MBTA's application
                          is contrary to the facts and the law . . . . . . . . . . . . . . . . . . . 24

                    d.    The FTA made a reasoned determination
                          of no adverse effects that is fully
                          supported by the record . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

e.  There is no new information requiring the FTA to engage in a post-review consultation . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

2.  The FTA Satisfied the Requirements of Section 110(f) . . . . . . . . . . . . 28

3.  The FTA Complied With Section 4(f) . . . . . . . . . . . . . . . . . . . . . . . . . 28

B.  The Public Interest Will Be Harmed by Delay of the Project . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

C.  The Balance of Potential Harms Weighs Against an Injunction . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

D.  The Balance of Equities Weighs Against an Injunction . . . . . . . . . . . . . . . . . . . 35

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 36

**INTRODUCTION**

Title II of the Americans With Disabilities Act of 1990 (ADA) required public transit agencies to develop a plan for handicap accessibility at identified "key stations." The MBTA's Copley Station (Copley Station, or Copley) was designated a key station thirteen years ago. The purpose of the Copley Station "Accessibility Improvement Project" at issue (the project), is to meet federally-mandated requirements to make Copley accessible to individuals with disabilities and thereby compliant with the ADA. *First Amended Complaint* (Compl.), ¶ 10. See 42 U.S.C. § 12147(b)(2)(A)(2000). Copley Station is located within the Back Bay Historic District, adjacent to the Boston Public Library (BPL, or the Library) and Old South Church (OSC, or the Church), both of which are listed in the State and National Registers of Historic Places, and are designated National Historic Landmarks. AR271, 402.

Despite the fact that the 1992 key station plan was prepared through a public process, AR93-101, that plaintiffs were aware by 1997 at the latest that plans were going forward to make Copley handicap accessible, that the Boston Landmarks Commission, City of Boston, Massachusetts Historical Commission, the Church, and the Library were consulted throughout the process, and the public had an opportunity for input, plaintiffs seek at the eleventh hour to block the project based on claims that defendant Federal Transit Administration (FTA), did not take into account the effect on historic structures or consider alternatives for siting the elevators. On the contrary, the record evidences an extensive consultation process, shows the FTA's compliance with applicable laws, and reveals a reasoned, supported decision to approve the project. Plaintiffs' Motion for a Preliminary and Final Injunction should be denied and the Complaint dismissed.

<p style="text-align:center">**STATUTORY AND REGULATORY BACKGROUND**</p>

Under ADA regulations, 49 C.F.R. §§ 37.47-51, all key stations were required to be made accessible no later than July 26, 1993.  The MBTA received an extension for Copley, deferring the compliance date until June 2005.  AR114.  The proposed project will be financed with federal funds from the United States Department of Transportation (DOT).  Compl., ¶ 13.  The  FTA is a funding agency within DOT authorized to review and process applications for federal grants to state and local agencies to assist certain local and regional mass transit projects, such as the accessibility improvements to Copley.  49 U.S.C. § 5301(f).  See, e.g., AR180.

The project, its approval by the FTA, and plaintiffs' challenge to the FTA's approval, implicate a number of overlapping statutory and regulatory requirements.  Plaintiffs have invoked the Administrative Procedure Act (APA), 5 U.S.C. §§ 702-706, to challenge the FTA's December 30, 2004, Finding of No Significant Impact (FONSI), issued under regulations for DOT to implement the National Environmental Policy Act (NEPA).  23 C.F.R. §§ 771.101-137.  Plaintiffs contend, Compl. at 2, that the FONSI and the FTA's approval of the project (for federal funding) violate both Sections 106 and 110 of the National Historic Preservation Act (NHPA), 16 U.S.C. § 470f (Section 106)[1] and 16 U.S.C. § 470h-2(f) (Section 110(f)), as well as Section 4(f) of the Department of Transportation Act of 1966 (DOTA), 49 U.S.C. § 303 (Section 4(f)).  All federally funded transportation programs must comply with a number of federal environmental protection and historic preservation laws, including the NHPA and Section 4(f).  Valley Cmty. Pres. Comm'n v. Mineta,  373 F.3d 1078, 1084 (10th Cir. 2004).

---

[1] "Section 106 is the shorthand name, taken from the congressional bill number, for a federal review process under the NHPA.  Section 106 requires federal agencies to take responsibility for the impact of their decisions on historic resources."  Comm. to Save Cleveland's Huletts v. U.S. Army Corps of Eng'rs, 163 F. Supp. 2d 776, 782 n. 8  (N.D. Ohio 2001) (citing 16 U.S.C. § 470f).

<p style="text-align:center">2</p>

In addition, the project must comply with Title II of the ADA.  FTA regulations generally require recipients of federal grants for transportation projects to make each individual mode of transportation supported by federal funds "accessible to and usable by individuals with disabilities, including individuals who use wheelchairs."  49 C.F.R. § 37.47.  The ADA provides very specific requirements and guidance governing mass transit accessibility.  See, e.g., "ADA Accessibility Guidelines for Buildings and Facilities," 49 CFR Pt. 37, App. A (2005), Guidelines 10.3.1(1), 10.3.2(2) (requiring that the handicap accessible route and entrance to the station shall "to the maximum extent practicable," coincide with the circulation path of the general public), and 10.3.1(17) (requiring that, "where provided, elevators shall be glazed or have transparent panels to allow an unobstructed view both in to and out of the car").

The project at issue involves: redesigning the current 1960's brick outbound stairwell headhouse in front of the OSC with a lighter, glass-enclosed structure; placing one elevator headhouse behind the re-designed stairwell next to the Church; rehabilitating the historic inbound subway entrance next to the BPL; and placing an outbound elevator headhouse east of the historic kiosk, on the side of the Library and upon a small section of the wide side steps owned by the Library; and redesigning the existing outbound stairwell headhouse on the west side of Dartmouth Street across from the OS.  AR187, 233-240, 246, 331-337, 347-353.  As explained below, specific features of the Copley project implicate the federal statutes in different ways.

**The NHPA, 16 U.S.C. § 470f ("Section 106")**

Section 106 requires federal agencies proposing federally-assisted undertakings to "take into account" the effect of the undertaking on any building listed in or eligible for inclusion in

3

the National Register of Historic Places.[2]  Section 106 imposes procedural obligations on federal

agencies to obtain information they must take into account.  Valley Cmty. Pres. Comm'n, 373

F.3d at 1085 (citing City of Alexandria v. Slater, 198 F.3d 862, 871 (D.C. Cir. 1999)).  As the

First Circuit has stated, "Section 106 is characterized aptly as a requirement that agency

decisionmakers 'stop, look, and listen,' but not that they reach particular outcomes."

Narragansett Indian Tribe v. Warwick Sewer Auth. 334 F.3d 161, 166-67 (1st Cir. 2003)(citing

Muckleshoot Indian Tribe v. U.S. Forest Serv., 177 F.3d 800, 805 (9th Cir.1999)); see also

Conn. Trust for Historic Pres. v. ICC, 841 F.2d 479, 483-84 (2d Cir.1988) ("NEPA and NHPA

require only that agencies acquire information before acting.").

        The regulations promulgated pursuant to Section 106 impose a consultation process to

carry out the law's mandate.  Under Section 106, the agency is first required to consult with the

State Historic Preservation Office (SHPO) (in this case, the Massachusetts Historical

Commission, or MHC) to identify eligible historic properties within the area of potential effects.

See Comm. to Save Cleveland's Huletts, 163 F. Supp. 2d at 789 (citing 36 C.F.R. § 800.4).  If

the agency determines that a historic property may be affected, the agency shall notify all

---

[2] Section 106 provides in relevant part that:

> [t]he head of any Federal agency having direct or indirect jurisdiction over a proposed Federal or federally assisted undertaking in any State . . . shall, prior to the approval of the expenditure of any Federal funds on the undertaking or prior to the issuance of any license, . . . take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register.  The head of any such Federal agency shall afford the Advisory Council on Historic Preservation . . . a reasonable opportunity to comment with regard to such undertaking.

16 U.S.C. § 470(f).

"consulting parties."[3]  36 C.F.R. § 800.4(d)(2).  The agency then must evaluate whether the proposed project has any adverse effects as defined by § 800.5(a)(1), and consider any views provided by consulting parties and the public.[4]

When the project's effects do not meet the criteria of paragraph § 800.5(a)(1), the agency may propose a finding of "no adverse effect."  36 C.F.R.§ 800.5(b).  If the agency finds no adverse effect, then the agency must notify all consulting parties of the finding and provide them with the documentation specified in § 800.11(e).  36 C.F.R.§ 800.5(c).  The SHPO and other consulting parties then have 30 days to review the finding.  Id.  If the SHPO agrees with the finding of no adverse effect, then the agency may proceed with the undertaking and its duties under § 106 are fulfilled.  § 800.5(c)(1).

The regulations require a written notification by the federal agency to the SHPO accompanied by documentation supporting the agency finding.  Comm. to Save Cleveland's

_____

[3]  Consulting parties are defined as the SHPO, Indian tribes and Native Hawaiian organizations, representatives of local government with jurisdiction over the area, the applicant for federal assistance or approval, and "additional consulting parties."  36 C.F.R. § 800.2(c).  Additional consulting parties are "certain individuals and organizations with a demonstrated interest in the undertaking . . . due to the nature of their legal or economic relation to the undertaking or affected properties, or their concern with the undertaking's effects on historic properties."  36 C.F.R. § 800.2(c)(5).  An interested party only participates as a consulting party, however, if the party requests participation in writing and the agency determines that they should be granted consulting party status.  Mid States Coal. for Progress v. Surface Transp. Bd., 345 F.3d 520, 553 (8th Cir. 2003) (citing 36 C.F.R. § 800.3(f)(3)).  There is nothing in the administrative record to suggest that either Neighborhood Association of the Back Bay (NABB) or the Boston Preservation Alliance, Inc. ever requested in writing to become a consulting party.

[4]  "Adverse effect" is defined as an impact where "an undertaking may alter, directly or indirectly, any of the characteristics of a historic property that qualify the property for inclusion in the National Register in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling or association."  36 C.F.R. § 800.05(a)(1)  An example of an adverse effect is the introduction of visual or atmospheric elements that diminish the integrity of the property's significant features.  36 C.F.R. § 800.05(a)(2)(v).  Adverse effects also include physical destruction or damage to the property or alterations not consistent with the Secretary's standards for the treatment of historic properties.  36 C.F.R.§§ 800.5(a)(2)(i) and (ii).

5

Huletts, 163 F. Supp. 2d at 790-91.  The agency is required to support its determination with sufficient documentation to enable any reviewing parties to understand its basis.  36 C.F.R. § 800.11(a).  The SHPO must be given a "reasonable opportunity to comment" on the effect of the federally funded program on the historic site.  Concerned Citizens Alliance v. Slater, 176 F.3d 686, 695 (3d Cir. 1999).  While the agency must take the SHPO's comments into consideration, the ultimate conclusion rests with the agency.  Id. at 695-696.  Thus, there is no requirement of a final concurrence before an agency may proceed with the project.  See 36 C.F.R. § 60.2(a); Concerned Citizens Alliance, Inc., 176 F.3d at 695.  A determination of "no adverse impact" under § 106 is reviewed under an arbitrary and capricious standard.  Aertsen v. Landrieu, 488 F. Supp. 314, 318 (D. Mass. 1980), aff'd 637 F.2d 12 (1st Cir. 1980).

**The NHPA, 16 U.S.C. § 470h-2(f) ("Section 110(f)")**

In 1980, Congress amended the NHPA, adding section 110(f), which establishes a higher standard of care for undertakings that might adversely affect National Historic Landmark (NHL) properties by requiring that, prior to approval of any Federal undertaking which may "directly and adversely" affect any NHL, the agency shall take such planning and actions as may be necessary to minimize harm to the NHL, and provide the Advisory Council on Historic Preservation (the Council), a "reasonable opportunity" to comment on the project.  16 U.S.C. § 470h-2(f).[5]  Like Section 106, the mandates of Section 110 are purely procedural.  See Nat'l

---

[5] Section 110(f) provides that:
"Prior to the approval of any Federal undertaking which may directly and adversely affect any National Historic Landmark, the head of the responsible Federal agency, shall, to the maximum extent possible, undertake such planning and actions as may be necessary to minimize harm to such landmark, and shall afford the Advisory Council on Historic Preservation a reasonable opportunity to comment on the undertaking.
16 U.S.C. § 470h-2(f).

Trust for Historic Pres. v. Blanck, 938 F. Supp. 908, 921-22 (D.D.C. 1996) (concluding that §

110 does not create "new substantive preservationist obligations separate and apart from the

overwhelmingly procedural thrust of the NHPA as described by every court that has considered

the Act.") (citing  Lee v. Thornburgh, 877 F.2d 1053, 1057 (D.C. Cir. 1989)).  Review of an

agency's actions under § 110 is likewise under the deferential "arbitrary and capricious"

standard.  See Blanck, 938 F. Supp. at 915, 925.

**49 U.S.C. § 303 ("Section 4(f)")**

Plaintiffs also allege a violation of Section 4(f) of the Department of Transportation Act

of 1966, 49 U.S.C. § 303(c) (1994) (originally codified at 49 U.S.C. § 1653(f) (1970)).  Section

4(f) requires DOT to avoid approving a project that uses the land of a protected resource unless

there is no feasible and prudent alternative to such use.  49 U.S.C. § 303(c).[6]

Insofar as relevant here, Section 4(f) requirements only apply to sites on or eligible for

the  National Register of Historic Places (National Register).  23 C.F.R. § 771.135(e).  By its

terms, the statute only provides Section 4(f) protection to historic sites when they will be "used"

in the course of the transportation project.  49 U.S.C. §303(c).  See Nat'l Trust for Historic Pres.

---

[6] Section 4(f) provides in relevant part that:

> The Secretary may approve a transportation program or project (other than any project for a park road or parkway under section 204 of title 23) requiring the use of publicly owned land of a public park, recreation area, or wildlife and waterfowl refuge of national, State, or local significance, or land of an historic site of national, State, or local significance (as determined by the Federal, State, or local officials having jurisdiction over the park, area, refuge, or site) only if- -

> (1)    there is no prudent and feasible alternative to using that land; and

> (2)    the program or project includes all possible planning to minimize harm to the park, recreation area, wildlife and waterfowl refuge, or historic site resulting from the use.

49 U.S.C. § 303(c).

in U.S. v. Dole, 828 F.2d 776 (D.C. Cir. 1987).  If the proposed project constitutes a "use" of a

historical site, the project may not be approved unless there are no prudent and feasible

alternatives to the use of the land and the project includes all possible planning to minimize the

harm.  Id.  Thus, compliance with § 4(f) proceeds in three stages.  First, the agency identifies

which resources are protected.  Second, the agency determines whether a proposed project will

"use" the lands identified.  If not, further § 4(f) requirements are not triggered.  If the project

does use the challenged site, however, then the agency must comply with the requirements of §

4(f) in order to proceed with the project.  49 U.S.C. § 303(c); 23 C.F.R. § 771.135(a).

A "use" can be direct or constructive.  A direct use occurs "[w]hen land is permanently

incorporated into a transportation facility."  A constructive use occurs when the project does not

incorporate land from a Section 4(f) resource, but "the project's proximity impacts are so severe

that the protected . . . features or attributes that qualify a resource for protection under section

4(f) are substantially impaired."  23 C.F.R. §§ 771.135(p)(1)(i) and (p)(2) (emphasis added).

"No 'use' will be deemed to have occurred where an action will have only an insignificant effect

on the existing use of protected lands." Allison v. Dep't of Transp., 908 F.2d 1024, 1028 (D.C.

Cir. 1990)(citing Sierra Club v. United States Dep't of Transp., 753 F.2d 120, 130 (D.C. Cir.

1985); see Town of Belmont v. Dole, 766 F.2d 28, 31 (1st Cir. 1985) (observing that "the word

'use' in the statute refers to a use that is *adverse* in terms of the statute's preservationist purposes,

a 'use' that might 'harm' the resources the statute seeks to protect").  If the proposed project will

not directly or constructively "use" the historic site, § 4(f) requirements are not applicable and

the agency is not required to examine alternative sites nor minimize harm.  Geer v.  Fed. Hwy.

Admin., 975 F. Supp. 47, 67 (D. Mass. 1997).  Compliance with § 4(f) is predicated on

compliance with § 106.  Valley Cmty. Pres. Comm'n, 373 F.3d at 1085 (quoting Slater, 198 F.3d at 871).  The plaintiff has the burden to allege facts that, if taken as true, would show that the project will "use," in some significant way, a historic site.  Citizen Advoc. for Resp. Expansion, Inc. (I-Care) v. Dole, 770 F.2d 423, 441 (5th Cir. 1985)(citing Save Our Ten Acres v. Kreger, 472 F.2d 463, 466 (5th Cir. 1973)); Adler v. Lewis, 675 F.2d 1085, 1092 (9th Cir. 1982).

There is no independent cause of action under § 4(f).  Valley Cmty. Pres. Comm'n, 373 F.3d at 1084.  This Court's jurisdiction to review the FTA's §4(f) action arises out of the APA.[7] Conservation Law Found. v. Fed. Hwy. Admin., 24 F.3d 1465, 1471(1st Cir. 1994); Geer, 975 F. Supp. at 58.  Under the APA, a final agency decision will only be set aside if the decision was "arbitrary, capricious, an abuse of discretion or otherwise not in accordance with the law or if the action failed to meet statutory, procedural or constitutional requirements." Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 414 (1971).

## The National Environmental Policy Act, 42 U.S.C. § 4332 (NEPA)

Another statute implicated by plaintiffs' claims and allegations is NEPA, which generally requires an assessment of the environmental impact of, *inter alia*, "federal actions."  The environmental implementing regulations for FTA, 23 C.F.R. §§ 771.101-137, provide that FTA, "in cooperation with the applicant, has the responsibility to manage the preparation of the appropriate environmental document" to facilitate the necessary environmental review.  23

---

[7] Plaintiffs have invoked this Court's jurisdiction under the APA.  Complaint, ¶ 8.  Oddly, however, plaintiffs also have invoked 42 U.S.C. § 1983 as a basis for this Court's jurisdiction.  Id.  Any purported claim against the FTA under §1983 should be dismissed, as that statute does not provide a cause of action against federal actors.  "§ 1983 cannot form the basis of an action against individuals acting under color of federal law."  Rogers v. Vicuna, 264 F.3d 1, 4 (1st Cir. 2001)(citing Chatman v. D.E. Hernandez, 805 F.2d 453, 455 (1st Cir.1986) ("Section 1983 applies to persons acting 'under color of state law' and not to persons acting pursuant to federal law.")).

C.F.R.§ 771.109(c).  Under NEPA, there are three categories or "classes" of action, which "prescribe the level of documentation required" for the NEPA process; the agency determines the appropriate level of environmental documentation necessary for it to make its determination. 23 C.F.R. §§ 771.115, 771.119(a).  The renovation of an existing public transit station ordinarily qualifies as Class II, "Categorical Exclusion" (CE), or an action that does not have a significant environmental effect.  23 C.F.R.§ 771.115(b).  See 23 C.F.R. § 771.117(15) (listing "alterations to facilities . . . in order to make them accessible for elderly and handicapped persons" as a CE). An action that would be classified as a CE but that could involve "unusual circumstances," is evaluated to determine if a more detailed, Class III review is appropriate.  § 771.117(b).  A Class III review involves the preparation of an Environmental Assessment (EA).  § 771.115(c).  As the FTA did with the Copley project, the agency may require the preparation of an EA where it believes a more detailed evaluation would assist in its NEPA determination.  § 771.119(a).  The EA must be prepared by the applicant, id., and made available to the public.  § 771.121(d).  The applicant must furnish the agency with copies of comments received and its responses thereto. § 771.119(g).  If the agency agrees with the applicant's recommendation, it issues a written FONSI, "incorporating by reference the EA."  § 771.121(a).

### AGENCY PROCEEDINGS

Completed in 1915, Copley Station is one of the oldest subway stations on the oldest subway line in the country.  AR016, AR403.  In addition to being located within the Back Bay Historic District, AR402, adjacent to the BPL and OSC, both of which are individually listed in the State and National Registers of Historic Places and also are NHLs, AR402, 694, its inbound kiosk is a one-of-a-kind design in the MBTA system and is itself listed on the National Register.

10

AR411.  Since the staggered inbound and outbound platforms at Copley are not connected, the plan necessitated two elevators and associated headhouses, one for each side of the station. AR050, AR187, AR694.  The MBTA retained the services of a preservation consultant to assist on the Copley project.  AR256-259.

In December 2001, the MBTA commenced design development of the accessibility improvements for Copley Station.  AR187.  The MBTA had originally evaluated six different elevator headhouse locations, along with a "no-build" option, before proposing the current location and design.[8]  AR410, AR856-68.  Four options (A-D) were considered for the outbound platform, and two (E & F) were examined for the inbound side.[9]  AR410, AR856-860.

Option A located the new elevator headhouse behind the new west entrance headhouse, adjacent to the Church.  AR858.  The feasibility and advantages of that option were explained as "no major impact on the streetscape elements and infrastructure; minimal tunnel and construction work; sited within a wide sidewalk and location along the main path of access." AR858.

Option B located the elevator behind the east entrance's open stairway.  AR856.  The

---

[8] The initial design included five new headhouses (one each for the inbound and outbound elevators, two exit-only emergency stairwells, and a "cosmetic" headhouse on the east side of the historic inbound kiosk to balance the elevator proposed for the west side).  AR694.  The emergency exit headhouses have been eliminated from the plan by virtue of the MBTA's obtaining of a variance to substitute ground-level hatchways, AR1053, and the purely cosmetic headhouse was eliminated from the proposal early in the process by consensus of the MHC and architects.  AR272.

[9] At present, the outbound platform is serviced by two stairways on the north side of Boylston Street.  AR552.  The west entrance, located adjacent to the Church, is enclosed by a large, 1960's brick headhouse.  AR261.  The MBTA has proposed redesigning the existing brick headhouse to form a matched set that can be more transparent and contextual to the church.  AR246, 858.  Plaintiffs have endorsed this proposal.  AR658.  The east entrance, on the other side of Dartmouth Street, is an open stairway with low brick walls.  AR261, 552.  That entrance will be redesigned consistent with the west entrance and elevator.  AR247, 540.

option would "block an already narrow sidewalk, create a visual obstruction . . . to Copley Square, and may create a hardship to the retail users directly behind it." AR857.  The option was eliminated from consideration because of construction and passenger access problems.  AR860.

Option C incorporated the elevator into the existing retail building on the east side of Dartmouth Street.  AR857. While the option had the least streetscape impact, the MBTA determined that the substantial construction costs and risk along with the unsatisfactory access made this alternative imprudent.  AR861.

Option D also sited the elevator on the east side of Dartmouth in front of the east entrance open stairway. AR857.  This option was eliminated due to its complicated engineering issues, but mainly due to its significant impacts on pedestrian flow.  AR861.

The inbound platform is currently accessed via a single stairway enclosed by a wrought iron headhouse, located along the Boylston Street facade of the old Library building. AR260, AR551.  Option E located the inbound headhouse west of and next to the existing headhouse. AR859.  The MBTA noted that adding "new structures along the side of the intricately detailed wrought iron headhouse" is a "very difficult task," but "if done with sympathetic contextual emphasis, it could also be an opportunity to provide a focus to the historic headhouse and enrich the quality of the existing streetscape." AR858.

Option F placed the inbound elevator headhouse in front of the new Library wing at the west end of the underground platform.  While the location had "the least streetscape and urban design impacts," it was eliminated due to significant engineering issues, poor customer access, and ADA requirements.  AR860, AR862.

After studying these various alternatives, the MBTA proposed a hybrid of Option A for

12

the outbound elevator, and Option E for the inbound elevator, along with the rehabilitation of the historic wrought iron headhouse. AR410, AR860. On June 21, 2002, a schematic design was completed. AR219. The MBTA reviewed the plans and sent copies to the FTA, Boston Landmarks Commission (BLC), and MHC in October 2002. AR227. On October 28, 2002, the MBTA held a design review meeting attended by the MHC and FTA.[10] AR256. At the meeting, Jane Carolan, the MBTA's preservation consultant, gave a presentation detailing the historical significance of Copley Square and describing the MBTA's efforts to minimize any visual impact of the proposed improvements. AR257. The MBTA also proposed elimination of the outbound "cosmetic" kiosk. AR272, AR860. Those in attendance agreed its elimination "would not be detrimental to the overall project goal." AR272.

The MBTA met again with the MHC and BLC in December 2002 and January 2003. AR283, 304. In June 2003, the MBTA provided a site plan and architectural renderings to the MHC and BLC for review prior to the July public meeting. AR346.

Throughout design development, the MBTA also met regularly with the project's abutters. Meetings were held with representatives of the Church in May 2002, August 2002, January 2003, and July 2003. AR203, 217, 304, 356. One of the meetings included a visual inspection of the OSC's basement. AR217. The MBTA also met with the representatives of the Library in May 2002, January 2003, May 2003, July 2003, and November 2003. AR203, 304, 328, 356, 782. In addition to the two public meetings which were held on July 21, 2003 and July 15, 2004, AR359, 848, the MBTA also met with Plaintiff NABB in August 2003 and March 2004. AR655; Exhibit (Ex.) 1 to the Affidavit of Janet Hurwitz (Hurwitz Aff.).

---

[10] The BLC did not attend, but did provide comments via email. AR269.

The MBTA's preservation consultant, in concert with the project's architects, Graham Gund, produced a draft "Section 106 and 4F Review" (106/4f Review) in August 2003. AR400. The MBTA forwarded this report to the FTA on August 28, 2003, and formally requested a finding of "no adverse effect." AR376. The FTA had been aware of and involved in the project since 1992, when the MBTA designated Copley as a "key station." AR001. The FTA received cost estimates for the project in 1993, AR102, and attended a design review meeting with the MBTA and MHC in October 2002. AR271, 514. The FTA also documented the project's status in monthly reports starting in January 2002. AR176, 193. In January 2004, as part of the FTA's review of the MBTA's submission, the FTA asked for and received additional information regarding traffic, groundwater and environmental issues, and public notice. AR513.

On January 23, 2004, after fourteen months of monitoring the design development process, the FTA requested the MHC's concurrence in a finding of no adverse effect to the Back Bay Historic District, the inbound kiosk, the BPL, and the OSC.[11] AR516-589. The MHC, which had also been involved in design review meetings and site visits for over fourteen months, concurred with FTA's determination on January 29, 2004. AR589. As required by § 4(f) regulations, the FTA requested, on February 8, 2004, the Department of the Interior's (DOI) concurrence that there is no reasonable and prudent alternative to use of the BPL steps and that all possible measures to minimize harm were included in the planning. A595. The DOI forwarded its concurrence on May 10, 2004, conditioned upon the implementation of measures outlined in Section 6.b of the 106/4(f) Review. AR680. In response, the FTA required the

---

[11] Contrary to Plaintiffs' claim, Plaintiffs' Memorandum (Pls. Mem.) at 14, Copley Square is not listed on the National Register.

MBTA to finalize and clarify Section 6.b of the draft 106/4(f) Review.  AR1053, AR866.

Prior to responding to the MBTAs request for a "no adverse effect" finding, the FTA directed the MBTA to complete an Environmental Assessment (EA).  While station renovations normally qualify as Categorical Exclusions not requiring an EA, 23 C.F.R. § 771.117(15),  in light of the historical sensitivities and in response to plaintiff NABBs' concerns, the FTA requested that the MBTA complete the more detailed EA.  AR647, 655, 674.  In June 2004, the MBTA sent the completed EA to the FTA, the plaintiffs, and other interested parties.  AR690, 725, 726.  A public meeting addressing the EA was held on July 15, 2004.  AR776, 988.  The MBTA received eight formal responses during the comment period, including one from the plaintiffs.  AR848, 878.  During the next few weeks, the MBTA developed itemized responses that were appended to the final EA which was sent to the FTA along with renewed request for a "No Adverse Effect" finding on September 17, 2004.  AR898.

After analyzing the EA and 106/4f Review, FTA requested additional information and clarification from the MBTA.  AR1053.  The MBTA responded to the  request by modifying and finalizing the 106/4f Review, and confirming that approval had been granted to install flush hatches in lieu of planned emergency stairway headhouses.[12]  AR1053.  The MBTA also clarified that the outbound headhouse was to be sited on property owned by the City of Boston. AR1053.

After reviewing the CE documentation, the EA, and the 106/4f Review, the FTA's Regional Counsel provided a statement of legal sufficiency to the Regional Administrator on December 29, 2004.  AR1056.  The statement explained the FTA's determination that while

---

[12] Plaintiffs supported the MBTA's efforts to obtain the variance necessary to do this.  AR1031.

Option E resulted in a "use" under Section 4(f), the only alternative, Option F, was not feasible

or prudent due to engineering issues, customer access, and ADA requirements.  AR1057.  It

further concluded that neither the rehabilitation of the wrought iron headhouse nor the new

outbound elevator headhouse adjacent to the Church resulted in a  § 4(f) use or adversely

affected the historic qualities of the historic resources. AR1058.

On December 30, 2004, after more than two years of involvement in the development and

design of the project, the FTA issued a Finding of No Significant Impact (FONSI) and a

determination that the project complied with Sections 106 and 4(f).  AR271, 1060.

## ARGUMENT

### PLAINTIFFS CANNOT MEET THEIR BURDEN FOR JUSTIFYING A PRELIMINARY INJUNCTION

A preliminary injunction is an extraordinary remedy, which is not issued as a matter of

course.  Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982); see N.E. Fla. Chapter of

Ass'n of Gen. Contractors of Am. v. Jacksonville, Fla., 896 F.2d 1283, 1285 (11th Cir. 1990) ("A

preliminary injunction is an extraordinary and drastic remedy").   Under a well-established

framework, a plaintiff seeking a preliminary injunction must demonstrate four things: "(1) a

substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the

injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction)

between the injunction and the public interest."  Nieves-Marquez v. Puerto Rico, 353 F.3d 108,

120 (1st Cir. 2003)(citing McGuire v. Reilly, 260 F.3d 36, 42 (1st Cir. 2001)); see Dialogo, LLC

v. Santiago-Bauza, — F.3d —, 2005 WL 2253611 (1st Cir. Sept. 16, 2005); Charlesbank Equity

Fund II v. Blinds To Go, Inc., 370 F.3d 151 (1st Cir. 2004).  "Likelihood of success is the

touchstone of the preliminary injunction inquiry."  Phillip Morris, Inc. v. Harshbarger, 159 F.3d

16

670, 674 (1st Cir. 1998).  The burden of proof to justify an injunction is solely on the movant; a

defendant bears no burden to defeat the motion.  Narragansett Indian Tribe, 334 F.3d at 166; see

Granny Goose Foods, Inc. v. Teamsters, 415 U.S. 423, 442-43 (1974).  Here, plaintiffs cannot

meet their burden to demonstrate the essential prerequisites warranting the injunction they seek.

### A.    PLAINTIFFS ARE NOT LIKELY TO SUCCEED ON THE MERITS.

As an initial matter, this Court's assessment of whether plaintiffs have a substantial

likelihood of success on the merits must be guided by the standard of review that would apply to

its consideration of the merits upon a motion for summary judgment.[13]  The role of a court in

conducting a review of an agency's decision under § 4(f) and §§106 and 110 is to determine

whether such action is arbitrary and capricious.  See, e.g., Blanck, 938 F. Supp. 908.  Judicial

review of the agency's decision in this context is governed by the standards set forth in the APA,

5 U.S.C. § 706, which requires that "the focal point for judicial review should be the

administrative record already in existence, not some new record made initially in the reviewing

court,"[14] Camp v. Pitts, 411 U.S. 138, 142 (1973), and prescribes a deferential standard of review

that presumes the validity of the agency action and prohibits a reviewing court from substituting

its judgment for that of the agency.  See Overton Park, 401 U.S. at 413-414.  As the Supreme

Court has stated, an administrative decision should be "set aside only for substantial procedural

---

[13] A rule 56 motion is generally the mechanism used to join APA claims for the court's review. When a district court is assessing a decision of an administrative agency which is itself the finder of fact, "summary judgment is an appropriate mechanism for deciding the legal question of whether the agency could reasonably have found the facts as it did."  City & County of San Francisco v. United States, 130 F.3d 873, 876 (9th Cir. 1997) (quoting Occidental Eng'g Co. v. INS, 753 F.2d 766, 769 (9th Cir. 1985)).

[14] Therefore, the Court's consideration of this prong of the four-factor evaluation must be based solely on the Administrative Record; the additional documents plaintiffs have filed with their Motion should be disregarded.  See Camp v. Pitts, 411 U.S. 138, 142 (1973) (per curiam); Bradley v. Weinberger, 483 F.2d 410, 414-15 (1st Cir. 1973).

or substantive reasons as mandated by statute . . . not simply because the reviewing court is unhappy with the result reached."  Vermont Yankee Nuclear Power Corp. v. Natural Resources Def. Council, Inc., 435 U.S. 519, 558 (1978).  Moreover, the First Circuit has recognized that both NEPA and the NHPA are designed to produce informed decision making in contexts where it is necessary for agencies to weigh a range of options and balance competing concerns.  See Campanale & Sons, Inc. v. Evans, 311 F.3d 109, 124-125 (1st Cir. 2002) (and cases cited).  Here, over many months of meetings, plans, studies, and consultations, the FTA considered and weighed significant historic preservation concerns with the requirement – mandated by both federal law and the public interest – to make Copley accessible.

     **1.**     **Plaintiffs Cannot Show That the FTA's Actions Were Inconsistent With the Provisions of Section 106 of the NHPA**

         **A.**     **The FTA satisfied the procedural requirements of Section 106.**

The FTA satisfied the "stop, look, and listen" procedural obligations of Section 106 by participating in a fourteen-month review of the proposed accessibility improvements before making a finding of "no adverse effect."  The record shows that, during this lengthy engagement, the FTA fulfilled its regulatory mandate of "tak[ing] into account the effect of the undertaking" on eligible historic properties. 16 U.S.C. § 470f.  While the Plaintiffs are entitled to disagree with the FTA's ultimate determination, their dissatisfaction with the result is insufficient to negate the FTA's proper application of each phase of the Section 106 process.  As the First Circuit has recognized, "consultation is not the same thing as control over a project." Narragansett Indian Tribe, 334 F.3d at 166 (citing Save Our Heritage, Inc. v. FAA, 269 F.3d 49, 62 (1st Cir. 2001)).

The FTA complied with the preliminary "stop and look" step of § 106 by consulting with

18

the SHPO and the MBTA's preservation consultant, and correctly identifying historic properties within the scope of potential effects.  36 C.F.R. § 800.4.  Plaintiffs do not, and cannot, argue that the FTA failed to identify potentially affected properties and determine if they are subject to the statute's protections.  AR257-259, 373.  There is no credible argument that the first requirement of § 106 was not fulfilled.  See Comm. to Save Cleveland's Huletts, 163 F. Supp. 2d at 789.

The FTA complied with the "listen" requirement of § 106 by applying the criteria of adverse effects in consultation with the SHPO and by considering views provided by consulting parties and the public.  36 C.F.R. § 800.5.  The administrative record and the FTA's involvement over many months show that the FTA satisfied its procedural obligation under the NHPA to "acquire information before acting."  Conn. Trust for Historic Pres. 841 F.2d at 483-84.

Consistent with Section 106, the FTA properly consulted in making a determination of no adverse impact.  In addition to meeting with the FTA in October 2002, the MHC met directly with the MBTA in December 2002 and January 2003 to review the project.  AR283, 304.  In fact, the MHC sent a letter to the MBTA in August 2003 stating that the "proposed designs are responsive to the comments of the MHC . . . ." and that the MHC looked "forward to receiving and reviewing the [FTA]'s determination of effect . . ." AR373.  In January of 2004, the FTA formally requested the MHC's concurrence in applying the adverse effect criteria.  Through its meetings and correspondence with the MHC, the record shows, the FTA satisfied its obligation to consult with the SHPO.  Plaintiffs' argument that FTA provided an "incomplete representation" of information to the SHPO, Plaintiffs' Memorandum (Mem.) at 16, and an insufficient opportunity to comment, is belied by the MHC's own site visits and attendance at meetings, in addition to the documentation provided by FTA.  AR227, 271, 103, 304, 516-589.

19

The FTA properly considered the views of consulting parties, abutters, and the public before making a final determination.  The record shows that the concerns of the BLC, the BPL, the OSC, and the plaintiffs were expressed and, whether or not resolved by the design team, documented for consideration by the FTA.  Between October 2002 and January 2004, when the FTA issued its finding, there were at least ten different meetings of the various parties with the MBTA.[15]  The fourteen-month process also generated meeting minutes and correspondence, all of which were in the materials reviewed by the FTA.  One example is the July 2003 letter from the BPL which not only raised specific design concerns but noted the MBTA's "excellent work to include the Library staff in ongoing discussions . . . ." AR368.   The record evidences a sustained effort to elicit and consider the concerns of the abutters and interested parties.

Finally, the FTA satisfied the § 106 requirement to consider the views provided by the public.  The accessibility improvements were presented to the general public at a meeting in July 2003.[16]  After a presentation which included the "background, history and impact of project on historic structures and neighborhoods," the design team responded to eighteen specific questions posed by attendees.  AR359-363.  The minutes from the 2003 meeting are part of the record and part of the views considered by the FTA in the § 106 process.  The FTA clearly satisfied the obligation to "stop, look, and listen," and to "acquire information before acting," through consulting with the SHPO and by considering the views of interested parties.

---

[15] The MHC attended four, the BLC two, the Church four, the Library five, and NABB one.

[16] The MBTA's decision to complete 75% drawings during the § 106 process is fully consistent with the regulation.  The regulations provide that an applicant may proceed – at its own risk – with pre-construction (or contract award) activities while the §106 review is pending.  36 C.F.R. § 800.1.  See City of Grapevine, Tex. v. Dept. Of Transp, 17 F.3d 1502, 1509 (D.C. Cir. 1994) (noting that if the applicant commits its own resources short of construction "then it does so at the risk of losing its investment should the 106 process later turn up" an adverse effect).

Plaintiffs' allegation that FTA "stymied any party's attempt at participation," Pls. Mem at 18, is belied by the record of months of meetings and consultations with abutters,[17] the BLC, and the MHC.  E.g., AR203, 217, 271, 283, 304, 328, 346, 356, 368, 373, 782.  Plaintiffs' contention that FTA "did not involve consulting parties," and the implication that plaintiffs were consulting parties, Pls. Mem at 19, or were "entitled" to be consulting parties, id. at 17, who would have been consulted but for some inaction on the part of FTA, id., at 18, is both disingenuous and an incorrect reading of the regulations.  Plaintiff NABB was aware for years that accessibility improvements to the Green Line were proceeding.[18]  Although they imply otherwise, Plaintiffs were not a "consulting party as a matter of right" under the regulations.  36 C.F.R. §§ 800.2(c), 800.3(f); Mid States Coal. for Progress, 345 F.3d at 553.  Instead, their involvement was permissive and depended upon their submission of a written request.  See 36 C.F.R. § 800.3(f)(3).  Nonetheless, neither plaintiff asked to be a consulting party.  Finally, plaintiffs contention that they did not have a timely opportunity for input is likewise belied by the record.  In addition to an opportunity to attend the public meeting in July 2003, plaintiff NABB had a private

---

[17] It is unclear whether plaintiffs have standing to raise an alleged failure to involve abutters.

[18] FTA believes it would not be inconsistent with the requirement that the Court decide the merits on the basis of the Administrative Record, for the Court to take judicial notice of the record in the companion case challenging accessibility improvements to Arlington Street station, the record for which is on file with the Court in Civil Action No. 04-11550.  See Shuttlesworth v. City of Birmingham, 394 U.S. 147, 157 (1969) (taking judicial notice [on appeal] of record in prior litigation between same parties).  At page AR680 of that record, minutes of a public meeting in 1997, at which a representative of NABB was present, AR685, indicate that while the meeting focused largely on the Arlington project, an MBTA representative gave an overview of the Green Line accessibility project at the outset of the meeting.  Moreover, a member of plaintiff Neighborhood Association, Janet Hurwitz, who has offered expert and fact witness testimony in support of the present motion, actually worked as an architect for the MBTA on its 1995 schematic design study on accessibility improvements at subway stations, including Copley.  Quite apart from the seeming impropriety of Ms. Hurwitz's offering professional opinion testimony against the MBTA about the very matter she was paid by the T to work on, under these circumstances plaintiffs can hardly claim they didn't know the accessibility project was coming.

presentation by the MBTA prior to the FTA's § 106 or 4(f) determinations, and their comments were made part of the record considered by the FTA.  AR359, 655.

### b.  The FTA satisfied the administrative requirements of Section 106.

In addition to fulfilling its obligation to "stop, look, and listen," the FTA also met the notification and documentation requirements of Section 106.  If proposing a finding of "no adverse effect," the agency is required to "notify all consulting parties . . . and provide them with documentation specified in § 800.11(e)." 36 C.F.R. § 800.5(c).  The documentation must be sufficient to enable any reviewing parties to understand [the finding]." § 800.11(a).  The record shows that the FTA satisfied this requirement by providing sufficient information from which the MHC, who had been involved with the project for fourteen months, could understand the FTA's finding and provide a concurrence.  The documentation included:  FTA's own summary, AR516-17, the August MBTA determination request, AR518-19, the January MBTA follow-up letter, AR541-43, an August 2003 MHC letter noting the responsive design, AR520, the CE Checklist, AR521-23, project site plans, elevations, photographs, and architectural renderings for both inbound and outbound sites, AR524-40, and the 44-page Section 106/4F Review.  AR545-89.

Plaintiffs' argument that the documentation did not describe the undertaking's effect on the Back Bay Historic District, the OSC, and the BPL is without merit.  The site plans, elevations, and architectural renderings alone explicitly detail the effect of the project on all three.  This catalog, which depicts the full extent of the project and vividly illustrates the visual result, is supplemented by the detailed Section 106/4f Review.  In regard to the BPL, the report notes that through "consultation with the BLC and the MHC Option A.1 was selected as the best option.  It keeps the bollards and monuments in place, as well as the existing library steps . . . ."

22

AR555-6.[19]  As to the OSC, the FTA summary states "the primary effect of this project will be a

visual one," and the Section 106/4f Review notes the "outbound kiosk is adjacent to the church,

which is a National Historic Landmark and part of . . . the Back Bay Historic District." AR557.

The record shows that documentation provided by the FTA to the MHC was more than sufficient

for the MHC to understand the project's effect on the relevant historic properties.

Plaintiffs' contention, Pls. Mem at 15,  that the FTA did not sufficiently explain the

inapplicability of the adverse effect criteria is equally without merit.  While the Plaintiffs aver

that there was "certainly" no explanation, the record shows otherwise.  The Section 106/4f

Review notes that "it is extremely important that the designs are compatible with the existing

structures that will be most visually impacted.  These buildings are the Boston Public Library,

the New Old South Church . . . ." AR557.  The report further found that the proposed elevator

headhouses "have a form that is straightforward, yet elegant, and will read as contemporary but

will not interfere with the existing historic architectural structures." AR558 (emphasis added).

Under Section 106, visual elements that do not "diminish the integrity of the property's

significant historic features" are not adverse effects.  36 C.F.R. § 800.5(a)(2)(v).  As to the

historic kiosk, the Section 106/4f Review specifically states that "any work undertaken [on the

historical kiosk] must follow the guidelines of The Secretary of the Interior . . . ." AR556.  Only

rehabilitation "inconsistent with the Secretary's standards" is considered an adverse effect.

36 C.F.R. § 800.5(a)(2)(ii).  In sum, the information delivered to the MHC by the FTA was

---

[19] Plaintiffs claim that the FTA misrepresented the scope of work to the MHC.  Plaintiffs cite the
EA to argue that "the project will require changes to the existing stone steps and other open space
elements of the BPL."  Pls. Mem at 14.  While the stone steps immediately underneath the elevator will
be removed, that was evident in the documentation, AR532, 534-35, and the MHC likely understood this
to be necessary for the elevator to function properly.  The Plaintiffs also omit the phrase "such as the bus
shelter" which clarified "open space elements."

sufficient to allow the MHC to understand the inapplicability of the adverse effect criteria.

          **c.**       **Plaintiffs' claim that the FTA merely "rubber-stamped" the MBTA's application is contrary to the facts and the law.**

Plaintiffs' characterization of the FTA's fourteen-month Section 106 review process as "rubber-stamping," Pls. Mem at 13, is without merit. While Section 106 does require the FTA to make an independent evaluation, plaintiff's claim disregards both the explicit regulatory language and the totality of the FTA's actions. First, the FTA's consideration of third party reports in making its effects determination is consistent with the express procedural requirements of § 106. Section 106 provides that the agency "may use the services of applicants, consultants, or designees to prepare information, analyses, and recommendations." 36 C.F.R. § 800.2(a)(3). The First Circuit has noted that the "regulations themselves explicitly contemplate the use of consultants to provide analysis for use in the § 106 process." Narragansett Indian Tribe, 334 F.3d at 168; see Friends of the Earth v. Hintz, 800 F.2d 822, 834-35 (9th Cir. 1986) (holding Army Corps of Engineers was not required to "undertake an independent investigation or to gather its own information" for an EA).

Second, the FTA's careful review of the information submitted by the MBTA, shows its reliance on outside reports was not an improper delegation of authority. Plaintiffs' claim that the "FTA mirrored language of the [106/4f Review]," Pls. Mem. at 13-14, is irrelevant to assessing the FTA's § 106 compliance. Instead, the "key inquiry . . . is the extent of the [FTA's] review of the [MBTA's] assessment." Save Our Wetlands, Inc. V. Sands, 711 F.2d 634, 643 (5th Cir. 1983).[20] The FTA received the MBTA's request for determination on August 28, 2003. On

---

[20] Some of the cases cited were decided under NEPA; however, courts have noted that "NHPA is similar to NEPA except that it requires consideration of historic sites, rather than the environment." United States v. 0.95 Acres of Land, 994 F.2d 696, 698 (9th Cir. 1993)

January 9, 2004, in response to an inquiry by the FTA, the MBTA provided additional

information regarding traffic, environmental issues, public notification, and the process of

selecting the headhouse locations.  AR513.  On January 23, after fourteen months of review and

21 weeks after the MBTA's initial determination request, the FTA issued a finding of no adverse

effects.  Because plaintiffs offer no contradictory evidence sufficient to show that the FTA's

review of MBTA-submitted reports failed to satisfy the obligations of Section 106, they have not

demonstrated a substantial likelihood of success on the merits.

> **d.    The FTA made a reasoned determination of no adverse
> effects that is fully supported by the record.**

Finally, the conclusion reached by the FTA of "no adverse effects" is fully supported by

the record and well within the bounds of reasoned decision making.  The FTA's determination

that the proposed Inbound Elevator Headhouse has no adverse effect on the BPL is fully

supported by the record.  The use of a part of the library steps, steps not used to enter the library,

is not inconsistent with a finding of no adverse effect, where compatibility with the Library's

historic features was a paramount concern in the design.  See AR269, 328, 368, 555-56, 558.

Plaintiffs' claim that the decision to exclude an additional, purely cosmetic kiosk

evidences an adverse effect is also wide of the mark.  The "extra" kiosk was initially proposed to

"balance" the presence of the proposed elevator headhouse.  At a design review meeting in

October 2002 with the MHC and FTA, the design team explained that the cosmetic kiosk was to

be eliminated in light of engineering feasibility issues.  AR272.  Those in attendance agreed the

change would not be detrimental to the project.  AR272.  The Section 106/4f Review also notes

that the change would leave "the east side open to retain the important view corridor between the

wrought iron structure and Copley Square."  AR555.  In fact, NABB's own letter in support of

the emergency exit hatchways stated that NABB "wholeheartedly support[s] every effort by the MBTA to minimize the number of exterior structures." AR1031. Its "wholehearted" position contradicts its current claim that deleting the proposed cosmetic kiosk is a per se adverse effect.

Because the rehabilitation of the existing inbound kiosk will be consistent with the Secretary's standards of historic properties, AR516, 556, the FTA's finding that it is not an adverse effect under § 106 is fully supported by the record. The FTA's finding that the proposed Outbound Elevator Headhouse will not diminish the integrity of the Church's significant features and, therefore, will not have an adverse effect is also supported. AR259, 297, 328, 373. Likewise, the reasonableness of the FTA's determination that the proposed Outbound stairwell kiosk will not diminish the integrity of the Church's significant features and therefore will not have an adverse effect, is evidenced by the discussions and plans in the record. AR259, 328, 357, 373. Indeed, the project will result in improved views of the Church through elimination of the existing brick headhouse and its replacement with a lighter, transparent kiosk, designed with input from the BLC, OSC and MHC. A272, 283-85. The issues plaintiffs raise with regard to the Emergency Exit Kiosks are moot because the MBTA obtained variances permitting it to install hatches that will be flush with the sidewalk. Finally, that the SHPO concurred with the FTA's determination, even though such concurrence is not required by § 106 before the FTA can proceed, further evidences the reasonableness of FTA's conclusions. In sum, plaintiffs' disagreement with the outcome of the process does not make the determination capricious.

> **e.    There is no new information requiring the FTA to engage in a post-review consultation.**

Plaintiffs claim that new information requires re-opening of the § 106 process for a "post-review discovery consultation." Pls. Mem at 26-27. The record shows, however, that the issue

raised in the correspondence to which plaintiffs refer – the risk of damage to the windows or foundation of the Church – was considered, and is therefore not "new information" within the meaning of 36 C.F.R. § 800.13(b)   The MBTA held meetings and field visits as early as 2002 with the FTA and Church, including an on-site visit to the Church's basement.  AR203, 217, 300, 363.  Potential impacts to the Church from the relatively minimal excavation were discussed, including the structural status of the OSC and plans to monitor groundwater levels, vibrations, and settlement.  *E.g.*, AR203-207, 217-218, 300.  Analysis of those issues continued through the NEPA process.  AR702.

Plaintiffs present only one side of the correspondence on those topics; responses from the various parties are not in the record, nor is any information about the status of current or ongoing discussions.[21]  For that reason, the issue of "re-opening" is not properly before the Court.  The FTA is required to carefully review and consider any purported "new" information sent to it, but is not required to agree with plaintiffs that such information warrants additional § 106 process.  See Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 378 (1989) (holding that it was not arbitrary or capricious for Army Corps of Engineers not to reopen NEPA proceedings and prepare supplemental EIS, where the Corps "conducted a reasoned evaluation of the relevant information" before concluding that supplementation was unnecessary).

### 2.    The FTA Met the Requirements of Section 110(f).

The FTA well knew from the outset that both the Library and Church are NHL properties, and that information was clearly conveyed to the SHPO and DOI.  While Section

---

[21] Nor are the letters plaintiffs append to the Hurwitz affidavit properly part of the record for the Court to consider in its merits analysis.

110(f) imposes additional consultation requirements upon the federal agency, it does not

mandate "particular substantive outcomes."  Lesser v. City of Cape May, 110 F.Supp.2d 303,

308 (D.N.J. 2000), aff'd. Lesser v. City of Cape May, 78 Fed.Appx. 208 (3rd Cir. 2003).  The

FTA fulfilled its obligations under § 110(f).

First, its § 106 and § 4(f) analyses encompassed efforts to evaluate feasible and prudent

alternatives to locating an elevator headhouse on Library property, as well as efforts to minimize

effects therefrom.   Second, an overarching focus of the consultation process was to avoid an

adverse impact on the historic properties, and instead to make all aspects of the project

compatible with and respectful of the significant structures to which they would be adjacent.

Finally, although plaintiffs argue that FTA failed to provide appropriate notification to DOI,

PLS. Mem. at 27-29, their argument ignores that the Department of the Interior (DOI) itself

considered the 110(f) requirement "satisfied" by the dialogue that was carried out under § 4(f).[22]

AR680-81.

### 3.    The FTA Complied With Section 4(f).

With no case citations, plaintiffs argue that the FTA violated Section 4(f) of the DOTA in

its 4(f) determination and approval of the project.[23]  Pls. Mem at 29-31.  Under § 4(f), if there is

---

[22] The regulations implementing § 110(f) provide, in relevant part, that in cases involving NHLs, the Secretary of the Interior shall be included in any consultation following a determination by the Federal agency that a federally assisted undertaking will have an adverse effect on historic properties.  36 C.F.R. § 800.10(b).  Here, the FTA and the SHPO determined there would be no adverse effect.

[23] It is admittedly difficult to find cases even remotely analogous, since litigation under § 4(f) largely arises in the context of major highway or bridge projects proposed to be routed through parklands and historic districts.  See, e.g., Citizens to Pres. Overton Park, Inc. v. Volpe, 401 U.S. 402, 414 (1971) (proposed siting of section of six-lane high-speed expressway through 342-acre park that would destroy 26 acres of parkland); Town of Belmont v. Dole, 766 F.2d 28, (1st  Cir. 1985)  ( proposal to build a twelve-mile, four-lane bypass to relieve highway congestion on U.S. 3 that would run through 90 acres of land containing Indian and colonial settlement sites);  Conservation Law Foundation v. Federal Highway

to be a direct or constructive "use" of land from a significant historic site, then the Secretary of Transportation may not approve the project unless there is "no feasible or prudent alternative" to the use and the action includes all possible planning to minimize harm to the property resulting from such use. 23 CFR § 771.135. Here, the FTA properly made a § 4(f) evaluation and sent its proposed determination to DOI on February 5, 2004. DOI concurred on May 10, 2004.

The record shows FTA's compliance with Section 4(f). First, the FTA properly identified that in one aspect of the project there would be a direct "use" of an historic resource under 23 C.F.R. § 771.135 because an elevator headhouse would be physically placed on the BPL steps. FTA's "constructive use" evaluation focused on the visual impacts of the headhouses on the historic resources to which they will be adjacent, and on the rehabilitation of the historic kiosk.

Based on the plans and drawings and on its consultation with the SHPO, BLC, BPL and OSC, the FTA properly concluded that the remaining elements of the project would not cause a constructive use of the historic resources because the "proximity impacts" would not be so severe as to "substantially impair" the historic features of the Library or Church.[24] See 23 C.F.R. § 771.135(p)(2).

The record shows that concern for impact on the historic resources was considered from

---

Admin., 827 F.Supp. 871 (D.R.I.1993) (Challenging two-mile segment of 40-mile highway project that would use 16.8 acres of historic district land), aff'd. 24 F.3d 1465 (1st Cir.1994).

[24] Plaintiffs also suggest there will be a use of the Back Bay Historic District that was not taken into account by the FTA. Pls. Mem at 15, 25, 31. The District was clearly identified by FTA as one of the historic features of the project area. The only options for siting accessible entrances to Copley are within the District. If designed to be appropriate to the backdrop of the Library and Church, respectively, and to be respectful of the features of those NHLs, then the elevator kiosks would not "substantially impair" the historic features of the District as whole, since a 4(f) determination focuses on the impact to the historic features that contribute to the eligibility of the resource for listing on the National Register.

the outset, AR259 (design of new elements must be sensitive to "one of Boston's more intact architecturally significant areas; new elevator design would "uphold and reveal historic architecture," and "support historic environment"), and incorporated suggestions throughout from the BLC, BPL, MHC and OSC. *E.g.*, AR269, 302, 328, 357, 407-416. The FTA's conclusion that the elevator headhouses, designed to be harmonious with their historic surroundings, did not substantially impair the features of either the Church or the Library was not arbitrary or capricious, and is fully supported by the record. See AR259, 297, 328, 357, 373. Moreover, the SHPO concurred with the FTA's "no adverse effects" conclusion, and so there cannot be a constructive use under the regulations. 23 C.F.R. § 771.135(p)(5)(i). Likewise, the FTA properly found that Section 4(f) requirements do not apply to the rehabilitation of the historic kiosk, based on compliance with the Secretarly's standards and the MHC's concurrence with the FTA's § 106 finding that there would be no adverse effect. AR1063.

Finally, the FTA properly found that there would be a direct use of the library steps (but not the structure itself), and so evaluated that use under the 4(f) criteria. The record shows the FTA reasonably concluded there was no feasible and prudent alternative to the selected location Among other reasons for rejecting the site, the FTA found that the only alternative location for the inbound headhouse was imprudent because placing the elevator entrance 150 feet from the main entrance would result in a segregated entrance for the disabled, and therefore would not meet the project's purpose of providing ADA-compliant accessibility. AR1057. An alternative "that does not effectuate the project's purposes is, by definition, unreasonable, and need not be evaluated in detail under §4(f)." City of Bridgeton v. FAA, 212 F.3d 448, 461 (8th Cir. 2000), citing Ringsred v. Dole, 828 F.2d 1300, 1304 (8th Cir. 1987); Conservation Law Foundation v.

FHA., 827 F.Supp. at 874  (failure to meet the project's goals is "a proper basis for rejecting alternatives as imprudent").  Here, in order to make the station ADA compliant, the accessible entrance must be placed to "minimize the distance which wheelchair users and other persons who cannot negotiate steps may have to travel compared to the general public.  The circulation path, including an accessible entrance and an accessible route, for persons with disabilities shall, to the maximum extent practicable, coincide with the circulation path for the general public."  49 CFR Part 37, Appendix A, sections 10.3.1 and 10.3.2.

The record evidences all possible planning to minimize any impact.  *E.g.*, AR203-207, 288, 328-329, 408-413.  The MBTA accommodated the BLC's request that the existing stone monument and bollard be left in place to maintain symmetry, AR284, 2297-98, the headhouse was expressly designed to take "historic elements, materials and finishes" into account, AR328, and the MBTA pledged to make "every effort" to accommodate the Library's request that the location of the headhouse be shifted to "line up" with the window jamb behind it.  AR357. Because the record shows there was "consideration of the relevant factors and [no] clear error of judgment," Geer, 975 F. Supp. at 75, plaintiffs cannot prevail on their claim under Section 4(f).[25]

Since plaintiffs cannot show a likelihood, let alone a substantial likelihood, that they will prevail on the merits, the Court need not reach the other three elements of the four-part test. Wine and Spirits Retailers, Inc. v. Rhode Island, 418 F.3d 36, 54 (1st Cir. 2005).  Even were it to do so, however, the Court should still deny the motion, since plaintiffs cannot meet their burden

---

[25] An agency's findings will only be found to be arbitrary and capricious if the agency relied upon factors which Congress did not intend it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise. Burkholder v. Wykle, 268 F. Supp. 2d 835, 840 (N. D. Ohio 2002), aff'd, Burkholder v. Peters, 58 Fed. Appx. 94 (2003).

on the remaining three factors.

### B.    The Public Interest Will Be Harmed by Delay of the Project

Title II of the ADA makes discrimination in the provision of public transportation services unlawful.  42 U.S.C. § 12143.  The MBTA was required to make its key stations accessible by 1993, twelve years ago.  AR001, 111.  Given the complicated considerations present at Copley, the MBTA requested and was granted an extension until June 2005.  AR111.  As explained in the MBTA's Opposition filings, if the MBTA is prohibited from awarding the contract that already has been put out to bid, a significant delay will result.  In the meantime, since the construction contract combines the Copley project with that for Arlington Station, those unable to use stairs will continue to be denied access to the Green Line at those two locations.

There is an undeniable public interest in making public transportation accessible.  Indeed, in enacting the ADA, Congress stated that it is in the public interest to eradicate discrimination against individuals with disabilities, see 42 U.S.C. § 12101, and defined a national goal of "equality of opportunity, full participation, independent living, and economic self-sufficiency" for persons with disabilities.  Id.  As one court has stated, "[t]he public has an interest in the full participation of the disabled in the economic, social and recreational life of the community." Martin v. Metro. Atlanta Rapid Transit Auth., 225 F. Supp.2d 1362, 1383 (N.D. Ga. 2002)(citing Tugg v. Towey, 864 F. Supp. 1201, 1211 (S.D. Fla.1994)).  As the ADA recognizes, access to public transportation is critical to that participation; many disabled persons depend on public transportation to attend school, commute to jobs, travel to medical appointments and worship services, make visits to family, and perform routine errands.  42 U.S.C. § 12101.  That interest is codified in Part B of Title II of the ADA, addressing discrimination in public transportation.

Admittedly, significant public interest considerations weigh on both sides of the scale in this case. Congress likewise sought to further the public interest in preserving our historic heritage through, *inter alia,* enacting the NHPA. The record shows, however, that FTA indeed seriously "took into account" how the project will potentially affect the historic sites, and that those concerns informed the design throughout the process. *E.g.*, AR257, 283, 297, 269.

Since Copley Station is within an Historic District and adjacent to two NHLs, there is <u>no</u> option that will eliminate all effects of making Copley accessible, short of scrapping the project altogether. The record shows appropriate sensitivity to and consideration of the significant historic preservation concerns in all aspects of the project. Indeed, the project will provide an improvement, through elimination of the existing giant brick bunker entrance in front of the Church, and its replacement with a glass structure that will open up historic views and streetscapes. In short, public interest concerns weigh against an injunction.

### C.    The Balance of Potential Harms Weighs Against an Injunction

Plaintiffs argue that there is "great potential of irreparable harm" if the Court does not grant an injunction, Pls. Mem at 33, because historic views and venues will be irreparably altered and the Church might be damaged. Its argument is unavailing. First, although there is no way to eliminate 100% of the risk of damage from excavation, plaintiffs overstate the potential harm to the Church. As evidenced in the engineering report plaintiffs append to their filing (Ex. 9 to the Hurwitz Aff.), the Church's own consultants advised that the safeguards and monitoring proposed by the MBTA are reasonable, although they recommend an additional geotechnical instrument be used. As stated in the MBTA's Opposition papers, it is engaged in ongoing discussions about construction safeguards with the City, the Library and the Church.

33

Second, the next step in the process is the awarding of the contract, but construction will not start the next day. Since the Administrative Record is available to the Court, and the parties have provided full briefing of the issues for purposes of this Motion, the Court can decide the merits without further delay for additional briefs, before any new headhouses are constructed, making preliminary relief unnecessary.

Third, harm to the MBTA and the public fisc if the injunction is granted will be substantial. As explained in the MBTA's Opposition, once the project has gone to bid and the bids opened, as is the case here, the MBTA cannot, by law, delay the process if the selected contractor is unwilling to "hold" its prices. Nor can the MBTA simply start the process over later. A significant investment has been made to prepare the bid documents and Request for Proposals; some portion of that investment will be lost if this contract cannot go forward. Moreover, there was no reason to wait until the bids had been opened to seek injunctive relief.

The FTA issued its FONSI on December 30, 2004. Plaintiffs did not file their Complaint until June 9, 2005, and then did not move for preliminary injunctive relief until September. The Court may evaluate plaintiffs' own delay in assessing the balance of harms. Conservation Law Found., Inc. v. Busey, 79 F.3d 1250, 1272 (1st Cir. 1996) (affirming denial of injunctive relief where plaintiffs delayed in moving for injunction: "To be taken into account in assessing the balance of harms is the fact that between the time when plaintiffs filed suit and when they ultimately moved for injunctive relief, significant commitments were made to the[ ] project . . . . These commitments would be placed at risk if an injunction were granted."). This unexplained delay undercuts a claim of irreparable harm. See Castro v. United States, 775 F.2d 399, 408 (1st Cir. 1985) (plaintiffs' delay of more than a year "militates against a claim of irreparable injury").

34

For the same reason, plaintiffs cannot show that the equities weigh in their favor.

**D.    The Balance of Equities Weighs Against an Injunction**

Over an extensive review period, the MBTA and/or FTA met and consulted with the BPL, the OSC, the MHC, the BLC, in addition to the City of Boston, including engineers, the Chief Operating Officer, Boston Traffic Department and the PIC.   Plaintiffs, who did not apply to be consulting parties, had two private meetings and the opportunity to attend two public hearings.  In addition, they forwarded their views in writing.  AR655, 884; Ex. 1 to Hurwitz Aff. In sum, they had, and used, opportunities for input into the location and design of the proposed accessibility features for Copley.  But because their input did not lead to the results they advocated, plaintiffs now claim the process and decision were unlawful, arbitrary and capricious.

Plaintiffs challenge a final agency action that was issued December 30, 2004.  As noted above, plaintiffs inexplicably did not file suit for more than five months and, although their Complaint alleges the necessity of a preliminary and final injunction, did not file a motion for a preliminary injunction with the Complaint.   Despite knowing that the MBTA was opening bids in June, Ex. 9 to Hurwitz Aff., plaintiffs waited an additional three months before moving for an injunction.  Their current protestations of urgency are contradicted by their own dilatoriness.

The NHPA and NEPA review processes have been long completed; the record shows that FTA was informed of the historic preservation concerns and gave them careful consideration throughout.  Under these circumstances, and where plaintiffs have delayed unreasonably their request for preliminary relief until the process to award the contract is underway and cannot be "called back," the request for an injunction should  be denied.  See U.S. v. Metropolitan Dist. Com'n, 757 F. Supp. 121, 127 (D.Mass. 1991) .

35

**CONCLUSION**

Unhappy that the FTA and MBTA did not see things their way, plaintiffs Neighborhood

Association of the Back Bay and Boston Preservation Alliance want to block a project that

follows from a years-long process of consultations and review.  That process was not capricious,

the decision not arbitrary.  Instead, the process and decision appropriately balanced important

concerns, gave full consideration to the mandates of historic preservation laws, and were well

within the bounds of reasoned decision making.  FTA urges the Court to deny plaintiffs' motion,

make a final decision on the merits, and enter judgment for defendants.

<div style="margin-left:50%">

Respectfully submitted,

By its attorney,

MICHAEL J. SULLIVAN
United States Attorney


 /s/ Barbara Healy Smith
By:    Barbara Healy Smith
       Assistant U.S. Attorney
       John Joseph Moakley U.S.   Courthouse
       1 Courthouse Way, Suite 9200
       Boston, MA 02210
       (617) 748-3263

</div>

Dated: 11 October 2005