UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| NEIGHBORHOOD ASSOCIATION OF THE BACK BAY, INC., et al., | ) ) ) ) | |
| Plaintiffs, | ) ) | CIVIL ACTION NO. 05cv11211-JLT |
| v. | ) ) | |
| FEDERAL TRANSIT ADMINISTRATION and MASSACHUSETTS BAY TRANSPORTATION AUTHORITY, | ) ) ) ) ) | |
| Defendants. | ) | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

**MBTA'S MEMORANDUM OF LAW IN OPPOSITION TO
MOTION FOR PRELIMINARY AND FINAL INJUNCTION**

## I.    INTRODUCTION

Plaintiffs, Neighborhood Association of the Back Bay, Inc. ("NABB") and the

Boston Preservation Alliance, Inc., seek a preliminary injunction against the Federal

Transit Administration ("FTA") and the Massachusetts Bay Transportation Authority

("MBTA"), barring them from disbursing or using federal funds in connection with a

construction project which is designed to make the MBTA's Copley Square Subway

Station compliant with the Americans with Disabilities Act.  The MBTA submits this

memorandum in opposition to the motion.

Plaintiffs assert that FTA's approval of the project violated two federal statutes,

the National Historic Preservation Act and the Department of Transportation Act, and

that the MBTA violated its enabling legislation.  Plaintiffs cite virtually no cases in

support of their position (although there are many cases construing the federal statutes),

and they misunderstand the applicable federal regulations and the administrative record in this case.

## II.    COUNTER-STATEMENT OF THE FACTS

### A.    General Background

In 1989, the MBTA undertook a Light Rail Accessibility Program ("LRAP") in order to make parts of the Boston-area transit system (the Green Line and the light rail portion of the Red Line) accessible to passengers with disabilities.  This was done partly in response to the requirements of the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101.  Administrative Record ("AR") 179.[1]  Copley Station is one of the key Green Line stations in the LRAP.  AR 187.  Making the station accessible requires that the MBTA create an "Accessible Route between the new wheelchair accessible trains and patrons entering from the street."  AR 856.  Two such routes must be created, because the inbound and outbound platforms at the Station do not connect.  The major improvements planned for Copley Station include: (1) raising the platforms eight inches to accommodate new "Low Floor Vehicles"; (2) installing elevators and accompanying headhouses on each side of Boylston Street to permit handicap accessibility to the inbound and outbound platforms; (3) rehabilitating the existing, historic, inbound headhouse; and (4) reconstructing the existing outbound headhouse on the west side of Dartmouth Street.  AR 376, 694.

Copley Station is located close to Copley Square, a part of Boston that contains some of the City's most historic and distinctive architecture.  AR 376.  Specifically, the inbound elevator headhouse will be constructed adjacent to the Boston Public Library

---

[1] Defendant FTA filed the Administrative Record on August 16, 2005.  Docket Entries 8 and 9.

("BPL" or the "Library"), a National Historic and City of Boston Landmark. Also, the existing inbound headhouse, which is on the National Register of Historic Places, is to be rehabilitated. On the outbound side, the existing headhouse will be replaced and a new outbound elevator headhouse will be constructed. Both structures are located adjacent to Old South Church ("OSC" or the "Church"), a National Historic Landmark within the Back Bay Architectural District and the Back Bay Historic District. AR 376.

As part of its efforts pursuant to the LRAP, the MBTA commissioned a preliminary analysis of the work needed to make its light rail stations handicap accessible. AR 605. The resulting 1995 "Schematic Design Report" identified options for locating elevators for passengers in wheelchairs at stations on the MBTA's Red and Green lines. Neighborhood Ass'n of Back Bay, et al. v. Federal Transit Administration, C.A. 04-11550-JLT, Order Denying Plaintiffs' Motion for Leave to File Additional Papers (D. Mass. Sept. 14, 2005). When focused specifically on Copley Station, the MBTA reviewed the options presented in the 1995 report, AR 858-862, and concluded that none of them was feasible. AR 858. The MBTA considered additional options and ultimately selected the ones that constitute the present project.[2]

---

[2] The following options were considered:

    a.    Outbound Elevator Headhouse Options

The MBTA considered four locations for the placement of the outbound elevator headhouse:

Option A: Located the elevator behind the existing outbound headhouse. This option placed the elevator on the most open space, permitting a smoother pedestrian flow. This option was ultimately selected.

Option B: Located the elevator behind the existing open stairs on the opposite (east) side of Dartmouth Street. This option was ultimately eliminated, because it would have required removing the existing first flight of stairs at the lobby, rebuilding stairs to the street, widening the sidewalk, curb realignment, and the elimination of parking spaces. It was thought that this option would create a visual obstruction along Dartmouth Street and would be a less desirable option from a safety standpoint.

### B.    Meetings Concerning Historic Resources

The MBTA held a series of meetings to identify historic resources in the area of

the Project and, if necessary, to mitigate possible effects.

### 1.  May 28, 2002 Meeting with the Library and the Church

By May of 2002, the MBTA had identified the OSC and the BPL as properties

that could be affected by the Project.  AR 203.  Before it began subsurface investigation

of the site, the MBTA invited representatives of the Church and the Library to attend a

---

Option C:  Located the elevator in an existing retail building.  This option was eliminated because of construction issues and safety concerns.  The option would have required modification to an existing, privately owned commercial building, modification of the building's basement, widening of the sidewalk, and reconstruction of the below ground stairs.  Importantly, the elevator at this location would have been remote from the fare array; this would have required electronic or security surveillance.

Option D:  Located the elevator on the east corner of Boylston and Dartmouth Street.  This option was eliminated because it would have required widening the sidewalk and would have placed the elevator at a very busy intersection which would block existing pedestrian traffic and visual corridors.  This option also created significant engineering issues.

AR 857-859.

b.    Inbound Elevator Headhouse Options

Two options were considered for the location of the inbound elevator headhouse:

Option E:  Located the elevator next to the existing inbound headhouse.  Because of concerns about the symmetry of the façade of the Library, this option initially included a similar structure on the other side of the existing headhouse.  This option was ultimately selected, but the additional structure was eliminated because it would have been on top of an active below ground access point for the Library.

Option F:  Located the elevator in front of the new Johnson addition to the BPL, over 150 feet from other entrances.  This option created a segregated entrance for disabled people, and the MBTA was concerned that it would create ADA compliance issues.  This option also created significant engineering issues.  Because the location would bring a customer into an area of the Station beyond the fare collection area, the MBTA would have needed to create a new tunnel to bring the passenger back.  The tunnel would be difficult to construct, and would conflict with a 30 foot sewer line.  In lieu of a tunnel, the MBTA could have created a caged gate system where people in wheelchairs would have to wait until an MBTA station operator collected their fares and opened the cage.  This location was not thought to be feasible or prudent in light of the purposes of the Project.

AR 859-862.

meeting on May 28, 2002.  AR 203.  The Library's President and Facilities Officer and

the Church's Reverend attended the meeting.  AR 203.  The MBTA presented the

attendees with an overview of the Project and a general description of the scope of work.

AR 205.  The Library and the Church were able to ask questions and express concerns

regarding the overall Project.  AR 205-207.

> 2.     *October 28, 2002 Meeting with the Massachusetts Historic Commission[3] and FTA*

FTA's and the MBTA's efforts to identify and evaluate the effects of the Project

on historic properties and to gain approval for the design continued in a meeting on

October 28, 2002.  The MBTA presented the proposed Project, including its scope and

objectives, to FTA and the Massachusetts Historic Commission[4] ("MHC").  AR 225,

256-273.  Jane Carolan, a Preservation Consultant, presented the possible impacts of the

Project on historic structures.  AR 257-270.  After the presentations, MHC and the

Library requested that the MBTA explore other designs for the elevator headhouse

structures.  The MBTA agreed.  AR 272.

> 3.     *December 3, 2002 Meeting with the Boston Landmarks Commission and MHC*

At the request of MHC and the Library, the MBTA developed three alternative

design concepts and presented them at a meeting on December 3, 2002.  AR 283.  After

reviewing them, MHC, the Boston Landmarks Commission ("BLC"), and the MBTA

selected "Scheme A" as the appropriate concept to use for both the inbound and outbound

headhouses.  AR 283-284.  At the close of the meeting, the MBTA indicated that it would

---

[3] The Boston Landmarks Commission was invited but did not attend.  AR 272.

[4] MHC is designated as Massachusetts' State Historic Preservation Officer ("SHPO") pursuant to the National Historic Preservation Act.

schedule a meeting with the Church and the Library to present the proposed design.  AR

285.  The MBTA asked the BLC to attend that meeting.  AR 285.

        4.       *January 3, 2003 Meeting with the Library and the Church*

A third meeting regarding the Project took place on January 3, 2003, for the

purpose of showing the Library and the Church the current design and status of the

Project.  AR 296.  The BLC and MHC also attended.  AR 304.  The Library, the Church

and the BLC agreed that the overall design concept was "acceptable and moving in the

right direction."   AR 302.

        5.       *May 22, 2003 Meeting with the Library*

On May 22, 2003, the MBTA's Project Office held a fourth meeting to provide

the Library with an update on the design and status of the inbound elevator headhouse.

AR 328.  The Library indicated that it preferred Option A.1, which would maintain the

elevator door on the east of the headhouse and would set the headhouse off the existing

granite stone steps, but raised a concern that the framing of the inbound headhouse was

"stark."  AR 328.  The Library recommended that "curved" framing elements be used to

make the structure more symmetrical with the adjacent existing inbound headhouse.  AR

328-329.  The MBTA indicated that the BLC, MHC, and FTA had already reviewed and

approved the general design concept, and stressed that it was important that the

headhouse "have its own identity and define the era in which the headhouse was erected."

AR 328.  The MBTA also noted that the color, type and finish of the inbound elevator

headhouse would match the existing inbound headhouse, as directed by the BLC.  AR

328-329.

6.      *July 10, 2003 Meeting with Abutters*

The MBTA held a fifth meeting on July 10, 2003 for the purpose of presenting the 75% completed design of the Project to the Station's abutters and to review again the impact of the project on historic structures and neighborhoods.  AR 356.  The Library and the Church attended. AR 356. The Library requested that the location of the inbound elevator headhouse be shifted between nine inches and one foot so that the west elevation of the headhouse would "line up" with the jamb of an existing Library window.  AR 357. The location of the headhouse is directly tied to the underground fare collection lobby, but the MBTA indicated that it would try to accommodate the request.  AR 357.  After the meeting, the President of the Library wrote to the General Manager of the MBTA, complimenting the MBTA on the "excellent work to include Library staff in ongoing discussions" and for keeping the Library informed on the Project's progress.  AR 368.

7.      *July 21, 2003 Meeting with the General Public*

The MBTA held a public meeting on July 21, 2003 for the purpose of introducing the Project to the general public. AR  346, 355, 359.  The MBTA's presentation included: (1) the scope of the project; (2) the background history and impact of the project on historic structures; (3) the overview of design elements at street and platform levels and construction staging; and (4) the proposed restoration of headhouse structures, including locations, design goals, aesthetics, and materials.  AR 359.  The public was able to ask questions and express concerns regarding the project.  AR 359-363.

8.      *Meetings with NABB*

On August 5, 2003, the MBTA held a meeting with Plaintiff NABB, to discuss the Project and its potential impacts.  AR 657.  Thereafter, on August 22, 2003, the

NABB wrote to the MBTA with the following recommendations: (1) to relocate proposed inbound elevator to the front of the new "Johnson" addition to the Library; (2) to relocate the proposed outbound elevator to the opposite (east) side of Dartmouth Street; and (3) to leave the existing outbound headhouse on the west side of Dartmouth Street uncovered. AR 658-659.

In December 2003, FTA received another letter from the NABB, expressing concerns about maintaining the historic character of the neighborhood and raising an issue regarding groundwater. AR 504. The MBTA met with the NABB on March 3, 2004 to discuss those issues. AR 663.

8.    *The Carolan Review*

Jane Carolan, a Preservation Consultant who attended at least two of the meetings detailed above, prepared a Section 106 and 4F review of the Project in August of 2003 ("Carolan Review") AR 400-444. This document: (1) detailed the historic background of Boston's Transit System and of Copley Square; (2) explained the Project; (3) described the process by which the MBTA chose the locations for the various elements of the Project, particularly the new elevators; (4) described the design of the new headhouses; and (5) described the impacts and effects of the Project. AR 400-444. The Carolan Review found that "[t]he primary effect of [the Project would] be a visual one" and that "[n]o actual work [would] be undertaken on any structures in the immediate project area except for [rehabilitation of] the inbound kiosk." AR 412.

### C.    <u>Finding of No Adverse Effect</u>

*1.    MBTA's Finding of No Adverse Effect*

On August 29, 2003, the MBTA submitted the following documents to FTA:  (1)

the Carolan Review; (2) an August 21, 2003 letter from MHC to the MBTA indicating

that the proposed Project designs were responsive to MHC's commentary ("MHC

Letter"); and (3) a checklist of information required for Probable Categorical Exclusions

(the "CE Checklist").[5]  The letter accompanying the MBTA's submission indicated that

"[i]n view of [the] facts [set forth in the Carolan Review], it is our opinion that the project

will have 'No Adverse Effect' on any historic resources."  AR 376-377.  The MBTA

requested that FTA find "No Adverse Effect" as well.  AR 376-377.

*2.    FTA's Finding of No Adverse Effect*

On January 23, 2004, FTA submitted a "Finding of No Adverse Effect" to MHC.

AR 516-517.  FTA reported that the "work plan" was to restore the inbound headhouse,

replace the outbound headhouse and stairway and construct two elevator headhouses and

two emergency/exit-only stair headhouses.  AR 516.  Like the MBTA, FTA found that

the primary effect of the Project would be a visual one and that all work undertaken on

the existing inbound headhouse would follow the Secretary of the Interior's Standards for

the Treatment of Historic Structures.  AR 516.  FTA submitted to MHC the

documentation on which it relied:  (1) the MBTA's finding of "No Adverse Effect"; (2)

the MHC letter; (3) the CE Checklist; (4) maps of the Project location and schematics of

the Project; (5) the MBTA's response to FTA's commentary on the CE Checklist; and (6)

---

[5]  Categorical exclusions are actions which meet the definition contained in 40 CFR 1508.4, and based on past experiences with similar actions, do not involve significant environmental impacts.  23 CFR 71.117.

the Carolan Review.  AR518-589.  FTA requested that MHC concur in its finding.  AR 517.

### 3. *MHC's Finding of No Adverse Effect*

On January 29, 2004, MHC concurred with FTA's finding of "No Adverse Effect."  AR 589-A-589-B.

### D.    Finding of No Feasible and Prudent Alternatives.

### 1. *MBTA's Analysis*

As is described in footnote 2, the MBTA reviewed several alternatives for the location of the above ground elements of the Project.  AR 858.  This review began with the alternatives described in the 1995 Schematic Report.  Certain of those alternatives were found to be infeasible:  locating the outbound elevator on the east side of Dartmouth Street would present engineering, economic and pedestrian passage problems, AR 857-859; see note 2, supra; locating the inbound elevator in front of the "new" Johnson addition to the Library would also present engineering problems and, because it would segregate passengers in wheelchairs, it raised issues about compliance with the ADA and, hence, about achievement of the Project's objective, AR 859-861; see note 2, supra

### 2. *FTA's Finding*

On February 5, 2002 FTA found that there were no prudent or feasible alternatives to the Project as proposed and that all possible measures to minimize harm had been included in project planning.  AR 595-596.  FTA sought concurrence from the Department of the Interior ("DOI") on these issues. AR 595-596.

*3. DOI's Finding*

On May 10, 2004, DOI concurred that there were "no feasible and prudent alternatives to this proposed project."  AR 680.[6]  Because the Carolan Report suggested, but did not require, measures to minimize harm to cultural resources, DOI conditioned its agreement that the second proviso of Section 4(f) ("all possible measures to minimize harm") was satisfied upon a commitment to undertake such measures.  AR 680.

## III.    ARGUMENT

### A.        The Standard for Injunctive Relief

A preliminary injunction is "extraordinary relief.  It constitutes the exercise of far-reaching power which ought not be indulged in lightly."  Q Division Records, LLC v. Q Records, 2000 U.S. Dist. LEXIS 1773, *6 (D. Mass. 2000); accord Augusta News Co. v. News America Pub. Inc., 750 F. Supp. 28, 31 (D. Me. 1990) ("Preliminary inunctions must be used sparingly and only in cases where the need for extraordinary relief is clear and plain.").  Plaintiffs cannot show that they are entitled to such extraordinary relief.

The First Circuit has adopted the traditional test for determining whether a preliminary injunction should be granted: (1) will the plaintiff suffer irreparable injury if the injunction is not granted? (2) does such injury outweigh any harm which granting injunctive relief would inflict on the defendant? (3) has the plaintiff demonstrated a likelihood of success on the merits? and (4) is it demonstrated that the public interest will not be adversely affected by the granting of the injunction?  Dialogo v. Santiago-Bauza, 2005 WL 2253611 (1st Cir. 2005); Nieves-Marquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2003).  Other circuits have adopted an "alternative test", under which the factors

---

[6] DOI also noted that MHC's concurrence with FTA's determination of no adverse effect on historic resources "satisfies Section 106" of the NHPA.  AR 680.

are more explicitly balanced against each other, so that relative weakness on the equities may be offset by overwhelming strength on the merits and vice versa.  See North Carolina State Ports Auth. v. Dart Containerline Co., Ltd., 592 F.2d 749, 750 (4th Cir. 1979).  Without explicitly adopting the alternative test, cases in this district have suggested that such an overall balancing is appropriate.[7]  Under either the traditional standard or the alternative test, Plaintiffs have not demonstrated that they are entitled to a preliminary injunction.

**B.      The Balance of Equities and the Public Interest**

        As the major part of this brief will show (see Section III.C.), Plaintiffs are not likely to prevail on the merits of this case.  Even if that were not so, however, they are not entitled to a preliminary injunction, because the balance of equities tips decidedly against them, and the public interest would be disserved by the issuance of an injunction.

        *1.      Irreparable Harm*

        The issue of irreparable harm to the parties in this case is very much affected by the timing of Plaintiffs' motion.  Plaintiff NABB has known since 2003 that the MBTA intended to move forward with the Copley Square accessibility improvements in their present form.  AR 657.  The NABB knew that the MBTA had advertised for bids on the combined Arlington/Copley project in March of this year and would open those bids on

---

[7]  See CMRK, Inc. v. Mooney, 193 F. Supp.2d 286, 289 (D. Mass. 2001) ("[I]f the moving party presents only a weak case for success on the merits, a preliminary injunction is inappropriate unless that party demonstrates a high probability that he will be irreparably injured if the court fails to act."); A.W. Chesterton Co. v. Chesterton, 907 F. Supp. 19, 22 (D. Mass. 1995) ("The movant's burden regarding the showing of a probability of success varies depending on the corresponding harm to the opposing party of issuing the injunction."); Massachusetts Fed'n of Nursing Homes, Inc. v. Massachusetts, 772 F. Supp. 31, 37 (D. Mass. 1991)) ("[T]he plaintiff's burden of showing probable success on the merits is higher or lower depending on the corresponding harm to the defendant.")

June 15, 2005.[8]  Plaintiffs waited to file this litigation until June 9, 2005, and they did not

file their motion for preliminary injunction until September 12, 2005.[9]

    The consequence of Plaintiffs' delay in seeking preliminary relief is twofold:  as a

factual matter, it sharply increases the harm that will befall the MBTA if an injunction is

granted; as a legal matter, it undercuts Plaintiffs' claim that they will suffer irreparable

harm if an injunction is not granted.

            a.    Irreparable Harm to the MBTA

    On March 7, 2005, the MBTA advertised for bids for construction work necessary

to make two of its Green Line subway stations accessible to people with disabilities;

those stations are Arlington and Copley Square.  Affidavit of Michael Stoffel, filed

herewith ("Stoffel Affidavit"), ¶ 6.[10]  On June 15, 2005, the MBTA opened and read the

bids it had received. at Id. ¶ 7.

    The MBTA has determined that one of the bidders is the "lowest responsible and

qualified bidder."  Id. at ¶¶ 8-9.  On October 6, 2005, the MBTA Board of Directors

authorized MBTA staff to enter into a contract with that bidder. Id. at ¶ 11.  The MBTA

must now take several steps before it can issue a Notice to Proceed to the contractor, see

Id. at ¶¶ 12-13, after which work can begin, Id. at ¶ 14.  Once work begins, it will take 29

months to complete the accessibility improvements at Arlington and Copley.  Id. at ¶ 3.

---

[8]  NABB knew these things because it was a plaintiff in Neighborhood Ass'n. of the Back Bay, et al. v.
Federal Transit Administration, U.S.D.C. D. Mass. CA No. 04-11550-JLT(D. Mass. Sept. 14, 2005).  In
addition, they were matters of public record, easily within the ken of organizations whose purposes are to
"preserve and protect architectural beauty" and to provide "advocacy, leadership, and education to preserve
Boston's historic places."  Complaint, ¶¶ 6 and 7.
[9]  Plaintiffs could certainly have filed earlier.  They filed three affidavits in support of the motion: one was
signed in July (Affidavit of Richard Guy Wilson); one recounts a conversation that occurred in June
(Affidavit of Laurence E. Hardoon); and one recounts events that occurred over many years, the last one in
June (Affidavit of Janet Hurwitz).
[10]  The MBTA had determined that it would be less expensive and less disruptive for subway riders for the
construction work on the two stations to be part of one contract.  Id. at ¶ 4.

The injunction Plaintiffs seek would prevent the MBTA from issuing a Notice to Proceed, since, as soon as the contractor begins work, the MBTA will incur costs for the project.[11]  Id. at ¶ 15.  For every day that a preliminary injunction is in effect, therefore, there will be a day of delay in making both the Arlington Street Station and the Copley Square Station accessible to people who are unable to use them now.

In addition to this day-for-day delay in making the Arlington and Copley stations handicapped accessible, a preliminary injunction could well cause much more substantial delays and greater costs to the MBTA.  This is because of the legal requirements and practical considerations that apply to the MBTA's bidding and contracting process.  The bid specifications for the Arlington/Copley project requires that bidders "hold" their bid prices for 60 days. Id. at ¶ 10.  Beyond that, bidders may hold their prices, but the MBTA cannot require them to do that.  Id. at ¶ 18.  As a practical matter, the more time that passes, the less likely bidders will be to hold their prices.  Id.  If the low bidder declines to hold its price, the MBTA may seek to have another bidder do the work.  Id. at ¶ 19.  The second low bid on the Arlington/Copley contract is approximately $400,000 higher than the low bid.  Id.  If no bidder holds its price, or if no remaining bid is acceptable to the MBTA, a new project must be developed and put out to bid, because state law does not permit the MBTA to re-bid the same project.  Id. at ¶ 20.  Doing that would take a minimum of ten months and possibly much longer.  Id. at ¶ 22.  Any new bid specifications might separate the Copley accessibility improvements from those at Arlington, which would eliminate the economic and passenger-convenience advantages of the present project.  Id. at ¶ 23.

---

[11] Plaintiffs' motion seeks to enjoin the MBTA's "accepting or using federal funds" for any of the construction or alteration that is a part of the Project.  See Motion for Preliminary and Permanent Injunction, Docket Entry 12.

Issuance of a preliminary injunction thus has the potential to cause serious and irremediable harm to the MBTA and its passengers, especially its disabled passengers – harm that, as the next section makes clear, could have been avoided by Plaintiffs' expeditious prosecution of this case.

       b.      Plaintiffs Will Not Suffer Irreparable Harm

Plaintiffs make *pro forma* assertions about the harm that will occur if a preliminary injunction does not issue.  <u>See</u> Plaintiffs' Memorandum of Law in Support of their Motion for Preliminary and Final Injunction ("Plaintiffs' Memo"), Docket Entry 16, 33.  But this harm will not occur before the court can rule on the merits of Plaintiffs' claims, and it therefore is not irreparable harm within the meaning of the test.[12]

Moreover, Plaintiffs' conduct in waiting until September of 2005 to seek preliminary relief undercuts their assertion that they will suffer irreparable harm if it is not granted.  Plaintiffs have known since 2003 that the MBTA intended to proceed with the Copley Square accessibility improvements in their present form.  They knew in the spring of this year that the MBTA was seeking bids for the project.  And they knew in June that the MBTA intended to open those bids.

In similar circumstances, federal courts have declined to issue preliminary injunctions, reasoning that a plaintiff's delay in seeking relief belies its claim of irreparable harm.  In <u>Quince Orchard Valley Citizens Ass'n Inc., et al. v. Hodel, et al.</u>, the Court of Appeals upheld the denial of preliminary relief in a case that is remarkably similar to this one.  The court quoted from the district court's opinion:

> All the facts that the Plaintiffs [Associations] needed to bring this action were known to
> them at least six months before they requested preliminary relief. . . .  If Plaintiffs had

---

[12] The issue is not whether the events Plaintiffs describe will occur at all but whether they will occur before the court can reach the merits and determine whether they may lawfully occur.

> proceeded with this action expeditiously when the record was complete six months ago, it would not have been necessary for Plaintiffs to make their present request for extraordinary injunctive relief. . . .  [T]he Plaintiffs could have received a trial on the merits long before the awarding of the construction contract.  Whatever irreparable harm Plaintiffs face from the impending construction along Alternate 2A is very much the result of their own procrastination.

872 F.2d 75, 79 (4th Cir. 1989) (no internal citation).  The court concluded that "the district court acted well within its discretion in striking the balance of harms in favor of the defendants." Quince Orchard, 872 F.2d  at 79.

> This dispute could well have been resolved on the merits . . ..  The district court was therefore justified in concluding that much of the Associations' potential harm was a product of its own delay in pursuing this action. . ..  "Since an application for preliminary injunction is based upon an urgent need for the protection of [a] Plaintiff's rights, a long delay in seeking relief indicates that speedy action is not required."

Id. at 79-80 (quoting Skeehan v. Bd. of Trustees of Bloomsburg State College, 353 F. Supp. 542, 543 (M.D. Pa. 1973)). [13]

The First Circuit has recognized that delay in seeking injunctive relief undermines an assertion that irreparable harm will occur in the absence of such relief.  Conservation Law Foundation v. Busey, 79 F.3d 1250, 1272 (1st Cir. 1996) ("To be taken into account in assessing the balance of harms is the fact that between the time when plaintiffs filed suit and when they ultimately moved for injunctive relief, significant commitments were made to the . . . project. . ..  These commitments would be placed at risk if an injunction were granted.")

---

[13] In Majorica v. R.H. Macy & Co., 762 F.2d 7 (2d Cir. 1985), the Second Circuit **reversed** the grant of a preliminary injunction because of the Plaintiff's delay in seeking it.  The district court had erroneously applied a laches standard in the balancing of equities context:  "Although a particular period of delay may not rise to the level of laches and thereby bar a permanent injunction, it may still indicate an absence of the kind of irreparable harm required to support a preliminary injunction."  Majorica 762 F.2d at 8 (quoting Citibank, N.A. v. Cititrust, 756 F.2d 273, 275-6 (2d Cir. 1985)).  In this case, there will likely be a viable laches defense, based on Plaintiffs' failure to seek relief before the MBTA opened the bids for the Arlington/Copley project.  As the cited cases make clear, however, it is not necessary, in order to defeat an assertion that irreparable harm will befall the Plaintiffs, to show conduct that constitutes laches.

Like the plaintiffs in <u>Quince Orchard</u>, Plaintiffs here have behaved in a way that is inconsistent with their assertions of irreparable harm, and the court should conclude that "speedy action is not required".

> 2.    *The Public Interest*

The MBTA agrees with Plaintiffs that it is in the public interest that federal and state officials comply with laws designed to protect historically significant properties. As the remainder of this brief demonstrates, FTA and the MBTA did comply with those laws.

There is also another public interest at stake here, about which Plaintiffs are silent - the interest in making greater Boston's public transportation system accessible to people who cannot now use it. That interest is articulated in the ADA, and it is pursuant to that statute that the MBTA and FTA have moved forward with the Copley Square Station accessibility improvements that the Plaintiffs have asked this court to enjoin. The memorandum being filed today on behalf of FTA addresses at some length the public interest that the ADA seeks to advance. Because the MBTA's principle interest in this case is making the Copley Square Green Line Station accessible to its disabled riders, it shares the view of the public interest articulated by FTA and adopts that portion of FTA's memorandum.

> **C.    Plaintiffs Will Not Prevail on the Merits**

> 1.    *Standard of Review for Federal Claims*

Under the Administrative Procedure Act, 5 U.S.C. § 706, "a court's review of a challenge to an administrative decision is limited to scrutiny of the record for the existence of errors of law or absence of reasoned consideration of the record to support the factual conclusions reached by the agency." <u>Concerned Citizens Coalition v. Fed.</u>

Highway Admin., 330 F. Supp. 2d. 787, 792 (W.D. La. 2004), aff'd, 134 Fed. Appx. 760 (5th Cir. 2005). The appropriate standard is whether the agency decision is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law. Camp v. Pitts, 411 U.S. 138 (1973). A court's review "must be `searching and careful,' but `the ultimate standard of review is a narrow one.'" Marsh v. Oregon Natural Resources, 490 U.S. 360, 378 (1989). A reviewing court may not substitute its own judgment for that of the agency. Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council, Inc., 435 U.S. 519, 555 (1978).

Where judicial review involves an interpretation of law, an agency's interpretation of its own rules must be given "controlling weight unless it is plainly erroneous or inconsistent with the regulation." Udall v. Tallman, 380 U.S. 1, 16 (1965). The agency's interpretation of its rules "need only be reasonable, and not the only interpretation or the one the court would have reached if it was initially faced with the question." Enron Oil & Gas Co. v. Lujan, 978 F.2d 212, 215 (5th Cir. 1992). The same deference is due "[a]n agency's interpretation of a statute it is charged with administering." Alliance to Protect Nantucket Sound, Inc. v. United States Dep't of the Army, 288 F. Supp. 2d 64, 71 (D. Mass. 2003).

> 2. *Standard of Review for State Claims*

The pendent state claim here is an action in the nature of *certiorari* under G.L. C. 249, § 4, challenging the discretionary decision of a state official. Courts are to apply the arbitrary and capricious standard in reviewing such discretionary decisions. "Certiorari review of such discretionary action is generally not available except to determine whether the action was arbitrary and capricious." Chandler v. County Comm'r of Nantucket

County, 437 Mass. 430, 434 (2002); Northboro Inn, LLC v. Treatment Plant Bd. of Westborough, 58 Mass. App. Ct. 670, 673-74 (2003).

>    3.    *The Defendants Complied with NHPA*

The National Historic Preservation Act ("NHPA") is intended to "protect our historical heritage from extinction but not necessarily from every conceivable threat resulting from the exigencies of modern life." Cobble Hill Ass'n v. Adams, 470 F. Supp. 1077, 1089 (E.D.N.Y. 1979). The NHPA does not prohibit replacement or even destruction of historic property. Citizens for Scenic River Bridge, Inc. v. Skinner, 802 F. Supp. 1325, 1338 (D. Md. 1991). The statute does, however require that the historic nature of protected properties be considered in the course of federal agency decision making. Id.

Plaintiffs argue that defendants failed to comply with two sections of the NHPA, 16 U.S.C. § 47f ("Section 106") and 16 U.S.C. 470h-2 ("Section 110").

>    i.    Section 106

Section 106 of the NHPA has been referred to as a "stop, look, and listen" provision. Muckleshoot Indian Tribe v. U.S. Forest Service, 177 F.3d 800, 805 (9th Cir. 1999); Neighborhood Ass'n. of the Back Bay, CA No. 04-11550-JLT, Report and Recommendation for Summary Judgment 14-15 (D. Mass. Sept. 14, 2005). The Section provides that:

> federal agencies having authority to license any undertaking shall, prior to the approval of the expenditure of any Federal funds . . . take into account the effect of the undertaking on any district, site, building, structure, or object that is included in or eligible for inclusion on the National Register.

Section 106. Regulations issued by the Advisory Council on Historic Preservation ("Advisory Council") spell out Section 106's requirements. 38 C.F.R. § 800 et seq. An

"Agency Official" must "consult with a number of specified parties to identify historic properties, assess the adverse effects that the proposed project would have on those properties, and 'seek ways to avoid, minimize or mitigate any adverse effects.'" Mid States Coalition for Progress v. Surface Transportation Bd., 345 F.3d 520, 553 (8th Cir. 2003). This opposition will deal with Plaintiffs' various Section 106 claims separately, but it is worth noting at the outset that Plaintiffs' ultimate objection is that FTA reached a conclusion with which they disagree. Plaintiffs plainly believe that certain aspects of the Project will have adverse effects on historic sites. The question for this court is not whether Plaintiffs or Defendants are right about that. It is whether, in making its determination about adverse effects, FTA followed the requirements of Section 106. As this opposition demonstrates below, it did.

Plaintiffs attack both the process by which FTA conducted its Section 106 review and its substantive result.

Procedure. Plaintiffs make a scattershot attack on FTA's Section 106 process, alleging that: FTA did not conduct an independent review; that it did not properly document its finding of No Adverse Effect; that it should have included Plaintiffs as Consulting Parties and that Consulting Parties and the Public were not appropriately included in the process; that MHC and the BLC were not sufficiently involved in the process; and that the Library and the Church were not appropriately consulted.

The regulations and the case law and documents in the administrative record demonstrate that each of these assertions is incorrect:

- <u>Independent Review</u>.  FTA: (1) contracted with a consultant to prepare monthly reports as part of its "Project Management Oversight Program"[14]; <u>see</u> <u>e.g.</u> AR 176 (2) attended an October 28, 2002 meeting at which the historic properties and possible effects of the Project on the site were discussed with MHC; AR 256 (3) reviewed digital images and architectural site plan for the Project; AR 346 (4) commented on the MBTA's CE Checklist, comments that the MBTA included with its request for a finding of "No Adverse Effect"; AR 513 and (4) reviewed the Carolan Report, which detailed the historic properties within the Project area. Considerably less has been held sufficient to comply with the "independent review" requirement.  <u>See</u> <u>Lesser v. City of Cape May</u>, 110 F. Supp. 2d 303, 324 (D. N.J. 2000) (compliance with Section 106's procedural requirements sufficient to demonstrate independence of the review); <u>see</u> <u>also</u> <u>Southern Utah Wilderness v. Norton</u>, 277 F. Supp. 2d 1169, 1179 (D. Utah 2003) (where agency specialist reviewed proposal, prepared reports, reviewed drafts of the EA and engaged in consultation, agency review was "independent" for purposes of NEPA).[15]

- <u>Documentation of Finding of No Adverse Effect</u>.  FTA recognized that there would be an effect from the Project:  "The primary effect of this project will be a visual one."  AR 516.  FTA concluded that the effect would not be adverse because the new structures would use the design elements of existing, <u>historic</u> structures in a contemporary fashion and because work on the existing inbound headhouse would be performed in compliance with DOI standards.  AR 516.  This information permits a reviewing party to "understand the basis" of FTA's decision.  <u>See</u> 36 C.F.R. § 800.11(a).  Even if FTA's no effect letter, standing alone, did not satisfy the documentation requirement, the existence of other documents – the Carolan Review, the MBTA's finding, maps of the Project location and schematics of the Project – were sufficient to show what FTA

---

[14] "Agency officials" are entitled to use the services of applicants, consultants, or designees to prepare information, analyses and recommendations.  36 C.F.R. § 800.2(a)(3).

[15] Even a more substantial "delegation" by FTA would not mean that Plaintiffs are entitled to the relief they seek.  <u>See</u> <u>Cobble Hill</u>, 470 F. Supp. at 1090 ("Notwithstanding the possible accuracy of [claim of impermissible delegation], plaintiffs' argument do not entitle them to injunctive relief.")  Only "complete abdication of responsibilities under NHPA have been held sufficient to entitle plaintiffs to injunctive relief."  <u>Id.</u> (citing <u>Hall City Historical Society v. Ga. Dept. of Trans.</u>, 447 F. Supp. 471 (N.D. Ga. 1978)).

concluded, and therefore, satisfied the requirement. See Landrieu v. U.S. Dep't of Housing and Urban Development, 488 F. Supp. 314, 320 (D. Mass. 1980) (letter describing agency involvement, project area, and planned construction with attached documentation substantially complied with documentation requirements).[16]

- Consulting Parties.  "The agency must invite all relevant state historic preservation officers, tribal historic preservation officers, local government representatives, and the project applicant to participate in the NHPA process as consulting parties. . ..  [O]ther interested individuals or organizations '*may participate* as consulting parties due to the nature of their legal or economic relation to the undertaking . . . or their concern with the undertaking's effects on historic properties.'"  Mid State, 345 F.3d at 553 (emphasis in original) (citing 36 C.F.R. § 800.2).  "Other" parties, however, are required to make a written request if they would like to participate.  36 C.F.R. § 800.3(f)(3).[17]  Plaintiffs did not make such a request.[18]

- Public Involvement.  The MBTA held a public meeting on July 21, 2003, six months prior to FTA's finding of "No Adverse Effect", to discuss the Section 106

---

[16] MHC apparently found the documentation adequate, since it did not notify FTA of any shortcomings. See 36 C.F.R. § 800.11(a) ("If the . . . SHPO. . . determines the applicable documentation standards are not met, the. . .SHPO. . . shall notify the agency official and specify the information needed to meet the standard.")

[17] Plaintiffs were aware of the development of the Project and were therefore in a position to make a request.

[18] A written request does not entitle one to be a consulting party.  Following a request, the federal agency, together with the SHPO, determines whether to grant that status.  Mid State, 345 F.3d at 553; 36 C.F.R. § 800.4(f)(3); see also Advisory Council on Historic Preservation, Regulations Flow Chart Explanatory Material, available at www.achp.gov/flowexplain.html ("Others may request to be consulting parties, but that decision is ultimately up to the Agency Official.")

     In any event, Consulting Parties are not entitled to be involved in reviewing alternative locations for a project.  See Plaintiffs' Memo, 17-18 (objecting to absence of "consulting party in the section 106 review that should have encompassed consideration of this range of alternatives.")  Section 106 requires that an agency involve consulting parties in the effort to "identify historic properties potentially affected by the undertaking, assess its effects, and seek ways to avoid, minimize or mitigate any adverse effects on historic properties.  Southern Utah, 326 F. Supp. 2d at 109. The trigger is a finding of adverse effect.  36 C.F.R. § 800.5(d)(2) ("If an adverse effect is found, the agency official shall consult further to resolve the adverse effect").  Here, FTA found that the effect of the Project was not adverse.  (AR 516-517).  The SHPO concurred.  AR 589-A-589-B.  See Wicker Park Historic Dist. Pres. Fund v. Pierce, 565 F. Supp. 1066, 1075 (D.C. Ill. 1982) (requirement that agency provide "information necessary for adequate consideration of modifications or alterations" is limited to situations where the agency has found adverse effects).

determination with the general public."[19]  (compare AR 359 with AR 516-517).
This was sufficient.  Public participation in the Section 106 process is "basically
precatory rather than mandatory. . . [as] [t]he ultimate responsibility for making . .
. determinations is still upon the federal agency official."   Landrieu, 488 F. Supp.
at 320;  see Mid State, 345 F.2d at 553 (where public is encouraged to comment,
the statute is satisfied).  There was sufficient public participation here.[20]

- MHC and BLC.  FTA and the MBTA invited MHC and the BLC to a meeting on
  October 28, 2002 to discuss the Project's proposed design.  AR 271.  Both
  commented on the design and asked that other designs be considered.  AR 272.
  On December 3, 2002, the MBTA met again with these parties.  AR 283.
  Together, the MBTA, MHC, and the BLC chose a design for the elevator
  headhouses.  AR 283-284.   Additional refinements were made, and there was
  another meeting.  AR 284-285.  At the end of this process, MHC wrote to the
  MBTA that the "proposed designs are responsive to the comments MHC made at
  two planning meetings."  AR 373.

- The Library and the Church.  The MBTA or the MBTA and FTA met with the
  Library and the Church on May 28, 2002, AR 203-207, on January 7, 2003, AR
  297, on May 22, 2003, AR328-329, and on July 10, 2003, AR 356.  These
  meetings involved a back and forth about various elements of Project design.
  There is no basis for criticizing the role that was afforded the Library and the
  Church.

  Substance.  Plaintiffs assert that FTA's conclusion that there will be no adverse

effect on historic resources is "incomprehensible."  Plaintiffs' Memo, 20.  They also

insist, in somewhat more measured language, that the Project "represents a per se

'adverse effect.'"  Id.

_____

[19] In this meeting, the MBTA made a presentation consisting of the background history and impact of the
Project on historic structures and neighborhoods, an overview of design elements at the street and platform
levels, and the proposed restoration of headhouse structures, including locations, design goals, aesthetics
and materials.  AR 359. After the presentation, the floor was opened for a question and answer period on
the Project.  AR 359-363.  Plaintiffs did not attend this meeting.

[20] Plaintiffs also assert that failure to involve the public until the 75% design phase was a violation of
Section 106.  But the agency is to "identify the appropriate points for seeking input and for notifying the
public of proposed actions." 36 C.F.R. § 800.4(e).

With regard to the second point, Plaintiffs' argument is circular. They take the list of potential adverse effects (see 36 C.F.R. § 800.5(a)(2) ("change of character", "introduction of visual elements", etc.)), insist that those effects will occur and then conclude that there is necessarily an adverse effect. But none of these are, *per se* adverse effects. They are all things that may be adverse depending on whether they have an impact on the historic qualities of the protected site. Plaintiffs' first assertion – that the finding of "No Adverse Effect" is incomprehensible – is of course nothing more than a statement that they disagree with it.

The response to both of these assertions is found in the section above, which shows that FTA and the MBTA complied with the procedural requirements of Section 106. See Narragansett Indian Tribe v. Warwick Sewer Auth., 334 F.3d 161, 166-67 (1st Cir. 2003). ("Section 106 is characterized aptly as a requirement that agency decision makers 'stop, look and listen," but not that they reach particular outcomes'). Davis v. Latschar, 202 F.3d 359, 370 (D. D.C. 2000) ("requirements of Section 106. . . do not require . . . any particular preservation activities . . . only . . . consult[ing] the SHPO . . . and consider[ing] the impacts of its undertaking); Neighborhood Ass'n. of the Back Bay, CA No. 04-11550- JLT, Report and Recommendation for Summary Judgment, 19 (D. Mass. Sept. 14, 2005) ("While the plaintiffs may disagree with the conclusion, they have no recourse under Section 106").

To the extent that Plaintiffs' expert disagrees[21] with those at MHC, the BLC, and with the MBTA's architect, those disagreements should have been aired in the administrative process (where NABB was provided with its own meeting and otherwise

---

[21] See Affidavit of Richard Guy Wilson, filed with Plaintiffs' Memo.

communicated extensively with the relevant government bodies.  See AR 504, 657, 663.
It is not this court's role to resolve such disagreements.

"New" Information.  Plaintiffs argue that two new circumstances justify awarding
them the relief they seek.  One has to do with purported structural damage to the Church;
the other is the future use on the MBTA system of the "Charlie Card," which Plaintiffs
assert was not anticipated when the Copley Station accessibility improvements were
designed.  See Plaintiffs' Memo, 26-27.

The first response to this argument is that these issues belong before FTA, not this
court.  And indeed, one of them has been.  As attachments 1, 2 and 3 to this
memorandum show, after the close of the administrative process at FTA, the Church
raised with the Advisory Council the issue of potential structural impacts of Project
construction.[22]  The Advisory Council asked FTA to respond, which it did, both to the
Advisory Council and to the Church.  The response to the Church points out that the
report by the Church's own consultant "indicates that the mitigating measures that
MBTA is proposing are all reasonable."  Attachment 3, p. 2.

So far as is known, no one has raised the issue of the Charlie Card with either the
Advisory Council or FTA.  That is likely because the issue is so outlandish:  an
automated fare card may reduce the need for fare collectors and the booths they sit in; it
cannot possibly affect the need for elevators to permit people in wheelchairs to reach the
platforms.

There is no new information that would justify reopening the Section 106 process.

---

[22] True and accurate copies of three letters regarding accessibility improvements to Copley Station are
attached hereto as Exhibits 1, 2, and 3.

ii.  Section 110(f)

Plaintiffs argue that FTA violated Section 110(f) of NHPA by not affording the

Advisory Council the opportunity to comment on the Project.  Plaintiffs' Memo, 27.  This

is incorrect as a legal matter:  Section 110(f)'s mandatory consultation requirement is

triggered only when the proposed federal undertaking "may directly and adversely affect

any National Historic Landmark".  Because FTA properly determined that there would be

no adverse effect, see discussion at 19-26, there was no obligation under Section 110(f).

Plaintiffs point to 36 CFR §800.10(b), which was promulgated pursuant to Section

110(f), which states that the "agency official shall notify the Secretary [of the Interior] of

any consultation involving a National Historic Landmark and invite the Secretary to

participate in the consultation where there may be an adverse effect."  The requirement

that the Advisory Council review all "No Adverse Effect" determinations was eliminated

in 1999, 64 F.R. 27060 (May 18, 1999), but the above language remained.  In this

somewhat ambiguous legal setting, the Interior Department's statement that "the NPS

considers the requirement concerning National Historic Landmark status as being

satisfied", AR 680-681, eliminates any need for an injunction requiring further Advisory

Council involvement on this issue.[23]

4.    *The Defendants Complied with Section 4(f).*

The Department of Transportation Act, 49 U.S.C. et seq., provides that the

Secretary of Transportation may approve a transportation project "requiring the use of . . .

an historic site . . . only if:  (1) there is no prudent and feasible alternative to using that

---

[23]  Moreover, compliance with Section 110 is supported by the demonstration in the administrative record of "significant efforts to mitigate any adverse effects on historic sites, including design changes." Vieux Carre Property Owner, et.al. v. Pierce, 719 F.2d 1272 (5th Cir. 1983).  The record here amply demonstrates such efforts.  See AR 203-207, 257-270, 283-286, 296-302, 328-329, 356-369.

land; and (2) the . . . project includes all possible planning to minimize harm to the . . .

historic site resulting from the use."  49 U.S.C. § 303(c) ("Section 4(f)").  Thus the

trigger for application of Section 4(f) is the "use" of an historic site.  If there is a use, a

project may not proceed unless the two statutory criteria are met.  Plaintiffs' claim that

there will be two "uses" as part of the Copley Square accessibility improvements – a

physical use of the plaza in front of the Library and a constructive use of the Church –

and that neither of these uses meets the "no alternative" and "all planning" test.

Plaintiffs' Memo, 29-31.[24]  The MBTA does not concede that the Project's occupation of

a small area on the Library Plaza is a "use" of the Library, but the court need not resolve

that issue, because this aspect of the Project meets the statutory criteria for such a use:

that there is "no prudent and feasible alternative" to placing the handicap accessible

elevator there and that all possible planning has been done to minimize harm to the

Library.  With respect to the Church, there is no "constructive" use.

The Library

The Project as proposed by the MBTA and approved by FTA places the elevator

for people in wheelchairs next to the existing entrance, which is used by people who can

walk down the stairs to the inbound platform.  Plaintiffs insist that the elevator should be

placed in front of the new addition to the Library, over 150 feet away.  Plaintiffs' Memo,

30.  The MBTA considered that option and rejected it.  These are the reasons that the

MBTA did so:  (1) the distance itself raises questions about compliance with the ADA,

which prohibits discriminatory treatment in transportation services; AR 862 (2) using the

more remote location would result in passengers in wheelchairs arriving on the "paid"

---

[24] Plaintiffs also quarrel with the basis for FTA's conclusion that the rehabilitation of the existing inbound headhouse is not a "use" of that structure.  Plaintiffs' Memo, 31.  But Plaintiffs do not show independently that such rehabilitation does constitute a "use".

part of the platform, thereby necessitating either the construction of an additional tunnel to bring them back into the unpaid area or adoption of a practice of keeping them locked in the elevator until an MBTA employee can come and unlock it and collect the fare; Id. and (3) there are significant construction difficulties associated with this option, including conflicts with an existing sewer line.  Id.

It was not arbitrary or capricious for FTA to conclude that the foregoing difficulties demonstrated that it is not prudent and feasible to locate the handicapped elevator at the remote location suggested by Plaintiffs.[25]

Old South Church

Plaintiffs argue that "[t]he proximity of the proposed project to the Church is adverse. . . . [and] 'substantially impairs' [its] visual or esthetic qualities . . .."  Plaintiffs' Memo, 31.  They do not say what components of the Project they are referring to, but we will assume that they are most concerned about those closest to the Church – the new outbound elevator and the rebuilt outbound headhouse on the west side of Dartmouth Street.  These project components will not "use" the Church within the meaning of Section 4(f).

Nearby activity may constitute a constructive use of an historic site in limited circumstances:

> Constructive use occurs when . . . the project's proximity impacts are so severe that the protected activities, features, or attributes that qualify a resource for protection under section 4(f) are substantially impaired.  Substantial impairment occurs only when the protected activities, features or attributes of the resource are substantially diminished.

23 C.F.R. § 771.135(p)(2).

---

[25] Plaintiffs' complain that the administrative record information about the infeasibility of the alternative location appears in the Environmental Assessment but not in the 4(f) evaluation.  Plaintiffs' Memo, 30. Accepting this as a basis for granting the relief plaintiffs request means that the court should invalidate the administrative decision, with all of the consequences described in B.1.a. above, so that FTA can copy information from one document into another.

There is simply no showing that locating a small, largely transparent elevator on the sidewalk of a busy street along the side façade of the Church and reducing the size of the existing headhouse there would "substantially diminish" "the protected activities, features or attributes" of the Church.  There was nothing arbitrary or capricious about FTA's determination that there will not be a constructive use of the Church.[26]

In passing, Plaintiffs also argue that any part of the Project that is within the Back Bay Historic District "uses" an historic site – the District – and hence violates Section 4(f).  Plaintiffs' Memo, 31.  Such a reading of the law would mean that no transportation improvements could be made in large areas of the City of Boston.  For that reason, this court rejected it in the Arlington Street case.  <u>Neighborhood Ass'n of the Back Bay et. al. v. Federal Transit Administration</u>, CA No. 04-11550-JLT, Report and Recommendation for Summary Judgment 23 (D. Mass. Sept. 14, 2005).

     5.     <u>*The MBTA Did Not Violate Its Enabling Statute*</u>

Plaintiffs argue that in the planning and development of the Copley Square accessibility improvements, the MBTA violated Mass. Gen. Laws, Chapter 161A, Section 5(k).  That statute provides that certain parties shall be afforded "the timely opportunity to participate in the development of major transportation projects."  This argument is perfunctorily made by Plaintiffs; it takes up only one page in a 35 page brief.  On that one page, Plaintiffs restate arguments about the significance of their own interests and the timing of their being invited into the process, arguments that they made with

---

[26] In addition, FTA's "No Adverse Effect" determination means as a matter of law that there is no constructive use resulting from proximity impacts.  23 CFR 771.117 (p)(5)(i).

respect to the NHPA and the DOT Act.  On those points, the MBTA relies on the responses made above.

There is one other issue raised by Plaintiffs' argument, but they do not address it - the meaning of "major transportation projects".  As the court is aware, the MBTA has in recent decades extended one end of the Red Line beyond Harvard Square to Alewife and the other end beyond Quincy to Braintree; it has extended the Orange Line beyond Sullivan Square to Oak Grove.  It has more recently built a tunnel under Fort Point Channel so that the new Silver Line can go from South Station to Logan Airport.  It has reinstated the Middleborough and Plymouth Commuter Rail lines and is in the process of rebuilding the Greenbush Line.  It is considering whether to extend the Green Line beyond Lechmere to Medford.  And it is considering the construction of an "Urban Ring" through the inner suburbs and parts of Boston.[27]  There can be little doubt that these are "major transportation projects" and, therefore, that the timely public participation requirements of Section 5(k) apply to them.

The same cannot be said of the addition of two elevators for disabled people at the Copley Square Station and the reconstruction of certain existing features there.  The converse of a "major transportation project" is a "minor transportation project" – something to which the requirements of Section 5(k) do not apply.  If the Copley Square accessibility improvements are not a "minor transportation project", it is difficult to imagine what would be.  In any event, the statutory phrase is not self-defining, and the MBTA's interpretation of it is entitled to deference and should not be overturned unless it

---

[27] The court may take judicial notice of these facts.  Fed. R. Evid. 201 (to qualify for judicial notice, a fact "must be one not subject to dispute in that it is either:  (1) generally known within the territorial jurisdiction of the trial court; or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot be reasonably questioned."); U.S. v. Bello, 194 F.3d 18 (1st Cir. 1999).

is plainly incorrect.  <u>Alliance to Protect Nantucket Sound, Inc. v. United States Dep't of the Army</u>, 288 F. Supp. 2d 64, 71 (D. Mass. 2003) ("An agency's interpretation of a statute it is charged with administering is, accordingly, entitled to deference.")

## CONCLUSION

For all the foregoing reasons, defendant MBTA asks that the court deny Plaintiffs' motion for preliminary injunction.

Respectfully submitted,

**Massachusetts Bay Transportation Authority**

By its attorneys,

/s/Erika M. Holmes
Erika M. Holmes (BBO #657243)
BROWN RUDNICK BERLACK ISRAELS LLP
One Financial Center
Boston, MA 02111
(617) 856-8200

Dated: October 11, 2005

I hereby certify that a true copy of the above document was served upon the attorney(s) of record for each other party by electronic mail and US mail.

/s/ Erika M. Holmes
Erika M. Holmes BBO#657243

# 1390875 v1 - HOLMESEM - 020445/0008

# EXHIBIT 1





*Preserving America's Heritage*

August 26, 2005

Richard H. Doyle
Regional Administrator
Federal Transit Administration
55 Broadway, Suite 929
Cambridge, MA 02142

Re:    Accessibility Improvements, Copley and Arlington Stations
       Boston, Massachusetts

Dear Mr. Doyle:

We were recently contacted by a number of parties that expressed concerns regarding Federal Transit Administration's (FTA) proposal to improve accessibility at the Copley and Arlington Stations in Boston, Massachusetts. It is our understanding that FTA reached a finding of no adverse effect for this project in accordance with Section 800.5 of our regulations, 36 CFR Part 800, "Protection of Historic Properties." The Massachusetts State Historic Preservation Officer concurred with that finding by letter of January 29, 2004.

Since the finding was made, the Old South Church has expressed concern with the potential adverse effects that the subterranean excavations related to this undertaking may have on this Church and adjacent structures that may be listed or eligible for listing on the National Register of Historic Places (see enclosed letter). These parties question whether such effects were considered in reaching the finding of no adverse effect. Since we were not involved during this review, we are unable to respond to the issues that have been raised.

In order to respond to this matter, we request that FTA clarify the basis upon which it made its assessment of effects on each historic property within the APE. If such effects were not considered and could constitute an adverse effect to historic properties, the correct course of action for FTA would be to consult towards a Memorandum of Agreement in accordance with Section 800.6 of our regulations (see Section 800.13(b) regarding post-review discoveries).

Please feel free to contact Karen Theimer Brown of our office at 202.606.8534 or via eMail at ktheimer@achp.gov should you have any questions. Thank you for your consideration of this matter.

ADVISORY COUNCIL ON HISTORIC PRESERVATION

1100 Pennsylvania Avenue NW, Suite 809 • Washington, DC 20004
Phone: 202-606-8503 • Fax: 202-606-8647 • achp@achp.gov • www.achp.gov

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com



Sincerely,

XXXXX Klima
Office of Federal Agency Programs

Cc: Brona Simon, MA SHPO - Brona.Simon@state.ma.us]

Also send to:

The Reverend Dr. Nancy S. Taylor
Senior Minister
Old South Church in Boston
645 Boylston Street
Boston, MA 02116

PDF created with FinePrint pdfFactory trial version http://www.fineprint.com

# EXHIBIT 2



U.S. Department
of Transportation
**Federal Transit
Administration**

REGION I                    Volpe Center
Connecticut, Maine,         55 Broadway  Suite 920
Massachusetts,              Cambridge, MA  02142-1093
New Hampshire,              617-494-2055
Rhode Island, Vermont       617-494-2865 (fax)

September 28, 2005

Donald Klima
Director
Office of Federal Agency Programs
Advisory Council on Historic Preservation
1100 Pennsylvania Avenue, NW Suite 809
Washington, DC 20004

Re:    **Accessibility Improvements at Copley Station
        Boston, Massachusetts**

Dear Mr. Klima:

The Federal Transit Administration (FTA) has reviewed your letter dated August 26, 2005,
requesting additional information about our Section 106 determination of "no adverse effect" for
the Copley Station Accessibility Improvement Project (the "Project"). Specifically, the Old South
Church (OSC) has written to FTA, and apparently to the Advisory Council on Historic
Preservation, to express concerns related to whether FTA considered the effect of subterranean
excavations on the National Historic Landmark (NHL) OSC building prior to reaching our
determination. The short answer is yes. As early as 2002, meetings and field visits were held,
including on-site in the OSC's basement and potential impacts to the OSC from the relatively
minimal excavation were analyzed. These meetings included, among others, representatives from
the FTA and the OSC. Analysis of those issues continued through the National Environmental
Policy Act process. Discussions addressed a range of topics, including the structural status of the
OSC and plan to monitor groundwater levels, vibrations, and settlement. As the discussion and
analysis progressed, and various issues were addressed, the remaining areas of impact for
consideration under Section 106 were primarily visual in nature.

In addition, the OSC recently forwarded to FTA some letter reports from consultants it had
retained to advise it on potential impacts from the Project. The FTA has reviewed this information,
and has concluded that no new information within the meaning of 36 CFR Section 800.13(b) has
been raised to change our assessment. The OSC's consulting engineers have opined that the
Massachusetts Bay Transportation Authority's (MBTA) proposed measures to address the potential
effect of excavation are in the main reasonable, although the OSC's consultant recommends some
additional monitoring, and advises the OSC to meet regularly with the MBTA and continue to
review documentation. FTA understands that those parties are engaged in ongoing discussions on
those topics.

2

As to the other historic properties within the Area of Potential Effect, there has been no post-Finding of No Significant Impact (FONSI) new information raised, and the FTA's assessment is now the subject of an Administrative Procedures Act challenge. FTA is a defendant in two separate lawsuits challenging our FONSIs for Arlington Station and Copley Station, respectively.

In its potential effects analysis, the FTA coordinated with the State Historic Preservation Office in making its determinations. The Boston Landmarks Commission was also involved from an early stage, as well as representatives from the NHL Boston Public Library. FTA determined that the primary effect of this project would be visual. As to the inbound head house, which is a significant historical structure, all work undertaken will follow the guidelines of the Secretary of the Interior's Standards for the Treatment of Historic Structures. All of the other exterior improvements will be designed in a manner that uses the design elements of the inbound kiosk in a contemporary fashion. The project will involve one Section 4(f) constructive use of the Boston Public Library steps, but FTA determined that there was "no prudent and feasible" alternative and the Department of the Interior concurred with that determination.

FTA will be responding directly to the Old South Church, and providing them with a copy of this letter.

I hope this information is helpful. Please let us know if you have any additional questions.

Sincerely,

Richard H. Doyle
Regional Administrator

cc:  Massachusetts Historical Commission
     Old South Church

# EXHIBIT 3



**U.S. Department
of Transportation
Federal Transit
Administration**

REGION I
Connecticut, Maine,
Massachusetts,
New Hampshire,
Rhode Island, Vermont

Volpe Center
55 Broadway Suite 920
Cambridge, MA 02142-1093
617-494-2055
617-494-2865 (fax)

September 29, 2005

Reverend Dr. Nancy S. Taylor
Senior Minister
The Old South Church in Boston
645 Boylston Street
Boston, MA 02116

Re:     **Accessibility Improvements at Copley Station
        Boston, Massachusetts**

Dear Reverend Taylor:

The Federal Transit Administration (FTA) has reviewed the information provided in
Mr. McCabe's letter dated June 24, 2005, related to the impact on the Old South Church (OSC)
from the Copley Station Accessibility Project (the "Project"), as well as the accompanying
documents and additional correspondence provided by Brad Maxwell on August 2, 2005.  These
include the following:

1. An email and letter from the Boston Groundwater Trust.  The letter is dated June 3,
   2005;
2. A letter from Mr. McCabe to the Massachusetts Bay Transportation Authority dated
   July 1, 2005;
3. A letter from Jean Carroon of Goody Clancy dated June 30, 2005;
4. A letter from Alburn Blankenship of Marsh USA Inc. dated June 15, 2005; and
5. A report by LeMessurier Consultants dated May 10, 2005.

The materials focus on concerns by the OSC related to the construction impacts from the Project.
Specifically, the OSC raises questions related to excavation impacts and monitoring of
groundwater.  As to the issues raised in Mr. Laffer's letter to the Massachusetts Bay Transportation
Authority (MBTA), FTA understands that the parties are engaged in ongoing meetings to address
those concerns and will hopefully resolve them to the satisfaction of the Boston Groundwater
Trust.  FTA does not get involved in detailed discussions related to number and placement of
monitoring wells.

With regard to the information related to the subterranean excavation impacts, the OSC has not
provided any new information that would warrant FTA reopening the Section 106 process under 36
CFR Section 800.13(b). FTA did consider subterranean excavation impacts on the OSC building
prior to reaching our final determination.  As early as 2002, MBTA held a series of meetings and

- 2-

field visits, including on-site in the OSC's basement, and potential impacts to the OSC from the relatively minimal excavation were analyzed. Discussions at the meetings addressed a range of topics, including the structural status of the OSC and plans to monitor groundwater levels, vibrations, and settlement. The OSC was involved in these meetings and was provided an opportunity to express its concerns.

Additional opportunities to comment were provided through the National Environmental Policy Act process. The information you have provided is not new. In fact, the LeMessurier Consultants Report indicates that the mitigating measures that MBTA is proposing are all reasonable. It recommends that OSC receive copies of data as it becomes available and also suggests the use of an additional monitoring well. FTA suggests that you make those requests directly to the MBTA, if you have not done so already. FTA understands that the OSC is engaged in ongoing discussions with the MBTA; we hope the dialogue will continue.

We understand that the OSC has concerns about obtaining additional insurance and hope that it can work with the MBTA to resolve this issue as well. FTA encourages you to continue your discussions on that subject.

FTA understands the importance and historical significance of the OSC. We remain committed to ensuring that the MBTA complies with all the mitigating measures that are required in the Finding of No Significant Impact. Additionally, I am enclosing a copy of FTA's response to the Advisory Council on Historic Preservation regarding similar issues.

Please feel free to contact the Regional Office or have Mr. McCabe contact our acting Regional Counsel Nancy-Ellen Zusman, if you have any additional questions. Ms. Zusman can be reached at 312-353-2577.

Sincerely,

Richard H. Doyle
Regional Administrator

Enclosure

cc: Walter R. McCabe III

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

|                                          |     |                          |
| ---------------------------------------- | --- | ------------------------ |
|                                          | )   | CIVIL ACTION             |
| NEIGHBORHOOD ASSOCIATION                 | )   | NO. 05cv11211-JLT        |
| OF THE BACK BAY, INC., et al.            | )   |                          |
| Plaintiffs                               | )   |                          |
|                                          | )   |                          |
|                                          | )   |                          |
| FEDERAL TRANSIT                          | )   |                          |
| ADMINISTRATION and                       | )   |                          |
| MASSACHUSETTS BAY                        | )   |                          |
| TRANSPORTATION AUTHORITY                 | )   |                          |
| Defendants                               | )   |                          |
|                                          | )   |                          |

## AFFIDAVIT OF MICHAEL STOFFEL

I, Michael Stoffel, being duly sworn, do hereby depose and state as follows:

1.    I am the Assistant General Manager for Design and Construction for the Massachusetts

Bay Transportation Authority ("MBTA").  In that position, I have overall responsibility for the

public bidding and contract award processes for the MBTA's construction projects.

2.    In 1992, the MBTA submitted a Key Station Plan to the Federal Transit Administration

("FTA"), in compliance with the Americans With Disabilities Act.  The Key Station Plan

establishes a schedule by which a number of MBTA stations will be made accessible to people

with disabilities.  The Key Station Plan was approved by FTA and thereby became a requirement

of federal law that is binding on the MBTA.

3.    The Copley Square Green Line subway station is a Key Station.  The Key Station Plan

requires the Copley Square station to be fully accessible to people in wheelchairs by 2005.

Construction of the accessibility improvements to the Copley Square Station will take 29

months.

4.      The MBTA determined that it would be less expensive and less disruptive to users of the Green Line to put into one contract the work necessary to construct the accessibility improvements at Copley Square and at those at the Arlington Street Station, which is also a Key Station and is the next station inbound from Copley Square.

5.      During 2005, the MBTA assembled a bid package for the work necessary to make the Copley Square and Arlington Street stations handicapped accessible.  (The proposed work includes other improvements at those stations that are not related to accessibility.)

6.      The MBTA advertised for bids on the Arlington/Copley work on March 7, 2005 in accordance with Mass. Gen. Laws Chapter 30, Section 39M ("Section 39M").

7.      The bids were publicly opened and read on June 15, 2005.

8.      After the bids were opened, MBTA staff analyzed them to determine whether they complied with the specifications in the bid package.  MBTA staff determined that the bid of J.F. White Company complied with the specifications.

9.      Thereafter, the MBTA informed the J.F. White Company that it was the "lowest responsible and qualified bidder" within the meaning of Section 39M.

10.     The specifications for the Arlington/Copley bids required that bidders "hold" the price of their bids for 60 days after the bid is opened.  J.F. White Company has voluntarily agreed to hold its bid longer, until November 12, 2005.

11.     On October 6, 2005, the MBTA Board of Directors authorized MBTA staff to enter into the Arlington/Copley contract with the J.F. White Company.

12.     Following the MBTA's award of a bid and execution of a contract, the contractor must meet certain bonding and insurance requirements.

13.     When the bonding and insurance requirements have been met, the MBTA will issue a Notice to Proceed to the contractor.

14.     Following issuance of a Notice to Proceed, the contractor may commence work on the project.

15.     When the contractor commences work on the project, the MBTA will begin to incur costs under the contract.

16.     Each day that a Notice to Proceed on the Arlington/Copley contract is delayed will result in a delay in the completion of the improvements to the stations, including the accessibility improvements.

17.     In addition to the "day-for-day" delay described in Paragraph 16, any lengthy delay in giving a Notice to Proceed will place the Arlington/Copley accessibility improvements in serious jeopardy, as is described in the following paragraphs.

18.     J.F. White Company is not required to hold its bid beyond November 12, 2005.  The more time that elapses before a bidder is awarded a contract and given a notice to proceed, the less likely that the contractor will hold its bid.

19.     If a contractor does not hold its bid for a project, and the MBTA wishes to proceed with the project, the MBTA must repeat the process described  above for the next lowest qualified bidder (but only if that bidder agrees to hold its bid).  The next lowest bid for the Arlington/Copley project is $381,393.40 more than the J.F. White bid.

20.     The MBTA is precluded by statute from seeking bids on a project that is the same as a project for which it has already opened bids.  Thus, if the MBTA does not award a contract to one of the contractors that have already submitted qualified bids (because there is no other

qualified bidder, or because no bidder will hold its bid, or because the remaining bids are too high), the MBTA will have to redesign the project.

21.    Such a redesign would involve the accessibility improvements for both the Copley Square station and the Arlington Street station.

22.    A redesign of the projects for the two stations would take at least six months to complete. The bid process following redesign would take at least four months.  For many projects, the time for design and bidding is substantially longer than these minimums.

23.    It may be that any redesign will involve separate bid packages for Copley Square station and Arlington Street station, which will result in the elimination of the economies and the passenger convenience that result from doing work at the two stations as part of one contract.

24.    During the past several months, MBTA construction project staff have engaged in discussions with representatives of Old South Church and the Boston Groundwater Trust, to address construction-phase monitoring issues that they have raised.  Those discussions will continue as construction occurs.


SWORN TO UNDER THE PAINS AND PENALTIES OF PERJURY THIS 7th DAY OF
OCTOBER, 2005


                                                    /s/Michael Stoffel____
                                                    Michael Stoffel


# 1388331 v1 - LEONARSM - 020445/0008