UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No.: 05-11211JLT

NEIGHBORHOOD ASSOCIATION OF THE BACK BAY, INC., and THE BOSTON PRESERVATION ALLIANCE, INC.

Plaintiffs,

v.

FEDERAL TRANSIT ADMINISTRATION and MASSACHUSETTS BAY TRANSPORTATION AUTHORITY,

Defendants

**AFFIDAVIT OF DOROTHY BOWMER**

I, Dorothy Bowmer, hereby depose and state based upon personal knowledge or upon information and belief which I believe to be true and accurate:

1. I am a member of the Neighborhood Association of the Back Bay and have been for the past twenty years.

2. I have been a member of the Board of Directors of the Neighborhood Association of the Back Bay for the past five years.

3. I live on Fairfield Street in the Back Bay and have lived in the Back Bay for the past twenty years.

4. I was the Co-Chair of the Architecture Committee for the Neighborhood Association of the Back Bay, Inc. ("NABB").

5. I held this position from May 1998 to January 2005 and after that remained as a member of the Architecture Committee.

6. NABB is an organization that was founded in 1955 for the purpose of preserving and protecting the architectural beauty of the Back Bay. It currently has about 2500 members, both business and individuals residing in the Back Bay. NABB is located on Newbury Street in the Back Bay.

7. The Back Bay is a National Historic District and is listed on the National Register of Historic Places. It is protected as an architecturally significant historic district. All components of this project lie within the Back Bay Historic District.

8. The proposed Copley inbound elevator headhouse is located on the site of the National Historic Landmark, Boston Public Library.

9. A proposed outbound elevator structure and an existing escalator/stair enclosure are located adjacent to the National Historic Landmark Old South Church.

10. Of the almost 83,000 listings on the National Register of Historic Places, there are less than 2300 National Historic Landmarks. Landmark designation is an official recognition by the Federal Government of a property's national significance. I believe the Boston Public Library, Old South Church and Trinity Church, just east of the project, comprise the 3 closest National Historic Landmarks in the country.

11. The area on the north side of Boylston Street encompassing the Old South Church lies within the Back Bay Architectural District, a state designation.

12. The MBTA Copley Square Light Rail Accessibility Project is exactly the type of project that NABB takes an interest in and would have an interest in participating in developing.

13. NABB through its Architecture Committee and association with the Back Bay Architectural Commission participates in reviewing most proposals for both public and private exterior modifications and construction in the Back Bay Architectural District. Additionally other Committees within NABB participate in many proposals concerning public or private development in and adjacent to the neighborhood. NABB has been an active participant for the entire time of its incorporation.

14. Based on a previous project, the Arlington Station Project, where NABB voiced strong concern, it is my belief that the MBTA was aware of NABB's desire to participate in any projects within the neighborhood.

15. On July 21, 2003, the MBTA held its first public meeting regarding the Copley project's plans and informed those present that the design was 75% complete. A 75% design is basically a completed design and may even include construction drawings.

16. At NABB's request, on August 5 2003, a second presentation of the plans was made at the NABB Architecture Committee meeting. The MBTA again stated that the design process for the project was 75% complete.

17. I helped draft a letter on August 14, 2003 to William Young, Senior Preservation Officer of the Back Bay Architectural Commission expressing NABB's concern with respect to the MBTA's failure to follow procedures mandated under M.G.L. ch. 161A, §5. **Attachment 11** contains a true and accurate copy of that letter.

18. I helped draft a letter on behalf of NABB to the MBTA dated August 26, 2003, informing them of our opposition with and concerns regarding the project, as well as suggesting options. **Attachment 1** contains a true and accurate copy of that letter.

19. The MBTA issued a Draft Environmental Assessment (DEA) for the project in July 2004 and a public hearing was held on it. The proposed project remained unchanged from the presentation the previous year.

20. I helped draft a letter on behalf of NABB to the MBTA, dated July 28, 2004, in which NABB stated its concerns with the presented design and the process used to arrive at the same. **Attachment 2** contains a copy of that letter.

21. The MBTA responded that it would not provide specific responses to each commenter but would provide them with a copy of the final

Environmental Assessment (EA) so they could see how their issues were addressed. **Attachment 3** contains a copy of that letter.

22. Although the MBTA apparently sent the FTA the final EA in September 2004, it did not provide NABB with a copy until January 2005. **Attachment 4** is a copy of the letter from the MBTA to NABB dated January 6, 2005 when they also included a copy of the Environmental Assessment and the FTA's Finding of No Significant Impact ("FONSI").

23. A letter dated February 11, 2005 was sent to the FTA in which NABB expressed its disagreement with the FONSI and feeling that prudent and feasible options were not adequately explored. **Attachment 5** is a copy of that letter.

24. NABB received a copy of a letter from Cara Metz, the State Historic Preservation Officer (SHPO), to the FTA dated May 31, 2005 in which she asked that they discuss new alternatives in the project's design that are feasible given implementation of the MBTA's Charlie Card. **Attachment 6** is a copy of that letter. I am not aware of any response to that letter.

25. On June 15, 2005, NABB received a copy of a letter dated June 9th that the SHPO sent to the FTA, with an email from the Old South Church attached regarding the results of an engineering survey of the Church property. **Attachment 7** is a copy of the same. I am not aware of resolution of this issue.

26. NABB sent a letter to Don Klima, of the Advisory Council in Washington, D.C. The letter was sent on June 16, 2005. **Attachment 8.** NABB has not received a response to this letter.

27. **Attachment 9** contains additional correspondence from the Old South Church regarding the dangers presented by the excavation for an elevator next to it on Dartmouth Street.

28. It is NABB's position shared by The Boston Preservation Alliance that the current project is detrimental to the historic character of the National Historic Landmark Buildings and National Historic Site upon which it impacts and that there are prudent and feasible alternative options for accessibility that would preserve and maintain the historic integrity of these very important sites.

29. It is NABB's position that other options such as those presented in the 1995 Light Rail Accessibility Program Schematic Design Report were not adequately studied or were dismissed without adequate reason. **Attachment 10** contains a copy of that report as it pertains to Copley Station.

30. It is NABB's position that the MBTA knew that NABB existed as a active and concerned community group and that the MBTA should have involved NABB early on in the decision making process, when there was still the ability to explore alternatives that would create an overall solution that best respects this historic site and Landmarked buildings.

31. Upon information and belief, the delivery of the light rail vehicles to be used to provide handicapped access to the trains has been postponed for a substantial length of time. This aspect of the project thus has been delayed.

32. From my familiarity with the Arlington Street plans, I am aware that the tunnel proposed for that project is substantially more isolated and is of a comparable length to the passageway alternative of Option F and that the Arlington Street tunnel and headhouses impacts an historic site. Option F, on the other hand, avoids an historic site and presents a direct access alternative to the platform below that eliminates any passageway entirely.

33. From my familiarity with the Arlington Street plans, I am aware that five stairways at that station are to be left open.

34. Upon information and belief, automated fare machines are to be in place in 2006.

Signed under the pains and penalties of perjury this 12th day of October 2005.

Dorothy Bowmer

DOROTHY BOWMER

EXHIBIT 1

# NEIGHBORHOOD ASSOCIATION OF THE BACK BAY, INC.

Mailed 8/26/03

**Officers:**
Marianne M. Castellani
*Chair*
Susan D. Prindle
*President*
Manya Chylinski
*Vice Chair*
Daniel K. Hardenbergh
*Vice President*
Karen A. Young
*Secretary*
Nancy A. Hubeck
*Treasurer*

**Directors:**
Brenda Adams
Dorothy B. Bowmer
John R. Boreske
Karen Carper
Mark Cohen
Roseann M. Colot
John R. Devereaux
Fran Duffly
William L. Elsbree
Peter Y. Flynn
Michael E. George
Frederick C. Gleason
Jack W. Gregg
Janet Hurwitz
Warren A. Johnson
Ed Johnston
Kathleen S. Kolar
Gail Korn
Shirley L. Kressel
Rosanne Kumins
Elliott Laffer
Jennifer R. Lowe
Nancy A. Macchia
Fred Mauet
Jacquelin McBride
Christopher Mitchell
Tim Ian Mitchell
Molly Mosier
Nancy Nottonson
Jeryl Oristaglio
Margaret Pokorny
Luanne Pryor
Patricia Quinn
Ellen E. Rooney
Maureen E. Rooney
Steven M. Sayers
Sandy Shapiro
Peter M. Sherin
Anne C. Swanson
Stella M. Trafford
Martha M. Walz
Michael P. Ward
Linda A. Zukowski

Lois A. Harvey
*Office Administrator*

August 26, 2003

Michael Mulhern, General Manager
Massachusetts Bay Transportation Authority
10 Park Plaza
Boston, MA 02116

RE: ARLINGTON AND COPLEY STATION LIGHT RAIL ACCESSIBILITY PROJECTS

Dear Mr. Mulhern:

On August 5, 2003, the Architecture Committee of the Neighborhood Association of Back Bay (NABB) heard a presentation by Barbara Boylan and several other MBTA staff concerning the Arlington and Copley Station Accessibility Plans. As co-chairs of the Architecture Committee, we are writing to express the Committee's concerns regarding the proposals for these two stations.

**Arlington Station** –NABB recently submitted detailed comments to the Federal Transit Administration in response to the MBTA's Draft Environmental Assessment, and a copy of the comments was forwarded to you. Our comments can be summarized as follows:

1. We feel that locating two headhouse structures in front of the National Landmark Arlington Street Church strongly conflicts with the facade of the church, and also blocks critical pedestrian and visual corridors up and down Boylston Street.

2. It was clear at our August 5 meeting that the MBTA would consider placing advertising panels on the " glass structures", thus negating the promise of transparency.

3. The problem of depleting ground water at this location has not been adequately or accurately addressed.

4. The elevator and stair headhouses seem to be sited in the least favorable and most expensive location, requiring both the cost of a new tunnel and the cost of purchasing an easement from the neighboring church. There was previously an entrance to the station in the corner of the Public Garden. Although the entrance has been removed, the tunnel to the mezzanine still remains. Alternative locations on the east side of Arlington street could tie into existing tunnels, would not spend excessive public dollars and would not interfere with the problematic location in front of the Church and on Boylston Street.

**Copley Station** - The Architecture Committee was very concerned with the five new headhouses proposed for Copley Station, making a total of seven headhouses in this area. Two of these are to be located adjacent to the National Landmark Old South Church and on the Dartmouth Street Mall, a significant visual and pedestrian way leading to and from Copley Square. Most troubling are the two new headhouses proposed in front of the Boston Public Library, one of which would seriously interfere with the existing historic facade and the much loved wrought iron headhouse.

The Committee's recommendations to reduce the number and impact of these potential structures are as follows:

1. **On the inbound side, adjacent to the Library, the proposed elevator structure would be more appropriately located in front of the new Library, not the historic McKim building.** We are confident that an accessible entrance could be located west of the old Library facade so that it does not interfere with the symmetry of the existing wrought iron headhouse centered on the McKim building. This approach would be similar to what is being proposed at Arlington Station where the accessible entrance is located away from the main corner entrances. In fact, the MBTA Light Rail Accessibility Program Schematic Design Report completed in 1995 shows an elevator entrance in front of the new Library as a viable option.

2. **On the outbound side, every effort should be made to open up the view of the east facade of the Historic Landmark Old South Church and the important visual and pedestrian corridor that connects Copley Square to Newbury Street and the rest of Back Bay.** We are pleased that the existing brick entrance is being replaced, however, we feel that an additional elevator headhouse would be overwhelming at this location. The Light Rail Accessibility Program Schematic Design Report option for placing the elevator within the overhang of the building across the street, on the east side of Dartmouth, would be much preferred.

3. **The existing uncovered stair for the outbound platform should remain uncovered.** This would be similar to the current plan for the existing stair entrance at Arlington Street. The brick surround could be removed and replaced with an open rail similar to the rail that currently exists at Heritage-on-the-Garden, at the corner of Arlington and Boylston Streets.

4. **The two emergency exits should remain hatches, thereby eliminating two of the currently proposed structures.** We feel that replacing hatches with headhouses sets an unreasonable standard and could result in a proliferation of unnecessary sidewalk structures throughout the city. We are confident that a technological solution can be found.

5. **No advertising should be allowed on the facades of the headhouses.** If advertising is allowed, they will no longer be the "transparent structures" promised by the MBTA. It should be underscored that advertising is highly regulated in the Back Bay historic neighborhood so that the buildings and streetscapes are not overshadowed by unnecessary visual clutter. We hope that the MBTA will respect our historic neighborhood by complying with this guideline.

6 **Sidewalk structures should be kept at a minimum and their location and design should be part of a coordinated plan.** The area around Copley Square is an important tourist and local node. Recently two bus stops, a public toilet, and an advertising panel have been installed in front of the Library on Boylston Street between Dartmouth and Exeter. The BRA is also planning streetscape improvements in this area. Without

coordinated planning and design, we are in danger of creating a hodgepodge of structures on one of Boston's most important public blocks.

In addition to the design considerations outlined above, we also have serious concerns about the design process itself. We believe that the MBTA has not followed the mandate of its own enabling act regarding the Arlington and Copley Station improvements. According to M. G. L. Section 5(k), NABB, along with other interested parties and elected officials should have been given an opportunity to participate in these design processes at their outset. Instead, we have were told by Barbara Boylan at our recent meeting that the design process for Copley Station is already at least 75% complete, with Arlington Station even further along.

In order to provide an adequate opportunity to explore viable alternative locations and designs, we strongly request that the design process be slowed down. Then NABB, along with other interested civic groups, officials and appropriate agencies can fully participate, as the MBTA enabling act requires. We welcome the opportunity to work together to create a coordinated plan which will minimize the impact of additional headhouses and create the best possible streetscape at locations as significant to our city as Copley Square and Arlington Street.

Sincerely,

Janet Hurwitz Dorothy Bowmer

Janet Hurwitz AIA and Dorothy Bowmer
Co-Chairs Architecture Committee

cc: Thomas M. Menino, Mayor of Boston
Barbara Boylan, Director of Design, MBTA
Michael P. Ross, Boston City Councilor
Dianne Wilkerson, State Senator
Paul Demakis, State Representative
Brona Simon, Deputy State Historical Preservation Officer
Antonia Pollak, Director Environmental Department
Michael Galvin, Chief of Basic City Services
Harry Collings, BRA Executive Director/Secretary
Anthony O. Gordon, Chair, Back Bay Architectural Commission
Ellen Lipsey, Boston Landmarks Commission
Albert Rex, Executive Director, Boston Preservation Alliance

**EXHIBIT 2**

Ms. Diana C. Parcon,
Manager of Environmental Construction
Massachusetts Bay Transportation Authority
10 Park Plaza, Room 6720
Boston MA 02116

July 28, 2004

RE: Copley Station Light Rail Accessibility Project, Boston, MA

Dear Ms. Parcon:

As you know, the Neighborhood Association of the Back Bay (NABB) was founded in 1955 for the purpose of preserving and protecting the architectural beauty of the Back Bay. It presently has about 2500 members, both business and individuals residing in the Back Bay, an area that is a National Historic District.

We have reviewed the Draft Environmental Assessment (DEA) for the Copley Station Light Rail Accessibility Project, submitted by the Massachusetts Bay Transportation Authority (MBTA). We are very concerned with the five new headhouses proposed for Copley Station, making a total of seven headhouses in this area. Two of these are to be located adjacent to the National Landmark Old South Church and on the Dartmouth Street Mall, a significant visual and pedestrian way leading to and from Copley Square. Most troubling are the two new headhouses proposed in front of the Boston Public Library, one of which would seriously interfere with the existing historic facade and the much loved wrought iron headhouse. In addition, at the public briefing on the DEA on July 15, 2004, it became clear that the DEA is not complete since the MBTA is still evaluating the need for headhouses at the stairwells and the possibility of using hatches at the emergency exits.

While we applaud the efforts to minimize the impact of these structures, approval of such an incomplete plan seems premature. Since there is no real plan for the FTA to approve in this DEA, we request that the FTA either abandon this submission until such time that a single consolidated proposal can be issued, or require that a full Environmental Assessment be prepared that represents the final project that the MBTA plans to build. It certainly seems untimely for either the Massachusetts Historic Commission or the Federal Transit Authority to find that there will be no significant impact on the adjacent landmarked properties, when it has not yet been determined what structures the MBTA proposes to add.

As is discussed in more detail in subsequent sections, we feel that the options reviewed in the DEA are incomplete in that an option which would have the least impact on the church is not considered--i.e., the removal of the headhouse altogether from the west outbound entrance. This could be done by relocating or eliminating the escalator. There certainly is historic precedent for this option, since it must have been the configuration of this entrance prior to the introduction of the escalator and the existing headhouse.

Since minimizing project impact on historic interests is the goal of the Section 106 process, this option should be thoroughly analyzed and assessed.

In addition to the design considerations outlined above, we also have serious concerns about the public process followed in this project. We believe that the MBTA has not followed the mandate of its own enabling act regarding the Copley Station improvements. According to M. G. L. Section 5(k), NABB, along with other interested parties and elected officials, should have been given an opportunity to participate in the design process at its outset. Instead, we were told by Barbara Boylan at an August 5, 2003, meeting that the design process for Copley Station was already at least 75% complete. This DEA is further proof that a single preferred option has gone through a design process without the public process required by law.

Therefore, the process should be reopened with all options submitted to a complete and appropriate public process, with open analysis of all criteria, including: engineering, historic and preservation impacts, and maintaining and reinforcing pedestrian and visual corridors.

We have the following detailed comments on the sections of the DEA listed below:

1.2.1 DESCRIPTION OF THE PROPOSED ACTION

In the second paragraph of this section the report implies both review of all options and consent to the Preferred Option by Boston Landmarks Commission and the Massachusetts Historic Commission (MHC). However, other than a stamp on a letter sent to the MHC, no clear documentation as to the Landmarks Commission consent is included. Furthermore, since the underlying data is not included, it is not at all clear what plan MHC is concurring with. Since the 106 process is an assessment of options, it is crucial that the option concurred with be identified. It also would instill confidence in the process if there were some discussion of the rationale underlying the MHC concurrence in the finding of no adverse effect.

2.0 ALTERNATIVES

The discussion of the options seems to be taken from the MBTA's 1995 Light Rail Accessibility Program, Schematic Design Report. Although a Preferred Option is presented in the DEA, there is not adequate discussion as to why this option was chosen and the remaining options eliminated. There is also no documentation that all the 1995 options were presented to the abutters, community, and relevant Commissions. In fact, as previously stated, we know that these options were not presented to NABB. At the first meeting that NABB had with the MBTA concerning Copley, on August 5, 2003, no options were presented other than the "Preferred Option." (Please see letter to the MBTA dated August 22, 2003 attached hereto stating NABB's opposition to the Preferred Option.)

The MBTA states in the DEA that the Preferred Option "...provides the best option to minimize impacts to adjacent historic resources..." However, this conclusion directly conflicts with the DEA's own analysis, which supports NABB's contention that the Preferred Option is the most detrimental to the adjacent historic buildings and streetscape.

The Preferred Option adopts Option E for the inbound station without the east headhouse. According to the analysis of Option E, the east headhouse was considered necessary to avoid compromising " ... the explicit symmetry of the composition ... " (of the headhouse in relation to the library building). Thus the Preferred Option would eliminate the measure considered necessary to mitigate the negative impact of the addition of another headhouse next to the historic headhouse, thereby destroying a critical element of its historic and architectural importance, that being its symmetry in relation to the library building. Even with the east headhouse, the analysis of this option considers it "... highly problematic because it not only creates the very difficult task of imposing new structures alongside the intricately detailed wrought iron headhouse, but also creates many interface problems with the landmark Boston Public Library. It should be emphasized that any attempt to add a structure in this location will be highly controversial ..." (which could only be mitigated by the addition of an east headhouse, designed in a way to blend with the existing architecture of the Library and old headhouse).

In contrast to the problems created by Option E, the DEA finds that of the two inbound options, Option F (which locates the elevator in front of the new library building), "... has the least streetscape and urban design impacts. Although the DEA states an obviously erroneous reason for rejecting this option ("This Option because of the sensitivity and design consequences of locating the elevator in front of the Old Library was dismissed due to the impacts to the Boston Public Library, a National Register Landmark"), the apparent reason for rejecting it is the distance of the elevator entrance from the toll area. This was not considered a problem in the location of the elevator for the Arlington Street station, where the distance of the elevator entrance is 120 feet from the toll area, about the same as in Option F. The other difficulties described in Option F appear to be no greater and possibly less than those described in Option E. Thus, by the DEA's own analysis, it is Option F and not Option E that would "minimize impacts to the adjacent historic resources" and therefore should be the choice for the location of the inbound elevator.

For the outbound elevator, the preferred option adopts Option A, which locates the elevator north of the present station entrance in front of the Old South Church. This option adds an additional structure in front the landmark church and on the Dartmouth Street mall, which is considered an important contributing element to the National Historic District of Back Bay. The DEA does not acknowledge the importance of this mall and the impact of the station entrance structures on the mall's composition or on the sightlines provided from the mall up and down Dartmouth Street. The present entrance structure obviously egregiously impacts both the Church and the mall. The DEA justifies the introduction of an additional structure in this sensitive location by designing the structures to be "see through". Although they may not have the negative impact of the existing entrance headhouse, the proposed headhouses will nevertheless constitute a negative and unnecessary visual and physical obstruction of this site, thereby causing an adverse effect on the historic interests at this location.

As indicated above this is not a necessary result, since three other options (Options B, C and D) would place the elevator on the other side of Dartmouth Street where neither the Dartmouth Street mall or the Church would be impacted. Of these options, Option C would "... have the least impact on the streetscape..." and the Church and mall, although the DEA does not acknowledge the latter.
The DEA does, however, note as a problem with the two options placing the elevator on the sidewalk-- i.e., the "visual obstruction along Dartmouth Street from Newbury Street to Copley Square and the possible hardship to the retail user directly behind it ...". These impacts are apparently

considered important at this location but not on the Church side. This is completely inconsistent with the historic and architectural importance of these two locations. Other flaws in the DEA analysis of these options include the finding that Option B would eliminate parallel parking spaces. (In fact this option can only eliminate one parking space because that is all that exits between the existing entrance and the alley.) The DEA statement that Options B and D would block an already narrow sidewalk is also erroneous, unless the elevator headhouse is wider than the existing entrance, which does not appear to be the case. In any event no backup data or plans are provided to support this conclusion.

As previously stated, there is an option that would remove the obstruction of the existing headhouse next to the Church and not require replacement with any structure other than the railing necessary for an open stairwell. This option could be achieved by relocating the escalator to the other side of Dartmouth Street or eliminating it altogether. This option would not only have the least impact on the historic interests, but would remove a totally inappropriate and visually obstructive structure that should never have been built in the first place. Although loss of the escalator should be avoided if possible, that should be the choice if it cannot be relocated. The inbound station has no escalator, nor do many other very busy stations, which do not have the historic sensitivities of this location. The option of relocating the escalator to the east side of Dartmouth Street should be thoroughly analyzed, including locating it in the building adjacent to the existing entrance and placing the elevator alongside it, within the adjacent building overhang, or on the sidewalk as in Options B and D.

## 3.2 LAND ACQUISITION AND DISPLACEMENTS

The DEA includes no documentation showing that the City of Boston, the Boston Public Library and Kostitgen LLC agree to the Preferred Option, and therefore are willing to grant easements to the MBTA.

## 3.3 LAND USE AND ZONING

The Preferred Option proposes headhouses within the Back Bay Architectural District. If local land use and zoning regulations are relevant, why has a local Historic Commission been excluded from the process?

## 3.6 WATER QUALITY

To assure maintenance of existing groundwater levels during construction it is important for permit granting authorities, neighboring property owners and the public to be able to evaluate the "detailed measures" that are referenced but described neither here nor in section 3.15 CONSTRUCTION.

We also believe it is incumbent on the proponent to investigate and document existing conditions of groundwater levels in the vicinity. Observations by the Boston Groundwater Trust for one of the mentioned monitoring wells, 23J 2343A, indicate a range of levels from 6' to 3' BCB, which is significantly below the naturally occurring level of 7' to 9' BCB. This is near the Old South Church on Dartmouth and Boylston Streets. Monitoring wells, 22J 0154 and 22J 0188, not mentioned in the Draft Assessment, report levels of 2' to 5' BCB. These are near the tunnel of the Huntington

Ave. line as it branches southwestward from Copley Station along Exeter Street. Further environmental assessments should be made to determine the extent of this existing depletion and to identify construction defects in the existing station and connecting tunnels that may be contributing factors. The threat to stability of neighboring timber pile supported buildings should be considered for mitigation by including appropriate repairs in the scope of the project.

3.14 HISTORIC PROPERTIES AND PARKLANDS

As previously stated, there is no documentation in this DEA as to the coordination with the Boston Landmarks Commission. There is a "concurrence" stamp on a letter to the Massachusetts Historic Commission. We would like to see evidence that the options were presented and that the above-mentioned Commissions are in agreement with the Preferred Option in light of the other possible locations that would not interfere with National Historic Landmarks. If in fact the Massachusetts Historic Commission is in "concurrence" with the project as presented in the DEA, and since many elements of the project are still in flux, we would like some assurance of what the MHC is in concurrence with.

We agree that the proposed outbound headhouse that replaces the existing brick entrance adjacent to Old South Church will be a significant improvement over the existing condition, but we do not believe that should be determinative. As noted above, NABB believes that an option that replaces the existing structure with an open stairwell should be the preferred option. Furthermore, the detailed description of the other five new structures will not negate the fact that they block important landmarks, offset the historic symmetry of the Library and block important pedestrian and visual corridors. We feel that five thirteen foot tall elevator and stair structures will not be transparent, and will have an extremely negative impact on the historic buildings and the streetscape.

At a meeting of the NABB Architecture Committee held on August 5, 2003, in which the MBTA presented the Preferred Option, we were told that advertising on the glass headhouse structures would be considered by the MBTA. These structures, being described as light and transparent, could in fact be faced with solid panels that would obscure and belie the promise of transparency. This potential advertising will further disrupt the streetscape and compete with the important adjacent buildings.

3.16 AESTHETICS

We do not agree with the statement that the project "...is intended to complement the historic character of the adjacent National Historic Landmarks". It should be noted that when the original wrought iron headhouse in front of the Library was added, many years after the completion of the Library, the MBTA's architects at that time chose a design vocabulary that blended with the forms and materials previously used on that façade of the Library. We do not agree that the proposed glass structures are an appropriate design approach. Moreover, the MBTA's 1995 Light Rail Accessibility Program Schematic Design Report specifically states that any headhouses in front of the historic Library should include two "symmetrically located structures on each side of the existing headhouse within the Boston Public Library property." This requirement is repeated in the DEA analysis. As noted above, the Preferred Option ignores this essential element of this option.



EXHIBIT 3

# Massachusetts Bay Transportation Authority

*Mitt Romney*
*Governor*

*Kerry Healey*
*Lt. Governor*

*Daniel A. Grabauskas*
*Secretary and MBTA Chairman*

*Michael H. Mulhern*
*General Manager*

July 30, 2004

Marianne M. Castellani
Chairman
Neighborhood Association of the Back Bay, Inc.
337 Newbury Street
Boston, MA 02115

Susan D. Prindle
President
Neighborhood Association of the Back Bay, Inc.
337 Newbury Street
Boston, MA 02115

Dear Ms. Castellani and Ms. Prindle:

I am in receipt of your recent comment letter on the Copley Station Accessibility Project Draft Environmental Assessment. I appreciate hearing from you on this matter.

The MBTA will be taking each of the comments received during the comment period and developing a Final Environmental Assessment that is responsive to the comments received. We will not be writing specific letters back to each commenter. We will, however, provide you with a copy of the Final EA so that you can see how your issues were addressed by the MBTA.

Again, I appreciate your interest in this project. If you have any questions, do not hesitate to contact me.

Sincerely,

Diana C. Parcon
Manager of Environmental Construction

cc: Michael H. Mulhern

**EXHIBIT 4**

**Massachusetts Bay Transportation Authority**

*Mitt Romney*
*Governor*

*Kerry Healey*
*Lt. Governor*

*Daniel A. Grabauskas*
*Secretary and MBTA Chairman*

*Michael H. Mulhern*
*General Manager*

January 6, 2005

Susan D. Prindle
President
Neighborhood Association of Back Bay, Inc.
337 Newbury Street
Boston, MA 02115

Dear Ms. Prindle:

Attached please find a copy of the Final Environmental Assessment for the Copley Station Light Rail Accessibility Project. The Draft EA was prepared in June 2004 and a public hearing was held. This EA was developed in response to comments received during the public comment period on the Draft EA. A Response to Comment Section was also prepared and added and is included in the EA. This EA was submitted to the Federal Transit Administration in September 2004. The FTA issued a Finding of No Significant Impact (FONSI) on December 31, 2004 and is attached.

If you have any questions, do not hesitate to contact me.

Sincerely,

Andrew D. Brennan
Director of Environmental Affairs

ADB/lab
Attachments



U.S. Department of Transportation
**Federal Transit Administration**

REGION I
Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, Vermont

Volpe Center
55 Broadway Suite 920
Cambridge, MA 02142-1093
617-494-2055
617-494-2865 (fax)

DEC 30 2004

Mr. Michael H. Mulhern
General Manager
Massachusetts Bay Transportation Authority
Ten Park Plaza
Boston, MA 02116

Re: **Copley Station Environmental Assessment**
**Finding of No Significant Impact**

Dear Mr. Mulhern:

Based upon a review of the environmental documentation, the Federal Transit Administration (FTA) has issued a Finding of No Significant Impact (FONSI) for the Copley Station Light Rail Accessibility Improvement Project. The purpose of this project is to make the station compliant with the American's with Disabilities Act (ADA) of 1990 through the construction of a safe, barrier-free pedestrian access to the station and platforms.

Please be advised that in accordance with 23 CFR 771.121, the Massachusetts Bay Transportation Authority (MBTA) is required to transmit a notice of availability of this FONSI to all affected Federal, state and local governmental entities. In addition, under Section 106 of the National Historic Preservation Act, the FTA has determined that this project will have no adverse effect on historic resources. Furthermore, FTA has determined that there is no prudent and feasible alternative to the use of Section 4(f) property (Boston Public Library, a National Historic Landmark) and that the action includes all possible planning to minimize harm. Moreover, FTA determined there would be no Section 4(f) use of the Old South Church, a National Historic Landmark because compliance with Section 106 for proximity impacts resulted in a finding of "no adverse effect." (23 CFR 771.135(p)(5))

Please let me know if you have any questions regarding this matter. The FTA looks forward to continuing to work with the MBTA on this important transit improvement.

Sincerely,

Richard H. Doyle
Regional Administrator

Attachment

FEDERAL TRANSIT ADMINISTRATION
REGION I

## Finding of No Significant Impact

**Project: Copley Station Accessibility Improvement**

**Applicant: Massachusetts Bay Transportation Authority (MBTA)**

**Project Location: Boston, Massachusetts**

### Purpose and Need

The Americans with Disabilities Act (ADA) of 1990 requires public transit agencies to identify key stations and develop a plan to implement accessibility improvements at these stations. The Copley Station has been determined to be a key station based on ADA criteria. The primary purpose of this project is to make the station compliant with the ADA.

### Alternatives Considered

Since the existing station has no accessible entrance, the No Build alternative does not meet the project purpose and need to make the station compliant with the ADA.

Beyond the No Build Alternative, the MBTA identified several options for locating elevators at Copley Station (originally identified in the 1995 Schematic Design Report for the MBTA's Light Rail Accessibility Program). The MBTA conducted an alternative analysis to assess the impacts of the project against the transportation, construction, accessibility, operational and pedestrian/customer needs of the station. The consideration of alternatives is further limited by the ADA's requirement that the accessible route and entrance shall, to the maximum extent practicable, coincide with the circulation path of the general public (ADA – 49 CFR Part 37, Appendix A sections 10.3.1 and 10.3.2).

### Proposed Project

The primary purpose of the Copley Station accessibility project is to meet the federally mandated key station plan objectives of accessibility to individuals with disabilities. Making this station accessible will require new work or renovations at surface and platform levels. At the surface level, new elevators to gain entry to the inbound (Boston Public Library) and outbound (Old South Church) platforms will provide access from the street to the fare mezzanine.

Other accessibility improvements include raising the entire platforms to 8 inches above top-of-rail to allow individuals in wheelchairs to enter the new low-floor trains and installation of a public address system with LED signs. New lighting, accessible fare collection, emergency exit stairs and a new electrical service from Arlington Station are also included.

### Agency Coordination and Public Opportunity to Comment

The MBTA has involved a number of agencies, local officials and the public in the planning and design of the Copley Station project. The EA was made available to the public on June 28, 2004 with the comment period closing on July 28, 2004. A public hearing was held on July 15, 2004.

**Determinations and Findings**
National Environmental Policy Act (NEPA) Finding

FTA served as the lead agency under NEPA for the project. The MBTA prepared an Environmental Assessment (EA) in compliance with NEPA, 42 U.S.C. 4321 et. seq. and with FTA's regulations, 23 CFR Part 771. The EA analyzes and describes the project's potential significant impacts.

After reviewing the EA and supporting documents and public comments, the FTA finds under 23 CFR 771.121 that the proposed project will have no significant adverse impacts on the environment. The record provides sufficient evidence and analysis for determining that an Environmental Impact Statement (EIS) is not required.

Section 106 Compliance

Section 106 of the National Historic Preservation Act requires the review of federally assisted projects for impacts to districts, sites, buildings, structures and objects listed in, or eligible for inclusion in the National Register of Historic Places. Federal agencies must coordinate with the State Historic Preservation Officer (SHPO) and potentially affected Tribes to make this determination. The Advisory Council on Historic Preservation (ACHP) has established procedures for the protection of historic and cultural properties in, or eligible for the National Register (36 CFR Part 800).

The project site is immediately adjacent to the Old South Church and the Boston Public Library, National Historic Landmarks. In preparation of a Section 106 determination the FTA and the MBTA coordinated with the Massachusetts Historical Commission (MHC) and the Boston Landmarks Commission (BLC) to ensure the surface elements of the Copley Station accessibility improvements are compatible with these historic structures.

Based on this consultation and analysis prepared by the MBTA, the FTA submitted a determination of effect to the SHPO on January 23, 2004. On January 29, 2004 the MHC concurred with FTA's determination that the proposed project will have no adverse effect on historic resources.

Section 4(f) Findings

According to Section 4(f) of the Department of Transportation Act of 1966, codified as 49 U.S.C. 303, the Secretary of Transportation may not approve the use of land from a significant publicly owned public park, recreation area, or wildlife and waterfowl refuge or any significant historic site unless a determination is made that: there is no feasible and prudent alternative to the use of land from the property; and the action includes all possible planning to minimize harm to the property resulting from such use (23 CFR 771.135). An element of the proposed project, construction of a new elevator at the inbound Copley Station, will use land from the Boston Public Library, a National Historic Landmark (NHL). The FTA submitted to the Department of Interior (DOI) a Section 4(f) evaluation that was prepared by the MBTA that analyzed alternatives to the proposed action to ensure that all possible planning had been undertaken to minimize harm to the historic resources.

An alternative not presented in the 4(f) evaluation was to locate the elevator 150 feet away from the station entrance in front of the recent library addition and thereby avoid NHL property. FTA did not consider this alternative to be prudent and feasible since it would not coincide with the circulation path of the general public (ADA – 49 CFR Part 37, Appendix A sections 10.3.1 and 10.3.2). Although not identified in the 4(f) evaluation, this alternative is presented in the EA as an option considered and dismissed during the NEPA process. Beyond considerations of the ADA, the EA presented two design options for this alternative. The first option would involve significant engineering issues such as the need to construct a new tunnel for fare collection purposes that would conflict with a 30' sewer line. In lieu of the tunnel, the second design option involves the construction of a caged gate system which would isolate the passenger and create operational impediments. Neither of these two designs for this alternative (tunnel or caged gate system) is appropriate nor feasible.

Moreover, FTA determined there would be no Section 4(f) use of the Old South Church, a National Historic Landmark because compliance with Section 106 for proximity impacts resulted in a finding of "no adverse effect." 23 CFR 771.135(p)(5).

By letter dated May 10, 2004, DOI concurred with FTA's 4(f) determination that there is no prudent and feasible alternative to the proposed action.

Finally, it is FTA's position that Section 4(f) requirements do not apply to the rehabilitation of the historic inbound headhouse because the SHPO concurred in FTA's determination that the project will not adversely affect the historic qualities of that transportation facility. 23 CFR 771.135(f).

Approved: [signature] Date: December 30, 2004
Richard H. Doyle
Regional Administrator
FTA, Region I

Concur: Margaret E. Foley Date: December 30, 2004
Margaret E. Foley
Regional Counsel



**EXHIBIT 5**

February 11, 2005

Richard H. Doyle, Regional Administrator
Federal Transit Administration, Region I
Volpe Center
55 Broadway, Suite 920
Cambridge, MA 02142-1093

Re: Copley Station Environmental Assessment
FTA Finding of No Significant Impact

Officers:
Peter M. Sherin, *Chair*
Jolinda K. Taylor, *President*
Jacquelin S. McBride, *Vice Chair*
Steven M. Sayers, *Vice President*
Thomas W. High, *Secretary*
Roseann M. Colot, *Treasurer*

Directors:
Brenda Adams
Nancy Amer
Susan Ashbrook
John R. Boreske
Dorothy B. Bowmer
Marianne M. Castellani
Manya S. Chylinski
Mark Cohen
John R. Devereaux
Fran Duffly
Daniel P. Fickes
Peter Y. Flynn
Frederick C. Gleason
Jack W. Gregg
Daniel K. Hardenbergh
Suzanne L. Heywood
Janet Hurwitz
Warren A. Johnson
Ed Johnston
Kathleen S. Kolar
Shirley L. Kressel
Rosanne Kumins
Elliott Laffer
Jennifer R. Lowe
Nancy A. Macchia
Fred C. Mauet
Myron Miller
Tim Ian Mitchell
Molly H. Mosier
Jeryl Oristaglio
Margaret Pokorny
Susan D. Prindle
Luanne W. Pryor
Patricia M. Quinn
Gordon Richardson
Ellen E. Rooney
Sandy Shapiro
Anne C. Swanson
Stella M. Trafford
Sandi Underwood
Michael P. Ward
Mark Yessian
Linda A. Zukowski

Lois A. Harvey
*Office Administrator*

Dear Mr. Doyle:

We have received your Finding of No Significant Impact (Finding) for the Massachusetts Bay Transportation Authority's (MBTA's) Environmental Assessment (EA) for the Copley Station Light Rail Accessibility Project in Boston. The Neighborhood Association of the Back Bay (NABB) disagrees with this Finding for the following reasons:

The proposed project includes the construction of structures that will obstruct two important National Historic Landmarks (NHLs): the Boston Public Library and the Old South Church. The proposed project is inappropriate not only because of the adverse impact on these historic structures, but because other suitable alternatives were rejected or not adequately considered which would have provided accessibility and at the same time mitigated the impact on historic interests.

The EA and the process leading to it are defective because the primary neighborhood organization for the location of the Copley Station, i.e. NABB, was not included in the review process until the proposed design was "at least 75% complete" whereas Massachusetts law specifically requires the MBTA to give organizations such as NABB "timely opportunity" to participate in major transportation projects. ("Timely opportunity" is defined as sufficiently early in the design process so as to permit comments to be considered prior to the final development of or commitment to any specific design of such project. MGL c.161A, § 5k) We have stated our concerns about the process and the project, first after meeting with the MBTA, followed by an August 22, 2003 letter (included in the EA, to which there was no response from the MBTA) and then about the project itself in great detail in a July 28, 2004 letter to the MBTA to which they responded in the Environmental Assessment. However, we do not agree with and/or are confused by many of their responses. Therefore, we feel that the MBTA has both failed to comply with the Massachusetts requirements for such reviews and has not responded adequately to the input that they did get. This is especially the case where the historic properties are as significant as those involved here as set forth below.

We also feel, as we stated in our July 28, 2004 letter, that since all of the components of the project have not been clearly determined (for instance, the open stairs are now to be hatches), a Finding is premature. It could be construed more as blanket approval than a serious reflection of the impacts that the total project will have on the streetscape, in general, and the National Historic properties, specifically.

We outline below some of our specific concerns with the EA and this Finding:

The Neighborhood Association of the Back Bay, Inc.
337 Newbury Street, Boston, MA 02115 Tel 617.247.3961 Fax 617.247.3387 nabbinc@verizon.net www.nabbonline.com

**Section 106 Compliance**

According to the National Park Service, "National Historic Landmarks are nationally significant historic places designated by the Secretary of the Interior because they possess exceptional value or quality in illustrating or interpreting the heritage of the United States. Today, fewer than 2,500 historic places bear this national distinction."

The NHL Boston Public Library, completed in 1895, was designed by McKim Mead and White as a "palace for the people." Both the interior with its grand staircase, reading room, and John Singer Sargent murals, and the exterior expression of symmetry and grandness make this building a truly significant structure. Twenty years after it was built, around 1915, the historic wrought-iron entrance to the subway was added to the Boylston Street façade. It is our belief that the Library's symmetrical façade, with its wrought-iron detailing, is enhanced and reflected by the central location and materials of the 1915 subway headhouse. The current proposal, to add a headhouse asymmetrically to one side, designed without attention to the architecture of the Library, can only permanently diminish its historic architectural integrity.

Old South Church is another National Landmark Building which will be severely compromised by the current proposal of two headhouses in front of its Dartmouth Street façade. Constructed between 1872 and 1875, Old South Church is considered an outstanding example of Northern Italian Gothic architecture. When Old South Church moved to the current Back Bay site in 1875, the Boston Transcript described the New Old South Church as "the most beautiful basilica in North America." The two proposed headhouses will permanently block many of the carved stone details and the Dartmouth Street façade of this building. The contention that one of the proposed glass and steel headhouses will be not obscure as much of the church's detail as the existing brick headhouse may be true. However, the two proposed headhouses encompass much more volume than the existing headhouse, thus interfering with much more of the church's façade than the existing headhouse. It is also erroneous to believe that the proposed headhouses will be transparent since the reflectivity of the glass will present the headhouses as solid objects. Furthermore, the materials of which the proposed headhouses will be built should not be the controlling criteria pertaining to the decision to minimize the impact on the historic structure. The basis for that determination should be to preserve the Church façade without any interference by headhouse structures. If feasible, this should be the preferred solution. If it is not feasible, then the next solution with the minimal impact on the NHL property should be the choice. As shown below, this was not done in this case and the EA and Finding are flawed accordingly.

Because of the extraordinary importance of both the Boston Public Library and the Old South Church to the city, state and nation, the MBTA should have taken extraordinary measures to make sure that the façades of these structures be preserved and respected. Since the preferred project does not do this, the Finding that the proposed project will have no adverse effect on the historic resources is erroneous on its face.

**Alternatives Considered**

We disagree that alternatives were adequately considered that would have provided accessibility and at the same time mitigated the impact on historic interests.

<u>Inbound/ Library Entrance</u>. Alternatives that would either provide two symmetrical structures or provide an accessible entrance to the west of the McKim façade were not adequately considered.

The Environmental Assessment states that it eliminated Option E, two headhouses symmetrically located on the library's façade, because of the underground access needs of the Library east of the wrought-iron entrance. However, a structure located east of the existing headhouse need not protrude into the Library's below ground space, but could rather be a surface structure used as a kiosk or bus shelter. Therefore, it is clear from the stated reason for eliminating option E that the option was not adequately evaluated.

Similarly, alternative design options to the modern glass box and steel architectural vocabulary were not considered. It should not be assumed that a modern intrusion on the old façade is the only appropriate architectural solution. There are certainly other architectural solutions that might better blend with the façade of the Library. The MBTA's architects managed to do this in 1915, 20 years after the library was built. It is incumbent upon the MBTA to at least present alternative design options in light of the historic significance of the Library, that respond to its specific architecture, rather than a dressed-up, system-wide elevator that could be placed anywhere in any city.

Option F, which locates an accessible entrance in front of the new library addition so as not to interfere with NHL property, was eliminated, according to the Finding and the EA, because it would bring the customer down to the platform beyond the unpaid lobby and it would not coincide with the circulation path of the general public. Again, it would seem possible, especially in light of the MBTA's movement toward automatic tolls, that a customer could pay with a token or card at the street entrance to the elevator and end up directly on the platform, without having to go to the unpaid lobby. This would eliminate the need for a tunnel, or a caged gate system. A technological solution to the problem should at least be evaluated where such a solution could preserve the historic interests. This rationale is completely inconsistent with the solution chosen for the Arlington Station where a tunnel was selected despite the fact that its entrance will be 120 feet from the entrance for the general public. Locating the entrance closer to the Boylston Street entrance to the Library that puts the customer directly on the platform is an option worthy of serious consideration not given in either the EA or the Finding.

<u>Outbound/Old South Church Entrances</u>. Options that would preserve and enhance the Dartmouth Street façade of Old South Church as well as the important pedestrian views to and from Copley Square were not adequately considered and unjustifiably eliminated.

The EA shows a picture of an original 1915 entrance stair at Old South Church, partially covered, but low to the ground so as not to obscure the ornate carvings on the wall of the NHL Old South Church or the pedestrian views up and down Dartmouth Street. An option to eliminate the headhouse structure at this location and to provide a low covered or open stair was not considered. Instead two headhouses are being proposed at this location.

A solution, similar to the original 1915 design, would eliminate the existing and proposed visual blockage at Dartmouth Street, thereby reinforcing the recent expansion

of the Library's plaza on Dartmouth Street by reopening the vista down the Dartmouth Street Mall, connecting the Library Plaza with the North/South axis from the Charles River to the newly expanded Library plaza. This option was not adequately explored.

Options B and C, to locate the elevator headhouse on the east side of Dartmouth Street opposite the façade of the Church, were eliminated. Losing one parking space or having to negotiate with the property owner to place the elevator in his property (a solution that there is certainly precedence for throughout the city and is clearly our preferred option) seems justified in light of the positive effect of freeing up the visual aspects of the NHL Church and the vistas to and from Copley Square. These solutions would clearly eliminate the need to interfere with a NHL property and should be given more serious attention.

The EA states that there would not be direct sight lines from the lobby if an elevator were located on the east side of Dartmouth Street. This would be true also for the proposed west side location. Neither would provide direct site lines to the fare collection booth. Site-line obstruction is not an adequate reason for eliminating the east side location.

<u>Outbound/East Side Stair</u>. Neither the Finding nor the EA presents adequate reason for enclosing the existing open stair entrance to the station on the east side of Dartmouth Street. Such a structure will block important pedestrian views to and from Copley Square and further tighten an already narrow sidewalk. In combination with the two proposed headhouses on the west side of the street, the vistas on both sides of Dartmouth Street would be permanently obstructed, creating a negative effect of a visual barrier separating Back Bay and the Dartmouth Street Mall from Copley Square.

Enclosing this existing stair is not consistent with design decisions for other stations. The current design for Arlington Station, for example, has the two existing stairs and one rerouted stair left open. There is no adequate explanation in the EA for this inconsistency.

<u>Advertising</u>. The approved EA is not clear where advertising would be allowed. The EA states, "The existing structure has an advertising space above the transom that is currently leased out by the MBTA. The new headhouse will be designed to accommodate this type of advertising. It is limited to the entrance to the main outbound headhouse." However, when reviewing the design of this headhouse, there does not appear to be space above the entrance as the proposed structure is lower than the existing. Also, in response to Representative Demakis's letter, the MBTA refers to selling "advertising space above the station entrance on the transom in a manner that does not block or reduce the transparent nature of the structures." This states "structures," not just one "structure." The structures referred to are not identified. Finally, the fact that the MBTA specifically states that it intends to place advertising on the headhouses, even if only above the transoms, compromises its claim that the headhouses will not adversely impact the NHL properties because of their translucent design.

As previously stated, many of our comments were detailed in our August 2003 and July 2004 letters. We do not feel that the MBTA adequately responded to our comments, nor does the EA present adequate reasons for elimination of options that would provide the least interference with NHL properties. The process itself did not allow an opportunity for NABB or possibly other commenters to respond to the MBTA's

responses. In effect, the EA illustrates a set design, presented in August of 2003, without incorporating community concerns or further protecting the National Historic Landmarks.

Sincerely,

Peter M. Sherin, Chairman

Jolinda K. Taylor, President

cc:     Thomas M. Menino, Mayor, City of Boston
        Mitt Romney, Governor, Commonwealth of Massachusetts
        Senator Edward Kennedy, United States Senate
        Senator John Kerry, United States Senate
        Congressman Michael Capuano, United States House of Representative
        Michael Mulhern, MBTA General Manager
        Michael P. Ross, Boston City Councilor
        Dianne Wilkerson, Massachusetts State Senator
        Marty Walz, Massachusetts State Representative
        Byron Rushing, Massachusetts State Representative
        Cara Metz, Deputy State Historical Preservation Officer
        Harry Collings, BRA Executive Director
        William Young, Chair, Back Bay Architectural Commission
        Ellen Lipsey, Executive Director, Boston Landmarks Commission
        Susan Park, President, Boston Preservation Alliance
        Steven Spinetto, Commissioner of Disabled Persons
        Helen Hendrickson, Boston Center for Independent Living
        Elisa Blanchard, The Old South Church in Boston
        Bernard Margolis, The Boston Public Library
        Francine Shron, Friends of Copley Square
        P. A. D'Arbeloff, Boston Public Library Foundation
        Meg Mainzer-Cohen, Back Bay Association

bcc: Tony Gordon

**EXHIBIT 6**

JUN 0 6 2005

# The Commonwealth of Massachusetts

William Francis Galvin, Secretary of the Commonwealth
Massachusetts Historical Commission

May 31, 2005

Richard H. Doyle
Regional Administrator
Federal Transit Administration
55 Broadway, Suite 929
Cambridge, MA 02142

Re: Accessibility Improvements, Copley Station/Green Line
Boston, MA, MHC #31902

Dear Mr. Doyle:

On January 29, 2004, the Massachusetts Historical Commission (SHPO) concurred with your finding that the referenced project would have No Adverse Effect on Historic Resources in accordance with Section 106 of the National Historic Preservation Act of 1966, as amended. Recently, it has come to our attention that the MBTA is exploring technology that would streamline the need for token booths at MBTA system stations (i.e. Charlie Card). In light of this new technology, we request that you consider if this would allow a reduction in the number of head houses required as part of this project.

If there are new alternatives that are feasible as a result of the implementation of the Charlie Card, we request the opportunity to discuss these with you further.

I look forward to hearing from you.

Sincerely,

Cara H. Metz
State Historic Preservation Officer

cc: Andrew Brennan, MBTA
Representative Marty Walz
Cristina Prochilo, BPA
Sue Prindle, NABB
Ellen Lipsey, BLC

bcc: John Perreaux, Esq.
Janet Hurwitz

220 Morrissey Boulevard, Boston, Massachusetts 02125
(617) 727-8470 • Fax: (617) 727-5128
www.state.ma.us/sec/mhc



**EXHIBIT 7**

# The Commonwealth of Massachusetts

William Francis Galvin, Secretary of the Commonwealth
Massachusetts Historical Commission

June 9, 2005

JUN 15 2005

Richard H. Doyle
Regional Administrator
Federal Transit Administration
55 Broadway, Suite 929
Cambridge, MA  02142

Re:    Accessibility Improvements, Copley Station/Green Line
Boston, MA, MHC #31902

Dear Mr. Doyle:

Please find attached an email message that I received from Reverend Nancy Taylor of Old South Church. I have recommended to her that she direct her letter to you.

The letter suggests that there is new information that should be considered in order to evaluate the impact of the project on historic resources. We request that you review the new information and inform us of new impacts to historic properties in accordance with 36 CFR 800.13(b)(1).

Please contact me if you have any questions or if I can be of further assistance.

Sincerely,

Cara H. Metz
State Historic Preservation Officer

cc:    Andrew Brennan, MBTA
Representative Marty Walz
Cristina Prochilo, BPA
Sue Prindle, NABB
Ellen Lipsey, BLC
Rev. Nancy Taylor, Old South Church

220 Morrissey Boulevard, Boston, Massachusetts 02125
(617) 727-8470 • Fax: (617) 727-5128
www.state.ma.us/sec/mhc

**Metz, Cara @ SEC**

**From:** Nancy Taylor [nst@oldsouth.org]
**Sent:** Friday, June 03, 2005 1:51 PM
**To:** Metz, Cara (SEC)
**Cc:** 'Makholm, Jeff'; 'Guilliaem Aertsen'; 'Dwight Crane'; 'Thomas Bulkeley'; 'Roger Burke'; operations@oldsouth.org; wmccabe@ropesgray.com; Walz, Marty (HOU ); festival@bostonharborfest.com; jean.carroon@goodyclancy.com
**Subject:** OLD SOUTH & MBTA
**Importance:** High

Cara H. Metz
State Historic Preservation Officer and Executive Director
Massachusetts Historical Commission

Dear Cara Metz:

I am writing on behalf of Old South Church, a national historic landmarks building located at Boylston and Dartmouth Streets, in Copley Square. We are seriously concerned about the impact of the MBTA Light Rail Accessibility Project on our historic structure.

The Massachusetts Historical Commission signed off on the MBTA's project over a year ago, concluding that it would have "no adverse impact" on the national historic landmarks surrounding it (Old South Church and Boston Public Library). We have ***new information***, however, concluding that there is, indeed, the risk of a significant and adverse impact on Old South Church. We are writing, therefore, to ask that the Massachusetts Historical Commission reconsider its earlier assessment.

We recently hired LeMessurier Consultants, an engineering firm, to assess the impact to the church of the subterranean excavations proposed by the MBTA in order to add an additional headhouse for an elevator on Dartmouth Street at the Copley Square T-Stop. LeMessurier Consultants is the same firm the MBTA hired for its peer review of the same project. **Unfortunately, when LeMessurier earlier reviewed the project for the MBTA, they did not take into account the impact of the excavations on any adjacent structures.** They were not asked to. We had to independently hire the same firm to ask them to review the same project from our perspective.

After reviewing the project from the perspective of the Old South Church, LeMessurier Consultants concluded that the work presents a "risk of horizontal and vertical soil settlement and of lowering the groundwater table. Differential vertical settlement of the (church's) Dartmouth Street wall could cause **cracking of masonry or stained-glass windows.** Lowering of the groundwater table could cause **deterioration of timber piles** that support the Dartmouth Street wall." This is an untenable risk. The building is fragile, historic and irreplaceable. Additionally, we find ourselves in the position of bearing the enormous burdens of hiring attorneys, engineers and other consultants, of providing and reading geotechnical instrumentation and seismographs for our wall and stained-glass during and after construction, and of investigating insurance against potential damage.

Let me be clear that we are in favor of accessibility and sensitive to the impatience of persons with disabilities for this long-overdue project. We, too, are impatient for this project. We simply believe the MBTA is placing the elevator in the wrong location. It could and should be placed on the other side of Dartmouth Street.



Neighborhood Association of the Back Bay

N A B B

50th ANNIVERSARY

**EXHIBIT 8**

Officers:
Peter M. Sherin
*Chair*
Jolinda K. Taylor
*President*
Jacquelin S. McBride
*Vice Chair*
Steven M. Sayers
*Vice President*
Thomas W. High
*Secretary*
Roseann M. Colot
*Treasurer*

Directors:
Brenda Adams
Nancy Amer
Susan Ashbrook
John R. Boreske
Dorothy B. Bowmer
Marianne M. Castellani
Manya S. Chylinski
Mark Cohen
John R. Devereaux
Fran Duffly
Daniel P. Fickes
Peter Y. Flynn
Frederick C. Gleason
Jack W. Gregg
Daniel K. Hardenbergh
Suzanne L. Heywood
Janet Hurwitz
Warren A. Johnson
Ed Johnston
Kathleen S. Kolar
Shirley L. Kressel
Rosanne Kumins
Elliott Laffer
Jennifer R. Lowe
Nancy A. Macchia
Fred C. Mauet
Myron Miller
Tim Ian Mitchell
Molly H. Mosier
Jeryl Oristaglio
Margaret Pokorny
Susan D. Prindle
Luanne W. Pryor
Patricia M. Quinn
Gordon Richardson
Ellen E. Rooney
Sandy Shapiro
Anne C. Swanson
Stella M. Trafford
Sandi Underwood
Michael P. Ward
Mark Yessian
Linda A. Zukowski

Lois A. Harvey
*Office Administrator*

June 16, 2005

Don L. Klima
Director, Office of Planning and Review
Advisory Council on Historic Preservation
1100 Pennsylvania Avenue NW
Old Post Office Building, Suite 809
Washington, DC 20004

Dear Mr. Klima,

Marilyn Fenollosa from the National Trust for Historic Preservation suggested we write to you concerning Federal Transit Administration (FTA) findings of no significant impact (FONSI) for two proposed projects within the National Register Back Bay Historic District in Boston, MA. She told us that she has already spoken to you about these projects.

The two projects are the Arlington Station and Copley Station Light Rail Accessibility Projects. The FTA issued a FONSI for the Arlington Station Project on May 14, 2004. The Copley Station Project received a FONSI by the FTA on December 30, 2004. Both projects are proposed in order to make these two existing underground transit stations compliant with the Americans With Disabilities Act (ADA) of 1990.

Our organization, the Neighborhood Association of Back Bay (NABB), wholeheartedly supports making both the Arlington and Copley Stations ADA compliant. However, we know that there are prudent and feasible alternatives that would achieve this accessibility and at the same time less adversely affect the historic and architectural character of the Back Bay Historic District, two National Historic Landmark buildings (the Boston Public Library and Old South Church), and the National Register Arlington Street Church.

**Arlington Station**

With regard to the Arlington Station Project, the Massachusetts Bay Transit Authority (MBTA) is proposing a new enclosed stair structure and an elevator enclosure on the sidewalk adjacent to the Arlington Street Church, built in 1861, listed on the National Register of Historic Places, and located within the National Register Back Bay Historic District. The proposed structures will significantly interrupt the view of the historic church and negatively alter streetscapes and views within the Back Bay Historic District. They are also proposing a handicapped ramp within the front yard of the Arlington Street Church to access the Church, designed in a way that is typically not allowed in the Back Bay Architectural District.

As soon as NABB learned about the project we repeatedly urged the FTA and the MBTA to consider other feasible and prudent sites that were not adjacent to historic

interests or would impact historic interests less. Additionally, the Arlington Station Project requires a new 120-foot tunnel to be built partially under the Arlington Street Church property connecting the elevator to the station lobby.

Alternative sites, that would not require a tunnel, that would bring the elevator users almost directly into the station lobby, that would cost less, and that would not impact the Church, were eliminated without adequate evaluation or eliminated for an invalid reason such as to avoid opposition from the owner of two relatively new, non-historic buildings across from the National Register Arlington Street Church.

**Copley Station**

The Copley Station Project includes even more significant historic interests as it directly affects two National Historic Landmarks, The Boston Public Library and Old South Church. Both buildings are also within the Back Bay Historic District, listed on the National Register of Historic Places.

The NHL Boston Public Library completed in 1895, was designed by McKim Mead and White as a "palace for the people." Today both the Library and its wrought-iron subway headhouse are well known and much loved by residents and visitors alike. The Library's exterior expression of symmetry and grandness make this building a truly significant structure. Thirty years after the Library was built, the inbound wrought-iron entrance was added on the Library's Boylston Street plaza. According to a 1925 reference, "The wrought iron and glass subway entrance canopy was constructed in 1925 by the Boston architectural firm of Fox and Gale. Copley Station had been constructed in 1915 and the Boston Transit Department decided that its task was to erect a sidewalk entrance that would meet the high architectural standards set by the Public Library behind it designed by the firm of McKim, Mead and White." The Library's symmetrical façade, with its wrought-iron detailing, is both reflected and enhanced by the central placement and similar materials of this 1925 subway headhouse. This wrought-iron structure is believed to be landmarked as well.

The current proposal to add a modern glass and steel headhouse off to one side of the wrought iron headhouse, designed without attention to the symmetry and detailing of the Library, will permanently disturb the Library's historic architectural integrity. The placement of this elevator would also severely compromise views of the NHL Library and the original wrought-iron headhouse. The project would include permanent alterations to the existing stone plaza of the Library in such a way that would destroy the symmetry of the historic plaza. The MBTA also proposes removing and replacing portions of the existing historic wrought-iron headhouse in a way that would rehabilitate, not restore, the headhouse and would allow alterations of the headhouse.

Alternatives to locate the elevator to the west of the NHL Library, or to design two historically compatible symmetrical structures, both identified in the MBTA's own 1995 Schematic Report, have been eliminated without adequate evaluation.

Across the street from the Library the MBTA proposes three new headhouse structures for its outbound entrance. All three structures are within the Back Bay Historic District. Two of the three are adjacent to the NHL Old South Church.

Old South Church, founded in 1669 and numbering many Revolutionary patriots among its congregants, moved to its current site in 1875 at which time it was described as "the most beautiful basilica in North America."

This NHL Church will be severely compromised by the two proposed headhouses adjacent to its Dartmouth Street façade. A new stair/escalator enclosure may appear to be an improvement over an existing brick structure, however, with the addition of a separate elevator structure, the combined volume will block much more of the church's façade than at present. It is erroneous to believe that these glass and steel headhouses will be transparent since the reflectivity of the glass and the opacity of the elevator will cause the headhouses to appear as solid objects, blocking the views of much more of the Library's Dartmouth Street façade than at present, as well as views to and from the Dartmouth Street Mall.

The additional proposed stair enclosure on the east side of Dartmouth Street negatively affects views within the Back Bay Historic District, connecting the area to Copley Square. Covering this existing open stair is also inconsistent with leaving two existing open stairs and one rerouted stair uncovered for the Arlington Station Project.

Alternatives to locate the elevator in one of three locations across the street from the NHL Church, to keep the existing open stair open and to reduce the size of the new stair/escalator enclosure were either not considered or eliminated without adequate evaluation.

We believe that Sections 106, 110, and 4(f) of the National Preservation Act and the Department of Transportation Act of 1966 are being violated by the FTA's finding of no significant impact. Not only was the FTA required to take into account the effect of the undertaking on the historic sites, (Section 106); but it was also to have approved the projects only if there were no prudent and feasible alternatives to using those sites and the program or project included all possible planning to minimize harm to the historic sites, (Section 4(f)). **The FTA was also required to afford the Advisory Council on Historic Preservation a reasonable opportunity to comment on the undertakings,** (Section 110).

Additionally, we believe that the process has been flawed in other respects. For example, NABB and other important interest groups were not given an opportunity to comment on the Copley Project until the project design was 75% complete- well beyond the planning phase. Impacts of the construction on the foundations of

adjacent properties which could, for example, undermine the structure of the NHL Old South Church, have recently come to light.

Because of the above, NABB filed a suit in Federal Court in July 2004 concerning the Arlington Street Station FONSI. This last week, on June 9, 2005, NABB along with the Boston Preservation Alliance have filed another suit in Federal Court regarding the Copley Station FONSI. Both suits ask for declaratory and injunctive relief to suspend disbursement of FTA funds to the MBTA, allowing the planning process to be reopened.

Despite the prior existing Arlington Station suit, the MBTA has combined the bid documents to include both the Arlington and Copley Station Projects, and has let the projects out to bid. The bid opening was scheduled for June 15, 2005.

At this time, we urge you to request that the FTA reopen the planning and design phases of both projects so that we can work together to reach a mutually agreed upon solution as quickly as possible. It would benefit us all to avoid a lengthy and costly court case.

Since the bid opening may have already happened, we request your immediate attention to this matter.

Please do not hesitate to contact us for any support materials or questions you might have.

Sincerely,

Peter M. Sherin, Chairman

Janet Hurwitz, Chair/Architecture Committee

cc: Sen. Edward M. Kennedy, United States Senate
Sen. John Kerry, United States Senate
Congressman Michael Capuano, United States House of Representatives
Richard H. Doyle, Federal Transit Administration
Rep. Marty Walz, Massachusetts State House
Daniel Grabauskas, Massachusetts Bay Transportation Authority
Cara Metz, Deputy State Historical Preservation Officer
The Rev. Dr. Nancy S. Taylor, Old South Church in Boston
Bernard Margolis, Boston Public Library
Marilyn Fenollosa, National Trust for Historic Preservation
Susan Park, Boston Preservation Alliance

Enclosed - June 28 2004 Mr Doyle letter - Feb 11, 2005 Mr Doyle letter

✓ bcc: Larry Hardoon



**EXHIBIT 9**

COPY

FOUNDED IN 1669

OLD SOUTH CHURCH IN BOSTON
A CONGREGATION OF THE UNITED CHURCH OF CHRIST
645 BOYLSTON STREET, BOSTON, MASSACHUSETTS 02116
PHONE 617-536-1970

AUG 2 3 2005

July 1, 2005

Mr. Daniel A. Grabauskas
General Manager
MBTA
10 Park Plaza
Boston, MA 02116

Dear Mr. Grabauskas:

I am please to provide you with the enclosed materials at the request of Mr. Aaron D'Elia relative to your conversation about the risks to the Old South Church from the proposed MBTA Light Rail Accessibility Project at the Copley Station.

We are as impatient as anyone for improved accessibility. In fact, Old South has spent hundreds of thousands of dollars in recent years to improve accessibility to our facility; this is an area of concern and civil rights we believe in and champion. We are convinced, however, that the risks to our building from the proposed excavations for the elevator on Dartmouth Street are unacceptable. The enclosed materials make that case. Further, we are persuaded that a new elevator and head house can be quite easily accommodated across Dartmouth Street, thus significantly diminishing adverse risks to our Landmark building.

As our architect attests in the enclosed materials, our building is a priceless and irreplaceable work of art. But it is more than that: as the congregation whose former home (the Old South Meeting House), held the mass meetings that led to the Boston Tea Party, Old South is also a vital symbol of our nation's quest for freedom and justice.

Thank you for your attention to this matter.

Sincerely,

Nancy S. Taylor

The Rev. Dr. Nancy S. Taylor
Senior Minister
617.425.5150 (direct)
nst@oldsouth.org

GOODY
CLANCY

Jean C. Carroon AIA
Robert C. Chandler AIA
John M. Clancy FAIA (1930—2004)
David D. Dixon FAIA
James T. Dunn CPA
Roger N. Goldstein FAIA
Joan E. Goody FAIA
Robert J. Pelletier AIA
Ralph H. Tolbert AIA
Geoffrey M. Wooding AIA

June 30, 2005

Walter R. McCabe III
Ropes & Gray, LLP
One International Place
Boston, MA 02110

Re: Old South Church Architectural Significance

Dear Walter:

As you are aware, I have been professionally involved with Old South Church for almost ten years, working with the church to prioritize the ongoing care that such a significant historic building requires. Old South Church is recognized as one of the most important historic buildings in our county. Designated a National Historic Landmark by the Secretary of the Interior in 1970, Old South is also a Boston City Landmark and is considered one of the most noteworthy buildings within the National Register and Local Historic Districts of Boston's Back Bay.

My professional opinion, as a preservation architect with over twenty years of experience, substantiates what every major preservation agency in Boston, the Commonwealth and the Nation have already made official. Old South Church, constructed in 1874-1875, is one of the country's finest examples of High Victorian Gothic architecture. Designed by the Boston architectural firm of Cummings and Sears it was modeled in the style of Northern Italian Gothic architecture and it is one of three key buildings that define one of Boston's great public spaces, Copley Square. It is a building of both outstanding design and exceptional cultural significance.

The building is an exemplar of Victorian architecture as well as masterful combination of local materials and European design ideals inspired by John Ruskin. Old South's façade, composed of precisely cut alternating buff and brown sandstone arches, rough textured Roxbury Puddingstone, elaborate wrought-iron work, and soaring 246 foot campanile with its extremely ornate copper roof, stands in delightful contrast to McKim Mead and White's monochromatic Neo-Classically styled Boston Public Library. It celebrates texture, color, materials, and design at every opportunity. The interior of the sanctuary is equally elaborate with polychromatic stenciled walls, elegantly carved and molded walnut pews, pulpit, and other furnishings. Its stained glass windows are extremely significant artifacts in their own right.

I understand that the proposed construction work with respect to Copley Station may pose a risk of damage to this building. It would be impossible to evaluate potential risk to Old South Church, since no damage to the building would be acceptable. This building, which occupies such a pivotal position in the urban design of the Back Bay neighborhood and the City as a whole, and which is such a rich and significant example of architecture, should be protected and preserved at all cost. The building is essentially priceless in the same way that any significant work of art is priceless.

Sincerely,

Jean Carroon
Principal for Preservation
Goody Clancy

334 Boylston Street, Boston, Massachusetts 02116-3866 617.262.2760 fax 617.262.9512

MARSH

**Alburn Blankenship**

Marsh USA Inc.
200 Clarendon Street
Boston, MA 02116-5093
617 421 0418 Fax 617 421 0344
www.marsh.com

June 15, 2005

Walter R. McCabe III, Esq.
Ropes & Gray, LLP
One International Place
Boston, MA 02110

Re: Old South Church
645 Boylston Street
Boston, MA 02116

Dear Mr. McCabe:

The Trustees of Old South Church have discussed with me the availability of property insurance that might be purchased to cover any physical damage to their building (located at 645 Boylston Street in Boston, MA.), that might arise out of future expected excavation and construction near the foundation of their church building. Although the Church has existing insurance coverage which includes a number of important types of coverage's and is favorable in its terms to Old South Church the coverage will not necessarily adequately address the risks involved with the contemplated construction. Thus, specialized insurance should be obtained to try and address such risks. Such special insurance would need to be broad enough to bridge gaps and exclusions in the Church's existing property insurance policy. As you know, the inquiry regarding insurance coverage is a result of published reports that the Massachusetts Bay Transportation Authority (the " T") plans to place an elevator and head house in the Copley Station at Boylston and Dartmouth Streets next to the foundation of the Church's building.

Before our firm goes into the market to actually place the proposed coverage we would need to have a detailed engineering report that describes the present conditions of the church building as well as a complete description of the work the "T" expects to perform. Additionally, the report would need to provide guidance, should there be some mishap, on the expected probable maximum loss to the building that could result from the contemplated work.

In the absence of an engineer's report we have made some assumptions and (but without any discussions with potential underwriters) we can express some opinions that are based on the facts as we now understand them:

This will not be an easy risk to insure. Underwriters will see this as an adverse selection process and there are only half dozen or so companies who might provide the requested coverage.

MARSH

A limit of at least $3 to $5 Million is likely to be needed and such amount of coverage is likely to be as much as can be placed notwithstanding that major damage to the church building might cost significantly more to remedy.

There is likely to be a minimum premium of $50,000 per underwriter participating in this coverage.

We would expect a premium rate necessary to place this protection to be as high as "Ten Percent on Line". (That is a $3 Million Limit would cost $300,000; and a $5 Million Limit $500,000.)

There will be some "deductible" before coverage is paid. Expect no less that $50,000.

The exact policy form and wording details, as well as cost, will all be subject to negotiation.

Under the best of circumstances it will take some time to locate willing underwriters and to negotiate terms. You should allow at least 60 days for such activity. Please also note that the chances of success in placing this coverage will be greatly affected by the quality and detail of the engineering report mentioned above.

Very truly yours,

Alburn Blankenship

**LeMessurier Consultants**
675 Massachusetts Avenue Cambridge, MA 02139
Tel: (617) 868-1200 Fax: (617) 661-7520

10 May 2005

Rev. Dr. Nancy S. Taylor
Senior Minister
The Old South Church in Boston
645 Boylston Street
Boston, MA 02116

Via Mail & Fax: 617-536-8061

Reference: Old South Church MBTA Construction Review
LeM File No. 25118

Subject: Construction Documents Review

Dear Rev. Taylor,

As requested, we have reviewed construction documents prepared by STV Incorporated for renovation of the existing MBTA Copley Station. Proposed renovations include replacement of the existing outbound headhouse and construction of a new outbound passenger elevator and headhouse near the Dartmouth Street wall of Old South Church.

**Discussion**

Since the new outbound headhouse will be located above grade, approximately 13'-9" from the property line, and within the plan dimensions of the existing headhouse, this construction presents a relatively low risk of damage to Old South Church. However, the new passenger elevator will require excavation of a shaft approximately 18'-8" wide by 20'-4" long by 26'-3" deep. Although the edge of this shaft will be located approximately 14'-4" from the face of the Church, this construction presents a greater risk of horizontal and vertical soil settlement and of lowering the groundwater table. Differential vertical settlement of the Dartmouth Street wall could cause cracking of masonry or stained-glass windows. Lowering of the groundwater table could cause deterioration of timber piles that support the Dartmouth Street wall.

The enclosed sketch represents a composite section taken through the existing Dartmouth Street wall and the proposed elevator shaft. This section is based on MBTA architectural and structural drawings and from 1932 structural drawings for replacement of the Church tower. 1932 structural drawings indicate that the elevation of the Ground Floor is 20.30' and that the elevation at the top of timber piles that supported the original tower is 3.25' and that the groundwater elevation is 5.28'. We assume that these elevations are representative of conditions at the Dartmouth Street wall in the absence of original structural drawings. Boring logs from MBTA drawings indicate that groundwater is approximately 12-feet below grade. This is reasonably consistent with 1932 structural drawings that indicate groundwater is approximately 2-feet above the top of piles, assuming that the Ground Floor of the Church is approximately 3-feet above existing grade. This

section illustrates the proximity of groundwater to the top of timber piles that support the Dartmouth Street wall and that the new elevator shaft lies within the zone of influence for Dartmouth Street wall foundations.

Geotechnical Instrumentation

MBTA Drawing G9 specifies geotechnical instrumentation for monitoring the effects of construction. Proposed geotechnical instrumentation in or near Old South Church includes one inclinometer to monitor horizontal soil settlement, one observation well to monitor groundwater levels, three deformation monitoring point (DMP2) instruments to monitor vertical settlement of the Dartmouth Street wall and one seismograph to monitor construction vibrations within Old South Church. This instrumentation seems reasonable, although we do recommend one additional DMP2 instrument near the Boylston Street corner of the Dartmouth Street wall.

MBTA Specifications Section 02015 provides specifications for geotechnical instrumentation. Paragraph 1.07.L.7.c requires pre-construction and post-construction surveys of conditions at Old South Church. We recommend that you request a copy of these conditions surveys for review by your consultants.

Paragraph 3.03.E of Specifications Section 02015 requires readings of observation wells every three days while excavations are above the groundwater table and readings every day while excavations are below the groundwater table. This frequency of observation well readings seems reasonable. Paragraph 3.03.F specifies that groundwater levels shall be maintained with one foot of pre-construction groundwater levels and requires a groundwater recharge system if groundwater levels fall more than one foot below pre-construction levels. Paragraph 3.03.G also requires that the Contractor cease all work except remedial actions if groundwater levels fall by more than one foot. These requirements seem reasonable for preventing deterioration of timber piles.

Paragraph 3.04.C of Section 02015 requires readings of DMP2 instruments every seven days prior to excavation, every three days while excavations are above the groundwater table and twice daily while excavations are below the groundwater table. This frequency of DMP2 readings seems reasonable. Paragraph 3.04.D requires that the Contractor cease all work except remedial actions if DMP2 readings indicate more than ½ inch total settlement and propose remedial actions to limit settlement to 1-inch maximum. We recommend that the MBTA also provide threshold and limiting values for differential vertical settlement between DMP2 instruments since differential vertical settlement presents a risk of cracking masonry walls and stained-glass windows.

Paragraph 3.05.E of Section 02015 requires readings of inclinometers every seven days prior to excavation, every three days while excavations are above the groundwater table and every day while excavations are below the groundwater table. This frequency of inclinometer readings seems reasonable. Paragraph 3.05.F requires that the Contractor cease all work except remedial actions if inclinometer readings indicate more than ½ inch total movement and propose remedial actions to limit movement to 1-inch maximum. These limits seem reasonable.

Paragraph 3.06.C of Section 02015 requires readings of seismographs whenever the Contractor is utilizing equipment that produces vibrations, after monitoring ambient vibrations for a seven-day period prior to construction. This could be construed as requiring continuous monitoring of

seismographs during use of vibration producing equipment which may be difficult to enforce. Paragraph 3.06.D requires that peak particle velocities from seismograph readings not exceed 0.25-inches per second at Old South Church and 0.50-inches per second elsewhere. This is consistent with Swiss Standard SN 640312 Criteria for Construction Vibrations for "buildings which are especially sensitive or worthy of protection".

We recommend that you request that copies of instrumentation readings be sent directly from the Contractor to your consultants so that readings may be reviewed in a timely manner.

**Support of Excavation**

MBTA Drawing S300 and Specifications Section 02295 require installation of jet-grouted walls around the perimeter of the excavation for the new elevator shaft. While jet-grouted walls are relatively stiff and may provide an effective seal against inflow of groundwater, the design for the support of excavation system to brace jet-grouted walls and limit soil movement will be submitted by the Contractor. We recommend that you request a copy of submittals for the support of excavation system for review by your consultants.

**Construction Staging**

MBTA Drawing CS101 shows a temporary barrier along the Dartmouth Street wall of Old South Church. Paragraph 1.02.E of MBTA Specifications Section 02050 indicates that this will be a solid barrier designed to protect the Church wall. This paragraph requires that the temporary barrier be erected prior to any other demolition or construction activities adjacent to the Church and remain in place until all adjacent construction work is completed. The paragraph requires graphics on the exposed face of the barrier to replicate obscured features of the Church facade. This paragraph also requires Church review and approval of the type of barrier, graphics and any non-destructive attachments of the barrier to the Church facade. Finally, Paragraph 3.05.B.14.b requires that the barrier extend five feet above the working envelope of the largest piece of equipment to be used near the Church. These requirements for the temporary barrier seem reasonable.

**Summary**

Excavation for the new outbound passenger elevator shaft may cause vertical and horizontal soil settlement and lowering of the groundwater table adjacent to the Dartmouth Street wall of Old South Church. This presents some risk of cracking for masonry walls and stained-glass windows and deterioration of timber piles.

Pre-construction and post-construction surveys will be performed to document conditions at Old South Church. We recommend review of these surveys by Church consultants.

Geotechnical instrumentation will be provided to monitor the effects of construction. We recommend one additional DMP2 instrument at the Boylston street corner of the Dartmouth Street wall. The frequency for reading geotechnical instrumentation seems reasonable. Although criteria for geotechnical instrumentation are generally reasonable, we recommend establishing limiting and threshold values for differential vertical settlement between DMP2 instruments. We recommend review of geotechnical instrumentation readings by Church consultants.

Relatively stiff and impermeable jet-grouted walls will be installed around the perimeter of the elevator shaft. We recommend review by Church consultants of Contractor submittals for the support of excavation system.

A temporary barrier will be installed to protect the Church facade during demolition and construction, subject to review and approval by the Church.

From our experience with similar projects, we recommend regular meetings with the MBTA, its consultants and the Contractor to discuss construction schedule, instrumentation readings, impact of construction activities on the Church and any mitigation measures that may be required, especially during installation of jet-grouted walls and excavation for and construction of the elevator shaft.

Finally, although MBTA construction documents indicate significant measures to protect the Church, these measures can not eliminate all risk of damage to the Church.

Very truly yours,
**LeMessurier Consultants**

Richard A. Henige, Jr., P.E., S.E.
Vice President

encl.

xc: Robert Hoyler, McPhail Associates

S:\2005\25118\Review.wpd



LeMessurier Consultants
Structural Engineers
By RAH
Date 10 May 2005
File No. 2518
Sheet No.
Subject Old South Church
Dartmouth St. Wall
14'-4"±
20'-4"±
Ground Floor
(20.30')
3'-0"± Assumed
112.61±
12'-0"± from Boring Logs
Basement
Groundwater
Top of Piles
(3.25')
Excavation for New Elevator
Zone of Influence
Existing Timber Piles
Section @ Dartmouth St.
1/8" = 1 FT

30 by 38 blocks at .25 inches

Massachusetts Bay Transportation Authority
MBTA Contract No. S5PS11

EXHIBIT 10

# Light Rail Accessibility Program

## Schematic Design Report

Draft Submission
March 1995

**Gannett Fleming, Inc.**
Engineers and Planners

**Stull and Lee, Inc.**
Architects and Planners

Katherine McGuinness & Associates
Paul C.K. Lu & Associates
Robert G. Neiley & Associates
Railway Systems Design, Inc.
Jenny Engineering Corporation
Hygienetics, Inc.
GEI Consultants, Inc.
SAR Engineering, Inc.
ASEC Corportaion

## 6.2 Copley Station

### 6.2.1 Existing Conditions, Constraints and Access Issues

[illegible]

elevators, possible stair enclosures, curb ramps and crosswalks will all be required at the street level. A thorough understanding of the existing context is key to help station architects make informed design decisions.

**[illegible]rban Design Context**

[illegible]opley Square is a busy institutional, com[illegible]ercial and tourist area surrounded by [illegible]ildings and places of urban design and [illegible]hitectural significance, including:

[illegible]he New Old South Church (1875, [illegible]ational Historic Landmark)

[illegible]he Boston Public Library (1895, [illegible]ational Register of Historic Places, [illegible]uilding, site and existing headhouse)

[illegible]pley Square and Trinity Church

[illegible] Station itself is also listed on the [illegible]l Register, notwithstanding that both [illegible]or and exterior have experienced [illegible] "modernization" phases.

The Square also serves as an important east-west link, connecting the residential Back Bay area, the Esplanade, the Commonwealth Avenue Mall and commercial Newbury Street, to Copley Square, Copley Plaza, Back Bay Station and the South End.

Access to and from the entrances is by means of public sidewalks with existing non compliant curb ramps, crosswalks and pedestrian signals. The public sidewalks are of generous width, except where the bus shelter adjacent to the inbound entrance, and the outbound stair and headhouse severely constrict pedestrian flow. Most of the curb ramps (6 of 7) do not meet accessibility slope requirements (see appendix 1 for access audit). The corner curb ramp at Copley Square although currently compliant, will probably not be allowed in the upcoming MAAB requirements. None of the curb ramps are contained with the marked pedestrian crossings also making them noncompliant.

The primary urban design objectives to be considered throughout the design of the project include:

*Figure 6-40: Boston Public Library*

*Figure 6-37:* [illegible]

[illegible] *Copley Square*

*Figure 6-39: Historic Headhouse*

*Figure 6-41: Sidewalk at bus shelter*

Case 1:05-cv-11211-JLT Document 28-11 Filed 10/12/2005 Page 3 of 53

- Reinforce the visual and nodal aspects of Copley Square as a key urban place within the Back Bay Historic District.
- Respect the historic character of landmark buildings & properties adjacent to the station, especially the Boston Public Library with its existing headhouse, and the Old South Church.
- Keep busy corners open for pedestrian usage and minimize blockage of pedestrian flows in the proximity of the Station entrance.
- Minimize visual blockage along street view corridors and retail frontages.
- Do not block existing commercial users.



*Figure 6-42: Inbound Historic Headhouse,*

In summary, any streetscape intervention resulting from access improvements to the station should address the importance of the station area as a highly used urban node with special historical adjacencies.

**Street Level**

No accessible entrance currently exists to this station. Three separate stair entrances bring people from the street directly to the separate platform levels below. There is one inbound stair entrance in the headhouse fronting the Boston Public Library and there are two outbound entrances; an open stair, and a stair and escalator within a headhouse.

The inbound entrance stairway, centrally located in the facade of the old Boston Public Library, is a landmark wrought iron headhouse. Originally built in 1917, in front of what was a carriage entrance to the Library's courtyard, the headhouse borrows the wrought iron imagery existing in the Library facade. A new bus stop shelter exists along side the old headhouse. It is visually incompatible with the historic headhouse and also blocks the generous sidewalk in front of the Public Library. The Boylston Street Improvements Master Plan Design (Boston Public Works Department, 1991) includes proposals for relocation and image improvements to these bus shelters.

The outbound entrances, rebuilt in the 1960's are brick structures that have no architectural significance. The stair and escalator headhouse adjacent to the new Old South church, blocks key views up the Dartmouth Street corridor and does not relate well to the Old South Church facade. The open stair entrance on the east side of Dartmouth Street with its flayed brick parapet walls is more intrusive than is necessary.



*Figure 6-43: Outbound entrance at church*



*Figure 6-44: Dartmouth St. east entrance*

The Station entrances are currently approached by pedestrians coming from all directions and by a bus stop located in front of the Public Library. The inbound stair entrance is heavily used during the morning rush hour, where as the outbound entrances are more heavily used by deboarders during the evening rush hour. The escalator is always in the exit position.

Although not part of the accessible route, the existing stairs will probably have to be made accessible. (See *PDM, Stairs.)* The stair risers and treads have recently been upgraded, leveled and covered with "step ease". It is expected that this work will conform to MAAB requirements, however the station architects should verify the final profiles of stair treads and risers, railings, signage, etc. for compliance with those requirements.

In addition to making the existing stairs accessible, the MBTA's current policy is to enclose all open stairs. The east Dartmouth outbound stair entrance would fall into this category. Given the issues of building an enclosure on an already narrow sidewalk blocking the commerical users behind and constricting important views up Dartmouth Street to Copley Square, covering this stair may create serious problems from an urban design perspective.

**Platform Level**

Whether entering on the inbound or outbound side, one would go directly to the platform level, through an unpaid lobby area. Each unpaid lobby is quite different. The inbound lobby, adjacent to the Public Library, is very small and sometimes experiences congestion when a line forms at the ticket counter that interferes with pedestrians using the stairs. However, unlike many stations the ticket booths are built in, giving a well designed appearance. In addition, the

Figure 6-45: Exit stairs at inbound platform

inbound wrought iron headhouse contains a mezzanine level with employee toilets and service spaces not accessible to the public.

The outbound unpaid lobby is very generous, but slopes considerable towards the fare array. This slope has been initially determined to be within the acceptable 5% requirement (See *Access Audit*), but the station architects will be required to verify this through surveys. Neither fare collection arrays comply with present accessibility requirements. (See Appendix 1, *Access Audits.*)

The existing platforms are simple linear corridors of 20'-0" +/- feet and relatively level with a line of columns parallel to the track. They are both approached almost midway from the fare array. The outbound platform has both entrance and egress through the same fare array area. The inbound platform provides a similar arrangement with an additional egress directly from the platform through a separate revolving gate and stair.

The primary access issue at the platform level will be providing accessibility to and from the future Low Floor Vehicles (LFV's). Specifically, the existing platform is too low to permit operation of the LFV's deployable access ramps. (See *PDM, Platforms.*) The existing columns are far enough from the edge of the platform so that they will not interfere with the LFV's operation.

## 6.2.2 Proposed Accessibility Program and Designs

This section delineates the scope of work required to make Copley Station accessible. The scope items are discussed by station levels, except when dealing with vertical circulation elements, such as the elevators, where the issues related to the two levels connected by the elevators will be combined into the presentation. This section also defines other work elements that will either be triggered by the implementation of the accessibility project or have been requested by the MBTA, but not necessarily associated with a particular access requirement. Station wide program elements, not tied to a particular level, are presented at the end of this section. In addition, engineering system upgrades (HVAC, Plumbing, Fire Protection and Electricity) for this particular station are given in Appendix 4.

### Street Level Program

The primary program requirements at the street level, will be to provide an accessible route of travel (curb cuts and crosswalks) and an accessible entrance (elevator) to the station with the appropriate signage. (See the *PDM, Signage and Circulation.*) Since the location of elevator headhouses and stair enclosures involves review by many community groups and agencies, several options have been kept open for elevator locations at this station. (See Appendix 2 for options that were previously explored, but eliminated)

**Curb Ramps/Crosswalks:** Figure ___ shows the location of all proposed curb ramps and crosswalks. As per the PDM, it is assumed that even though people approach the station from other directions, the limits of the accessible route to the station include only the Dartmouth/Boylston Intersection.

Figure 6-46: Outbound unpaid lobby

Figure 6-47: Outbound platform







6 STATIONS

LEGEND:
EXISTING TO REMAIN
EXISTING TO BE REMOVED
NEW CONSTRUCTION
BELOW
FACE OF EXISTING BUILDING
PROPOSED ACCESSIBLE ROUTE CROSSWALK
PROPOSED CURB RAMP
LOCATION OF ELEVATOR OPTION
ROOM LEGEND:
1. ELEVATOR MACHINE ROOM
2. ELECTRICAL ROOM
3. STORAGE
4. CONCESSION/VENDOR
5. TOILET
6. INSPECTOR'S ROOM
7. OFFICE
8. PUMP ROOM
9. ABANDONED SPACE
NEW OLD SOUTH CHURCH
DARTMOUTH STREET
OUTBOUND ENTRANCE
UNPAID LOBBY BELOW
BOYLSTON STREET
TUNNEL BELOW
INBOUND PLATFORM BELOW
OUTBOUND PLATFORM BELOW
CANOPY ABOVE
INBOUND ENTRANCE
BUS SHELTER TO BE RELOCATED
PROPOSED STRUCTURE TO PROVIDE SYMMETRY TO OPTION E HEADHOUSE
MEZZANINE BELOW
TRAFFIC ISLANDS TO BE MODIFIED
NEW LIBRARY
OLD BOSTON PUBLIC LIBRARY
COPLEY SQUARE

Figure 6-48: CopleyStation, Street plan Scale: 1"=40'

6-22 MBTA Light Rail Accessibility Program Schematic Design Report Rev. # March 1995

Figure 6-45: Exit stairs at inbound platform

inbound wrought iron headhouse contains a mezzanine level with employee toilets and service spaces not accessible to the public.

The outbound unpaid lobby is very generous, but slopes considerable towards the fare array. This slope has been initially determined to be within the acceptable 5% requirement (See *Access Audit*), but the station architects will be required to verify this through surveys. Neither fare collection arrays comply with present accessibility requirements. (See Appendix 1, *Access Audits.*)

The existing platforms are simple linear corridors of 20'-0" +/- feet and relatively level with a line of columns parallel to the track. They are both approached almost midway from the fare array. The outbound platform has both entrance and egress through the same fare array area. The inbound platform provides a similar arrangement with an additional egress directly from the platform through a separate revolving gate and stair.

The primary access issue at the platform level will be providing accessibility to and from the future Low Floor Vehicles (LFV's). Specifically, the existing platform is too low to permit operation of the LFV's deployable access ramps. (See *PDM, Platforms.*) The existing columns are far enough from the edge of the platform so that they will not interfere with the LFV's operation.

## 6.2.2 Proposed Accessibility Program and Designs

This section delineates the scope of work required to make Copley Station accessible. The scope items are discussed by station levels, except when dealing with vertical circulation elements, such as the elevators, where the issues related to the two levels connected by the elevators will be combined into the presentation. This section also defines other work elements that will either be triggered by the implementation of the accessibility project or have been requested by the MBTA, but not necessarily associated with a particular access requirement. Station wide program elements, not tied to a particular level, are presented at the end of this section. In addition, engineering system upgrades (HVAC, Plumbing, Fire Protection and Electricity) for this particular station are given in Appendix 4.

### Street Level Program

The primary program requirements at the street level, will be to provide an accessible route of travel (curb cuts and crosswalks) and an accessible entrance (elevator) to the station with the appropriate signage. (See the *PDM, Signage and Circulation.*) Since the location of elevator headhouses and stair enclosures involves review by many community groups and agencies, several options have been kept open for elevator locations at this station. (See Appendix 2 for options that were previously explored, but eliminated)

**Curb Ramps/Crosswalks:** Figure ___ shows the location of all proposed curb ramps and crosswalks. As per the PDM, it is assumed that even though people approach the station from other directions, the limits of the accessible route to the station include only the Dartmouth/Boylston Intersection.

Figure 6-46: Outbound unpaid lobby

Figure 6-47: Outbound platform

**Existing curb ramps (6 of the 7) will need to** be reconstructed in accordance with the latest requirements. (See *PDM Circulation, Curb Ramps/Crosswalks*). The existing corner curb ramp on the corner of Copley Square may have to remain in order to permit the necessary pedestrian movements. Two separate curb ramps at this corner will put the ramp across Boylston Street too far from the crossing. The station architect and the MBTA may have to seek a variance from MAAB at this location.

Final design work at this corner should also be coordinated with the proposed Boylston Street Improvements Master Plan, 1991, by Boston Public Works Department (see *Figure 6-49.*) This plan shows paved crosswalks, curb ramps, and other streetscape improvements appropriate to such a prominent location.

**Street to Platform Level Elevator Options:** In order to provide accessible entrances to each platform, 2 new hydraulic elevators will be required. (See *PDM Elevators.*) *Figure 6-48* delineates 4 options for the outbound entrance.(Options A, B, C, D) and 2 options for the inbound entrances (Options E and F). The discussion for each option will cover work items affecting both the street and platform levels.

*Figure 6-49: Partial plan, Boylston Street Improvements Master Plan*



6 STATIONS

**Legend**

- EXISTING TO REMAIN
- EXISTING TO BE REMOVED
- NEW CONSTRUCTION
- BUILDING LINE ABOVE
- BELOW
- FACE OF EXISTING BUILDING
- TRACKS
- TACTILE WARNING STRIP
- DOWN W/% OF SLOPE
- DIRECTION OF TRAVEL

ROOM LEGEND:

1. ELEVATOR MACHINE ROOM
2. ELECTRICAL ROOM
3. STORAGE
4. CONCESSION/VENDOR
5. TOILET
6. INSPECTOR'S ROOM
7. OFFICE
8. PUMP ROOM
9. ABANDONED SPACE

OLD SOUTH CHURCH
EQ.
EQ.
A
DARTMOUTH STREET
UNPAID LOBBY BELOW
OUTBOUND PLATFORM BELOW
TUNNEL BELOW
BOYLSTON STREET
COPLEY SQUARE
LINE OF BUILDING ABOVE TYP.
UNPAID LOBBY
OUTBOUND PLATFORM

*Figure 6-50: Elevator Option A, Street level plan* Scale: 1/32" = 1'-0"

*Figure 6-51: Elevator Option A, Platform level plan* Scale: 1/32" = 1'-0"

6-24

MBTA Light Rail Accessibility Program Schematic Design Report Rev. # March 1995

- ***Elevator Option A***, shown in *Figures 6-50 and 6-51*, is located along the New Old South Church facade, behind the existing brick and glass headhouse. This option will require:
  - Minor extension of the passageway below (involving some cut and cover structural work) in order to incorporate the elevator hoistway and associated machine room with a "foyer" area in front. (See *Figure 6-51.*)
  - Dewatering, monitoring and recharging the groundwater in order to protect the existing station and adjacent structures.
  - Sidewalk reconstruction.

Of the outbound options, this location has the most serious historic adjacency issues. However, for a sidewalk located option, it has the most open space around it, thereby constricting visual and pedestrian flow the least. Location of the elevator in this location would suggest redesigning the existing stair and escalator headhouse to form a matched set that can be more transparent, contextual to the Church, and create a better image at this busy corner.

*Figure 6-52* suggests an image for the elevator that may work in combination with the redesign of the existing stair and escalator headhouse.

The main advantages of Option A are:

- No major impacts on streetscape elements and infrastructure.
- Minimal tunnel and construction work.
- Location within a wide sidewalk.
- Location along the main path of access.

The main disadvantages of Option A are:

- Its sensitive location adjacent to the New Old South Church and potential for image problems if not designed in conjunction with a new stair and escalator headhouse. Two separate looking structures would be inappropriate at this corner.
- Poor visibility from the fare collection booth.

***Figure 6-52:** Option A, elevator image study*

***Figure 6-53:** Option A, structural diagram*



6 STATIONS

**Legend**

- EXISTING TO REMAIN
- EXISTING TO BE REMOVED
- NEW CONSTRUCTION
- BUILDING LINE ABOVE
- BELOW
- FACE OF EXISTING BUILDING
- TRACKS
- TACTILE WARNING STRIP
- DOWN W/% OF SLOPE
- DIRECTION OF TRAVEL

ROOM LEGEND:

1. ELEVATOR MACHINE ROOM
2. ELECTRICAL ROOM
3. STORAGE
4. CONCESSION/VENDOR
5. TOILET
6. INSPECTOR'S ROOM
7. OFFICE
8. PUMP ROOM
9. ABANDONED SPACE

OLD SOUTH CHURCH
DARTMOUTH STREET
PROPOSED SIDEWALK EXTENSION
PROPOSED STAIR ENTRANCE
UNPAID LOBBY BELOW
OUTBOUND PLATFORM BELOW
TUNNEL BELOW
BOYLSTON STREET
COPLEY SQUARE
LINE OF BUILDING ABOVE TYP.
EXISTING STAIRS TO BE REMOVED, FLOOR ELEVATION TO BE LOWERED
PROPOSED STAIRS
UNPAID LOBBY
OUTBOUND PLATFORM

**Figure 6-54:** *Elevator Option B, Street level plan* Scale: 1/32" = 1'-0"

**Figure 6-55:** *Elevator Option B, Platform level plan* Scale: 1/32" = 1'-0"

-26

MBTA Light Rail Accessibility Program Schematic Design Report Rev. # March 1995

*Figure 6-56: View of Copley Square from Dartmouth Street*

- ***Elevator Option B***, shown in *Figures 6-54 and 6-55*, proposes locating the elevator behind the existing open stairs on the east side of Dartmouth Street. This option will require:
  - Reconstruction of the adjacent stairs by removing the existing first flight of stairs at the passageway to the lobby level and rebuilding and extending the existing stairs to the street.
  - Minor extension of the passageway below in order to incorporate the elevator hoistway, machine room and a foyer. (*Figure 6-53* shows similar structural work requirements.)
  - Widening the sidewalk, curb realignment and removing parallel parking spaces.
  - Detailed groundwater monitoring, given the proximity of the adjacent retail structures.

The location of an elevator in front of the retail building has no historic architectural implications but would have to be designed to be as transparent as possible and a positive addition to the architecture of Back Bay.

This option would, however, block an already narrow sidewalk, create a visual obstruction along Dartmouth Street from Newbury street to Copley Square, and may create a hardship to the retail user directly behind it. If the reconstructed stair would have to be enclosed as well, the obstruction issues discussed above would be compounded. This elevator option provides poor visibility from the fare collection booth, notwithstanding its location along a public path of access.

*Figure 6-57: Option B, existing condition*

*Figure 6-58: Option B, elevator image study*



**Legend**

- EXISTING TO REMAIN
- EXISTING TO BE REMOVED
- NEW CONSTRUCTION
- BUILDING LINE ABOVE
- BELOW
- FACE OF EXISTING BUILDING
- TRACKS
- TACTILE WARNING STRIP
- DOWN W/% OF SLOPE
- DIRECTION OF TRAVEL

ROOM LEGEND:

1. ELEVATOR MACHINE ROOM
2. ELECTRICAL ROOM
3. STORAGE
4. CONCESSION/VENDOR
5. TOILET
6. INSPECTOR'S ROOM
7. OFFICE
8. PUMP ROOM
9. ABANDONED SPACE

*Figure 6-59:* Elevator Option C, Street level plan — Scale: 1/32" = 1'-0"

*Figure 6-60:* Elevator Option C, Platform level plan — Scale: 1/32" = 1'-0"

- ***Elevator Option C,*** shown in *Figures 6-59 ans 6-60,* proposes incorporating the elevator into the existing retail building, with its entrance directly off the sidewalk. This option will require:
  - Negotiation of a real estate transaction between the MBTA and a private owner.
  - Modification of the existing commercial building entrance as well as to the basement in order to accommodate the new elevator. This will include breaching several floors of the structure, design of the support system for each level and through the exterior wall, design the support structure for the hoistway at the lower level including closure walls. (See *Figure 6-62.*)
  - An extension of the unpaid lobby below, to accommodate the elevator hoistway, machine room and a foyer.
  - Reconstruction of the stairs by removing the existing first flight at the lobby level and rebuilding and extending the existing stairs to the street.
  - Reconstruction of the sidewalk and relocation of utilities to allow access to the basement area of the existing commercial building. Some modification, shoring and underpinning of the building foundation and structural system will also be required.
  - Groundwater control.

In this option the elevator entrance should be designed to fit in with the existing facade of the building and, for safety reasons, to be as transparent as possible.

Option C has the least impacts on the streetscape (assuming that the MBTA will not require the enclosure of the existing adjacent stairs). But the elevator connection to the unpaid lobby is too remote from the fare array, thus requiring some electronic means of security surveillance. This option will demand delicate negotiations with a private owner and mitigation of the construction issues presented above.

*Figure 6-61: Option C, elevator image study*

2ND FLOOR
607 BOYLSTON ST
GROUND FLOOR EL. 18.10'
NEW HOISTWAY
NEW ARCHITECTURAL HEADHOUSE OVER EXISTING STAIRS
STREET LEVEL
EXIST. STAIR (BEYOND)
WATER-PROOFING
EXISTING BUILD. PILE FOUNDATION
NEW CORRIDOR
WATERPROOFING
NEW PILE FOUNDATION
EXISTING STATION PILE FOUNDATION

*Figure 6-62: Option C, structural diagram*



6 STATIONS

**Legend**

- EXISTING TO REMAIN
- EXISTING TO BE REMOVED
- NEW CONSTRUCTION
- BUILDING LINE ABOVE
- BELOW
- FACE OF EXISTING BUILDING
- TRACKS
- TACTILE WARNING STRIP
- DOWN W/% OF SLOPE
- DIRECTION OF TRAVEL

ROOM LEGEND:

1. ELEVATOR MACHINE ROOM
2. ELECTRICAL ROOM
3. STORAGE
4. CONCESSION/VENDOR
5. TOILET
6. INSPECTOR'S ROOM
7. OFFICE
8. PUMP ROOM
9. ABANDONED SPACE

OLD SOUTH CHURCH
DARTMOUTH STREET
UNPAID LOBBY BELOW
PROPOSED TUNNEL BELOW
OUTBOUND PLATFORM BELOW
TUNNEL BELOW
BOYLSTON STREET
COPLEY SQUARE
D
LINE OF BUILDING ABOVE TYP.
UNPAID LOBBY
OUTBOUND PLATFORM

***Figure 6-63:*** *Elevator Option D, Street level plan* *Scale: 1/32" = 1'-0"*

***Figure 6-64:*** *Elevator Option D, Platform level plan* *Scale: 1/32" = 1'-0"*

6-30

*MBTA Light Rail Accessibility Program* *Schematic Design Report* *Rev. #* *March 1995*

- ***Elevator Option D,*** shown in *Figure 6-63 ans 6-64* calls for siting the elevator closer to Boylston Street, in front of the existing open stair. It will require:

  - An extension of the unpaid lobby by tunneling under the street and sidewalk, in order to accommodate the elevator hoistway, machine room and foyer.
  - Reconstruction of the sidewalk and relocation of utilities to allow access to the elevator.
  - Groundwater control.

In this option, the elevator would be located on a busy corner, blocking existing pedestrian and visual corridors up Dartmouth Street and along Boylston Street.

Option D, like Option B, should be designed to be a positive addition to the streetscape, especially because of its prominent location along Copley Square.

At the lobby level, Option D provides good surveillance from the booth, is located on the street along the general path of access, and unlike the other options on this side of Dartmouth Street, would not require rebuilding of the existing stairs. However, if the MBTA requires a stair enclosure, both structures should be built as a pair. There would be serious urban design implications of locating two massive structures on a narrow sidewalk that is so heavily used.

*Figure 6-65: Option D, existing condition*

*Figure 6-66: Option D, elevator image*

- ***Elevator Option E,*** shown in *Figure 6-67 and 6-68* locates the elevator serving the inbound platform next to the existing wrought iron headhouse. Since the historic headhouse is centrally located on the facade of the Boston Public Library, locating a new structure only on one side will seriously compromise the explicit symmetry of the composition. Therefore, Option E also includes a similar structure that could be a bus stop, automated fare collection kiosk, or information kiosk on the other side of the wrought iron headhouse. It will therefore require the implementation of the following:
  - Negotiations with the Boston Public Library for use of their property.
  - Symmetrically located structures on each side of the existing headhouse within the Boston Public Library property.
  - Modifications to the Library's plaza steps and other open space elements, such as the bus shelters.
  - Minor extension of the unpaid lobby below, involving minor cut-and-cover structural work.
  - Modification of the fare collection booth below and relocation of the existing concession on the platform.
  - Attention to the groundwater control and foundation implications of building a new structure adjacent to the existing Library including the relocation of a 30" sewer and the possible underpinning of the Library.

This option is problematic because it not only creates the very difficult task of imposing new structures along side the intricately detailed wrought iron headhouse, but also creates many interface problems with the landmark Boston Public Library. *Figures 6-70 and 6-71* shows concept drawings that attempt to integrate new structures within the site by either creating similar wrought iron structures, or introducing more monumental stone bases with statues (an opportunity for public art to flank the existing headhouse similar to the stat-

**Legend**

- EXISTING TO REMAIN
- EXISTING TO BE REMOVED
- NEW CONSTRUCTION
- BUILDING LINE ABOVE
- BELOW
- FACE OF EXISTING BUILDING
- TRACKS
- TACTILE WARNING STRIP
- DOWN W% OF SLOPE
- DIRECTION OF TRAVEL

ROOM LEGEND:

1. ELEVATOR MACHINE ROOM
2. ELECTRICAL ROOM
3. STORAGE
4. CONCESSION/VENDOR
5. TOILET
6. INSPECTOR'S ROOM
7. OFFICE
8. PUMP ROOM
9. ABANDONED SPACE

OLD SOUTH CHURCH

BOYLSTON STREET

INBOUND PLATFORM BELOW

BUS SHELTER TO BE RELOCATED

PROPOSED STRUCTURE TO PROVIDE SYMMETRY TO OPTION E HEADHOUSE

OLD BOSTON PUBLIC LIBRARY

*Figure 6-67: Elevator Option E, Street level plan* *Scale: 1/32" = 1'-0"*

*Figure 6-68: Elevator Option E, Platform level plan* *Scale: 1/32" = 1'-0"*




*Figure 6-69: Sketch of existing stair headhouse*

*Figure 6-70: Option E, elevator image study (1)*

*Figure 6-71: Option E, elevator image study (2)*

ues at the east facade of the library). It should be underlined that any attempt to add a structure in this location will be highly controversial, however, if done with a sympathetic contextual emphasis, it could also be an opportunity to provide a focus to the historic headhouse and enrich the quality of the existing streetscape.

As stated above, Elevator Option E has complicated contextual and design implications, however from a access and functional analysis it provides an accessible entrance without blocking existing street level pedestrian movement, close to the main pedestrian path, within the existing unpaid lobby, and with only minor tunneling required.

*Figure 6-72: Option E, structural diagram, plan*

LIMIT OF HISTORICAL HEADHOUSE (BEYOND)

NEW ARCHITECTURAL HEADHOUSE

STREET LEVEL

WATERPROOFING

EXISTING STRUCTURE (BEYOND)

NEW HOISTWAY

BOSTON PUBLIC LIBRARY

FINISH LINE STATION PLATFORM

30" SANITARY SEWER

FOUNDATION TO MATCH EXISTING

WATERPROOFING

*Figure 6-73: Option E, structural diagram, Section A*

- ***Elevator Option F***, shown in *Figure 6-74 and 6-75* locates the inbound elevator in front of the new Boston Public Library. Even though this location contradicts MBTA policy by placing the elevator at the end of the platform and thereby bypassing the unpaid lobby, it remains an option because of the extreme political and design consequences of locating the elevator in front of the Old Library. Option F would require the following:

  - Excavation and structural work at the end of the platform, in front of the new Library in order to accommodate the elevator hoistway and machine room.
  - A screened passage from the elevator to the unpaid lobby within the existing platform.
  - Removal of one fare collector's booth and relocation of the benches.
  - Groundwater control and structural considerations adjacent to the existing library.
  - Reconstruction of the brick sidewalk and relocation of the utilities affected by the construction of the proposed elevator shaft.

In this option the elevator entrance should be located in line with the face of existing wrought iron headhouse, in order to maintain the sidewalk widths and views. It could also be centered in the last bay of the new Library.

Concept diagram (*Figure 6-76*) shows an image of the headhouse that is transparent, contextual and incorporates a bus shelter within its canopy. (Hoping to replace the badly located existing shelter in front of the old Library.)

Option F, of the two inbound options, has the least streetscape and urban design impacts, but places the entrance in a remote location from the main entry to the station. It also compromis-

Legend
EXISTING TO REMAIN
EXISTING TO BE REMOVED
NEW CONSTRUCTION
BUILDING LINE ABOVE
BELOW
FACE OF EXISTING BUILDING
TRACKS
TACTILE WARNING STRIP
DOWN W/% OF SLOPE
DIRECTION OF TRAVEL
ROOM LEGEND:
1. ELEVATOR MACHINE ROOM
2. ELECTRICAL ROOM
3. STORAGE
4. CONCESSION/VENDOR
5. TOILET
6. INSPECTOR'S ROOM
7. OFFICE
8. PUMP ROOM
9. ABANDONED SPACE
OLD SOUTH CHURCH
BOYLSTON STREET
INBOUND PLATFORM BELOW
PROPOSED TUNNEL BELOW
F
PROPOSED CANOPY ABOVE
BUS SHELTER TO BE RELOCATED
NEW LIBRARY
OLD LIBRARY

**Figure 6-74:** *Elevator Option F, Street level plan* *Scale: 1/32" = 1'-0"*

es the architectural character of the platform level below and creates a potential security problem given the direct connection of the elevator to the paid platform.

**Stairs:** The three existing or modified stairs will need to:

- Incorporate required signage and lighting as per accessibility requirements. (See PDM.)
- Conform to accessible guidelines concerning threads, risers and handrails. (See PDM.)
- Conform, if feasible to the MBTA guidelines requiring enclosures on all stairs. (See PDM.) This would pertain to the east Dartmouth Street stair that is currently uncovered and also to the west Dartmouth Street headhouse if it is replaced with a more contextual structure. (See Elevator Option A.)

If a decision is reached not to enclose the east Dartmouth Street stair, it is recommended that the stair be remodeled to remove the flared parapet wall and be replaced with an open rail. (See *PDM*.)

LINE OF BUILDING ABOVE TYP.
INBOUND PLATFORM
UNPAID LOBBY
EMERGENCY EGRESS STAIR
PROPOSED OPEN SCREEN BARRIER
PROPOSED PASSAGE TO UNPAID LOBBY
BENCH TO BE RELOCATED AND RAISED, TYP.
FARE COLLECTION BOOTH TO BE REMOVED

*Figure 6-75: Elevator Option F, Platform level plan* *Scale: 1/32" = 1'-0"*

**Platform Level Program**

The access requirements at both inbound and outbound platforms are primarily a function of providing an accessible route from the elevator, through the fare array to the deployable ramps of the future LFV's.

The location of the route will vary depending on the elevator option selected at the street level. (Additional work elements related to the street elevator impacts at the platform level are presented in the previous subsection, *Street Level)* The program at this level is thus driven by the need to raise the platforms to 8" above the top of rail in order for the LFV's to operate their ramps.

**Outbound unpaid lobby floor:** The lobby floor will need to be partially raised in order to tie into the required raised platform. According to the access audit the existing slope of the unpaid lobby meets the 5% accessibility standard. Station architects will require accurate surveys to verify the exact slope and subsequent program requirements. The material of the

*Figure 6-76: Option F, elevator image study*



6 STATIONS

LEGEND:
ROOM LEGEND:
NEW CONSTRUCTION
TRACKS
COLUMN
LINE OF BUILDING ABOVE, TYP.
PROPOSED ELECTRICAL ROOM
PROPOSED LOCATION FOR CONCESSION
CONCESSION TO BE RELOCATED
UNPAID LOBBY TO BE RAISED TO BLEND WITH ELEVATED PLATFORM
UNPAID LOBBY
FARE ARRAY SYSTEM TO BE MODIFIED
PLATFORM TO BE RAISED 8" ABOVE TOP OF RAIL, TYP.
BENCH TO BE RAISED, TYP.
PROPOSED ELECTRICAL ROOM
PROPOSED UNISEX TOILET
OUTBOUND PLATFORM
INBOUND PLATFORM
UNPAID LOBBY TO BE RAISED
MEZZANINE ABOVE
DOORS TO BE RAISED, TYP.
LIMIT OF RAISED PLATFORM, RAMP DOWN, 8%, TYP.
MEZZANINE
STAIRS TO STREET
A
B
C
D
E
F

Figure 6-77: Copley Station, Platform plan Scale: 1"=40'

6-36 MBTA Light Rail Accessibility Program Schematic Design Report Rev. # March 1995

raised unpaid floor should be the same as the platform. How this material ties into the existing grade at the base of the stair and escalators will require further study by the station architects. The existing escalator is not impacted by the accessibility project. The MBTA may require the escalator replaced to conform to new, operational standards.

**Inbound unpaid lobby floor:** The inbound lobby floor should be raised to align with the raised platform. Several doors, stairs and booths will be affected by this raise.

**Fare Array Systems:** The present fare arrays, both inbound and outbound, will need to be modified to make them accessible. This work should be coordinated with the proposed Automatic Fare Collection (AFC) system that the MBTA is presently planning. A preliminary investigation of the impacts of establishing the AFC system at Copley Station was completed as part of this study.

- ***Copley Inbound:*** Concept sketches shown in *Figures 6-78* and *6-79* were developed in response to the following preliminary MBTA requirement for:

  7 Automatic fare collection gates
  1 Accessible egress gate
  1 Customer service booth
  9 Ticket vending machines

A summary of this study shows that the proposed fare array elements cannot be physically accommodated in the existing unpaid lobby as the space available at this station is very limited, and will create conflicts between queuing and circulation. In order to maximize the space of the unpaid lobby, some modifications are recommended:

1. Remove the stairs to the mezzanine. The existing mezzanine above the lobby includes a toilet and other abandoned spaces. Since a new accessible toilet room is proposed to be located at the platform level as part of this project, the existing stairs that connect the platform with the mezzanine may be able to be removed. If the need to provide access to that area arises in the future, a new entry can be created from the first landing of the main stairs to the street level. In that case, some additional modifications may be required inside the mezzanine in order to match the level of this landing.
2. Once the stairs to the mezzanine are removed, a new access has to be provided to the ejector room under the exit stairs on the eastern side of the lobby.
3. The existing inspector's room and token booth, presently located on both sides of the fare array, can be removed, including all the non-bearing walls around them, thus clearing additional space for the new AFC system.
4. Since some modifications are necessary on the west side of the lobby for either elevator option, the concession structure existing on that area of the platform will have to be relocated. A new concession could be placed on the eastern end wall of the platform, thus minimizing the physical interference, and at the same time allowing for adequate queuing space in front of it. (See Platform Plan, *Figure 6-77*)

Figures 6-78 and 6-79, show the proposed layout for this lobby for both elevator Option E and F. For the purpose of this analysis, it is assumed that all the elements required by the program are to be located within the lobby. (Although if Option E is chosen with its symmetrical structure, some of the ticket vending machines may be located in that structure.)

- For elevator **Option E:** The egress gate and all 7 fare gates required can be located at approximately the same location as the current fare array. The customer service booth can be placed between the elevator and the platform. All 9 TVM's can be placed where the stairs to the mezzanine have been removed. Although the concentration of TVM's in this area may result in some congestion of users at peak hours, this would minimize interference with circulation through the fare gates. The transferal of some of these TVM's to the street level would clearly simplify changes required in the lobby. These should be located within the proposed structure east of the existing head-house.

- Elevator **Option F:** The configuration of the unpaid lobby will be impacted by the location of elevator option F at the western end of the platform, and the screen barrier on the platform.

Given the fact that the booth will occupy part of the area available after the removal of the stair to the mezzanine (assigned to TVM's on the previous layout for elevator option E), some of the TVM's will have to be located on the western side of the unpaid lobby. This produces potential circulation conflicts between the queuing space for the TVM's on this side, the fare gates, and the access from the passage to the elevator.

**Figure 6-78:** *Fare array diagram, inbound unpaid lobby, elevator option E*

**Figure 6-79:** *Fare array diagram, inbound unpaid lobby, elevator option F*

As a way of providing additional space in this area, the fare array line is move forward toward the platform approximately 3 ft., in line with the existing columns. Providing a custom booth aligned with the fare array, opens more space for the TVM's at the base of the stairs, and provides better surveillance of the platform.

- *Copley Outbound:* *Figure 6-80* shows a concept sketch for the following MBTA fare array program:

  9 Automatic fare collection gates
  1 Accessible egress gate
  1 Customer service booth
  4 Ticket vending machines

  According to this preliminary study, fare array elements can be accommodated within the existing unpaid lobby. Both the customer service booth and the ticket vending machines (TVM's ) can be centrally located in the unpaid lobby, allowing for circulation along the sides. There seems to be adequate queuing space in front of the TVM's but some interference with general circulation may occur during peak use. The standard customer service booth should be modified, as shown, to adapt to its central location.

  This layout eliminates the existing revolving gate. If this gate is required to remain, there seems to be enough space to include it in the fare array line, but one of the fare gates would have to be located in front of an existing column.

  As an alternative layout, the TVM's and customer service booth could be shifted one module south, towards the platform, allowing for some more queuing space in front of the TVM's, as well as a better sight lines from the booth to the platform area. In this case, the fare array should be moved about 5 feet towards the edge of the platform area, in line with the existing column.

**Platform Floors:** The platform floor will need to be raised to 8" above top of rail along its entire length and width. (See *Figure 6-77.*) The materials should be unit pavers or tiles, consistent with the overall station design. A tactile warning strip at the edge will also be required. The design parameters for this work are illustrated in the *PDM, Section 2.4 Platforms.*

Raising the inbound and outbound platforms will impact several station elements, thus adding the following items to the program:

- ***Walls:*** The present lower sign band along the platform varies from 7" to 14" above the existing floor. When the platform is raised, the lower sign band will be removed, and a new 1" edge added in order to provide a clean stop for the existing tile and wall panels. A new wall base should be created out of the new floor material. The benches will be mounted on the existing tile panels as required. The above program assumes the least amount of intervention, however at the time of the actual implementation, a total refurbishing may be called for by the MBTA, necessitating a total redesign of the wall elements.

- ***Benches:*** The present cantilevered benches will require removal, refinishing and replacment at the appropriate height. If Elevator Option F is chosen, the outbound benches parallel to the screened barrier will need to be replaced, with post supports, on the vehicle side of the barrier. Half of all the benches should also be provided with arm rests. (See PDM, Section 2.6, Benches.) Benches may be required, if

*Figure 6-80:* Fare array diagram, outbound unpaid lobby

*Figure 6-81:* Elevation *B* at platform Scale: 1/4" = 1'-0"

there is space, in the unpaid lobby as well.

- ***Stairs and Handrails:*** The increased platform height will interface with 3 stairways on the inbound platform and unpaid lobby. See the PDM for options at stairs.

**Car Ramp Zones:** Areas defined by the ramp zones in front of every LFV's accessible door will need to be clear of any obstacle, including structural elements. A study was performed in order to evaluate the measures necessary to minimize the potential conflicts between the car ramps zones and the existing row of columns at each platform. No conflicts exist at the Copley Platform. *Figure 6-77* shows the proposed stop lines based on the assumptions presented in *Appendix 1, Ramp Zones Analysis*, of the *PDM*.

*Figure 6-83: Stair detail*

**Toilet Rooms:** New employee toilets are proposed to be located at the ends of each platform, one unisex facility per platform. (See *Figure 6-77*.) See *PDM* for accessibility design criteria.

**Passenger Assistance Areas:** The station architect in coordination with the MBTA, should identify at least two Passenger Assistance Areas per platform in order to ensure equal access to safe egress. Although not necessarily separate spaces, these areas should incorporate the appropriate signage and a police callback intercom, among other requirements. (See *MBTA Guide to Access, Emergency Egress Section*.)

**Electric Room:** an expansion of the existing electric room will be required to accommodate the new power requirements for the station resulting from accessibilities improvements. (See *Engineering Analysis; Appendix 3*) The existing electric room at the eastern end of the outbound platform could be expanded towards the platform side. (See *Figure 6-77*.)

## Other Program Elements

In addition to the scope of work summarized above (per station level) other elements to be incorporated in the accessibility program are station wide in nature, including:

**Signage:** The station architect, in coordination with the MBTA should propose signage modifications at each level of the station using the visual and tactile means to make the system accessible.

*Figure 6-82: Section A at platform* Scale: 1/8" = 1'-0"

**Communications:**

- ***Public Address System:*** The existing audio public address system may be relocated and reused. As part of normal aging, some devices may be required to be replaced to function properly.
- ***Readers Boards and Video Monitors:*** A new electronic sign system or video monitor is recommended to provide passenger information via LED scrolling bulletin boards throughout the station as a means to convey information to the hearing impaired. Each electronic sign displays a message developed and transmitted from existing computer equipment located at a central MBTA site.
- ***Clocks:*** If the MBTA decides to provide clocks for this station (presently there are none), they should be designed and located in accordance with accessibility requirements.
- ***Emergency Call-Boxes:*** Emergency call boxes should be provided in conformance with MBTA Guidelines.
- ***Emergency Alarms:*** A fire alarm system that meets N.F.P.A., state, local, MAAB and ADA requirements is required as none exists. The fire management panel has a telephone and fan controls for tunnel ventilation only. Pull stations, smoke and heat detection, monitoring of sprinkler services and new audio/visual devices will be required.
- ***Telephones, TDD:*** Two pay telephones (presently New England Telephone devices) are currently located in the unpaid outbound lobby as well as two on the inbound platform. A TDD (Telecommunication Device for the Deaf) must be added in each location as per the *MBTA Guide to Access Requirements.* Existing telephones must also be replaced to meet access requirements in respect to operations and mounting heights.

**Vendor/Vending Machines:** The existing concessions, at the inbound and outbound platforms, will need to be relocated (See *Figure 6-77)* and modified per accessibility requirements.

Accessibility Design Criteria for these elements could be found in the *PDM/and MBTA Guide to Access.*

### 6.2.3 Constructability

The constructability issues at Copley Station are a result of several specific program areas in the proposed Accessibility Program and Designs. The individual program elements which have the greatest constructability impact include:

- the construction of the elevator hoistways;
- upgrade of electrical systems;
- the raising of the platform to accommodate the new LFV;
- and the automation of the present fare collection system.

Construction work for each of the items above can be phased and implemented as individual contracts or as a single contract. Secondary items should be combined with the appropriate larger work items if the work is let as individual contracts. For the purpose of discussion each piece will be addressed separately in terms of construction impacts on the station and MBTA service.

There are significant street level construction impacts for most of the elevator options that provide access to the outbound platform at this station. Elevator option A is the least disruptive. This elevator is located on the sidewalk along Dartmouth Street and would not impact the roadway but will impact pedestrian circulation on the sidewalk. Option B will require the taking of a portion of Dartmouth Street. The construction of Option B will also include a machine room and passageway beneath Dartmouth Street and the adjacent sidewalk. This would require staged construction and the temporary closure of a portion of the roadway and the sidewalk. Elevator Option C will also require the construction of a passageway under Dartmouth Street and the sidewalk during construction. Elevator Option D will require temporary closure of the Dartmouth Street sidewalk and pedestrian mitigation at this corner. Like Option A, D is also least disruptive but, the adjacent travel lane may be impacted by construction of this elevator hoistway and machine room. This lane may need to be closed during construction. Elevator options E and F for the inbound platform have no significant street level construction impacts on vehicular or pedestrian traffic.

Additional temporary lane closures may be required at times for construction vehicles or delivery of materials. All of the elevator options will require pedestrian traffic to be maintained safely around the site. Traffic maintenance on the city streets must be coordinated with the city of Boston Transportation Department.

At the platform level the major constructability issues associated with the incorporation of the elevators are maintaining continuity of service and means of egress. Construction of elevator Options A, E, and F will impede pedestrian traffic in and out of the station requiring some mitigation to assure safe access and nuisance control. Each of these options could be constructed during normal operating hours with some planning. Elevator Options B and C will require either off peak work hours or staged construction to insure maintenance of the means of egress stairs during reconstruction.

As a consequence of the installation of the elevators the current available power will be exceeded. This will result in the need to upgrade the present electrical systems. Upgrade and conversion from DC to AC power and the addition of a generator will need to take place when the station is closed. Fire alarm systems, emergency signage and lighting, will need to be maintained operational during the construction period.

Raising the inbound and outbound platforms will also require a staged work sequence to avoid interruption of station usage and service. It may be more advantageous to perform work during off peak hours to minimize station disruption and construction nuisances.

Implementation of the automated fare collection system will require staged sequencing in order to maintain station operation and circulation to and from the platform.

### 6.2.4 Cost

The total estimated cost is $3,500,000.

For estimating assumptions regarding the above construction cost see section 7.6, Project Cost.

This total does not include the cost for the automatic fare collection system or the unpredictable cost of taking private property for the public good (elevator option C).

The cost of the most expensive elevator option(s) addressed is considered for this preliminary estimate.

It should be noted that for preliminary estimate purposes, inbound elevator option E and F are considered the same.

# 6.3 Arlington Station

## 6.3.1 Existing Conditions, Constraints and Access Issues

\rlington Station, located at the intersection f Boylston and Arlington Streets, is a grade eparated subway station which includes a ıezzanine level between the street and latform levels. Separate inbound and out-ound platforms share street level entrances nd are accessed from the same fare collec-on mezzanine.

ıre 6-84: *Arlington Street Church*

### Urban Design Context

This station serves a very busy, high density, mixed-use downtown area with a distinct historical character. It supports an important gateway node that marks the beginning of the Back Bay Historic District and fronts onto Boston's showcase park, the Public Garden.

Three of the four corners at the intersection of Arlington and Boylston Streets are important locations from an architectural and urban design perspective, as they incorporate properties with significant historic or landmark status:

- The Arlington Street Church (1861, National Register of Historic Places, City of Boston Landmark)
- Boston Public Garden and the William Ellery Channing Monument (1859, National Register of Historic Places)
- The Shreve, Crump and Low Building (1912, included in the Back Bay Historic District boundaries)

The southeast corner is occupied by a recently completed mixed-use complex, the Heritage on the Garden Building, characterized by its contextual architectural design. In addition, the station itself is listed in the National Register.

The station is currently approached by pedestrians coming from all directions. Three stair entrances are located parallel to Arlington street: one at the Arlington Street Church corner, one next to the Shreve, Crump and Low Building, and the other across the street fronting the Heritage on the Garden Building. Another stair entry existed inside the Public Garden, but its use has been discontinued and the opening sealed off. In addition to these entrances, the station originally included a secondary (part-time) connection to the Berkeley/Boylston Street intersection, west of the present station entrances. This alternative entrance has also been closed-off to the public and there are no plans to reopen it in the foreseeable future.

Access to and from the stair entries is by way of public sidewalks, signalized crosswalks and noncompliant diagonal curb ramps located at the corners of the Arlington/Boylston Street intersection. The public sidewalks in the vicinity of the station entrances are generous in width, except where the width of the sidewalks is reduced due to the location of the stair parapet walls or guardrails. (Especially next to the Shreve, Crump and Low Building). Most of the curb ramps (3 of the 4) do not meet accessibility slope minimum requirements (see Appendix 1 for Access Audit information). The curb ramp adjacent to the Heritage on the Garden Building is compliant with present ADA/MAAB requirements. The existing crosswalks are narrow, worn and not in all cases aligned with the curb ramps which they serve.

The main urban design objectives to be considered throughout the design of the project include:

- Respect the historical character of landmark properties adjacent to the station.
- Keep the busy corners open for pedestrian usage and minimize blockage of pedestrian flows in the proximity of the station entrances.
- Minimize visual blockages along important street view corridors.

In summary, any streetscape intervention resulting from access improvements to the station will need to address the special historical character and pedestrian circulation patterns of the Arlington/Boylston Street intersection area.

**Figure 6-85:** *Boston Public Garden, Channing Statue*

**Figure 6-86:** *Heritage on the Garden Building*



*Figure 6-87: Boston Public Garden, Arlington Street*

*Figure 6-88: Entrance stair at Shrieve bldg.*

### Street Level

No accessible entrance exists to this station. Presently, the stair entrances are being refinished as part of a station-wide upgrading project. It is expected that this work will conform to MAAB requirements, however the station architects should verify the final profiles of stair treads and risers, railings, etc. for compliance with those requirements.

In addition to providing an accessible station entry at the street level, the MBTA's current policy is to enclose the presently open stairs, in order to minimize weather exposure and potential safety problems. Given the urban design issues discussed above, this may seem more a challenge than an opportunity. (See the *PDM, Stairs.*)

### Mezzanine Level

All of the existing station street entrances lead to the unpaid lobby of the mezzanine. The unused pedestrian tunnel from the former Public Garden entrance presently provides storage space for a flower vendor. Employee toilet facilities, not currently accessible, and various other support spaces (not requiring conformance to access requirements) are also located along the unpaid lobby.

The fare array system does not comply with present accessibility requirements with respect to the gate and fare collector's booth design parameters. (See *Access Audits Forms.*)

Beyond the fare array, the paid lobby leads to sets of stairs and escalators connecting the mezzanine to the separate platforms below. In addition, two exit turnstiles are provided for egress towards the street level stairs.

*Figure 6-89: Stair entrance at Church*

*Figure 6-90: Stair entrances at Heritage*

Access to and from the escalators is through corridors at a higher floor elevation from the mezzanine floor, a small flight of stairs provides a transition between the two levels. The escalators are normally running in the exit direction all the time.

The stairs leading to each platform are being upgraded to MAAB standards, except the lower runs in contact with the platforms. These have open risers and railings not in compliance with the above standards.

Currently, there is no accessible vertical circulation connecting the mezzanine level with the two platforms below.

**Platform Level**

The existing platforms are simple linear corridors, somewhat narrow (+/- 15'-3") and relatively level with a line of columns close to the edge of the platform. They are presently approached from the eastern ends of the platforms only. Normal egress from the trains is accommodated through the end of platform stairs and the mid-platform escalators leading to the mezzanine level. As previously mentioned, the stairs at the western end of the platforms (2 per platform) are currently closed.

Aside from providing an accessible route connecting the platform to the paid lobby of the mezzanine, the main access issue at the platform involves the boarding/ exiting of the future Low Floor Vehicles (LFV's). Specifically, the existing platform levels are too low to permit operation of the LFV's deployable access ramps. Another key design problem is that the existing columns are so close to the platform edges and to each other that they form potential obstructions which will significantly limit the flexibility of deploying the LFV's car ramps along the platforms.

***Figure 6-92:*** *Existing open stair at platform*

*Figure 6-93:*

***Figure 6-91:*** *Fare array system at mezzanine*

***Figure 6-94:*** *Platform, general view*



6 STATIONS

LEGEND:
EXISTING TO REMAIN
EXISTING TO BE REMOVED
NEW CONSTRUCTION
BELOW
FACE OF EXISTING BUILDING
PROPOSED ACCESSIBLE ROUTE CROSSWALK
PROPOSED CURB RAMP
LOCATION OF ELEVATOR OPTION
TREE PIT
ROOM LEGEND:
1. ELEVATOR MACHINE ROOM
2. ELECTRICAL ROOM
3. STORAGE
4. CONCESSION/VENDOR
5. MENS' TOILET
6. WOMENS' TOILET
7. SAFE ROOM
8. EJECTOR ROOM
9. COMMUNICATIONS ROOM
ARLINGTON STREET CHURCH
ARLINGTON STREET
BOSTON PUBLIC GARDEN
CHANNING STATUE
DISCONTINUED STAIR AND TUNNEL BELOW
A
PROPOSED ELEVATOR BELOW TYP.
LINE OF MEZZANINE BELOW TYP.
BOYLSTON STREET
B
C
EXISTING CANOPY ABOVE
BERKELEY STREET MEZZANINE BELOW, (CLOSED)
SHREVE, CRUMP, AND LOW BUILDING
HERITAGE ON THE GARDEN BUILDING

*Figure 6-95: Arlington Station, Street plan*   *Scale: 1"=40'*

6-44   *MBTA Light Rail Accessibility Program*   *Schematic Design Report*   *Rev. #*   *March 1995*

## 6.3.2 Proposed Accessibility Program and Designs

This section summarizes the scope of work required to make Arlington Station accessible. The scope items are discussed by station levels, except when dealing with vertical circulation elements, such as the elevators, where the issues related to the two levels connected by the elevators will be combined into one presentation. This section also defines other work elements that will either be triggered by the implementation of the accessibility project or have been requested by the MBTA, but not necessarily associated with a particular access requirement. Station wide program elements, not tied to a particular level, are presented at the end of this section. In addition, engineering systems upgrades (HVAC, Plumbing, Fire Protection and Electricity) for this particular station are given in Appendix 4.

### Street Level Program

At the street level, the main accessibility program requirements will be to provide an accessible route of travel (i.e. curb ramps and crosswalks) and an accessible entrance (i.e. elevator) to the station with the appropriate signage. Alternative locations for an accessible entrance and proposed accessible route are indicated in *Figure 6-95.*

The following summarizes the work elements required at Arlington Station street level:

**Curb Ramps/Crosswalks:** 3 of the 4 existing corners and 4 crosswalks at the Arlington/Boylston Street Intersection will need to be reconstructed in accordance with the latest accessible route requirements.

The intersection also has many existing infrastructure elements (utilities, light poles, signage, etc.) that will need to be relocated in order to locate the recommended curb ramps and crosswalks.

The proposed street plan shows 3 corner curb cuts that, according to the current draft of MAAB, may not be allowed in the future. However, in order to avoid interference with the existing MBTA stairs, and because of the angled geometry of the curb in front of the Public Garden, these corner cub cuts seem to be necessary. The station architect and the MBTA may have to seek a variance from MAAB for these crossings.

Final design work at this corner should also be coordinated with the proposed *Boylston Street Improvements Master Plan.* This plan shows paved crosswalks and curb ramps, appropriate to such a prominent corner.

**Street To Mezzanine Level Elevator Options:** In order to provide an accessible entrance to the station at street level, three potential options for the location of a hydraulic elevator are proposed. (See *Figure 6-95.*) The station architect, in coordination with the MBTA, will need to request a variance from MAAB in order to provide only one elevator entrance at this station. The discussion for each option will cover work items affecting both the street and mezzanine levels.

- ***Elevator Option A,*** shown in *Figures 6-97 and 98,* located on the edge of the Public Garden, is the most historically sensitive of the 3 siting options. It will provide accessibility to the mezzanine by reopening the existing pedestrian tunnel underneath. This option will require, among other things:

*Existing*

*Proposed*

*Figure 6-96: Option A; elevator image study*



6 STATIONS

**Legend**

- EXISTING TO REMAIN
- EXISTING TO BE REMOVED
- NEW CONSTRUCTION
- BUILDING LINE ABOVE
- BELOW
- FACE OF EXISTING BUILDING
- TRACKS
- TACTILE WARNING STRIP
- DOWN W% OF SLOPE
- DIRECTION OF TRAVEL

ROOM LEGEND:

1. ELEVATOR MACHINE ROOM
2. ELECTRICAL ROOM
3. STORAGE
4. CONCESSION/VENDOR
5. MENS' TOILET
6. WOMENS' TOILET
7. SAFE ROOM
8. EJECTOR ROOM
9. COMMUNICATIONS ROOM

ARLINGTON STREET CHURCH
ARLINGTON STREET
PUBLIC GARDEN
PROPOSED STAIR
CHANNING STATUE
CANOPY ABOVE
RELOCATED ENTRY TO PUBLIC GARDEN
TUNNEL BELOW
MEZZANINE BELOW
BOYLSTON STREET
PROPOSED ELEVATOR BELOW TYP.
SHREVE, CRUMP, AND LOW JEWELRY STORE
HERITAGE BUILDING
LINE OF BUILDING ABOVE TYP.
PROPOSED STAIR
STAIR TO BE REMOVED/ TUNNEL FLOOR ELEVATION TO BE LOWERED
OUTBOUND PLATFORM BELOW
INBOUND PLATFORM BELOW
PAID LOBBY
UNPAID LOBBY
TUNNEL BELOW
STAIR ABOVE TYP.

*Figure 6-97: Elevator Option A, street level* Scale: 1″=32′

*Figure 6-98: Elevator Option A, mezzanine level* Scale: 1″=32′

6-46

MBTA Light Rail Accessibility Program Schematic Design Report Rev. # March 1995

- modification and reopening of the existing tunnel to incorporate the elevator hoistway and associated machine room. The present flower vendor will need to be relocated.
- elimination of the tunnel's existing intermediate steps (between the unpaid lobby level and the sealed-off stair). The tunnel floor will need to be lowered and leveled with a maximum of 5% slope.
- relocation of the previous Public Garden stair to a new location along the sidewalk edge, next to the proposed elevator headhouse, thus improving its safety and public exposure. The new stair will provide an additional entrance to the station as well as a means of egress from the tunnel underneath.

The architectural imagery for the proposed elevator and stair headhouse should blend with the Public Garden setting. This will require skillful distribution of massing and use of materials. Its design should reflect the existing stone architecture used in the Public Garden.

Figure 6-96 suggests an image for the proposed elevator with a stone base and stone clad corner posts, metal/glass infill, and a copper or translucent roof. A wrought iron guard rail, consistent with the existing Public Garden fence could wrap around the new stair and garden entry.

The entire headhouse structure should be as transparent as possible to provide visual surveillance from both inside and outside the elevator. (See the PDM for cab and elevator guidelines).

The major structural issues for this option will be providing a temporary earth support system for both the demolition of the existing tunnel egress structure and design of the new hoistway, stairway and corridor extension (See *Figure 6-99.*) Excavation to a depth beyond the existing foundation will require removal or cut off of the original piles, ground water control (see *PDM*) and waterproofing details to match existing conditions.

The main advantages of Option A are: its location alongside, rather than within the sidewalk, its easy access and visibility from the street, and its potential to be a positive addition to the streetscape through sensitive architecture and landscaping. Also this option has the least impacts on vehicular and pedestrian traffic, tunnel structure and construction.

The main disadvantages of Option A are: its sensitive Public Garden location; complicated review processes; and its remote location through a not visible tunnel to the mezzanine fare array area.

*Figure 6-99: Option A; structural diagram*

- ***Elevator Option B***, shown in *Figure 6-100 and 6-101*, proposes incorporating the elevator within the Heritage Building, fronting on the sidewalk. This option will require:
  - negotiation of a real estate transaction between the MBTA and the private owner of the Heritage Building.
  - modifications to the storefront facade of the property as well as to the existing retail space and basement in order to accommodate the new elevator structure.
  - an extension of the mezzanine level below.
  - reconstruction of the sidewalk and relocation of utilities to allow access to the Heritage Building basement areas where the lower entrance to the street elevator and machine room will be located.

In this option the elevator entrance should be designed to fit in with the existing facade of the building and, for safety reasons, to be as transparent as possible.

The major structural issues that will be encountered in this option include breaching three floors of the Heritage Building, design of the support system for each level and through the exterior wall, design the support structure for the hoistway at the lower level including closure walls. (See *Figure 6-103.*)

In addition, within a cut and cover section between the building structure and the station, design a new corridor to the Mezzanine Level and through the exterior wall of the station. Underpinning of the station stairway is required. Option B, compared to the other options, has the least impacts on the streetscape (assuming that the MBTA

6 STATIONS

**Legend**

- EXISTING TO REMAIN
- EXISTING TO BE REMOVED
- NEW CONSTRUCTION
- BUILDING LINE ABOVE
- BELOW
- FACE OF EXISTING BUILDING
- TRACKS
- TACTILE WARNING STRIP
- DOWN W/% OF SLOPE
- DIRECTION OF TRAVEL

ROOM LEGEND:

1. ELEVATOR MACHINE ROOM
2. ELECTRICAL ROOM
3. STORAGE
4. CONCESSION/VENDOR
5. MENS' TOILET
6. WOMENS' TOILET
7. SAFE ROOM
8. EJECTOR ROOM
9. COMMUNICATIONS ROOM

ARLINGTON STREET CHURCH
PUBLIC GARDEN
CHANNING STATUE
ARLINGTON STREET
MEZZANINE BELOW
BOYLSTON STREET
PROPOSED ELEVATOR BELOW TYP.
CANOPY ABOVE
SHREVE, CRUMP, AND LOW JEWELRY STORE
HERITAGE BUILDING

*Figure 6-100: Elevator Option B, street level Scale: 1"=32'*

LINE OF BUILDING ABOVE TYP.
OUTBOUND PLATFORM BELOW
PAID LOBBY
UNPAID LOBBY
TUNNEL BELOW
INBOUND PLATFORM BELOW
B
STAIR ABOVE TYP.

*Figure 6-101: Elevator Option B, mezzanine level Scale: 1"=32'*

6-48 MBTA Light Rail Accessibility Program Schematic Design Report Rev. # March 1995

will not require the enclosure of the existing adjacent stairs), and allows for a good connection to the unpaid lobby level below. But it will demand delicate negotiations with a private owner, approval from various reviewing parties, and mitigation of the architectural and construction issues presented above.

*Figure 6-102: Option B; elevator image study*

*Figure 6-103: Option B; structural diagram*

- ***Elevator Option C***, shown in *Figure 6-105 and 6-106*, calls for the siting of the elevator close to the southeast corner of the Arlington/Boylston intersection, adjacent to the Heritage Building. It will require implementation of the following:
  - elimination of one of the two flights of stairs that combine in a common landing to form one of the present stair entrances to the mezzanine level. This particular stair was selected for elimination because its location allows for the elevator shaft to be situated in the most direct relationship to the nonpaid lobby below. The remaining stair will need to be widened in order to accommodate the appropriate station egress.
  - elimination or modification of the existing retail entrance canopy which will be conflict with the proposed elevator headhouse.
  - reconstruction of the brick sidewalk and relocation of the utilities affected by the construction of the proposed elevator shaft.
  - minor extension of the mezzanine level below to accommodate access to the elevator, machine room and the widened stair connecting to the street.
  - provision of bollards or other safety barriers along the sidewalk curb.

The elevator headhouse should be developed to give a light translucent appearance, with materials and articulations compatible with the Heritage Building. Materials such as steel frame with stone cladding, metal/glass infill, and a copper or translucent roof may be appropriate. (See *Figure 6-104.*)

*Existing*

*Proposed*

*Figure 6-104: Option B; elevator image study*



6 STATIONS

ARLINGTON STREET CHURCH
ARLINGTON STREET
PUBLIC GARDEN
CHANNING STATUE
MEZZANINE BELOW
BOYLSTON STREET
PROPOSED ELEVATOR BELOW TYP.
STAIR TO BE REMOVED
CANOPY TO BE REMOVED
STAIR TO BE WIDENED
C
SHREVE, CRUMP, AND LOW JEWELRY STORE
HERITAGE BUILDING
LINE OF BUILDING ABOVE TYP.
OUTBOUND PLATFORM BELOW
INBOUND PLATFORM BELOW
PAID LOBBY
UNPAID LOBBY
TUNNEL BELOW
STAIR TO BE REMOVED
STAIR TO BE WIDENED
C

*Figure 6-105:* Elevator Option C, street level Scale: 1"=32'

*Figure 6-106:* Elevator Option C, mezzanine level Scale: 1"=32'

*Legend*

- EXISTING TO REMAIN
- EXISTING TO BE REMOVED
- NEW CONSTRUCTION
- BUILDING LINE ABOVE
- BELOW
- FACE OF EXISTING BUILDING
- TRACKS
- TACTILE WARNING STRIP
- DOWN W/% OF SLOPE
- DIRECTION OF TRAVEL

ROOM LEGEND:

1. ELEVATOR MACHINE ROOM
2. ELECTRICAL ROOM
3. STORAGE
4. CONCESSION/VENDOR
5. MEN'S TOILET
6. WOMEN'S TOILET
7. SAFE ROOM
8. EJECTOR ROOM
9. COMMUNICATIONS ROOM

6-50

MBTA Light Rail Accessibility Program Schematic Design Report Rev. # March 1995

The major structural issue for this option will be the design of a hoistway shaft within the constraints of the space provided. (See *Figure 6-107.*)

Underpinning the station and widening of the remaining flight of stairs from street level will require extending the cut (and temporary earth support wall) to include the widened stair.

Elevator Option C is the most obtrusive alternative in terms of its impact at the street level. It creates both visual obstructions to the streetscape and to the retail space behind, as well as narrowing pedestrian flow at a busy corner. In addition, this option will involve major traffic impacts during construction. However, it does provide a good functional connection to the mezzanine level and involves the least complicated approval process.

The MBTA will need to assist the station architect in the process of narrowing these elevator options at the completion of the schematic design phase. This undoubtedly will involve a complex review process among many participants, as discussed later in this Report.

*igure 6-107: Option C; structural diagram*

**Stair Entrances:** Existing and proposed stair entrances will need to:

- incorporate the required accessible signage and lighting. (See *PDM.*)
- conform to Massachusetts State Building Code.
- conform to MAAB regulations concerning treads, risers and handrails. (See *PDM.*)
- conform, if feasible, to the current MBTA policy requiring stair enclosures, (taking into account that this is not an accessibility requirement -See *PDM Stair Section* for specific design criteria.) Given the sensitive historic location and limited sidewalk space surrounding these entrances, further design and circulation studies will need to be developed with the MBTA, the community and other pertinent review groups.
- If a decision is reached not to provide enclosures, it is recommended that the two existing stairs along the western edge of Arlington Street should be remodeled to match the materials and articulation of the open railing stairs adjacent to the Heritage Building. The proposed stair entrance at the Public Garden (as part of elevator Option A) will demand the special treatment discussed above in order to make it contextual with the garden.

*Figure 6-108: Heritage bldg stair detail*

## Mezzanine Level Program

At the mezzanine level the primary program requirement is to provide an accessible route from the street elevator, through the fare array, to the elevators going to the platforms. (See *Figure 6-109.*)

The location of the accessible route connecting the mezzanine to the street will vary depending on the elevator option selected at the street level. Additional work elements related to the introduction of this elevator at the mezzanine are presented under subsection *3.3.1, Street Level.*

The following summarizes the scope of work needed to establish this program requirement, as well as other related access improvements to the fare collection system and employee toilets.

**Fare Array System:** The present fare array will need to be relocated to accommodate the proposed elevators. The gate and fare collectors booth will also need to be modified to make them accessible. This work should be coordinated with the proposed Automatic Fare Collection (AFC) System that the MBTA is presently planning.

A preliminary investigation of the impacts of establishing the AFC system at Arlington Station was completed as part of this study. The concept sketch, shown in *Figure 6-110,* was developed in response to the following preliminary MBTA requirement for:

- 9 automatic fare collection gates
- 1 accessible egress gate
- 1 customer service booth
- 8 ticket vending machines

A summary of this study shows that the new fare gates can be accommodated in the proposed location. Their precise location will be determined by the appropriate alignment of the gates in relationship to the existing columns.

*Figure6-109: Arlington Station, Mezzanine plan* *Scale: 1"=40'*

*Figure 6-110: Fare array diagram*

The customer service booth will need to be located outside the fare array line in order to accommodate the number of gates. The proposed location for this booth requires the removal of the existing toilets on the south end of the unpaid lobby. The existing toilets would be replaced by two accessible, single occupancy toilets in the same area.

The 8 ticket vending machines can be organized in three groups, against the sides of the lobby. Queuing in front of these vending machines may result in circulation problems in the lobby, and some conflicts may also occur as a result of queuing in front of the customer services booth. Designated vending machines, accessible to people with impediments, will need to be spaced 5'-0" on center, in accordance to MBTA guidelines.

Introduction of the AFC system will require some modification of existing power, data and lighting systems as well as interior finishes, signage, ventilation and plumbing.

In addition, the new booth design will require heating, ventilation and air conditioning. The MBTA should assist in determining actual needs.

**Toilet Rooms:** The two existing employee toilets located adjacent to the unpaid lobby will need to be made accessible in accordance with ADA/MAAB requirements for single occupancy toilet rooms. If the AFC system is implemented as suggested in the concept sketch, the existing toilets will need to be relocated and made accessible and provided with new heating, ventilating, electrical and plumbing. Signage conforming to the PDM will be required in these rooms.

**Mezzanine To Platform Elevators:** The accessible route between the paid lobby and the platform level below is provided by means of 2 hydraulic elevators leading to the separate inbound and outbound platforms. They are located behind the fare array line and adjacent to each of the stairs leading to the platforms. These elevators reach the eastern end of both platforms. (See *Figures 6-111* and *6-112*.) Several issues result from this proposal:

- The recommended location of the hoistways will necessitate moving the fare array further into the unpaid lobby in order to provide the required access to the elevator. The stations fire management panel will be required to be relocated, as well as some lighting power and pay telephones.
- The street above will require excavation and the station tunnel roof will require structural modifications and support to accommodate the overrun of the elevator. Prior to the preliminary design phase, it will be necessary to complete a finish grade and top of station survey in this area to determine if the minimum hoistway overrun will fit the actual clearance. (Preliminary evaluation show that it will fit.) Utilities within the street may also be affected by this work.
- The major structural issues to the two mezzanine to platform elevators include the following:
  - Temporary support of the mezzanine floor; cut and re-frame structure.
  - Cut base slab; underpins structure at column locations; install elevator pit & hoistway.
  - Additional structural modifications will be required at the platform level.
  - Each elevator will require a separate vented machine room, at the platform level, in space currently used for high voltage electrical equipment. Modification of the present space, electrical equipment, and construction of the vented hoistway and pit are required.

These elevators should be as transparent as possible and designed in accordance with the Project Design Manual criteria.

*Figure 6-111: Platform partial plan* Scale: 1/16" = 1'-0"

**Platform Level Program**

The access program requirements at both inbound and outbound platforms are primarily a function of providing an accessible route between the proposed "platform to mezzanine" elevators and the access ramps of the future LFV's. The proposed design reflects the horizontal and vertical adjustments needed in this level in order to achieve these objectives (See *Figure 6-113* and *6-114*)

The following summarizes the scope of work for this level with particular emphasis on the operational impacts of the LFV's in the modifications of the platform. For a presentation of other work elements related to the introduction of elevators at this level, see the previous subsection *Mezzanine to Platform Elevators*, under the previous section *3.3.2 Mezzanine Level.*

**Platform Floors:** In order to facilitate barrier free access to the new LFV's the elevation of the platforms will need to be raised approximately 8" along their entire length and width. This platform modification will allow people with disabilities to the LFV's using the deployable ramps. The materials should be unit pavers or tiles, consistent with the overall station design. The design parameters for this work are given in the *Project Design Manual, Section 2.*

Raising the inbound and outbound platforms will impact several station elements, thus adding other items to the platform level program:

- ***Walls:*** The lower zone of the platform wall finishes will need to be replaced. Presently, the bottom of the lower sign band varies 7" to 14" above the existing floor. When the platform is raised, the lower sign band will need to be removed, and a new 1" edge added in order to provide a clean stop for the existing tile and wall panels (See *Figure 6-114.*) A new wall base should be created out of the new floor material. The existing cavity wall system will need to be modified; including replacement of damaged access plates. The benches will be mounted on the existing tile panels as required. This program represents a minimum scope of work, but the MBTA may desire to implement a complete modernization approach, requiring a total refinishing of all the walls.
- ***Benches:*** The present cantilevered benches (9 per platform) will require removal, refinishing, and replacing at the appropriate height. Half of them should also be provided with arm rests at the ends of the seats (See *Project Design Manual, Furnishings section* for design guidelines.)
- ***Doors:*** As a result of the raised platforms, both pairs of doors in the rooms located at the easterly end of the inbound and outbound platforms will need to be raised +/- 8" in height..
- ***Escalators:*** Each of the 2 existing escalators will need to be replaced because of the increased platform height. The existing escalator sump pits will need modifications to accommodate the plat-

LEGEND:
EXISTING TO REMAIN
EXISTING TO BE REMOVED
NEW CONSTRUCTION
TRACKS
TACTILE WARNING STRIP
STEEL RAILING
STEEL FENCE
DOWN WITH OF SLOPE
COLUMN
COLUMN TO BE REMOVED DUE TO CONFLICT WITH CAR RAMP ZONE
STOP LOCATION/NUMBER OF CARS
DIRECTION OF TRAVEL
BENCH
TELEPHONE

ROOM LEGEND:
1. ELEVATOR MACHINE ROOM
2. ELECTRICAL ROOM
3. STORAGE
4. CONCESSION/VENDOR
5. MEN'S TOILET
6. WOMEN'S TOILET
7. SAFE ROOM
8. EJECTOR ROOM

STAIR TO BERKELEY STREET MEZZANINE (CLOSED), TO BE MODIFIED TO MATCH NEW PLATFORM ELEVATION, TYP.
PLATFORM TO BE RAISED 8" ABOVE TOP OF RAIL, TYP.
ESCALATOR TO BE REPLACED, PIT TO BE ADJUSTED AS REQ., TYP.
STAIR TO BE MODIFIED, TYP.
PROPOSED ELECTRICAL ROOM
LIMIT OF RAISED PLATFORM, RAMP DOWN 8%, TYP.
OUTBOUND PLATFORM
INBOUND PLATFORM
PROPOSED PLATFORM TO MEZZANINE ELEVATOR, TYP.
PROPOSED ELECTRICAL ROOM
PROPOSED GUARD RAIL BELOW OPEN STAIRS TYP.
DOORS TO BE RAISED, TYP.
BENCH TO BE RAISED TYP.
LOW CEILING ABOVE ±7'-6" A.F.F.) TYP.
LIMIT OF RAISED PLATFORM, RAMP DOWN 8%, TYP.
A
A

*Figure 6-112: Arlington Station, Platform plan* *Scale: 1"=40'*



*Figure 6-113: Section A at platform* Scale: 1/8" = 1'-0"

*Figure 6-114: Elevation B at platform Scale: 1/4" = 1'-0"*

form raising. Even though it is narrow, because of the existing structural limitations, it is recommended that the escalator be replaced in kind (See *Figure 6-115*). The option of dealing with the new platform height by ramping down to the existing escalator was eliminated as this solution creates an undesirable interruption in the level plane of the platform.

- ***Stairs:*** The increase in platform height will decrease, if not eliminate, the first riser of each of the 6 metal stairs on both the inbound and outbound platforms. Until a detail grading analysis is completed it is difficult to determine the exact impacts at the first riser. Four of these metal stairs, located at the western end of the platform level, used to serve the Berkeley St. mezzanine (see *Figure 6-116*). The station architect should explore with the MBTA the possibility (not shown in the drawings) of removing at least the two stairs closest to the platforms and retaining the ones beyond (after minimum modifications) for emergency egress. This strategy will allow expansion of the platform at that end and simplify its height adjustment.

At the eastern end of the platforms, the first flight of the two stairs leading to the mezzanine will need modifications to meet the raised platform. This may entail removing the first tread and burying the stringers into the proposed raised platform. (See *PDM, Section 2.2.7 Stairs.*) Alternatively, the option of replacing the complete flight of stairs may prove more efficient in meeting the new platform level elevation.

In addition, since the stairs currently house open risers, these will have to be closed to provide a continuous uninterrupted step conforming to both MAAB and ADA. Handrails also will require upgrading to conform with these guide-

*Figure 6-115:* *Escalator at inbound platform*

*Figure 6-116:* *Stairs to Berkeley mezzanine*

lines. Whether new or remodeled, a perforated riser should be installed in order to maximize transparency to people using the proposed elevator. A railing barrier will also be necessary to prevent head injury at the lower end of the underside of the open stair.

- ***Tactile Warning Strip:*** A new tactile warning strip will be required in compliance with accessibility requirements along the entire length of the platform when the platform is raised.

**Car Ramp Zones:** Areas defined by the ramp zones in front of every LFV's accessible door will need to be clear of any obstacle, including structural elements. A study was performed in order to evaluate the measures necessary to minimize the potential conflicts between the car ramps zones and the existing row of columns at each platform.

A detailed description of the methodology and operational assumptions used for the ramp zone analysis is given in Appendix 1 of the *PDM*. For the purpose of this study, it was assumed that each platform in Arlington Station will allow for a maximum of 4 cars to serve the station at one time, in any number of combinations of No. 7 and LFV's. Train consists were assumed to have a maximum of 3 cars each.

The application of the ramp zone "template" to the station platforms showed the columns potentially obstructing the ramp zones (given the proximity of the columns to the centerline of the tracks: 8'-10" instead of the 9'-10" minimum required by the PDM).

Two operational scenarios were then considered in order to identify the specific number of columns in conflict with the LFV's ramp area, each with a set of variations:

- *Scenario A*, based on stated MBTA policy, calls for the driver of the train consist to stop at the designated platform stop location or within a stop range of +/- 5 feet. For a maximum platform capacity of 4 cars operating simultaneously, a total number of 19 columns are impacted. (See *Figure 6-112*.) This number could be reduced to 12 if only 3 cars are allowed to operate per platform.

- *Scenario B*, based on a tighter stop range of +/- 2 feet yields a reduction of columns impacted: 11 for the 4 cars per platform operation or 7 for the 3 cars per platform option.

The schedule of impacted columns (*Figure 6-117*) summarizes the above findings. It should be noted that the quantities shown

| | SCENARIO A +/- 5' STOP RANGE | | SCENARIO B +/- 2' STOP RANGE | |
|---|---|---|---|---|
| | 4 cars / platform | 3 cars / platform | 4 cars / platform | 3 cars / platform |
| INBOUND PLATFORM | 10 | 6 | 6 | 4 |
| OUTBOUND PLATFORM | 9 | 6 | 5 | 3 |
| **TOTAL COLUMNS IMPACTED:** | **19** | **12** | **11** | **7** |

***Figure 6-117:*** *Schedule of impacted columns*

***Figure 6-118:*** *Reframing strategy diagram*

do not account for column replacements resulting from a particular reframing strategy.

A potential reframing strategy is shown in *Figure 6-118* and *6-119*. The typical column removal scheme shows a two column replacement between the two columns removed. Added top and bottom beams account for the added bending stresses induced by the increased span. The scheme can be repeated for single column removal when applicable. See *Figure 6-118* showing the plan layout for each stopping zone.

For scenario A / 4 cars, this approach will require the replacement of an additional 26 columns, with a total number of columns to be removed of 45 (only 3 less than the 48 existing columns in the platform level.) In summary, a major restructuring of the station platform level will result. This approach also will create an uneven rhythmic distribution of columns and variations on their height. In order to create a consistent soffit, it is proposed to visually extend the new structural beam throughout.

An alternative reframing strategy that could result in a better architectural resolution is suggested in *Figure 6-119*. This strategy will require further structural analysis of the existing system. This cantelevered approach would relocate every column back from the edge of the platform an additional one foot, creating a consistent column line and a better sense of order.

Removal and replacement of columns at the station will include temporary support of the existing structure which will require bracing and framing in the track area. This precludes a continuous construction schedule, requiring evening work and staged sequencing. New structural members will require rail transport to the site.

A significant reduction of the structural impacts presented above can be achieved by relaxing or modifying some of the operational requirements assumed for this analysis. Possible alternatives include:

- allow for multiple train stopping
- limit ramp deployment to one car per consist
- limit ramp deployment to one side of the train only
- limit the number of cars stopping at the platform at one time

For more information on these operational alternatives, see *Section 3.6, Operational Assumptions.*

**Passenger Assistance Areas:** The station architect, in coordination with the MBTA, should identify at least two Passenger Assistance Areas per platform in order to ensure equal access to safe egress. These areas do not have to be physically separate but should incorporate the appropriate signage and a police callback intercom, among other requirements (See *MBTA Guide to Access, Emergency Egress Section.*)

**Electrical Rooms:** An expansion of the existing electric room will be required to accommodate the new power requirements for the station. (See *Engineering Analysis, Appendix 4.*) The existing electrical rooms at the eastern end of both platforms could be expanded to include the adjacent storage space. (See *Figure 6-112.*)

## Other Program Elements

In addition to the scope of work summarized above (per station levels) other elements to be incorporated in the accessibility program are station wide in nature, including:

**Signage:** The station architect, in coordination with the MBTA, should propose signage modifications at each level of the station, using the visual and tactile means to make the system accessible.

**Communications:**

- ***Public Address System:*** The existing audio public address system may be relocated and reused. As part of normal aging, some devices may be required to be replaced to function properly. More detailed studies will be required during preliminary design phase.
- ***Readers Boards and Video Monitors:*** A new electronic sign system or video monitor is recommended to provide passenger information via LED scrolling bulletin boards throughout the station as a means to convey information to the hearing impaired. Each electronic sign displays a message developed and transmitted from existing computer equipment located at a central MBTA site.
- ***Clocks:*** The existing clocks at Arlington Street Station presently are noncompliant with ADA and MBTA Guidelines and therefore it is recommended that they be replaced.
- ***Emergency Call-Boxes:*** Emergency call boxes should be provided in conformance with MBTA Guidelines.
- ***Emergency Alarms:*** A fire alarm system that meets N.F.P.A., state, local, MAAB and ADA requirements is required as none exists. The fire management panel has a telephone and fan controls for tunnel ventilation only. Pull stations, smoke and heat detection, monitoring of sprinkler services and new audio/visual devices will be required.
- ***Telephones, TDD:*** Two pay telephones (presently new England Telephone devices) are currently located in the mezzanine as well as one on each platform. The mezzanine telephones will need to be relocated due to their loca-

*Figure 6-119: Alternative reframing strategy*

tion within the area proposed for the elevators connecting to the platform. A TDD (Telecommunication Device for the Deaf) must be added at each location as per the *MBTA Guide to Access* requirements. Existing telephones must also meet access requirements in respect to operations and mounting heights.

**Vendors and Vending Machines.** The existing flower vendor will require relocation and storage space in the event the MBTA chooses Option A.

Accessibility Design Criteria for these elements could be found in the *PDM/and MBTA Guide to Access.*

### 6.3.3 Constructibility

The constructibility issues at Arlington Street Station are a result of the following major program elements :

- the construction of the elevator hoistway(s),
- upgrade of electrical systems,
- the removal of columns and raising of the platform to accommodate the new LFV technology
- and the installation of the new automatic fare collection system.

Construction work for the above can be phased and implemented independently of each other either under separate or singular construction contracts. It is recommended that secondary work items be combined with each of the appropriate program element above for the purpose of defining construction contracts.

This section will summarize the constructibility issues for each of the major program elements.

Elevator options A and B are located away from the roadway. Construction of elevator option A has significantly little impact on station operation, vehicular and pedestrian circulation. Option A will require a large staging area within the Public Garden and mitigation of pedestrian traffic on the sidewalks at the corner of Arlington and Boylston streets and within the Boston Common.

Elevator option B is located in the Heritage Building. A new passageway is required to connect the elevator to the lobby. This will have a significant impact on the sidewalk and the roadway at this corner. This option will require pedestrian traffic to be maintained safely around the site. A temporary lane closure may be required at times for construction vehicles or delivery of materials to site. This option will require closure walls for dust protection, security and maintaining the retail use during construction. Additionally, the connector tunnel will need to be staged to maintain egress to the stairs. Option C given its proximity to the adjacent properties, like B above has similar constructability issues. In addition, because C assumes the loss of 1 egress stair, a staged construction is necessary to maintain present egress capacity during the construction. The mezzanine to platform elevators may require a cut and cover within the intersection of Boylston and Arlington Street resulting in mitigation of vehicular traffic or even off peak work hours. Internally, construction of these 2 elevators will need to be scheduled so as to interface with station usage. This work may need to be done at off peak times to avoid impacts at the fare array and platform. New structural elements will need to be brought in by rail for below grade operations.

As a consequence of the installation of the elevators, the current available power will be exceeded. This will result in the need to upgrade the present electrical system. This upgrade and conversion from DC to AC power and the addition of a generator will need to take place when the station is closed. Fire alarm systems, emergency signage and lighting, will need to be maintained operational during the construction.

Like the electrical work, the removal of columns and raising of the platform may need to be performed on an off peak schedule to avoid interruption of service and station usage. Work areas will require separation from occupied platform areas. The roof of the station will need to be temporarily supported to allow column removals to take place, and new structure to be introduced. Staged construction will include temporary support of the existing structure and may include bracing in the track area. Large structural steel members must be transported to the site by rail. In contrast to the removal of columns raising the platforms could occur in scheduled stages once structural work is complete while the station is in use. Again passenger safety and egress routes will need to be maintained during construction operations.

Implementation of the automatic fare collection system will require a staged plan in order to maintain continuous uninterrupted service and safe egress to and from the station.

### 6.3.4 Cost

The total estimated cost is $10,100,000.

For estimating assumptions regarding the above construction cost see section 7.6, Project Cost.

This total does not include the cost for the automatic fare collection system or the unpredictable costs of taking private property for the public good (elevator Option B).

The cost of the most expensive elevator option(s) addressed is combined with the cost of providing a five foot stopping zone (when column removal is considered) for the development of this preliminary estimate.

The major structural issue for this option will be the design of a hoistway shaft within the constraints of the space provided. (See *Figure 6-107.*)

Underpinning the station and widening of the remaining flight of stairs from street level will require extending the cut (and temporary earth support wall) to include the widened stair.

Elevator Option **C** is the most obtrusive alternative in terms of its impact at the street level. It creates both visual obstructions to the streetscape and to the retail space behind, as well as narrowing pedestrian flow at a busy corner. In addition, this option will involve major traffic impacts during construction. However, it does provide a good functional connection to the mezzanine level and involves the least complicated approval process.

The MBTA will need to assist the station architect in the process of narrowing these elevator options at the completion of the schematic design phase. This undoubtedly will involve a complex review process among many participants, as discussed later in this Report.

Figure 6-107: Option C; structural diagram

**Stair Entrances:** Existing and proposed stair entrances will need to:

- incorporate the required accessible signage and lighting. (See *PDM*.)
- conform to Massachusetts State Building Code.
- conform to MAAB regulations concerning treads, risers and handrails. (See *PDM*.)
- conform, if feasible, to the current MBTA policy requiring stair enclosures, (taking into account that this is not an accessibility requirement -See *PDM Stair Section* for specific design criteria.) Given the sensitive historic location and limited sidewalk space surrounding these entrances, further design and circulation studies will need to be developed with the MBTA, the community and other pertinent review groups.
- If a decision is reached not to provide enclosures, it is recommended that the two existing stairs along the western edge of Arlington Street should be remodeled to match the materials and articulation of the open railing stairs adjacent to the Heritage Building. The proposed stair entrance at the Public Garden (as part of elevator Option A) will demand the special treatment discussed above in order to make it contextual with the garden.

***Figure 6-108:*** *Heritage bldg stair detail*

**Mezzanine Level Program**

At the mezzanine level the primary program requirement is to provide an accessible route from the street elevator, through the fare array, to the elevators going to the platforms. *(See Figure 6-109.)*

The location of the accessible route connecting the mezzanine to the street will vary depending on the elevator option selected at the street level. Additional work elements related to the introduction of this elevator at the mezzanine are presented under subsection *3.3.1, Street Level.*

The following summarizes the scope of work needed to establish this program requirement, as well as other related access improvements to the fare collection system and employee toilets.

**Fare Array System:** The present fare array will need to be relocated to accommodate the proposed elevators. The gate and fare collectors booth will also need to be modified to make them accessible. This work should be coordinated with the proposed Automatic Fare Collection (AFC) System that the MBTA is presently planning.

A preliminary investigation of the impacts of establishing the AFC system at Arlington Station was completed as part of this study. The concept sketch, shown in *Figure 6-110,* was developed in response to the following preliminary MBTA requirement for:

- 9 automatic fare collection gates
- 1 accessible egress gate
- 1 customer service booth
- 8 ticket vending machines

A summary of this study shows that the new fare gates can be accommodated in the proposed location. Their precise location will be determined by the appropriate alignment of the gates in relationship to the existing columns.

*Figure6-109: Arlington Station, Mezzanine plan* *Scale: 1"=40'*

*Figure 6-110: Fare array diagram*

The customer service booth will need to be located outside the fare array line in order to accommodate the number of gates. The proposed location for this booth requires the removal of the existing toilets on the south end of the unpaid lobby. The existing toilets would be replaced by two accessible, single occupancy toilets in the same area.

The 8 ticket vending machines can be organized in three groups, against the sides of the lobby. Queuing in front of these vending machines may result in circulation problems in the lobby, and some conflicts may also occur as a result of queuing in front of the customer services booth. Designated vending machines, accessible to people with impediments, will need to be spaced 5'-0" on center, in accordance to MBTA guidelines.

Introduction of the AFC system will require some modification of existing power, data and lighting systems as well as interior finishes, signage, ventilation and plumbing.

In addition, the new booth design will require heating, ventilation and air conditioning. The MBTA should assist in determining actual needs.

**Toilet Rooms:** The two existing employee toilets located adjacent to the unpaid lobby will need to be made accessible in accordance with ADA/MAAB requirements for single occupancy toilet rooms. If the AFC system is implemented as suggested in the concept sketch, the existing toilets will need to be relocated and made accessible and provided with new heating, ventilating, electrical and plumbing. Signage conforming to the PDM will be required in these rooms.

**Mezzanine To Platform Elevators:** The accessible route between the paid lobby and the platform level below is provided by means of 2 hydraulic elevators leading to the separate inbound and outbound platforms. They are located behind the fare array line and adjacent to each of the stairs leading to the platforms. These elevators reach the eastern end of both platforms. (See *Figures 6-111* and *6-112*.) Several issues result from this proposal:

- The recommended location of the hoistways will necessitate moving the fare array further into the unpaid lobby in order to provide the required access to the elevator. The stations fire management panel will be required to be relocated, as well as some lighting power and pay telephones.
- The street above will require excavation and the station tunnel roof will require structural modifications and support to accommodate the overrun of the elevator. Prior to the preliminary design phase, it will be necessary to complete a finish grade and top of station survey in this area to determine if the minimum hoistway overrun will fit the actual clearance. (Preliminary evaluation show that it will fit.) Utilities within the street may also be affected by this work.
- The major structural issues to the two mezzanine to platform elevators include the following:
  - Temporary support of the mezzanine floor; cut and re-frame structure.
  - Cut base slab; underpins structure at column locations; install elevator pit & hoistway.
  - Additional structural modifications will be required at the platform level.
  - Each elevator will require a separate vented machine room, at the platform level, in space currently used for high voltage electrical equipment. Modification of the present space, electrical equipment, and construction of the vented hoistway and pit are required.

These elevators should be as transparent as possible and designed in accordance with the Project Design Manual criteria.

*Figure 6-111: Platform partial plan* Scale: 1/16" = 1'-0"

## Platform Level Program

The access program requirements at both inbound and outbound platforms are primarily a function of providing an accessible route between the proposed "platform to mezzanine" elevators and the access ramps of the future LFV's. The proposed design reflects the horizontal and vertical adjustments needed in this level in order to achieve these objectives (See *Figure 6-113* and *6-114*)

The following summarizes the scope of work for this level with particular emphasis on the operational impacts of the LFV's in the modifications of the platform. For a presentation of other work elements related to the introduction of elevators at this level, see the previous subsection *Mezzanine to Platform Elevators*, under the previous section *3.3.2 Mezzanine Level.*

**Platform Floors:** In order to facilitate barrier free access to the new LFV's the elevation of the platforms will need to be raised approximately 8" along their entire length and width. This platform modification will allow people with disabilities to the LFV's using the deployable ramps. The materials should be unit pavers or tiles, consistent with the overall station design. The design parameters for this work are given in the *Project Design Manual, Section 2.*

Raising the inbound and outbound platforms will impact several station elements, thus adding other items to the platform level program:

- ***Walls:*** The lower zone of the platform wall finishes will need to be replaced. Presently, the bottom of the lower sign band varies 7" to 14" above the existing floor. When the platform is raised, the lower sign band will need to be removed, and a new 1" edge added in order to provide a clean stop for the existing tile and wall panels (See *Figure 6-114.*) A new wall base should be created out of the new floor material. The existing cavity wall system will need to be modified; including replacement of damaged access plates. The benches will be mounted on the existing tile panels as required. This program represents a minimum scope of work, but the MBTA may desire to implement a complete modernization approach, requiring a total refinishing of all the walls.
- ***Benches:*** The present cantilevered benches (9 per platform) will require removal, refinishing, and replacing at the appropriate height. Half of them should also be provided with arm rests at the ends of the seats (See *Project Design Manual, Furnishings section* for design guidelines.)
- ***Doors:*** As a result of the raised platforms, both pairs of doors in the rooms located at the easterly end of the inbound and outbound platforms will need to be raised +/- 8" in height..
- ***Escalators:*** Each of the 2 existing escalators will need to be replaced because of the increased platform height. The existing escalator sump pits will need modifications to accommodate the plat-

*Figure 6-112:* *Arlington Station, Platform plan* *Scale: 1"=40'*

*Figure 6-113: Section A at platform Scale: 1/8" = 1'-0"*

*Figure 6-114: Elevation B at platform Scale: 1/4" = 1'-0"*

form raising. Even though it is narrow, because of the existing structural limitations, it is recommended that the escalator be replaced in kind (See *Figure 6-115*). The option of dealing with the new platform height by ramping down to the existing escalator was eliminated as this solution creates an undesirable interruption in the level plane of the platform.

- ***Stairs:*** The increase in platform height will decrease, if not eliminate, the first riser of each of the 6 metal stairs on both the inbound and outbound platforms. Until a detail grading analysis is completed it is difficult to determine the exact impacts at the first riser. Four of these metal stairs, located at the western end of the platform level, used to serve the Berkeley St. mezzanine (see *Figure 6-116*). The station architect should explore with the MBTA the possibility (not shown in the drawings) of removing at least the two stairs closest to the platforms and retaining the ones beyond (after minimum modifications) for emergency egress. This strategy will allow expansion of the platform at that end and simplify its height adjustment.

At the eastern end of the platforms, the first flight of the two stairs leading to the mezzanine will need modifications to meet the raised platform. This may entail removing the first tread and burying the stringers into the proposed raised platform. (See *PDM, Section 2.2.7 Stairs*.) Alternatively, the option of replacing the complete flight of stairs may prove more efficient in meeting the new platform level elevation.

In addition, since the stairs currently house open risers, these will have to be closed to provide a continuous uninterrupted step conforming to both MAAB and ADA. Handrails also will require upgrading to conform with these guide-

*Figure 6-115: Escalator at inbound platform*

*Figure 6-116: Stairs to Berkeley mezzanine*

lines. Whether new or remodeled, a perforated riser should be installed in order to maximize transparency to people using the proposed elevator. A railing barrier will also be necessary to prevent head injury at the lower end of the underside of the open stair.

- ***Tactile Warning Strip:*** A new tactile warning strip will be required in compliance with accessibility requirements along the entire length of the platform when the platform is raised.

**Car Ramp Zones:** Areas defined by the ramp zones in front of every LFV's accessible door will need to be clear of any obstacle, including structural elements. A study was performed in order to evaluate the measures necessary to minimize the potential conflicts between the car ramps zones and the existing row of columns at each platform.

A detailed description of the methodology and operational assumptions used for the ramp zone analysis is given in Appendix 1 of the *PDM*. For the purpose of this study, it was assumed that each platform in Arlington Station will allow for a maximum of 4 cars to serve the station at one time, in any number of combinations of No. 7 and LFV's. Train consists were assumed to have a maximum of 3 cars each.

The application of the ramp zone "template" to the station platforms showed the columns potentially obstructing the ramp zones (given the proximity of the columns to the centerline of the tracks: 8'-10" instead of the 9'-10" minimum required by the PDM).

Two operational scenarios were then considered in order to identify the specific number of columns in conflict with the LFV's ramp area, each with a set of variations:

- ***Scenario A,*** based on stated MBTA policy, calls for the driver of the train consist to stop at the designated platform stop location or within a stop range of +/- 5 feet. For a maximum platform capacity of 4 cars operating simultaneously, a total number of 19 columns are impacted. (See*Figure 6-112.*) This number could be reduced to 12 if only 3 cars are allowed to operate per platform.

- ***Scenario B,*** based on a tighter stop range of +/- 2 feet yields a reduction of columns impacted: 11 for the 4 cars per platform operation or 7 for the 3 cars per platform option.

The schedule of Impacted columns (*Figure 6-117*) summarizes the above findings. It should be noted that the quantities shown

| | SCENARIO A +/- 5' STOP RANGE | | SCENARIO B +/- 2' STOP RANGE | |
|---|---|---|---|---|
| | 4 cars / platform | 3 cars / platform | 4 cars / platform | 3 cars / platform |
| INBOUND PLATFORM | 10 | 6 | 6 | 4 |
| OUTBOUND PLATFORM | 9 | 6 | 5 | 3 |
| TOTAL COLUMNS IMPACTED: | 19 | 12 | 11 | 7 |

***Figure 6-117:*** *Schedule of Impacted columns*

Section A-A

***Figure 6-118:*** *Reframing strategy diagram*

do not account for column replacements resulting from a particular reframing strategy.

A potential reframing strategy is shown in *Figure 6-118* and *6-119*. The typical column removal scheme shows a two column replacement between the two columns removed. Added top and bottom beams account for the added bending stresses induced by the increased span. The scheme can be repeated for single column removal when applicable. See *Figure 6-118* showing the plan layout for each stopping zone.

For scenario A / 4 cars, this approach will require the replacement of an additional 26 columns, with a total number of columns to be removed of 45 (only 3 less than the 48 existing columns in the platform level.) In summary, a major restructuring of the station platform level will result. This approach also will create an uneven rhythmic distribution of columns and variations on their height. In order to create a consistent soffit, it is proposed to visually extend the new structural beam throughout.

An alternative reframing strategy that could result in a better architectural resolution is suggested in *Figure 6-119*. This strategy will require further structural analysis of the existing system. This cantelevered approach would relocate every column back from the edge of the platform an additional one foot, creating a consistent column line and a better sense of order.

Removal and replacement of columns at the station will include temporary support of the existing structure which will require bracing and framing in the track area. This precludes a continuous construction schedule, requiring evening work and staged sequencing. New structural members will require rail transport to the site.

A significant reduction of the structural impacts presented above can be achieved by relaxing or modifying some of the operational requirements assumed for this analysis. Possible alternatives include:

- allow for multiple train stopping
- limit ramp deployment to one car per consist
- limit ramp deployment to one side of the train only
- limit the number of cars stopping at the platform at one time

For more information on these operational alternatives, see *Section 3.6, Operational Assumptions.*

*Figure 6-119: Alternative reframing strategy*

**Passenger Assistance Areas:** The station architect, in coordination with the MBTA, should identify at least two Passenger Assistance Areas per platform in order to ensure equal access to safe egress. These areas do not have to be physically separate but should incorporate the appropriate signage and a police callback intercom, among other requirements (See *MBTA Guide to Access, Emergency Egress Section.*)

**Electrical Rooms:** An expansion of the existing electric room will be required to accommodate the new power requirements for the station. (See *Engineering Analysis, Appendix 4.*) The existing electrical rooms at the eastern end of both platforms could be expanded to include the adjacent storage space. (See *Figure 6-112.*)

## Other Program Elements

In addition to the scope of work summarized above (per station levels) other elements to be incorporated in the accessibility program are station wide in nature, including:

**Signage:** The station architect, in coordination with the MBTA, should propose signage modifications at each level of the station, using the visual and tactile means to make the system accessible.

**Communications:**

- ***Public Address System:*** The existing audio public address system may be relocated and reused. As part of normal aging, some devices may be required to be replaced to function properly. More detailed studies will be required during preliminary design phase.
- ***Readers Boards and Video Monitors:*** A new electronic sign system or video monitor is recommended to provide passenger information via LED scrolling bulletin boards throughout the station as a means to convey information to the hearing impaired. Each electronic sign displays a message developed and transmitted from existing computer equipment located at a central MBTA site.
- ***Clocks:*** The existing clocks at Arlington Street Station presently are noncompliant with ADA and MBTA Guidelines and therefore it is recommended that they be replaced.
- ***Emergency Call-Boxes:*** Emergency call boxes should be provided in conformance with MBTA Guidelines.
- ***Emergency Alarms:*** A fire alarm system that meets N.F.P.A., state, local, MAAB and ADA requirements is required as none exists. The fire management panel has a telephone and fan controls for tunnel ventilation only. Pull stations, smoke and heat detection, monitoring of sprinkler services and new audio/visual devices will be required.
- ***Telephones, TDD:*** Two pay telephones (presently new England Telephone devices) are currently located in the mezzanine as well as one on each platform. The mezzanine telephones will need to be relocated due to their loca-

tion within the area proposed for the elevators connecting to the platform. A TDD (Telecommunication Device for the Deaf) must be added at each location as per the *MBTA Guide to Access* requirements. Existing telephones must also meet access requirements in respect to operations and mounting heights.

**Vendors and Vending Machines.** The existing flower vendor will require relocation and storage space in the event the MBTA chooses Option A.

Accessibility Design Criteria for these elements could be found in the *PDM/and MBTA Guide to Access.*

### 6.3.3 Constructibility

The constructibility issues at Arlington Street Station are a result of the following major program elements :

- the construction of the elevator hoistway(s),
- upgrade of electrical systems,
- the removal of columns and raising of the platform to accommodate the new LFV technology
- and the installation of the new automatic fare collection system.

Construction work for the above can be phased and implemented independently of each other either under separate or singular construction contracts. It is recommended that secondary work items be combined with each of the appropriate program element above for the purpose of defining construction contracts.

This section will summarize the constructibility issues for each of the major program elements.

Elevator options A and B are located away from the roadway. Construction of elevator option A has significantly little impact on station operation, vehicular and pedestrian circulation. Option A will require a large staging area within the Public Garden and mitigation of pedestrian traffic on the sidewalks at the corner of Arlington and Boylston streets and within the Boston Common.

Elevator option B is located in the Heritage Building. A new passageway is required to connect the elevator to the lobby. This will have a significant impact on the sidewalk and the roadway at this corner. This option will require pedestrian traffic to be maintained safely around the site. A temporary lane closure may be required at times for construction vehicles or delivery of materials to site. This option will require closure walls for dust protection, security and maintaining the retail use during construction. Additionally, the connector tunnel will need to be staged to maintain egress to the stairs. Option C given its proximity to the adjacent properties, like B above has similar constructability issues. In addition, because C assumes the loss of 1 egress stair, a staged construction is necessary to maintain present egress capacity during the construction. The mezzanine to platform elevators may require a cut and cover within the intersection of Boylston and Arlington Street resulting in mitigation of vehicular traffic or even off peak work hours. Internally, construction of these 2 elevators will need to be scheduled so as to interface with station usage. This work may need to be done at off peak times to avoid impacts at the fare array and platform. New structural elements will need to be brought in by rail for below grade operations.

As a consequence of the installation of the elevators, the current available power will be exceeded. This will result in the need to upgrade the present electrical system. This upgrade and conversion from DC to AC power and the addition of a generator will need to take place when the station is closed. Fire alarm systems, emergency signage and lighting, will need to be maintained operational during the construction.

Like the electrical work, the removal of columns and raising of the platform may need to be performed on an off peak schedule to avoid interruption of service and station usage. Work areas will require separation from occupied platform areas. The roof of the station will need to be temporarily supported to allow column removals to take place, and new structure to be introduced. Staged construction will include temporary support of the existing structure and may include bracing in the track area. Large structural steel members must be transported to the site by rail. In contrast to the removal of columns raising the platforms could occur in scheduled stages once structural work is complete while the station is in use. Again passenger safety and egress routes will need to be maintained during construction operations.

Implementation of the automatic fare collection system will require a staged plan in order to maintain continuous uninterrupted service and safe egress to and from the station.

### 6.3.4 Cost

The total estimated cost is $10,100,000.

For estimating assumptions regarding the above construction cost see section 7.6, Project Cost.

This total does not include the cost for the automatic fare collection system or the unpredictable costs of taking private property for the public good (elevator Option B).

The cost of the most expensive elevator option(s) addressed is combined with the cost of providing a five foot stopping zone (when column removal is considered) for the development of this preliminary estimate.

# 9.0 OTHER ISSUES

## 9.1 Community and Agency Reviews

Achieving full Light Rail Accessibility will require that a significant number of interested parties be given the opportunity to conduct their own reviews of the project. The proposed work at many of the stations may result in impacts to a wide variety of both public and private facilities including, but not limited to, roadways, parking, sidewalks, and traffic signals. The project will create significant opportunities to alter and improve the existing aesthetic characteristics at each station through the incorporation of urban design and architectural elements. Early and continuous liaison with appropriate parties is crucial throughout the entire design process to ensure that all concerns are voiced and properly addressed.

In general, the various interested parties can be broadly classified into three groupings: State agencies and organizations, Municipalities, and community or neighborhood groups. Throughout the design and construction process, a number of Departments within the MBTA will be required to provide review and input on the project. They include: Planning, Design, Construction, Transportation Access, Real Estate, Legal, Safety, Revenue, Engineering and Maintenance, Power and Distribution, Signals, Communications, Operations, etc.

Other State agencies which may be involved include: The Executive Office of Transportation and Construction (EOTC), the Mass Highway Department (MHD), the Metropolitan Area Planning Council (MAPC), the Access Advisory Committee, etc.

At many stations located adjacent to roadways, coordination with The Massachusetts Highway Department (MHD) will be required. MHD review is typically required if an adjacent project receives funding from the state.

Station construction work is slated for four different municipalities: Boston, Brookline, Cambridge, and Newton. Within each municipality, continuous liaison should be maintained with appropriate departments including but not limited to: Planning, Engineering, Public Works, Traffic and Parking, Street lighting, and Safety. Within the City of Boston, significant involvement by the Public Improvements Commission (PIC) and the Boston Redevelopment Authority (BRA) will be required.

All State and local organizations which control utilities in the station vicinities must be coordinated with.

Many of the stations are located within specific neighborhoods of a community. Relevant parties may include:

- Neighborhood groups and Associations
- Key Property owners
- Local businesses and merchants
- Institutions (Hospitals, Schools, Museums, etc.)

Certain stations are likely to fall under the jurisdiction of the Massachusetts Historical Commission or Back Bay Architectural Commission as well as local preservation groups. Both historic and environmental issues are discussed in chapter six of this report.

In general, changes to properties listed in the National Register of Historic Places must be reviewed and approved by the Massachusetts Historic Commission. Such properties in the present project include the following:

a) The Tremont Street Subway (Park Street to Copley)

b) Boston Common and Public Garden

c) Back Bay Historic District (Auditorium Stations)

d) Beacon Street (St. Mary's to Cleaveland)

e) Newton Center and Newton Highlands stations

In addition:

1. Changes affecting National Register properties and City of Boston Landmarks (such as Arlington Street Church) must be reviewed and approved by the Boston Landmarks Commission.

2. All surface changes within one hundred feet of a Boston park must be reviewed and approved by the Boston Parks and Recreation Department.

3. All surface changes at Copley Square would have to be reviewed and approved by the Back Bay Architectural Commission.

4. Changes on Beacon Street would need to be reviewed and approved by the Brookline Preservation Commission.

5. Changes to Newton Center and Newton Highlands stations would have to be reviewed and approved by the Newton Historical Commission.

6. Changes in the vicinity of the Common and Public Garden will need to be reviewed in a public meeting with the Friends of the Common and Public Garden (a vigilant citizens group).

The specific scope of work at each station will ultimately dictate the required Agency and community involvement. As the designs progress, this input will fluctuate considerably. For example, certain neighborhood groups may take no interest whatsoever in the project until they discover that a particular tree must be removed, or that a particular view or sight line is blocked.

In the development of Schematic Design Alternatives, contact has been established with all of the appropriate key parties to ensure that in concept, the project faces no major obstacles. Specific or general issues relating to each station are discussed where appropriate in chapter four of this report.

In terms of advancing the design of the Station Accessibility Improvements, the Authority has established a general framework for continuing the overall liaison effort. First and foremost, it is vital that all exchanges with municipalities or the community be conducted through the MBTA project office. All levels of interaction with state, local, and community based individuals or groups should be thoroughly documented.

The next step in the project is to conduct a general informational meeting with each of the appropriate municipalities to present the current scope of work and status of the project. The following key issues are among those which must be reviewed and updated as necessary.

- Adjacent roadway projects-anticipated or underway
- New or planned development in the station vicinity
- General community concerns
- Recommendations as to how to best approach community
- Identification of interested parties and what likely concerns are
- Possible construction impacts

The Authority and the Designer should then develop specific strategies to address the specific needs of each individual or grouping of stations.

In many cases, it will probably be desirable to delay making presentations to particular parties until the preferred design approach at each station has been identified and approved by the Authority.

## 9.2 Future Considerations

Throughout the development of this document, a significant number of issues have arisen, many of which will require additional review by the Authority prior to the completion of final design of each station.

### Fare Collection

Since the Authority is in the process of implementing a new automated fare collection system wide, the new equipment, policies and operational issues must be clearly defined to be compatible with the Access improvements. The potential overlapping of the various design and construction contracts needs to be carefully studied. Consideration must be given to the fact that the new system will be phased in gradually, often requiring a combination of new and old fare collection systems at each station.

### Accessibility Requirements

Since the implementation of the Americans with Disabilities Act (ADA), there seems to be an almost continuous series of revisions and updates to the regulations-both on the State and Federal levels. The point at which the station designers hold fast to the most current regulations will need to be established at some point. Also, where MBTA policy may differ from other regulations, or where code compliance is deemed not feasible by the Authority, a general approach for resolution needs to be established and documented.

### Low Floor Vehicles

The Authority's past experience with acquiring new Light Rail Vehicles is that the actual production vehicle clearances and operational characteristics may deviate from the specifications. Adequate tolerances must be incorporated into the station designs to ensure that fully compliant accessibility will be achievable and that train operations will not be adversely impacted if deviations do occur. It may be preferable to delay certain elements of the project until LFV prototypes arrive in 1997-98 and/or assurances as to actual specifications are obtained.

### Adjacent Projects

A large majority of the Key Light Rail Station designs have the potential to be impacted by either planned or ongoing adjacent projects which include roadway improvements, private developments, and utility projects. Several of these projects could either directly or indirectly assist in the Station accessibility improvements. The major issue relates to project scheduling which is often out of the MBTA's control.

## 9.3 Future MBTA Improvements

There are a relatively large number of projects, all in various levels of development which could affect system wide operations and create station specific issues as well. The status and potential impacts of the following projects and issues should be continuously monitored.

- System wide power, signal and communications improvements
- A new signal system on the Highland Branch
- Improvements to the Lechmere viaduct
- Relocation of the Lechmere Station
- Reconstruction of the North Station-Green Line
- Future service extension north of Lechmere to Medford/Tufts
- Possible major reconstruction of Government Center Station
- Future improvements at non-Key Light Rail Stations
- Possible future Transitway connection at Boylston St. Station
- Possible Light Rail Service on Washington St.
- Possible reactivation of the Arborway Line
- The future configuration of the Mattapan High Speed Line
- Future variations in system ridership
- Circumferential Transit
- North-South Rail link
- Possible Commuter Rail Connection at Riverside

## 9.4 Implementation of Accessibility

Providing an accessible Light Rail System depends upon two major elements. The new accessible Low Floor Vehicles must be operational, and the designated Key Stations must be constructed in compliance with pertinent regulations. Since the new trains will not begin to enter service until 1999, the Authority will, in theory, have several years to complete station reconstruction.

# NEIGHBORHOOD ASSOCIATION OF THE BACK BAY, INC.

**Officers:**
Marianne M. Castellani
*Chair*
Susan D. Prindle
*President*
Manya Chylinski
*Vice Chair*
Daniel K. Hardenbergh
*Vice President*
Karen A. Young
*Secretary*
Nancy A. Hubeck
*Treasurer*

**Directors:**
Brenda Adams
Dorothy B. Bowmer
John R. Boreske
Karen Carper
Mark Cohen
Roseann M. Colot
John R. Devereaux
Fran Duffly
William L. Elsbree
Peter Y. Flynn
Michael E. George
Frederick C. Gleason
Jack W. Gregg
Janet Hurwitz
Warren A. Johnson
Ed Johnston
Kathleen S. Kolar
Gail Korn
Shirley L. Kressel
Rosanne Kumins
Elliott Laffer
Jennifer R. Lowe
Nancy A. Macchia
Fred Mauet
Jacquelin McBride
Christopher Mitchell
Tim Ian Mitchell
Molly Mosier
Nancy Nottonson
Jeryl Oristaglio
Margaret Pokorny
Luanne Pryor
Patricia Quinn
Ellen E. Rooney
Maureen E. Rooney
Steven M. Sayers
Sandy Shapiro
Peter M. Sherin
Anne C. Swanson
Stella M. Trafford
Martha M. Walz
Michael P. Ward
Linda A. Zukowski

Lois A. Harvey
*Office Administrator*

August 14, 2003

William Young, Senior Preservation Planner
Back Bay Architectural Commission
City of Boston Environmental Department
Boston City Hall
Room 805
Boston, Massachusetts 02201

Re: Copley Square MBTA Project

Dear Mr. Young:

It has come to our attention that Section 5(k) of Chapter 161A of the Massachusetts General Laws, a section of the Massachusetts Bay Transportation Authority (MBTA) enabling act, states the following:

> "Section 5. The authority shall be subject to the following limitations, conditions, obligations and duties:
>
> (k) The board of directors is hereby authorized and directed to promulgate such rules, regulations and procedures, including public hearings, as are necessary and appropriate to provide the following parties the timely opportunity to participate in major transportation projects designed by the authority, as defined by the directors, and to review and comment thereon: (i) state, regional and local agencies and authorities affected by said projects (ii) elected officials and riders or potential riders from cities and towns affected by the projects; (iii) other public and private organizations, groups and persons who are affected by and who have provided the board with reasonable notice of their desire to participate in the development of the design of such projects. In this section, the words "timely opportunity" shall mean sufficiently early in the design process so as to permit comments to be considered prior to the final development of or commitment to any specific design of such project. (emphasis added)

The Back Bay Architectural Commission (BBAC) was informed in a letter dated May 9, 2000, signed by Andrew D. Brennan, the MBTA's Director of Environmental Affairs, that the BBAC does not have jurisdiction over the MBTA

337 NEWBURY STREET, BOSTON, MA 02115-2710 TEL. (617) 247-3961 FAX (617) 247-3387 EMAIL: nabb@worldnet.att.net