UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

Civil Action No.: 05-11211JLT

NEIGHBORHOOD ASSOCIATION OF THE
BACK BAY, INC., and THE BOSTON
PRESERVATION ALLIANCE, INC.

     Plaintiffs,

     v.

FEDERAL TRANSIT ADMINISTRATION
and MASSACHUSETTS BAY
TRANSPORTATION AUTHORITY,

     Defendants

## PLAINTIFF NEIGHBORHOOD ASSOCIATION OF THE BACK BAY, INC.' S OPPOSITION TO DEFENDANT MASSACHUSETTS BAY TRANSPORTATION AUTHORITY'S MOTION TO STRIKE AFFIDAVIT OF JANET HURWITZ

Plaintiff Neighborhood Association of the Back Bay, Inc. ("NABB") opposes the

motion of defendant Massachusetts Bay Transportation Authority ("MBTA") to strike

the Affidavit of Janet Hurwitz, which plaintiffs filed in support of their Motion for

Preliminary and Final Injunction.

On October 3, 1994, the MBTA entered into a contract with Gannett Fleming, Inc.,

an engineering firm, to serve as coordinating consultant  to provide services in

connection with the MBTA's  Light Rail Accessibility Project ("MBTA Contract").

Gannett Fleming, in turn, hired Stull and Lee, Inc., an architectural firm with experience

doing urban transit work, as one of several sub-consultants to provide services to it in

connection with the Project.  Stull and Lee hired Janet Hurwitz as a consultant architect

to serve on its seven-person team to provide services to Gannett Fleming.

The MBTA argues that, based on Ms. Hurwitz's work for Stull and Lee in 1994 and 1995 and her attenuated connection to the MBTA contract ten years ago, she is a former state employee within the meaning of the Massachusetts conflict law, G.L. c. 268A, § 5, and the conflict law prohibits her from filing an affidavit in this lawsuit.

As will be demonstrated below, Ms. Hurwitz was not a state employee based on the consulting services she rendered to Stull and Lee in 1994 and 1995. Therefore, she is not now a former state employee. Accordingly, the conflict law is inapplicable to her. Moreover, even if the conflict law is applicable to Ms. Hurwitz, the mere filing of her affidavit does not constitute an act of agency on behalf of a third party or otherwise violate the provisions of G.L. c. 268A, § 5.

## FACTUAL BACKGROUND

Janet Hurwitz is a registered architect in Massachusetts. She has been the sole proprietor since 1984 of an architecture firm located in the Back Bay. Hurwitz Affidavit ("Aff."), ¶1. She lives on Commonwealth Avenue in the Back Bay. Id. In approximately August 1993, David Lee, one of the principals of Stull and Lee, Inc., contacted Ms. Hurwitz to explore her potential interest in providing architectural consulting services to his firm. Supplemental Affidavit of Janet Hurwitz ("Supp. Aff."), ¶ 1. At the time, Stull and Lee was in the process of preparing a proposal to Gannett Fleming to provide sub-consultant services to the engineering firm if it were awarded the MBTA Contract. Gannett Fleming included Stull and Lee's proposal as part of its bid to the MBTA to serve as coordinating consultant in connection with the Project. Id. Stull and Lee had experience with urban transit projects, and Mr. Lee was the partner in charge of those projects.

2

From approximately 1977 through 1981, Ms. Hurwitz had been an employee of Stull and Lee and had participated in the firm's work involving the MBTA and Amtrak Southwest Corridor Transit Project. Aff. ¶ 5. She had no specific experience with accessibility issues. Ms. Hurwitz agreed with Mr. Lee to be listed as Project Architect for Stull and Lee's proposed architectural team, with an understanding that she would make a final decision about whether she could participate if the MBTA awarded the contract to Gannett Fleming.   Supp. Aff. ¶ 2.

The MBTA and Gannett Fleming entered into a contract in October 1994 (copy appended as Exhibit 1).   Once the contract was awarded, Mr. Lee contacted Ms. Hurwitz to ask about her interest and availability to work on the Project. Supp. Aff. ¶ 3. She agreed to work part-time at Stull and Lee's office as a member of its Project team, with an understanding that she would be allowed to continue to provide services to her other clients from her home office during the time period that she also provided consulting services to Stull and Lee. Id. at ¶ 4.

I.    **THE AFFIDAVIT OF JANET HURWITZ DOES NOT VIOLATE THE MASSACHUSETTS CONFLICT LAW, M.G.L. c. 268A, § 5, AND SHOULD NOT BE STRIKEN.**

    A.    **Janet Hurwitz was not a state employee within the meaning of the conflict law during 1994-1995; therefore, she is not now a former state employee, and the conflict law is inapplicable to her affidavit and to her current activities with the Neighborhood Association of the Back Bay.**

The MBTA argues that the filing of the Affidavit of Janet Hurwitz in support of plaintiffs' Motion for Preliminary and Final Injunction violates section 5(a) of M.G.L. c. 268A, which governs former state employees:

3

A former state employee[1] who knowingly acts as agent or attorney for, or receives compensation directly or indirectly from anyone other than the commonwealth or a state agency, in connection with any particular matter in which the commonwealth or a state agency is a party or has a direct and substantial interest and in which he participated as a state employee while so employed . . . [shall be sanctioned]

M.G.L. c. 268A, § 5(a) (emphasis added).  Memorandum In Support of the MBTA's Motion to Strike the Affidavit of Janet Hurwitz ("MBTA Memorandum"), p. 3.  As will be demonstrated below, Ms. Hurwitz was not a state employee during 1994 and 1995 based on her consulting work for Stull and Lee.  Therefore, contrary to the MBTA's assertion, Ms. Hurwitz is not now a former state employee, and the conflict law is inapplicable to her.

"The [State Ethics] Commission[2] has long recognized that a . . . contract between a [state or municipal government entity] and a corporation will not render the corporation a [government] employee." EC-COI-89-6 (copy appended as Exhibit 2). Further, when a corporation contracts with a state agency, the corporations' employees also will not be considered state employees unless the state agency "specifically targets a certain individual within the corporate structure to perform the services." Id. The Commission evaluates several factors in determining whether a state agency targets a specific individual within a corporation to provide services:

1.      whether the individual's services are expressly or impliedly contracted for;

2.      the type and size of the corporation;

3.      the degree of specialized knowledge or expertise required of the service;

---

[1] "State employee" is "a person performing services for or holding an office, position, employment, or membership in a state agency, whether by election, appointment, contract of hire or engagement, whether serving with or without compensation, on a full, regular, part-time, intermittent or consultant basis, including members of the general court and executive council. . . M.G.L. c. 268A, § 1(q).

[2] The Massachusetts State Ethics Commission is the administrative agency charged with civil enforcement of the conflict law [M.G.L. c. 268A, § 3.  The Office of the Attorney General and the District Attorneys' Offices enforce the law criminally.

4.   the extent to which the individual personally performs services under the contract, or controls and directs the terms of the contract or the services provided thereunder; and

5.   the extent to which the person has performed similar services to the public entity in the past.

EC-COI-92-13 (copy appended as Exhibit 3).  No one factor is dispositive.  The Commission balances all the factors based on the totality of the circumstances. Id.

Gannett Fleming and the MBTA were the only two parties to the MBTA Contract.  Under Commission precedent, neither Gannett Fleming, nor any of its employees, would be deemed to be state employees unless the MBTA specifically targeted certain Gannett Fleming employees to provide services.  Clearly then, neither Stull and Lee, a sub-consultant to Gannett Fleming, nor its employee, would be deemed to be state employees.  Again, the only exception would be if the MBTA specifically targeted one of Stull and Lee's employees to perform services.

Janet Hurwitz was a consultant to Stull and Lee.  The MBTA neither expressly nor impliedly contracted for Ms. Hurwitz's services.  The MBTA Contract nowhere identified specific tasks or services for Ms. Hurwitz to deliver.  Further, it did not require Gannett Fleming or Stull and Lee to report and/or seek MBTA approval of staffing decisions under the Contract.  See EC-COI-89-6 (copy appended as Exhibit 2) (employees of non-profit corporation not deemed to be municipal employees where the choice of personnel is within the sole province of the non-profit and the municipality has no right to demand the services of any specific personnel).  See also EC-COI-92-6 (employees of construction company not deemed to be state employees) (copy appended as Exhibit 4).  Cf. EC-COI-92-13 (employees of private consulting firm deemed state employees where each individual was named in the contract, designated

5

on organization chart and delegated specific tasks to be performed under the contract, and Commonwealth must be notified about and approve substitutions of designated persons) (copy appended as Exhibit 3).

Janet Hurwitz's name does not appear anywhere in the body of the MBTA Contract with respect to service provision or otherwise. Article III of the Contract is entitled "Compensation and Payment." See Exhibit 1, p. 21. That section provides that in exchange for satisfactory completion of the services described in the MBTA Contract, the MBTA would pay Gannett Fleming a fixed fee in accordance with the schedule of estimated costs shown in Exhibit "A" to the Contract. The only place Ms. Hurwitz's name appears is in Exhibit "A", which includes Stull & Lee's consultant cost proposal submitted to Gannett Fleming in August 1993. See Exhibit 1, Exhibit "A", pages 4 and 5 of 20. Under the heading "Direct Labor, the proposal lists "J. Hurwitz" as one of a seven-member proposed team to provide architectural and design services. Stull and Lee's proposal was one of several sub-consultant proposals that Gannett Fleming included in its bid to the MBTA.

Consistent with the language of Stull and Lee's proposal, it was used to estimate projected labor costs based on the MBTA's audit of past work performed by Stull and Lee for the MBTA. That cost proposal, which was submitted ten months prior to the MBTA's award of its contract to Gannett Fleming, in no way targeted or committed Janet Hurwitz to working on the Project. Gannett Fleming selected Stull and Lee as a sub-consultant because of the firm's experience with and reputation in providing urban transportation and design services. Mr. Lee was the partner in charge of those projects and was known for his expertise in those areas. Ms. Hurwitz had worked with Mr. Lee on one prior urban transportation project – the Southwest Corridor Transit Project – and had provided services to the MBTA only on that one prior occasion. Thus, Gannett

6

Fleming entered an agreement with Stull and Lee to provide services because of the experience and reputation of the firm and Mr. Lee, not because of Ms. Hurwitz's particular expertise. Moreover, she had no experience with accessibility projects.

Based on the totality of these circumstances, it is clear that the MBTA Contract did not target the specific services of Janet Hurwitz. Thus, Ms. Hurwitz was not a state employee within the meaning of M.G.L. c. 268A, § 5 based on her consulting work for Stull and Lee during 1994 and 1995. Accordingly, she is not now a former state employee within the meaning of G.L. c. 268A, § 5. Under these circumstances, the conflict law is not applicable to her affidavit or her activities with NABB.

**B.     Even if Ms. Hurwitz is a Former State Employee, the Conflict Law Does Not Require Her Affidavit To Be Stricken.**

As stated earlier, section 5 of M.G.L. c. 268A prohibits a former state employee from acting as an agent for anyone other than a state agency in connection with a particular matter in which the state agency is a party and in which she participated as a state employee. The Ethics Commission defines an agent as "anyone who represents another person or organization in their dealings with a third party." Commission Advisory No. 94-01, Agency, Part B: State Employee Acting as Agent (copy of page 2 appended as Exhibit 5). The restrictions of the statute are not triggered if the former state employee is not representing someone before a third party. Thus, a former state employee may offer advice to others and may help plan strategies, so long as her activity does not represent those people or organizations before a third party. Id.

7

Moreover, the conflict law only prohibits a former state employee from acting as an agent in connection with a particular matter[3] (defined by statute) in which she participated [4] (also defined by statute) as a state employee.

The MBTA moves to strike Ms. Hurwitz's affidavit on the ground that its mere filing violates the conflict law.  See MBTA Memorandum, p. 3.  In her affidavit, Ms. Hurwitz attests to background and factual information about herself and a variety of issues.  Providing such information in no way constitutes "acting as an agent" for NABB or anyone else.  Further, the MBTA has failed to identify any particular matter in which the MBTA is a party and in which Ms. Hurwitz allegedly participated as a state employee.   For all these reasons, the MBTA's motion to strike Ms. Hurwitz's affidavit would  fail even if she were deemed to be a state employee.

<div align="center">CONCLUSION</div>

For all the reasons set forth above, plaintiff Neighborhood Association of the Back Bay respectfully requests that the Court deny the MBTA's Motion To Strike The Affidavit of Janet Hurwitz.

---

[3] "Particular matter", any judicial or other proceeding, application, submission, request for a ruling or other determination, contract, claim, controversy, charge, accusation, arrest, decision, determination, finding, but excluding enactment of general legislation by the general court and petitions of cities, towns, counties and districts for special laws related to their governmental organizations, powers, duties, finances and property.  M.G.L. c. 268A, § 1(k).

[4] "Participate", participate in agency action or in a particular matter personally and substantially as a state, county or municipal employee, through approval, disapproval, decision, recommendation, the rendering of advice, investigation or otherwise. M.G.L. c. 268A, § 1(j).

Respectfully submitted,
The Plaintiffs,
By their attorneys,

Laurence E. Hardoon, BBO #221360
Judy A. Levenson, BBO #295570
Brody, Hardoon, Perkins & Kesten, LLP
One Exeter Plaza
Boston, MA  02116
(617) 880-7100

Dated:  October 17, 2005

9

## MASSACHUSETTS BAY TRANSPORTATION AUTHORITY
### CONTRACT NO. S5PS11

### LIGHT RAIL ACCESSIBILITY PROGRAM
#### COORDINATING CONSULTANT

THIS CONTRACT, made this *3rd* day of *October* in the year nineteen hundred and *ninety four* effective March 21, 1994, by and between the MASSACHUSETTS BAY TRANSPORTATION AUTHORITY, a body politic and corporate and a political subdivision of the Commonwealth of Massachusetts, hereinafter referred to as the "AUTHORITY" or "MBTA" and GANNETT FLEMING, INC., a Corporation duly organized under the laws of the State of Delaware, and having a usual place of business at 150 Wood Road, Braintree, Massachusetts 02185, hereinafter referred to as the "ENGINEER".

WITNESSETH THAT:

WHEREAS, the Authority has undertaken an Accessibility Improvements Program funded under Federal Transit Administration, U. S. Department of Transportation, Project Nos. MA-90-0112 and MA-23-9017, and the Commonwealth of Massachusetts, Chapter 33 of the Acts of 1991, and

WHEREAS, the Americans with Disabilities Act (ADA) has required that certain key stations be made accessible, and the Authority has identified 29 light rail stations in the Key Station Plan, and

WHEREAS, the Authority desires to engage the Engineer to perform Phase I - Schematic Design Services, as hereinafter described, of accessibility improvements to the light rail system, and

WHEREAS, the work to be performed under this Contract shall not duplicate work undertaken by others in the Authority, by other consultants of the Authority, or by other agencies.

NOW THEREFORE, the parties agree that:

In consideration of the payments to be made to the Engineer by the Authority, which are set out in Article III, the Engineer will perform design engineering services in accordance with the provisions of this Contract.

## ARTICLE I - SCOPE OF WORK

### A. DESCRIPTION OF SERVICES

The MBTA is presently undertaking a program to provide a transit system which is compliant with the American with Disabilities Act (ADA). To achieve this, the Authority has enacted a key station accessibility plan which prioritizes system accessibility. Providing accessibility on the Light Rail System is extremely complex in that there are a relatively large number of stations with a wide variety of site conditions. Also, accessibility will require the acquisition of new Light Rail Vehicles which incorporate low floor technology.

As Coordinating Consultant, the Engineer will perform the following primary work elements under Phase I - Schematic Design Services.

1. Preparation of a Schematic Design Report identifying requirements for providing full handicap accessibility at all designated Light Rail key stations. Report will also address all necessary Light Rail systemwide modifications to track, signal, communications and traction power systems.

2. Preparation of a Project Design Manual which will include guidelines, criteria and standards to facilitate the design of all Light Rail Stations and System Components.

3. Preparation of an existing conditions study as well as a schematic design report identifying maintenance and repair facility improvements necessary to service the new low floor vehicles (LFV).

4. Identification of all Historic and Environmental permitting required for Light Rail accessibility and the preparation of an ENF document.

5. Assist the Authority in preparing for and conducting Community and Agency Liaison.

2

B.    SCOPE OF SERVICES

The Engineer shall provide the following services:

PHASE I  SCHEMATIC DESIGN PHASE (15%)

This phase will involve the analysis of the Authority's entire Light Rail System (including the Mattapan Line) in order to identify, evaluate, set standards for and design improvements necessary to provide key station full accessibility and low floor vehicle (LFV) maintenance and operations.

TASK 1    PROJECT MANAGEMENT

   1.1  Prepare for and attend regular meetings with MBTA. (B)

   1.2  Prepare monthly updates of the project status. Prepare reports and memos as necessary.  Make necessary field reviews to address specific project issues. (B,S)

   1.3  Monitor the project progress with respect to schedule and budget constraints. (B,S)

   1.4  Coordinate and manage the activities of the project design team.  Conduct regular team meetings to monitor project progress. (B)

   1.5  Assist the Authority in coordinating the project with various agencies organizations and commissions including but not limited to Mass Historic, Department of Public Utilities, City and Town officials, disability groups. (S)

TASK 2    DATA COLLECTION & REVIEW

   2.1  Gather and review all available reports, studies, plans relating to the project. (B)

   2.2  Identify all public and private utilities likely to be impacted by the project. (B)

   2.3  Conduct complete inventory of all designated Key Light Rail Stations, facilities, track, structures and all other components.  Identify existing condition, usage, site constraints, pedestrian and vehicular travel patterns, safety issues. (B,S)

   (B) = Basic Services  3 (S) Special Services

2.4   Gather and review all codes, design criteria, standards, guidelines and other applicable regulations previously established by the Authority. (B)

2.5   Obtain from the Authority and update scaled schematic level base plans of all Key Light Rail stations and facilities. (B)

2.6   Obtain development, delivery, specification parameters for proposed LFV's. (B)

2.7   Review ongoing Light Rail Station design efforts by other consultants (North Station, Haymarket, Government Center, Lechmere, Park Street). (B,S)

2.8   Conduct access audits for all Key Stations. (S)

2.9   Conduct preliminary field survey of existing conditions at each Key Station. (S)

TASK 3    COMMUNITY AND AGENCY LIAISON

3.1   Establish a general strategy for community/agency liaison for the project duration. (S)

3.2   Prepare a project specific list of agencies, abutters, neighborhood groups, and other interested parties. (S)

3.3   Assist the Authority in planning, preparing for and conducting initial overview presentations of the project (5 presentations assumed). (S)

3.4   Assist the Authority in planning, preparing for and conducting community meetings/presentations. Evaluate community concerns and prepare timely responses as needed (5 presentations assumed). (S)

TASK 4    MAINTENANCE & REPAIR FACILITIES ANALYSIS

4.1   Identify LFV maintenance and repair requirements and the suitability of existing facilities. (S)

4.2   Establish design criteria for facility modifications necessary for the LFV. (S)

4.3   Inventory existing M&R facility conditions, and capacities as they relate to the new LFV. (B,S)


(B) = Basic Services 4 (S) Special Services

4.4  Identify any existing substandard hydraulic hoists and wheel trueing machines at the Reservoir and Riverside Facilities and develop a design for accommodation of the new LFV. (B)

4.5  Modify all existing facility hoists as required to accommodate new LFV. Specify changes to the existing hoists that may be required by the new LFV. (B)

4.6  Develop concepts for new LFV roof equipment access/maintenance platforms. (B)

4.7  Develop concepts for a maintenance/inspection facility at Mattapan Yard to accommodate accessible vehicles. (B)

**TASK 5**    **LIGHT RAIL SYSTEM COMPONENT EVALUATION**

5.1  Identify and analyze all required track modifications including but not limited to switches, realignments, clearances, crossovers as necessary to accommodate LFV's systemwide and at stations. (B,S)

5.2  Identify all required signal system upgrades, including but not limited to modifications to existing wayside signal system equipment, cable plant, conduit systems. Communication system modifications and upgrades include but are not limited to public address, CCTV. Police talk back, train communication systems and wayside telephones. (B,S)

5.3  Evaluate variable train operations and impacts. Combinations of Boeings, Type 7's and new Type 8 LFV's will be utilized. (B,S)

5.4  Identify all power/catenary system modifications required to make existing stations ADA compliant. Modifications include but are not limited to relocation of existing AC and DC feeders and conduit systems, modifications to existing unit substations to accommodate additional loads, temporary modifications and/or relocation of existing power and catenary facilities during staged construction. (B,S)

(B) = Basic Services 5 (S) Special Services

**TASK 6**      <u>PERMITTING AND ENVIRONMENTAL REVIEW</u>

6.1   Identify all possible environmental impacts which may be created by the project. (S)

6.2   Identify all permits, licenses, agreements, orders, reviews and approvals required for project/station construction work. (S)

6.3   Prepare and submit a schedule which establishes a timetable for filing documentation as identified under Subtask 6.2. (S)

6.4   Identify and evaluate all historic resource issues including but not limited to head houses, stations and parks. (S)

6.5   Prepare ENF documents as required.  The preparation of an EIR, if necessary, is not included in this Scope.

6.6   Identify MAAB, ADA and other State and Federal regulatory variances that may be required. (S)

**TASK 7**      <u>STATION CONCEPT DESIGN ALTERNATIVES</u>

7.1   Develop conceptual sketches depicting alternative ways to respond to the major design elements of the Project. (B,S)

7.2   Develop solutions for achieving full accessibility. (S)

7.3   The following issues will require study and solution alternatives will be developed to accommodate varying station conditions. (B,S)

1.   Platform/train gaps at stations
2.   Platform raising to meet low floor vehicles
3.   Platform widening to provide minimum required widths
4.   Impacts on adjacent streets of platform widening/raising
5.   Utility line impacts
6.   Pedestrian and vehicle track crossing at stations
7.   Platform and track drainage
8.   Fare collection issues
9.   Mixed LRV/LFV operation impacts
10   Possible Key Station/Platform relocations or abandonment
11.  Interim access/phasing alternatives

(B) = Basic Services 6 (S) Special Services

**TASK 8**      PROJECT SCHEDULE AND COST

8.1   Monitor and provide a schedule of all projects and developments planned for the light rail system including but not limited to North Station, Haymarket, Government Center, Lechmere, Beyond Lechmere, Park Street, Key Stations, the South Boston Piers Transit, Arborway and LFV development as well as, track, tunnel, power, signal, communication and right-of-way work.

8.2   Establish construction cost estimates for all required work. (B)

8.3   Develop project implementation and phasing program based on ADA and MBTA requirements and budgeting constraints. (S)

8.4   Based on development and delivery schedule of LFV, establish project design and construction schedule. (S)

**TASK 9**      SCHEMATIC DESIGN PRESENTATIONS

9.1   After review of concept alternatives and MBTA concurrence, develop preferred concepts into schematic design drawings. (B)

The schematic drawings will be detailed to include but not be limited to the following project elements:

• Existing Conditions
• Site Accessibility
• Architecture & Urban Design
• Track, Signal & Power
• Structural Analysis
• Site Engineering

9.2   Prepare for and assist the Authority in presenting the project to all interested parties including but not limited to the MBTA, the City of Boston, the BRA, Town of Brookline, City of Newton, AACT and MAAB.

**TASK 10**     SCHEMATIC DESIGN REPORT

10.1  Summarize all work from Task 1 through 10 into a Draft Report.  Report shall include Construction cost estimates and recommendations for construction sequencing and packaging. (B)


(B) = Basic Services 7 (S) Special Services

10.2 Preparation of Project Design Manuals to be used by the Station Design Consultants and for all Light Rail Design efforts. (S)

The following elements shall be included in the manual:

- Architectural Criteria & Guidelines
- Engineering Criteria & Guidelines
- Mechanical and Electrical Criteria & Guidelines
- Urban Design Criteria & Guidelines
- Standard and Directive Drawings
- Document Production Standards (Project Control, Drafting, Specifications)

- Light Rail Systems Criteria & Guidelines (Track, Power, Signals, Communications)
- Provide Accessibility Guidelines for ADA and light rail to be included in the MBTA Guide to Access.

10.3 Perform revisions as required and submit Final Documents.  Distribute Draft Schematic Design Report and Project Design Manuals to the MBTA. (B)

(B) = Basic Services 8 (S) Special Services

## ARTICLE II - GENERAL PROVISIONS

A. Available Data and Materials

All data applicable to this project in the possession of the Authority will be made available at no cost to the Engineer by the Authority. The Engineer will furnish all forms, cross section paper and other materials necessary for the preparation of plans, profiles and cross sections. They shall be of size and format conforming to Authority standards. The Engineer shall not be responsible for obtaining permits, licenses, or the like, required for the construction of the project except those required to permit the Engineer to do business in the jurisdiction where the services are to be performed.

B. Hearings

The Authority will be responsible for making all arrangements for and hold all necessary hearings in connection with the project, enter into all necessary agreements with railroads, public utilities, municipalities, agencies of the United States Government or others and make order of takings and financial settlements with owners of properties affected.

C. Appearance at Hearings

The Engineer shall, when requested by the Director of Construction, hereinafter referred to as the "Director", or his designee, render such assistance as necessary, including making arrangements for hearings and preparation and explanation of sketches or plans, at or for any hearing or conference held by the Authority.

D. Appearance as a Witness

If and when required by the Authority, the Engineer shall prepare for and appear in any litigation concerning this project in behalf of the Authority; the Engineer shall be paid reasonable and agreed upon costs and fee for its services and for any expenses incurred by it in relation thereto, which shall not be considered as covered by the ceiling price.

E. Duration

All work to be performed under this contract shall be completed within nine (9) months following notification to proceed with the work.

F.  **Termination of Contract**

1.  The Director may, by written notice to the Engineer, terminate this contract in whole or in part at any time, either for the Authority's convenience or because of the failure of the Engineer to fulfill his contract obligations. Upon receipt of such notice, the Engineer shall: (a) immediately discontinue all services affected (unless the notice directs otherwise), and (b) deliver to the Director all data, drawings, specifications, reports, estimates, summaries and such other information and materials as may have been accumulated by the Engineer in performing this contract, whether completed or in process.

2.  If the termination is for the convenience of the Authority, an equitable adjustment in the fixed fee shall be made, but no amount shall be allowed for anticipated profit on unperformed services. In addition to the adjusted fixed fee, the Authority shall pay the Engineer the allowable costs incurred prior to termination and any other costs reasonably incurred by the Engineer to implement the termination.

3.  If the termination is due to the failure of the Engineer to fulfill his contract obligations, the Authority may take over the work and prosecute the same to completion by contract or otherwise. In such case, the Engineer shall be liable to the Authority for any additional cost occasioned to the Authority thereby.

4.  If, after notice of termination for failure to fulfill contract obligations, it is determined that the Engineer had not so failed, the termination shall be deemed to have been effected for the convenience of the Authority. In such event, adjustment shall be made as provided in paragraph 2 of this clause.

5.  The rights and remedies of the Authority provided in this clause are in addition to any other rights and remedies provided by law or under this contract.

G.  **Revisions in Scope of Work**

If during the term of this contract, the limits of the project are revised or other changes are made in the scope or character of the work to be performed, the Engineer shall make the necessary changes only after receiving a written order from the Director. In the event any change, individually or in combination with other changes, causes an increase or decrease in the estimated cost or time of performance of the services, the Engineer shall continue the performance of the services as changed and equitable adjustments shall be made in the allowable costs, fixed fee, ceiling price, time of performance and terms and conditions as applicable. The fixed fee shall be adjusted on account of such changes only if, in the aggregate, they have a substantial impact on cost or time of performance.

10

The terms extra work or revisions in the scope of work are defined as work which was not anticipated and/or contained in the contract; is determined by the Authority to be necessary for the proper completion of the contract; and bears a reasonable subsidiary relation to the full execution of the work originally described in the contract.

H.    Ownership and Preparation of Plans and Specifications

Data prepared by the Engineer under this contract such as plans, drawings, tracings, estimates, specifications, proposals, sketches, diagrams and calculations, together with all materials and data furnished to the Engineer by the Director under the provisions of this contract, shall be returned to the Director upon completion of the term of this contract as being the property of the Authority; and the Authority shall not be limited in any way in its use thereof at any time. If the Engineer shall desire later to use any of the data prepared by him in connection with this project, he shall first obtain the written approval of the Director. The Engineer may retain copies of all data prepared by him and use the same in furtherance of his knowledge.

Plans and drawings prepared for the design submittal and approval stages (i.e. 30%, 60%, 90%, final contract bid documents, as builts, etc.) will be prepared in CADD (Computer Aided Drafting Design) format acceptable to the Authority. Data will be submitted concurrently in both hard copy and machine readable digitized format on either 9 track tape or cartridge (TK50 or TK70) medium. Plans and drawings will be submitted utilizing McDonnell Douglas' Graphics Design System (GDS) .FGB file format. Additional standards for the preparation of the GDS .FGB files will be identified and provided by the Authority. It is the responsibility of the Engineer to provide .FGB files created from the latest version of GDS. Other formats and media may be substituted upon prior written approval of the Director, or his designee.

Specifications, estimates, and ancillary data will be submitted concurrently in both hard copy and machine readable format on either tape (cartridge) or disk medium. These files will be produced using the latest version of WordPerfect word processing microcomputer software. Files in ASCII format may be substituted for WordPerfect files upon written approval of the Director or his designee.

I.    Subletting, Assignment or Transfer

The Engineer shall not sublet, sell, transfer, assign or otherwise dispose of the contract or any portion thereof, or of his right title, or interest therein, without written consent of the Director. This written consent shall in no way relieve the Engineer from his primary responsibility for the performance of the work.

11

J.    <u>Insurance</u>

1. The Engineer shall carry Comprehensive General Liability Insurance for personal injury, bodily injury and property damage with limits not less than $1,000,000 per occurrence covering all work performed under this Contract.

   a.    All operations.

   b.    Contractual liability.

   c.    Use of watercraft, aircraft where applicable.

2. Automotive Liability Insurance including the use of all vehicles, owned, leased, hired and non-owned, with limits not less than $1,000,000 combined single limit covering all work performed under this Contract.

3. The Engineer shall carry Worker's Compensation Insurance including Employers' Liability Insurance as provided by the Massachusetts General Laws, Chapter 152, as amended, covering all work performed under this Contract.

4. The Engineer shall carry or show evidence of coverage secured by subconsultants, Valuable Papers and Records Insurance to cover restoration or replacements of plans, drawings, computations, field notes and other data pertinent to this contract in a combined amount equal to 100% of the Contract value. Coverage is to be upgraded if the amount of the Contract increases by more than 5%. A new certificate of insurance is required evidencing any adjustment within 15 days of the authorized increase to the ceiling price of the Contract.

5. Architects and/or Engineers Professional Liability Insurance shall be carried in an amount not less than $1,000,000 covering losses arising from acts, errors or omissions whenever committed for services performed under this Contract. Coverage must specifically extend to include liability assumed under this contract and shall specifically include, but not be limited to, coverage for: 1) boundary surveys, 2) subsurface investigations, 3) soil testing, 4) quantity surveys, 5) bridge work, 6) tunnel work; and 7) dam work when applicable.

6. The Engineer shall carry Umbrella Liability coverage with limits of not less than $5,000,000 per occurrence covering all work performed by him under this Contract.

7. In the event that work is to be performed within 50 feet of track, the Engineer shall procure coverage known as Railroad Protective Insurance as specified as follows:

a. The Engineer shall furnish, with respect to the operations of the Engineer or any of the Engineer's subconsultants performing within the Railroad right-of-way, broad form Railroad Protective Liability Insurance covering all work performed under this Contract in the amount of not less than $2,000,000 per occurrence, $6,000,000 aggregate.

b. The insurance hereinbefore shall be written on an occurrence basis.

c. The MBTA, Conrail and Amtrak shall be the named insured.

d. The Engineer shall furnish to the MBTA and railroad companies a signed original of the policy for Railroad Protective Liability prior to entry upon the railroad right-of-way.

e. All certificates shall be endorsed to provide 30 days notice to each named insured by the insurance company before any change or cancellation of the policies.

f. The required Railroad Protective Insurance provided herein must be in the form commonly referred to as the AAR-AASHTO Form (not Oregon).

g. Original policies and certificates shall be made out to the MBTA, Conrail and Amtrak and mailed to:

MBTA:    Treasurer-Controller
         Massachusetts Bay Transportation Authority
         10 Park Plaza
         Boston, MA  02116
         Tel. - (617) 722-5594

AMTRAK:  General Superintendent
         230 Congress Street
         Boston, MA  02110
         Tel. - (617) 654-2020

CONRAIL: General Manager
         Conrail
         1 Bell Crossing Road
         RD #2, Box 145
         Selkirk, NY 12158-9618
         Tel. - (518) 767-6111

8. Comprehensive General Liability and Umbrella Liability are to be either with the same insurance carrier or the same insurance agent or broker or both.

9. All policies should be written either on an occurrence basis or, if a claims made form, applicable renewals must have a retroactive date equal to the Contract start date and must be maintained in force for two years following acceptance of all work performed under this Contract.

13

10. Insurance required of the Engineer shall be provided by or in behalf of all subconsultants to cover their operations performed under this agreement. The Engineer shall be held responsible for all modifications, deviations or omissions in these insurance requirements as they apply to subconsultants.

11. All insurance policies required herein with the exception of Professional Liability and Worker's Compensation shall name the Authority as an additional named insured as its interest appears under this Contract and waive any rights of subrogation against the MBTA.

12. Certificates of Insurance, evidencing the coverage and conditions of this Contract, as well as the MBTA's designated contract number, are to be furnished to the Authority's Assistant Director of Construction - Contract Administration at the time of authorization of the Contract. Coverage shall continue, with appropriate renewals of Certificates of Insurance, throughout the duration of the Contract. A minimum of 30 days notice shall be given to the Authority of any cancellation or major changes in this policy.

K.  General Compliance with Laws

The Engineer shall perform the work required under this contract in conformity with requirements and standards of the Authority, municipal and railroad agencies whose facilities and services may be affected by the construction of this project. The project shall be so designed as to cause minimum interruption to said services. The Engineer shall also comply with all Federal, Commonwealth and local laws and ordinances applicable to any of the work involved in this contract.

The Engineer shall, at the time of the 30% design submission identify all required Federal, State, local and other cognizant agency permits, licenses and environmental studies or statements which the Authority is required to file during the design phase of the project and prior to commencement of construction. The Engineer shall also submit a pedestrian access plan and identify whether a variance to Architectural Access Board regulations need be submitted. He shall prepare and submit a schedule which establishes a timetable for filing and assist the Authority in the preparation of the required documentation and applications to those agencies which have jurisdiction.

L.  Warranty

The Engineer warrants that he has not employed or retained any company or person, other than a bonafide employee working solely for the Engineer, to solicit or secure this contract and that he has not paid or agreed to pay any company or person, other than a bonafide employee working solely for the Engineer, any fee, commission, percentage, brokerage fee, gifts or any other consideration, contingent upon or resulting from the award or making of this contract. For breach or violation of this warranty, the Authority shall have the right to annul this contract without liability.

14

M.    <u>Employment of Authority Personnel</u>

The employment by the Engineer of personnel on the payroll of the Authority will not be permitted in the execution of this contract, even though such employment may be outside of the employee's regular working hours or on Saturdays, holidays or vacation time; further, the employment by the Engineer of personnel who have been on the Authority payroll within one year prior to the date of contract award, where this employment is caused by and/or dependent upon the Engineer securing this or a related contract with the Authority, is also prohibited.

N.    <u>Lodging</u>

Every person employed in the work covered by this contract shall lodge, board, or trade where and with whom he elects; and neither the Engineer nor his agents or employees shall directly or indirectly require as a condition of employment therein that an employee shall lodge, board or trade at a particular place or with a particular person.

O.    <u>Claims</u>

The Engineer agrees to be solely responsible for all bills or claims for payment for services rendered by any subcontractors, associates or others employed by the Engineer for the services and materials employed in the Engineer's work.

The Engineer agrees to indemnify and save harmless the Authority and the municipality in which the project is located and all of its or their officers, agents and employees against all suits, claims or liability of every name and nature arising out of or in consequence of negligent acts, errors or omissions of the Engineer or his personnel in the performance of the work covered by this contract and/or failure to comply with terms and conditions of this contract whether by himself, his associates, employees or subcontractors.

P.    <u>Staffing of Office and Inspection of Work</u>

The Engineer shall submit to the Director a record of the salaries paid to consulting staff or employees assigned to this project.

All salaries and increases, thereof, paid to engineering or technical employees assigned to this project shall be the result of a company-wide evaluation of all employees and shall not be restricted to employees assigned to this project.

If, in the opinion of the Director, any salary or increase, thereof, of consulting personnel assigned to this project is unreasonable, he shall notify the Engineer of his opinion with regard thereto, and request the Engineer to justify said salary or increase, thereof. In the event that the Engineer furnishes reasonable justification for said salary or increase, thereof, then such salary or increase, thereof, shall be approved as a payroll expense.

15

The Director shall have the right to exercise the power of review and approval of salaries and increases, thereof, for a period of thirty days after the submission of a monthly invoice by the Engineer. Unless the Director notifies the Engineer in writing during the thirty-day period that such salary or increase, thereof, is, in his opinion, unreasonable, such lack of notice shall constitute approval of said salary or increase, thereof, from the first day of the preceding month. All salary changes from those submitted on the previous notice shall be specifically noted by the Engineer.

It is understood that authorized representatives of the Authority and the Federal agency involved, if applicable, may inspect or review the Engineer's work, in progress, at any time.

Q.  **Publication of Plans**

No copies or sketches or plans, including design plans in the formative stages, are to be released by the Engineer to any other person or agency except after prior approval of the Authority, except as necessary for the performance of the services. All press releases including plans and information to be published in newspapers, magazines, etc., are to be handled only through Authority approved channels.

R.  **Regulations of the Authority**

The Regulations of the Authority's Board of Directors state that the General Manager is authorized to approve, without prior authorization of the Board, the issuance of Change Orders or Extra Work Orders, pursuant to any contract or other agreement previously authorized by the Board or the General Manager, in a total amount not exceeding 10% or $100,000.00 above the contract price of such agreement, whichever is greater; provided that if the issuance of any such Change Order or Extra Work Order would result in exceeding said 10% or $100,000.00 limitation or if the issuance of any one such Change Order or Extra Work Order would require an expenditure by the Authority of an amount exceeding $100,000.00, it shall not be issued without prior authorization of the Board.

The General Manager, as provided by the Regulations of the Board of Directors, has delegated to the Director of Construction the power to approve, without prior authorization of the General Manager or the Board, the issuance of Change Orders or Extra Work Orders, pursuant to any contract or other agreement previously authorized by the Board or the General Manager, in a total amount not exceeding 10% or $50,000.00 above the contract price of such agreement, whichever is greater; provided that if the issuance of any such Change Order or Extra Work Order would result in exceeding said 10% or $50,000.00 limitation or if the issuance of any one such Change Order or Extra Work Order would require an expenditure by the Authority of an amount exceeding $50,000.00, it shall not be issued without prior authorization as provided for herein.

The General Manager, as provided by the Regulations of the Board of Directors, has delegated to the Deputy Director of Construction the power to approve, without prior authorization of the General Manager or the Board, the issuance of Change Orders or Extra Work Orders, pursuant to any contract or other agreement previously authorized by the Board or the General Manager, in a total amount not exceeding 10% or $35,000.00 above the contract price of such agreement, whichever is greater; provided that if the issuance of any such Change Order or Extra Work Order would result in exceeding said 10% or $35,000.00 limitation or if the issuance of any one such Change Order or Extra Work Order would require an expenditure by the Authority of an amount exceeding $35,000.00, it shall not be issued without prior authorization as provided for herein.

The General Manager, as provided by the Regulations of the Board of Directors, has delegated to certain Assistant Directors of Construction the power to approve, without prior authorization of the General Manager or the Board, the issuance of Change Orders or Extra Work Orders pursuant to any contract or other agreement previously authorized by the Board or the General Manager in a total amount not exceeding 10% or $25,000.00 above the contract price of such agreement, whichever is greater; provided that if the issuance of any such Change Order or Extra Work Order would result in exeeding said 10% or $25,000.00 limitation or if the issuance of any one such Change Order or Extra Work Order would require an expenditure by the Authority of an amount exceeding $25,000.00, it shall not be issued without prior authorization as provided for herein.

Employees of the Authority are not authorized to request work to be performed or services to be provided other than as specified above. The Authority will not accept any responsibility whatsoever for work or services performed for which there is no specific proper authorization.

The ceiling price of this contract shall be treated as the equivalent of the "contract price" referred to in the regulations.

S.   <u>Responsibility of the Engineer</u>

The Engineer shall be responsible for the professional quality, technical accuracy and the coordination of all designs, drawings, specifications and other services furnished by the Engineer under this contract. The Engineer shall, without additional compensation, correct or revise any errors or deficiencies in his designs, drawings, specifications and other services.

Neither the Authority's review, approval or acceptance of, nor payment for, any of the services required under this contract shall be construed to operate as a waiver of any rights under this contract or of any cause of action arising out of performance of this contract; and the Engineer shall be and remain liable to the Authority in accordance with applicable law for all damages to the Authority caused by the Engineer's negligent performance of any of the services furnished under this contract.

17

T.  Requirements of the Urban Mass Transportation Administration of the U. S. Department of Transportation

1.  Audit and Inspection of Records

The Engineer shall permit the authorized representatives of the grantee, the U. S. Department of Transportation and the Comptroller General of the United States, to inspect and audit all data and records of the Engineer relating to his performance under this contract.

2.  Equal Employment Opportunity

In connection with the execution of this contract, the Engineer shall not discriminate against any employee or applicant for employment because of race, religion, color, sex or national origin.  The Engineer shall take affirmative actions to insure that applicants are employed and that the employees are treated during their employment, without regard to their race, religion, color, sex or national origin.  Such actions shall include, but not be limited to, the following: employment, upgrading, demotion or transfer; recruitment or recruitment advertising; layoff or termination; rates of pay or other forms of compensation and selection for training including apprenticeship.

3.  Interest of Members of or Delegates to Congress

No member of or delegate to the Congress of the United States shall be admitted to any share or part of this contract or to any benefit arising therefrom.

4.  Interest of Public Officials

No member, officer or employee of the Public Body or of a local public body during his tenure or for one year thereafter shall have any interest, direct or indirect, in this contract or the proceeds thereof.

5.  Clean Air Act of 1970

Work performed by the Engineer shall be in compliance with the provisions of the Clean Air Act of 1970, 42 USCS, Sections 1857-1857f, as amended.

6.  Minority Business Enterprise

In connection with the performance of this contract, the Engineer shall cooperate with the project sponsor in meeting his commitments and goals with regard to the maximum utilization of minority business enterprises and will use its best efforts to insure that minority business enterprises shall have the maximum practicable opportunity to compete for subcontract work under this contract.

7. <u>Accessibility for Mobility Impaired</u>

Work performed by the Engineer shall be in compliance with the provisions of 49 CFR, Chapter VI, Part 609 (Transportation for Elderly and Handicapped Persons), Sec. 609.13 (Fixed Facilities), and all other applicable federal codes.

8. <u>Subcontracts</u>

The Engineer will cause the foregoing provisions to be inserted in all subcontracts for any work covered by this contract so that such provisions will be binding upon each subcontractor, provided that the foregoing provisions shall not apply to contracts or subcontracts for standard commercial supplies or raw materials or to individual consultants.

U. Requirements of the Commonwealth of Massachusetts' Architectural <u>Access Board</u>

Work performed by the Engineer shall be in compliance with 521 CMR Rules and Regulations of the Architectural Access Board.

V. <u>Anti-Boycott Covenant</u>

The Engineer warrants, represents and agrees that during the time this contract is in effect neither it nor any affiliated company, as hereafter defined, participates in or cooperates with an international boycott, as defined in Section 999 (b) (3) and (4) of the Internal Revenue Code of 1954, as amended, or engages in conduct declared to be unlawful by Section 2 of Chapter 151E, Massachusetts General Laws. If there shall be a breach in the warranty, representation and agreement contained in this paragraph, then without limiting such other rights as it may have herein, the MBTA shall be entitled to rescind this contract. As used herein, an affiliated company shall be any business entity of which at least 51% of the ownership interests are directly or indirectly owned by the Engineer or by a person or persons or business entity or entities directly or indirectly owning at least 51% of the ownership interest of the Engineer or which directly or indirectly owns at least 51% of the ownership interests of the Engineer.

W. <u>Acceptance</u>

Upon completion of each phase of the services, the Engineer shall notify the Authority in writing of the date of said completion and request confirmation of same by the Authority. The Authority shall be deemed to have concurred with the Engineer's notice except for such items as the Authority may include in a written list furnished by the Authority to the Engineer within ninety (90) days following the Authority's receipt of the Engineer's notice.

X.  <u>Delays</u>

Neither party hereto shall be considered in default in the performance of its obligations hereunder to the extent that the performance of any such obligations is prevented or delayed by any cause which is beyond the reasonable control of such party.

Y.  <u>Entire Contract</u>

This contract constitutes the entire agreement between the parties hereto relating to the subject matter hereof and supersedes any previous agreements or understandings.

Z.  <u>Future Contracts</u>

The Engineer acknowledges the right of the Authority to limit eligibility for future contracts which may be related to work performed under this contract.

## ARTICLE III - COMPENSATION AND PAYMENT

The Engineer agrees to complete, to the full satisfaction of the Authority, all of the services described herein; and the Authority agrees to pay the Engineer as full compensation for work performed, including all expenses incurred and incidental thereto, an estimated amount not to exceed a Ceiling Price of One Million, Five Hundred Fifty Thousand, Seven Hundred and Forty Three ($1,550,743.00) dollars including a fixed fee of Ninety Two Thousand, Two Hundred and Ninety Eight ($92,298.00) dollars in accordance with the schedule shown in Exhibit "A".

The Ceiling Price is the maximum compensation to be paid for completion of all services including allowable expenses incurred and fixed fee for the scope of work described herein:

1.  The Authority shall reimburse the Engineer for the actual salaries paid engineering and technical employees by the Engineer not including salaries or other payments to partners or principals, unless otherwise specifically provided, for the time such employees are directly utilized on the work.

    If it is the usual practice for partners or principals to perform certain basic technical work, they must be compensated for the time when they are actually engaged on the work, but only at a rate of pay commensurate with the type of work performed, provided that written approval is obtained from the Director previous to the use of said principals. Payment of partners and principals for their administrative duties for these positions will not be allowed, it being considered that their salaries are included under the indirect expense item.

    Line items of cost contained in Exhibit "A" are not intended as individual ceilings for the specific costs identified.

2.  The Authority shall reimburse the Engineer for such costs incurred by the Engineer for the performance of the services as are allowable in accordance with Federal Acquisition Regulations, Part 31, in effect as of the date of this agreement.

3.  The Authority shall pay the Engineer allowances for the indirect expenses of the home and branch offices of the Engineer at a rate computed in accordance with the applicable cost principles of the Federal Acquisition Regulations, Part 31, in effect on the date of this agreement. The rate used for such computation shall be the audited rate established for the Engineer by its cognizant U. S. Government Audit Agency, by other audit acceptable to the Authority or based upon a final negotiated rate. Pending final determination of such rate on a fiscal year

basis, a provisional rate shall be applied. The provisional rate to be applied during the first fiscal year and thereafter until the audited rate is determined for the first fiscal year is set forth in Exhibit "A". The audited rate for the first fiscal year shall apply as the provisional rate for the second fiscal year and this procedure shall be followed for the duration of the services.

4. Partial payments against the Engineer's compensation shall be due and payable monthly for the work performed by the Engineer to the end of the preceding period including a proportionate amount of the fixed fee, as shown on the Engineer's bill accompanied by copies of payroll data certified by authorized employees of the Engineer.

Copies of payroll data submitted by the Engineer shall include the name, classification, dates and hours of engineering and technical personnel labor incurred that were directly employed on the project. If overtime work is required to maintain the desired time schedule, the overhead factor shall apply to the straight time portion of the premium time rate.

Payment in reimbursement of the Engineer for other direct costs incurred by the Engineer shall be due and payable upon submission and approval of the Engineer's bill accompanied by copies of invoices or other supporting documentation satisfactory to the Authority.

5. The Authority will retain 5 percent of all amounts due for partial payments made against work performed under each phase of this contract except for amount due for other direct costs, as part security for the fulfillment of this contract by the Engineer. Within thirty (30) days after completion and approval by the Authority of all work performed under each phase of this contract, retainage will be reduced to 2 percent.

All amounts due and retained will be paid to the Engineer ninety (90) days after completion and approval by the Authority of all work performed under each phase of this contract or until determination of allowable cost by audit, whichever is later.

At any time during the execution of the work, the Engineer may substitute and the Authority may accept, in lieu of all retainage held or to be held, a performance bond, letter of credit, or other security satisfactory to and in form approved by the Authority, in an amount (a) not less than 10% of the estimated value of the uncompleted work or (b) equal to the contract retainage, whichever is greater.

6.    The Engineer shall maintain records and other evidence pertaining to cost incurred in relation to this contract during the contract period and retain these records for three years after the date of final payment of the Federal funds to the Authority as pertains to this contract.  If requested, these records shall be made available for inspection and audit at all reasonable times to the representatives of the Authority and the Department of Transportation.

# MASSACHUSETTS BAY TRANSPORTATION AUTHORITY

**FIRM (NAME & LOCAL ADDRESS):**

Gannett Fleming, Inc.
150 Wood Road
Braintree, Massachusetts 02184

UMTA Project No.
MBTA Contract S5PS11
CONTRACT TITLE:
Light Rail Accessibility Program – Phase I

**CONSULTANT (X) SUBCONSULTANT ( )**

## 1. DIRECT LABOR BY CATEGORY

| Category | ESTIMATED HOURS BASIC | ESTIMATED HOURS SPECIAL | RATE PER HOUR | TOTAL BASIC | TOTAL SPECIAL | TOTAL COST |
|---|---|---|---|---|---|---|
| Project Manager (D.B. Nicholas) | | | | | | |
| Project Engineer | 210 | 120 | $43.60 | $9,156 | $5,232 | $14,388 |
| Senior Civil Engineer | 1,602 | 617 | $33.30 | $53,347 | $20,546 | $73,893 |
| Senior Structural Engineer | 1,374 | 641 | $22.70 | $31,190 | $14,551 | $45,741 |
| Senior Industrial Engineer | 590 | 96 | $32.60 | $19,234 | $3,130 | $22,364 |
| Civil Engineer | 940 | 120 | $22.30 | $20,962 | $2,676 | $23,638 |
| Structural Engineer | 2,511 | 880 | $17.10 | $42,938 | $15,048 | $57,986 |
| Technician/Drafter | 906 | 184 | $17.80 | $16,127 | $3,275 | $19,402 |
| Clerical | 1,354 | 182 | $19.00 | $25,726 | $3,458 | $29,184 |
| TOTAL | 244 | 156 | $16.00 | $3,904 | $2,496 | $6,400 |
| | 9,731 | 2,996 | | $222,584 | $70,412 | $292,996 |

**2. OVERHEAD RATE**

**(PROVISIONAL)**

| | | | | | |
|---|---|---|---|---|---|
| 2A. TOTAL LABOR AND OVERHEAD | 136.69% | | $304,250 | $96,246 | $400,496 |
| 3. PRINCIPAL (Use when OH Not Applicable) | | | $526,834 | $166,658 | $693,492 |

**4. OTHER DIRECT COSTS (Specify on Page 2)**

**5. TRAVEL (Specify on Page 2)** ................................................. $10,100

a. Transportation
b. Per Diem or Subsistence

| TOTAL TRAVEL | |
|---|---|
| a. | $3,990 |
| b. | $5,000 |

**6. SUBCONSULTANTS (Specify on Page 2)** ........................... $6,990

**7. GENERAL AND ADMINISTRATIVE EXPENSE RATE IF APPLICABLE**

**8. SUBTOTAL ALL COSTS** ................................................. $747,864

**9. FIXED FEE** ................................................................... $1,458,446

$92,298

**10. TOTAL ESTIMATED Amount** ....................................... $1,550,743

EXHIBIT "A"
Page 2 of 20

1. OVERHEAD RATE AND GENERAL & ADMINISTRATIVE EXPENSE RATE INFORMATION

| A. GOVERNMENT AUDIT PERFORMED:<br>Massachusetts Bay Transportation Authority<br>Commuter Rail Maintenance Facility (pre-audit) | DATE OF AUDIT:<br>June 1993 | FISCAL PERIOD COVERED:<br>1992 |
|---|---|---|
| B. NAME AND ADDRESS OF GOVERNMENT AGENCY MAKING AUDIT<br>MBTA Internal Audit<br>Ten Boylston Street, Second Floor<br>Boston Massachusetts 02116 | | C. IF NO GOVERNMENT RATES<br>HAVE BEEN ESTABLISHED,<br>FURNISH MOST RECENT AUDITED<br>FINANCIAL STATEMENTS |

2. SUBCONTRACT INFORMATION
NAME AND ADDRESS OF SUBCONSULTANTS

| NAME AND ADDRESS OF SUBCONSULTANTS | SUBCONSULTANT WORK | SUBCONTRACT | |
|---|---|---|---|
| | | TYPE | AMOUNT |
| Hull & Lee, Inc. | Architectural | | $373,000 |
| Railway Systems Design, Inc. | Track, Power, Signal Design | | $88,599 |
| Robert Neiley & Associates | Historic Resources | | $27,016 |
| Catherine McGuinness & Associates | Accessibility Review | | $89,898 |
| Paul C. K. Lu & Associates | Landscape Architecture | | $70,517 |
| SEC Corporation | Field Survey | | $49,871 |
| AR Engineering, Inc. | Electrical, Mechanical Design | | $48,963 |

| 3. OTHER DIRECT COSTS AND TRAVEL EXPENSE:<br>See Attachment A —     $10,100 | | TOTAL | $747,864 |
|---|---|---|---|

| 4. TRAVEL EXPENSE:<br>See Attachment A:<br>  Transportation:     $3,990<br>  Subsistence:     $3,000 | | TOTAL | $10,100 |
|---|---|---|---|
| | | Transportation     $3,990<br>Subsistence     $3,000<br>TOTAL     $6,990 | |

| 5. NUMBER OF EMPLOYEES: | STATE INCORPORATED IN: |
|---|---|
| 25 and Under     ( ) Over 25<br>Over 100 ____ (X) Over 500 | DELAWARE |

THE LABOR RATES AND OVERHEAD COSTS ARE CURRENT AND ESTIMATED COSTS HAVE BEEN DETERMINED BY GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

SIGNATURE: _____

DATE: December 8, 1993

Donald B. Nicholas, P.E.

TITLE: Vice President

ATTACHMENT A

MBTA LIGHT RAIL ACCESSIBILITY PROGRAM
CONTRACT S5PS11

DETAIL BACKUP FOR DIRECT EXPENSES

| DIRECT EXPENSE CATEGORY | DESCRIPTION | TOTALS |
|---|---|---|
| **Travel** | | |
| Site Visits | 40 Rd. Trips x 30 Mi x $.28/Mi | |
| Community/Agency Meetings | 20 Rd. Trips x 30 Mi x $.28/Mi | 336 |
| MBTA Meetings | 40 Rd. Trips x 30 Mi x $.28/Mi | 168 |
| Parking | 40 Trips x $10 | 336 |
| Airfare from Harrisburg, PA | $550/Trip x 5 Trips | 400 |
| Lodging & Meals | $150/Day x 20 Days | 2,750 |
| | | 3,000 |
| | | $6,990 |
| **Reproduction & Graphics** | | |
| Mylar Cut Sheets | 60 Shts x $30 | |
| Blue Line Prints | 80 Shts x 15 Sets x 2 Subm x $.50 | 1,800 |
| Copying | 400 Pgs x 15 Sets x 2 Subm x $.10 | 1,200 |
| MBTA Plan Copies | 200 Shts x $4 EA | 1,200 |
| Photographic Work | 5 Plan Enlargements and Mounting | 800 |
| | | 700 |
| | | $5,700 |
| **Miscellaneous** | | |
| CADD | 16 Hrs/Drawing x 100 Drawings @ $15/hr | |
| Fax | 1,000 Pgs x $.75 EA | 2,400 |
| Courier | 30 Pgs x $15 EA | 750 |
| Overnight Mail | 40 Pkgs x $20 EA | 450 |
| | | 800 |
| | | $4,400 |
| | Total | $17,090 |

EXHIBIT A
MASSACHUSETTS BAY TRANSPORTATION AUTHORITY
COST PROPOSAL
CONSULTANT PROPOSAL

| FIRM (Name and Local Address) | CONTRACT TITLE |
|---|---|
| STULL AND LEE, INC.<br>38 Chauncy Street, Suite 1100<br>Boston, Massachusetts 02111 | MBTA Light Rail Accessibility Program<br>Schematic Design (Phase I) |

CONSULTANT ( )                          SUBCONSULTANT ( )

**1- DIRECT LABOR**

| | EST. HOURS BASIC | SPECIAL | RATE PER HR. | TOTAL BASIC | TOTAL SPECIAL | TOTAL COSTS |
|---|---|---|---|---|---|---|
| E. Ortiz - Project Manager | 155 | 170 | $28.85 | $4,472 | $4,905 | |
| J. Hurwitz - Project Architect | 549 | 649 | $28.85 | $15,839 | $18,724 | |
| D. Kinsella - Sr. Proj. Designer | 478 | 472 | $21.63 | $10,339 | $10,209 | |
| E. Babnik - Project Designer | 684 | 892 | $15.87 | $10,855 | $14,156 | |
| J. Williams - Designer/Drafter | 648 | 720 | $14.00 | $9,072 | $10,080 | |
| R. Santos - Designer/Drafter | 581 | 627 | $14.00 | $8,134 | $8,778 | |
| K. Fuller - Designer/Drafter | 149 | 349 | $14.00 | $2,086 | $4,886 | |
| **TOTALS** | 3244 | 3879 | | $60,797 | $71,738 | $132,534 |

**2- OVERHEAD RATE**
1.35

TOTAL LABOR+OVERHEAD

| | BASIC | SPECIAL | | OVERHEAD | OVERHEAD | |
|---|---|---|---|---|---|---|
| | | | | $82,075 | $96,846 | $311,455 |

**3- PRINCIPAL (Use when O/H not applicable)**

| | EST. HOURS BASIC | SPECIAL | RATE PER HR. | TOTAL BASIC | TOTAL SPECIAL | |
|---|---|---|---|---|---|---|
| M. D. Lee - Partner in Charge | 109 | 91 | $87.00 | $9,483 | $7,917 | $17,400 |

| | | |
|---|---|---|
| **4- OTHER DIRECT COSTS (Specify on Pg.2)** | | |
| **5- TRAVEL (Specify on Pg.2)**<br>a. Transportation<br>b. Per Diem or Subsistence<br>TOTAL TRAVEL | | $12,351 |
| **6- SUBCONSULTANTS (Specify on Pg.2)** | | $270 |
| **7- GENERAL & ADMINISTRATIVE EXPENSE RATE, IF APPLICABLE ( % of Nos )** | | $0 |
| **8- SUBTOTAL ALL COSTS** | | |
| **9- FIXED FEE (10% of 2 and 3% of 4-6)** | $31,146    $379 | $31,524 |
| **10- TOTAL ESTIMATED COSTS** | | $373,000 |

**11- OVERHEAD RATE AND GENERAL & ADMINISTRATIVE EXPENSE RATE INFORMATION**

**A. GOVERNMENT AUDIT PERFORMED**

| | DATE OF AUDIT | FISCAL PERIOD COVERED |
|---|---|---|
| MBTA | 1990 | |

**B. NAME AND ADDRESS OF GOVERNMENT AGENCY MAKING AUDIT**

Mass Bay Transportation Authority
10 Park Plaza
Boston, MA 02116

**C.** If no government rates have been established, furnish most recent audited financial statements

**12- SUBCONTRACT INFORMATION**

| NAME AND ADDRESS OF SUBCONSULTANTS | SUBCONSULTANT WORK | SUBCONTRACT TYPE | AMOUNT |
|---|---|---|---|
| | | | |

**13- OTHER DIRECT COSTS AND TRAVEL EXPENSE**

| | | | |
|---|---|---|---|
| Xerox (12,000 X $.10) | $1,200 | Photography (Boards & Mounting) | $6,061 |
| Bluelines (720 X $2) | $1,440 | Model Materials | $1,500 |
| Reproducibles (45 X $30) | $1,350 | Postage and deliveries | $800 |
| | | TOTAL | $12,351 |

**14- TRAVEL EXPENSES**

| | | | |
|---|---|---|---|
| Travel (180 miles @ $.28) | $50 | | |
| Parking (12 @ $10) | $120 | | |
| Meals | $100 | | |
| | | TOTAL | $270 |

**NUMBER OF EMPLOYEES**

( ) 25 and under
( ) Over 100
( X ) Over 25
( ) Over 500

**STATE INCORPORATED IN:** Massachusetts

THE LABOR RATES AND OVERHEAD COSTS ARE CURRENT AND ESTIMATED COSTS HAVE BEEN DETERMINED BY GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

DATE: 12 AUGUST 1993

SIGNATURE: *[signature]*

TITLE:    VICE-PRESIDENT

EXHIBIT "A"
Page 6 of 20

# MASSACHUSETTS BAY TRANSPORTATION AUTHORITY
## COST PROPOSAL
## CONSULTANT CONTRACT

FIRM (NAME & LOCAL ADDRESS):

Railway System Design, Inc.
25 Great Road
Littleton, Massachusetts 01460

UMTA Project No.
MBTA Contract S5PS11
CONTRACT TITLE:
Light Rail Accessibility Program – Phase I

CONSULTANT ( ) SUBCONSULTANT (X )

| DIRECT LABOR BY CATEGORY | ESTIMATED HOURS | | RATE PER HOUR | TOTAL BASIC | TOTAL SPECIAL | TOTAL COST |
|---|---|---|---|---|---|---|
| | BASIC | SPECIAL | | | | |
| Project Manager (M. Izbicki) | 80 | 48 | $37.00 | $2,960 | $1,776 | $4,736 |
| Project Engineer (N. Shenoy) | 100 | 130 | $34.00 | $3,400 | $4,420 | $7,820 |
| Engineer (S/C/P) | 140 | 200 | $33.00 | $4,620 | $6,600 | $11,220 |
| Technical Aide/CAD | 270 | 40 | $18.00 | $4,860 | $720 | $5,580 |
| TOTAL | 590 | 418 | | $15,840 | $13,516 | $29,356 |
| OVERHEAD RATE | | | | | | |
| (PROVISIONAL) 141.26% | | | | | | |
| TOTAL LABOR AND OVERHEAD | | | | $22,376 | $19,093 | $41,469 |
| PRINCIPAL (Use when OH Not Applicable) | | | | $38,216 | $32,609 | $70,825 |

OTHER DIRECT COSTS (Specify on Page 2)

TRAVEL (Specify on Page 2)                                                  $7,460

- Transportation
- Per Diem or Subsistence                                       $2,620
  TOTAL TRAVEL                                                  $300
SUBCONSULTANTS (Specify on Page 2)                                          $2,920

GENERAL AND ADMINISTRATIVE EXPENSE RATE IF APPLICABLE

SUBTOTAL ALL COSTS                                                          $81,205

FIXED FEE ((10% of LINE 2A) + (3% OF LINES 4, 5 AND 6))                     $7,394

TOTAL ESTIMATED COST                                                        $88,599

EXHIBIT "A"
Page 7 of 20

| A. GOVERNMENT AUDIT PERFORMED | DATE OF AUDIT | FISCAL PERIOD COVERED |
|---|---|---|
| | | |

| B. NAME AND ADDRESS OF GOVERNMENT AGENCY MAKING AUDIT | C. IF NO GOVERNMENT RATES HAVE BEEN ESTABLISHED, FURNISH MOST RECENT AUDITED FINANCIAL STATEMENTS |
|---|---|
| | |

**12.    SUBCONTRACT INFORMATION**

| NAME AND ADDRESS OF SUBCONSULTANTS | SUBCONSULTANT WORK | SUBCONTRACT | |
|---|---|---|---|
| | | TYPE | AMOUNT |
| | | | |

**13.    OTHER DIRECT COSTS AND TRAVEL EXPENSE**

(See Attached)

| | TOTAL |
|---|---|

**14.    TRAVEL EXPENSE**

(See Attached)

| | TOTAL | 7.460 |
|---|---|---|

| | | TOTAL | 2,920 |
|---|---|---|---|

| NUMBER OF EMPLOYEES | STATE INCORPORATED IN |
|---|---|
| ( ) 25 and Under    (X) Over 25 ( ) Over 100    ( ) Over 500 | Delaware |

THE LABOR RATES AND OVERHEAD COSTS ARE CURRENT, AND ESTIMATED COSTS HAVE BEEN DETERMINED BY GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

DATE:  July 16, 1993

SIGNATURE
TITLE

Brian W. Clymer, President

**EXHIBIT "A"**
**Page 8 of 20**

RAILWAY SYSTEMS DESIGN, INC.

| | |
|---|---|
| PROJECT NAME: | MBTA Light Rail Accessibility Program |
| PROJECT NO: | MBTA Contract No. _____ |

DATE:          7/16/93

ESTIMATOR:     M. P. Izbicki

**1. PRELIMINARY SUBMISSION (30%)**

| | | | | | | |
|---|---|---|---|---|---|---|
| a. | 100 Pages | @ | 15 Copies | @ | $0.10 per page | - $150.00 |
| b. | 15 Prints | @ | 15 Copies | @ | $2.00 per dwg | - $450.00 |
| c. | 15 Copies | @ | $6.00 Copy | (Binding/Covers) | | - $90.00 |

**2. SUBMISSION (60%)**

| | | | | | | |
|---|---|---|---|---|---|---|
| a. | 0 Pages | @ | 0 Copies | @ | $0.10 per page | - $0.00 |
| b. | 0 Prints | @ | 0 Copies | @ | $2.00 per dwg | - $0.00 |
| c. | 0 Copies | @ | $6.00 Copy | (Binding/Covers) | | - $0.00 |

**3. PRE-FINAL SUBMISSION (90%)**

| | | | | | | |
|---|---|---|---|---|---|---|
| a. | 0 Pages | @ | 0 Copies | @ | $0.10 per page | - $0.00 |
| b. | 0 Prints | @ | 0 Copies | @ | $2.00 per dwg | - $0.00 |
| c. | 0 Copies | @ | $6.00 Copy | (Binding/Covers) | | - $0.00 |

**4. FINAL SUBMISSION (100%)**

| | | | | | | |
|---|---|---|---|---|---|---|
| a. | 0 Pages | @ | 0 Copies | @ | $0.10 per page | - $0.00 |
| b. | 0 Prints | @ | 0 Copies | @ | $2.00 per dwg | - $0.00 |
| c. | 0 Copies | @ | $6.00 Copy | (Binding/Covers) | | - $0.00 |

**5. IN-HOUSE CHECKING/COORDINATION**

| | | | | | | |
|---|---|---|---|---|---|---|
| a. | 15 Prints | (30%) | @ | 2 Copies | @ | $2.00 per dwg | - $60.00 |
| b. | 0 Prints | (60%) | @ | 2 Copies | @ | $2.00 per dwg | - $0.00 |
| c. | 0 Prints | (90%) | @ | 2 Copies | @ | $2.00 per dwg | - $0.00 |
| d. | 0 Prints | (100%) | @ | 2 Copies | @ | $2.00 per dwg | - $0.00 |

**6. FINAL BID DOCUMENTS**

| | | | | | | |
|---|---|---|---|---|---|---|
| a. | 0 Pages | @ | 0 Copies | @ | $0.20 per page | |
| b. | 0 Prints | @ | 0 Copies | @ | $2.00 per dwg | - $0.00 |
| c. | 0 Mylars | @ | 0 Copies | @ | $5.00 per dwg | - $0.00 |
| d. | 0 Negs | @ | 0 Dwgs | @ | $5.00 per dwg | - $0.00 |
| e. | 0 Diskettes | @ | | @ | $30.00 per disk | - $0.00 |
| | | | | | | - $0.00 |

**7. MISCELLANEOUS**

| | | | | | | |
|---|---|---|---|---|---|---|
| a. | Monthly Reports | (1/Month) | | | | |
| | 5 Pages | @ | 15 Copies | @ | $0.10 per page | |
| | | @ | 6 Months | | | - $45.00 |
| b. | Other Reports & Calculations | | | | | |
| | 50 Pages | @ | 15 Copies | @ | $0.10 per page | |
| | | @ | 6 Reports | | | - $450.00 |
| c. | Minutes of Meetings | | | | | |
| | 5 Pages | @ | 15 Copies | @ | $0.10 per page | |
| | | @ | 40 Meetings | | | - $300.00 |

TOTAL REPRODUCTION          - $1,545.00

\ra2.wb1\

## RAILWAY SYSTEMS DESIGN, INC.

| | | |
|---|---|---|
| PROJECT NAME: | MBTA Light Rail Accessibility Program | DATE: 7/16/93 |
| PROJECT NO: | MBTA Contract No. _____ | ESTIMATOR: M.P. Izbicki |

**COORDINATION MEETINGS (Littleton/Boston/Littleton avg. 60 miles ea way)**
| | | | | | |
|---|---|---|---|---|---|
| a. | 20 Meetings | @ | 120 Miles/Trp | @ | $0.27 per Mile | $648.00 |
| b. | 10 Pkg Fees | @ | $10 Per Day | | | $100.00 |

**JOB SITE VISITS (Littleton/Boston/Littleton assume 60 miles ea way)**
| | | | | | |
|---|---|---|---|---|---|
| a. | 20 Visits | @ | 120 Miles/Trp | @ | $0.27 per Mile | $648.00 |
| b. | 10 Pkg Fees | @ | $10 Per Day | | | $100.00 |

**AIRFARE (Media, PA/Boston, MA/Media, PA)**
| | | | | | |
|---|---|---|---|---|---|
| a. | 2 Rnd Trips | @ | $500 Rnd Trp | | | $1,020.00 |
| b. | 2 Trips | @ | 100 Miles | | $10 Airport Parking | $54.00 |
| | | | | @ | $0.27 per Mile | |

**PER DIEM**
| | | | | |
|---|---|---|---|---|
| a. | 2 Days | @ | $150 Day | $300.00 |

**TOLLS**    Lump Sum    $50.00

**GRAND TOTAL TRAVEL**    $2,920.00

**COMPUTER TIME**
| | | | | | |
|---|---|---|---|---|---|
| a. Spread Sheet Development | | | | | |
| | 180 Hrs | @ | $5.00 per Hour | | | $900.00 |
| b. CAD | | | | | | |
| | 16 Dwgs | @ | 16 Hrs/Dwg | @ | $15.00 per Hour | $3,840.00 |
| c. Plotting Material | | | | | | |
| | 16 Dwgs | @ | $15.00 Per Dwg | | | $240.00 |
| d. Conversion Cost | | | | | | |
| | 16 Dwgs | @ | $15.00 Per Dwg | | | $240.00 |
| e. Final Contract Document Diskette | | | | | | |
| | 3 Disk/Set | @ | $15.00 Per Disk/Set | | | $45.00 |

**DELIVERIES/MAILINGS**
| | | | |
|---|---|---|---|
| 10 Overnight Mailings | @ | $20.00 Per Pkg | $200.00 |

**POSTAGE**    Lump Sum    $50.00

**TELEPHONE**    Lump Sum    $100.00

**FAX TRANSMISSIONS**    400 Pages    @    $0.75 Per Page    $300.00

**TOTAL DIRECT EXPENSES**    $5,915.00

wbll

EXHIBIT "A"
Page 10 of 20

EXHIBIT "A"
CONSULTANT CONTRACT

FIRM (NAME & LOCAL ADDRESS)
Robert G. Neiley Architects
06 Congress Street
Boston, MA 02210

CONTRACT TITLE
MBTA Light Rail Accessibility Program
Design Services Contract No.S55PS11

UMTA PROJECT NO.

CONSULTANT ( )    SUBCONSULTANT (X)

| 1. DIRECT LABOR BY CATEGORY | ESTIMATED HOURS | | RATE PER HOUR | TOTAL BASIC | TOTAL SPECIAL | TOTAL COST |
|---|---|---|---|---|---|---|
| | BASIC | SPECIAL | | | | |
| Principal, Robert G. Neiley | | 185 | 28.50 | | 5130.00 | |
| Associate | | 140 | 17.22 | | 2410.00 | |
| Technical | | 130 | 14.00 | | 1820.00 | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| TOTALS | | 450 | | | 9360.00 | 9360.00 |
| OVERHEAD RATE (PROVISIONAL) | x BASIC | x SPECIAL | | OVERHEAD | OVERHEAD | |
| 1.6 | | 9360.00 | | | 14,976.00 | |
| TOTAL LABOR AND OVERHEAD | | 9360.00 | | | 24,336.00 | 24,336.00 |
| 3. PRINCIPAL (USE WHEN O/H NOT APPLICABLE) | ESTIMATED HOURS | | RATE PER HOUR | TOTAL BASIC | TOTAL SPECIAL | TOTAL |
| | x BASIC | x SPECIAL | | | | |
| | | | | | | |
| | | | | | | |
| 4. OTHER DIRECT COSTS (Specify on Page 2) | | | | | | |
| 5. TRAVEL (Specify on Page 2) 500 miles @ .28=$140.00   T Fare $100.00 | | | | | | |
| a. Transportation | | | | | | 240.00 |
| b. Per Diem or Subsistance | | | | | | |
| TOTAL TRAVEL | | | | | | |
| 6. SUBCONSULTANTS (Specify on Page 3) | | | | | | 240.00 |
| 7. GENERAL AND ADMINISTRATIVE EXPENSE RATE IF APPLICABLE ( % OF NOS. ) | | | | | | |
| 8. SUBTOTAL ALL COSTS | | | | | | 24,574.00 |
| 9. FIXED FEE (10% Labor & Overhead  3% Direct Costs) | | | | | | 2,460.00 |
| 10. TOTAL ESTIMATED COST | | | | | | 27,016.20 |

**11. OVERHEAD RATE AND GENERAL & ADMINISTRATIVE EXPENSE RATE INFORMATION**

| A. GOVERNMENT AUDIT PERFORMED | DATE OF AUDIT | FISCAL PERIOD COVERED |
|---|---|---|
| NO | | |

| B. NAME AND ADDRESS OF GOVERNMENT AGENCY MAKING AUDIT | |
|---|---|
| | C. IF NO GOVERNMENT RATES HAVE BEEN ESTABLISHED, FURNISH MOST RECENT AUDITED FINANCIAL STATEMENTS |

**12. SUBCONTRACT INFORMATION**

| NAME AND ADDRESS OF SUBCONSULTANTS | SUBCONSULTANT WORK | SUBCONTRACT | |
|---|---|---|---|
| | | TYPE | AMOUNT |
| | | | |

**13. OTHER DIRECT COSTS AND TRAVEL EXPENSE**

| | TOTAL | |
|---|---|---|

**14. TRAVEL EXPENSE** Auto: 100 miles @ $.30=$300.00
T Fares: 235 @ $.85=$200.00

| | | |
|---|---|---|
| | | 500 |
| | TOTAL | 500 |

NUMBER OF EMPLOYEES

(X) 25 and Under        ( ) Over 25
( ) Over 100            ( ) Over 500

STATE INCORPORATED IN
Massachusetts
286 Congress St.,Boston,MA

THE LABOR RATES AND OVERHEAD COSTS ARE CURRENT, AND ESTIMATED COSTS HAVE BEEN DETERMINED BY GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

DATE: July 13, 1993

SIGNATURE _Robert J Neiby_
TITLE     Principal

EXHIBIT "A"
Page 12 of 20

# MASSACHUSETTS BAY TRANSPORTATION AUTHORITY
## COST PROPOSAL
## CONSULTANT CONTRACT

| FIRM (NAME & LOCAL ADDRESS): | |
|---|---|
| Katherine McGuinness and Associates, Inc.<br>267 Moody Street<br>Waltham, Massachusetts 02154 | UMTA Project No.<br>MBTA Contract S5PS11<br>CONTRACT TITLE:<br>Light Rail Accessibility Program – Phase I |

CONSULTANT ( )  SUBCONSULTANT (X )    Prime: Gannett Fleming, Inc.

| 1. DIRECT LABOR BY CATEGORY | ESTIMATED HOURS | | RATE PER HOUR | TOTAL BASIC | TOTAL SPECIAL | TOTAL COST |
|---|---|---|---|---|---|---|
| | BASIC | SPECIAL | | | | |
| Project Director (K. McGuinness) | | 60 | $33.63 | | $2,018 | $2,018 |
| Project Manager | | 308 | $26.29 | | $8,097 | $8,097 |
| Senior Planner | | 140 | $25.24 | | $3,534 | $3,534 |
| Architect | | 571 | $21.00 | | $11,991 | $11,991 |
| Access Planner #1 | | 160 | $18.90 | | $3,024 | $3,024 |
| Access Planner #2 | | 300 | $12.00 | | $3,600 | $3,600 |
| TOTAL | 0 | 1,539 | | $0 | $32,264 | $32,264 |
| 2. OVERHEAD RATE | | | | $0 | $49,041 | $49,041 |
| (PROVISIONAL) | | | | | | |
| 2A TOTAL LABOR AND OVERHEAD    152.00% | | | | $0 | $81,305 | $81,305 |
| 3. PRINCIPAL (Use when OH Not Applicable) | | | | | | |
| 4. OTHER DIRECT COSTS (Specify on Page 2) | | | | | | |
| 5. TRAVEL (Specify on Page 2) | | | | | | $450 |
| a. Transportation | | | | | | |
| b. Per Diem or Subsistence | | | | | $0 | |
| TOTAL TRAVEL | | | | | $0 | |
| 6. SUBCONSULTANTS (Specify on Page 2) | | | | | | $0 |
| 7. GENERAL AND ADMINISTRATIVE EXPENSE RATE IF APPLICABLE | | | | | | $0 |
| 8. SUBTOTAL ALL COSTS | | | | | | $81,755 |
| 9. FIXED FEE ((10% of LINE 2A) + (3% OF LINES 4, 5 AND 6)) | | | | | | $8,144 |
| 10. TOTAL ESTIMATED COST | | | | | | $89,898 |

| Exhibit A Consultant Contract | | | | |
|---|---|---|---|---|
| **11. Overhead Rate and General & Administrative Expense Information** | | | | |
| A. Government Audit Performed | Date of Audit | | Fiscal Period Covered | |
| B. Name and Address of Government Agency Making Audit | | | C. Audited Financial Statement | |
| **12. Subcontract Information** | | | Subconsultant | |
| Name & Address of Sub | Subconsultant Work | | Type | Amount |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| **13. Other Direct Costs and Travel Expenses** | | | | |
| Postage & Delivery | $125 | | | |
| Repro | $100 | | | |
| L.D/Phone/Fax | $125 | | | |
| Mileage,Tolls,Parking | $100 | | | |
| | | | | |
| TOTAL | | | | $450 |
| **14. Travel Expense** | | | | |
| | | | | |
| Total | | | | |

Number of Employees
( X ) 25 and Under

Incorporated in the
State of Massachusetts

The Labor Rates and Overhead Costs are Current and Estimated Costs have been determined by generally accepted Accounting Principals.

| Date: | 7/13/93 | | Signature | | |
|---|---|---|---|---|---|
| | | | David Kessier | *David Kessler* | |
| | | | Principal | | |

## MASSACHUSETTS BAY TRANSPORTATION AUTHORITY
### COST PROPOSAL
### CONSULTANT CONTRACT

| FIRM (NAME & LOCAL ADDRESS)<br>Paul C.K. Lu & Associates<br>69 Trapelo Rd.<br>Belmont, MA 02178 | CONTRACT TITLE<br>MBTA - MBTA Light Rail<br>Accessibility Program<br>15% Schematic Design |
|---|---|

CONSULTANT ( )    SUBCONSULTANT ( X )

| 1. DIRECT LABOR BY CATEGORY | EST BASIC | HOURS SPECIAL | RATE PER HOUR | TOTAL BASIC | TOTAL SPECIAL | TOTAL COST |
|---|---|---|---|---|---|---|
| Paul C.K. Lu, Director | 152 | | $36.81 | $5,595 | | |
| Landscape Architect | 920 | | $17.36 | $15,971 | | |
| Support/Draftsperson | 240 | | $16.54 | $3,970 | | |
| | | | | | | |
| | | | | | | |
| TOTALS | 1312 | | | $25,536 | | $25,536 |
| 2. OVERHEAD RATE (PROV) | XBASIC | XSPECIAL | | OVERHEAD | OVERHEAD | |
| 1.5 x $25,536 | | | | | | |
| TOTAL LABOR & OVERHEAD | | | | $38,304 | | $38,304 |
| 3. PRINCIPAL (USE WHEN O/H Not Applicable) | XBASIC | XSPECIAL | RATE / HOUR | TOTAL BASIC | TOTAL SPECIAL | $63,840 |

| | |
|---|---|
| 4. OTHER DIRECT COSTS (Specify on Page 2) | |
| 5. TRAVEL (Specify on Page 2)<br>a. Transportation<br>b. Per Diem or Subsistence    Local Travel<br>Parking | $95<br><br>$108<br>90 |
| TOTAL TRAVEL | $198 |
| 6. SUBCONSULTANTS (Specify on Page 2) | NA |
| 7. GENERAL AND ADMINISTRATIVE EXPENSE RATE IF APPLICABLE | NA |
| 8. SUBTOTAL ALL COSTS | $64,133 |
| 9. FIXED FEE (Labor + Overhead) @ 10% | $6,384 |
| 10. TOTAL ESTIMATED COST | $70,517 |

**11.   OVERHEAD RATE AND GENERAL & ADMINISTARTIVE EXPENSE RATE INFORMATION**

| A.   GOVERMENT AUDIT PERFORMED | DATE OF AUDIT | FISCAL PERIOD COVERED |
|---|---|---|
| 1. Yes | April 5, 1990 | 1989 |
| 2. Yes | Nov. 13, 1990 | 1990 |

**B.** NAME & ADDRESS OF GOVERNMENT AGENCY MAKING AUDIT

1. Mass. Dept. of Public Works, One South Sta.
   Boston MA  02110
2. MWRA, Charlstown navy yard., 100 First Ave.
   Boston, MA  02129

**C.** IF NO GOVERNMENT RATES HAVE BEEN ESTABLISHED FURNISH MOST RECENT AUDITED FINACIAL STATEMENT

**12.   SUBCONTRACT INFORMATION**

| NAME AND ADDRESS OF CONSULTANTS | SUBCONSULTANT WORK | SUBCONTRACT TYPE | AMOUNT |
|---|---|---|---|
| | | | |
| | | TOTAL | |

**13.   OTHER DIRECT COSTS AND TRAVEL EXPENSE**

| | |
|---|---|
| Reproduction, Printing & Computer See Attached Spreadsheet | $95 |
| Local travel see attached TOTAL | $198 |

**14.   TRAVEL EXPENSE**

| | |
|---|---|
| TOTAL | $293 |

NUMBER OF EMPLOYEES

(X) 25 AND UNDER        ( ) OVER 25

( ) OVER 100        ( ) OVER 500

STATE INCORPORATED IN
Sole Proprietorship Firm
Practicing in
Massachusetts

THE LABOR RATES AND OVERHEAD COSTS ARE CURRENT AND ESTIMATED COSTS HAVE
BEEN DETERMINED BY GENERALL ACCEPTED  ACCOUNTING PRINCIPLES.

DATE:  November 5, 1993

SIGNATURE

TITLE    President

Direct Expenses for Phase I

| | | |
|---|---|---|
| Report Printing | $0 | (By others) |
| Reproduction and Graphics | $95 | (allowance) |
| Meetings | $90 | (9 trips, $10 parking each) |
| Local Travel | $108 | (20 trips @20 miles each @ $0.27/mi) |
| Computer | $0 | (drawings produced manually) |
| SUBTOTAL | $293 | |

 ASEC CORPORATION

## MASSACHUSETTS BAY TRANSPORTATION AUTHORITY
### EXHIBIT "A"
### CONSULTANT CONTRACT

| FIRM (NAME & LOCAL ADDRESS) | CONTRACT TITLE |
|---|---|
| ASEC Corporation<br>13 Clover Street<br>Boston, MA 02122 | LIGHT RAIL ACCESSIBILITY PROGRAM<br><br>UMTA PROJECT NO. |

CONSULTANT ( )     SUBCONSULTANT ( X )

| 1 DIRECT LABOR BY CATEGORY | ESTIMATED HOURS BASIC | ESTIMATED HOURS SPECIAL | RATE PER HOUR | TOTAL BASIC | TOTAL SPECIAL | TOTAL COST |
|---|---|---|---|---|---|---|
| PROJECT MANAGER    (Mansuori) | | | | | | |
| PROJECT ENGINEER   (Coleman) | 0.0 | 18.0 | $40.00 | $0 | $720.00 | |
| ENGINEER | 0.0 | 100.0 | $30.00 | $0 | $3,000.00 | |
| SENIOR TECHNICIAN | 0.0 | 30.0 | $25.25 | $0 | $758.00 | |
| TECHNICIAN | 0.0 | 160.0 | $20.25 | $0 | $3,240.00 | |
| CHIEF OF PARTY | 0.0 | 70.0 | $14.25 | $0 | $997.00 | |
| TRANSIT PERSON | 0.0 | 232.0 | $17.50 | $0 | $4,060.00 | |
| ROD PERSON | 0.0 | 232.0 | $13.50 | $0 | $3,132.00 | |
| | 0.0 | 232.0 | $10.00 | $0 | $2,320.00 | |
| | | | | | | |
| | | | | | | |
| | | | | | | |
| TOTALS | 0.0 | 1074.0 | | $0 | $18,227.00 | $18,227.00 |

| 2 OVERHEAD RATE (PROVISIONAL) | X BASIC | X SPECIAL | | OVERHEAD | OVERHEAD | |
|---|---|---|---|---|---|---|
| OVERHEAD ON DIRECT LABOR | 1.273 | 1.273 | | $0 | $23,203.00 | |
| | | | | | | |
| TOTAL OVERHEAD & LABOR | | | | $0 | $41,430.00 | $41,430.00 |

| 3 PRINCIPAL | ESTIMATED HOURS BASIC | ESTIMATED HOURS SPECIAL | RATE PER HOUR | TOTAL BASIC | TOTAL SPECIAL | TOTAL COST |
|---|---|---|---|---|---|---|
| | | | | | | |
| | | | | | | |

| 4 OTHER DIRECT COSTS | | | | | | $0.00 |
|---|---|---|---|---|---|---|
| 5 TRAVEL    TRANSPORTATION | | | | | | $3,580.00 |
| PER DIEM OR SUBSISTENCE | | | | | $593.00 | |
| TOTAL TRAVEL | | | | | | $0.00 |
| 6 SUBCONSULTANTS  (Specify on Page 2) | | | | | | $593.00 |
| 7 GENERAL & ADMINISTRATIVE EXPENSE RATE IF APPLICABLE ( | | | | % OF NOS. | ) = | $0.00 |
| 8 SUBTOTAL ALL COSTS | | | | | | $0.00 |
| 9 FIXED FEE    10% OF   $41,430   PLUS   3% OF   $4,173   = | | | | | | $45,603.00 |
| | | | | | | $4,266.00 |
| 10 TOTAL ESTIMATED COST | | | | | | $49,871.00 |

592-33RM

GANNETT FLEMING TRANSPORTATION ENGINEERS    LIGHT RAIL ACCESSIBILITY PROGRAM    PRELIMINARY SURVEY @ 19 STATIONS



**11 OVERHEAD RATE AND GENERAL & ADMINISTRATIVE EXPENSE RATE INFORMATION**

| A. GOVERNMENT AUDIT PERFORMED | DATE OF AUDIT | FISCAL PERIOD COVERED |
|---|---|---|
| MDPW Pre-Award Evaluation<br>MDPW Pre-Award Evaluation<br>MDPW Pre-Award Evaluation | April, 1991<br>April, 1992<br>June, 1993 Ongoing | FY Ending 12/31/90<br>FY Ending 12/31/91<br>FY Ending 12/31/92 |

| B. NAME AND ADDRESS OF GOVERNMENT AGENCY MAKING AUDIT | C. IF NO GOVERNMENT RATES HAVE BEEN ESTABLISHED, FURNISH MOST RECENT AUDITED FINANCIAL STATEMENTS |
|---|---|
| Massachusetts Highway Department (former MDPW)<br>10 Park Plaza<br>Boston, Massachusetts<br>617/973-7433 | |

**12 SUBCONTRACT INFORMATION**

| Name and Address of Subconsultants | Subconsultant Work | Subcontract Type | Amount |
|---|---|---|---|
| | | | |
| | | | |
| | | TOTAL | $0 |

**13 OTHER DIRECT COSTS**

| | | | |
|---|---|---|---|
| TOTAL STATION (Electronic Theodolite) | 29.00 DAYS @ | $100 PER DAY | $2,900 |
| COMPUTER/PLOTTER | 48.0 HOURS @ | $10 PER HOUR | $480 |
| POLICE DETAIL * | 0 HOURS @ | $0 PER HOUR | $0 |
| FLAGPERSON * | 0 HOURS @ | $37.50 PER HOUR | $0 |
| PHOTOGRAPHS/PLANS/COPIES/MISC. | | | $200 |
| OTHER | | | $0 |

\* It is assumed that no Detail or Flagpersons are required.  No costs have been included.

|  | TOTAL | $3,580 |
|---|---|---|

**14 TRAVEL EXPENSE**

| PARKING/TOLL EXPENSE | 1975 MILES @ | $0.25 PER MILE | $494 |
|---|---|---|---|
| | | | $99 |
| | | TOTAL | $593 |

| Number of Employees | ( ) 25 and Under | (X) Over 25 | State incorporated in |
|---|---|---|---|
| | ( ) Over 100 | ( ) Over 500 | Massachusetts |

The Labor Rates and Overhead Costs are Current, and Estimated Costs Have Been Determined By Generally Accepted Accounting Principles.

John R. Monteiro, Executive Vice-President/Treasurer

Date:    16-Aug-93

BENNETT/FLEMING TRANSPORTATION ENGINEERS    LIGHT RAIL ACCESSIBILITY PROGRAM    PRELIMINARY SURVEY @ 19 STATIONS

MASSACHUSETTS BAY TRANSPORTATION AUTHORITY
COST PROPOSAL
CONSULTANT CONTRACT

| :FIRM |
| :SAR ENGINEERING, INC. |
| :100 CONGRESS STREET |
| :QUINCY, MA. 02169 |

CONTRACT TITLE        JULY 15, 1993

LIGHT RAIL ACCESSIBILITY

:CONSULTANT ( )      SUBCONSULTANT (X)      SUMMARY: DESIGN

| 1. DIRECT LABOR BY CATEGORY | ESTIMATED HOURS BASIC | SPECIAL | RATE PER HOUR | TOTAL BASIC | TOTAL SPECIAL | TOTAL COST |
|---|---|---|---|---|---|---|
| :PROJECT MANAGER - MARK CHUDY | 140 | | $32.50 | $4,550 | | |
| :ENGINEER | 350 | | $25.00 | $8,750 | | |
| :DESIGNERS | 240 | | $22.00 | $5,040 | | |
| :DRAFTSPERSONS | 79 | | $15.75 | $1,244 | | |
| :TOTALS | 809 | | | $19,584 | | $19,584 |
| 2. OVERHEAD RATE | I BASIC | I SPECIAL | | OVERHEAD | OVERHEAD | |
| 1.25% | | | | | | |
| :TOTAL LABOR AND OVERHEAD | $19,584 | $0 | | $24,480 | | $44,065 |
| 3. PRINCIPAL (USE WHEN O/H N/A) | ESTIMATED HOURS I BASIC | I SPECIAL | RATE PER HOUR | TOTAL BASIC | TOTAL SPECIAL | TOTAL |

| 4. OTHER DIRECT COSTS (Specify on Page 2) | | |
|---|---|---|
| 5. TRAVEL    (Specify on Page 2) | | $0 |
| a. Transportation | | |
| b. Per Diem or Subsistence | | $476 |
| TOTAL TRAVEL | | $476 |
| 6. SUBCONSULTANTS    (Specify on Page 2) | | |
| 7. GENERAL & ADMINISTRATIVE EXPENSE RATE IF APPLICABLE ( % OF NOS. ) | | |
| 8. SUBTOTAL ALL COSTS | | |
| 9. FIXED FEE (10% LABOR & OVERHEAD, 3% DIRECT COSTS) | | $44,541 |
| 10. TOTAL ESTIMATED COST | | $4,421 |
| | | $48,963 |

11. OVERHEAD RATE AND GENERAL & ADMINISTRATIVE EXPENSE RATE INFORMATION

A. GOVERNMENT AUDIT PERFORMED
MBTA CONTRACT #SSPS06

DATE OF AUDIT
FEB. 20, 1992

FISCAL PERIOD COVERED
1991

B. NAME AND ADDRESS OF GOVERNMENT AGENCY
MAKING AUDIT:

C. IF NO GOVERNMENT RATES
HAVE BEEN ESTABLISHED
FURNISH MOST RECENT AUDITED
FINANCIAL STATEMENTS

MASS. BAY TRANSPORTATION AUTHORITY
INTERNAL AUDIT SECTION
10 BOYLSTON PLACE
BOSTON, MA. 02116

12. SUBCONTRACT INFORMATION

| NAME AND ADDRESS OF SUBCONSULTANTS | SUBCONSULTANT WORK | SUBCONTRACT TYPE | AMOUNT |
|---|---|---|---|
| | | | |

13. OTHER DIRECT COSTS

|  |  |
|---|---|
| | $0 |
| | $0 |
| TOTAL | $0 |

14. TRAVEL EXPENSE  26 TRIPS - 32 MILES/TRIP @ $.26/MI., PARKING @ $10/TRIP

|  |  |
|---|---|
| | $476 |
| TOTAL | $476 |

NUMBER OF EMPLOYEES

( ) 25 AND UNDER
( ) OVER 100                    (XX) OVER 25
                               ( ) OVER 200

STATE INCORPORATED IN

MASSACHUSETTS

THE LABOR AND OVERHEAD COSTS ARE CURRENT AND ESTIMATED COSTS HAVE BEEN
DETERMINED BY GENERALLY ACCEPTED ACCOUNTING PRINCIPLES.

DATE: July 15, 1993

SIGNATURE:
TITLE: Financial Manager



**GANNETT FLEMING, INC.**
P.O. Box 67100
Harrisburg, PA 17106-7100

Location:
207 Senate Avenue
Camp Hill, PA 17011

Fax: (717) 763-8150
Office: (717) 763-7211

## CERTIFICATION OF RESOLUTION

By Unanimous Consent of the Board of Directors of Gannett Fleming, Inc., dated Monday, July 30, 1990, it was

RESOLVED, that DONALD B. NICHOLAS, Vice President of GANNETT FLEMING, INC., be and he hereby is authorized to execute contracts and bonds in the name and behalf of said Corporation relating to work performed for the Massachusetts Bay Transportation Authority, and affix its corporate seal thereto; and such execution of any contract or obligation in this Corporation's name on its behalf by such Donald B. Nicholas, Vice President, under seal of the Corporation, shall be valid and binding upon this Corporation.

A true copy,

ATTEST: _Barbara A. Schnerring_
        Barbara A. Schnerring
        Assistant Secretary

Place of Business:        Harrisburg, PA

Date of this Contract:    September 13, 1994

I HEREBY CERTIFY that I am the Assistant Secretary of Gannett Fleming, Inc., that Donald B. Nicholas is a duly elected Vice President of said Corporation, and that the above resolution has not been amended or rescinded and remains in full force and effect as of this date.

_Barbara A. Schnerring_
Barbara A. Schnerring
Assistant Secretary

*A Tradition of Excellence Since 1915*

**MASSACHUSETTS
BAY
TRANSPORTATION
AUTHORITY**

*Board of Directors*
Transportation Building
Ten Park Plaza
Boston, Massachusetts 02116

I, Alice Ann Fernandes, Recording Secretary of the Board of Directors of the Massachusetts Bay Transportation Authority, hereby certify that, at a Meeting of the Board of Directors of the Massachusetts Bay Transportation Authority, acting under the provisions of Chapter 161A of the General Laws, as amended to date, duly called and held on the twenty-eighth day of February, 1994, at which all members were present, the following Vote was adopted:

**VOTED:** That the General Manager be, and hereby is, authorized to execute, in the name and on behalf of the Authority and in a form approved by the General Counsel, MBTA Contract No. S5PS11, Light Rail Accessibility Program - Coordinating Consultant, with Gannett Fleming, Inc., for Phase I Schematic Design of accessibility improvements to the Light Rail System, for an estimated amount not to exceed $1,550,743.

A true copy.

Attest:  March 15, 1994

*[signature]*

Recording Secretary
Board of Directors of the
Massachusetts Bay Transportation Authority

The Engineer hereby certifies under the penalties of perjury that no person or persons have a financial interest in this contract which would be prohibited by Chapter 268A of the General Laws of the Commonwealth of Massachusetts.

IN WITNESS WHEREOF, the parties to this contract have herewith set their hands and seals this _3rd_ day of _October_ in the year nineteen hundred and _ninety four_

GANNETT FLEMING, INC.
By

Title _VICE PRESIDENT_

MASSACHUSETTS BAY TRANSPORTATION
AUTHORITY
BY

John J. Haley, Jr.
General Manager

APPROVED AS TO FORM
BY

Peter B. Morin
General Counsel

Contract Documents prepared by _Jon_

# Commonwealth of Massachusetts
# State Ethics Commission

One Ashburton Place, Room 619, Boston, MA, 02108
phone: 617-727-0060, fax: 617-723-5851



### CONFLICT OF INTEREST OPINION
### EC-COI-89-6

**FACTS:**

Recently, the City Facility Committee (Committee) and ABC, a non-profit corporation, entered into a consultantship agreement, whereby ABC agreed to design, staff and execute a study of the facilities of the City, and the Committee agreed to pay ABC a specific fee. Pursuant to the consultantslup agreement, ABC presented the Committee with a comprehensive plan.

ABC and the Committee are currently negotiating a second agreement which will implement the plan. Although the final terms of this agreement have not yet been determined, a draft contract (Contract) outlines the undertakings of the parties and represents the basic structure by which both parties seek to revitalize facilities of the Committee.

The terms of the contract can be summarized as follows: The Committee will delegate to ABC all of its authority and responsibility for the management, supervision and oversight of the city facilities. ABC will develop curriculum and instruction, including the training, supervision, and evaluation of all personnel. In addition, ABC will conduct hearings; set compensation for employees, subject to all applicable laws and agreements; have authority to recruit, hire, appoint, evaluate, promote, assign, fire, suspend and dismiss employees and consultants; and conduct collective bargaining. The Committee will also delegate to ABC its powers, functions and duties relating to city finances, including the authority to determine expenditures within the total appropriation. Aiso, ABC will have authority to accept and expend gifts and grants, to prepare budgets, incur liabilities, and make expenditures for the facilities. Furthermore, ABC will prepare the annual budget, apply for and seek funds in the name of the Committee, and make contracts and agreements on behalf of the Committee. Except as provided for in the contract, no vote of the Committee shall be required in order for ABC to excrcise any powers delegated to it in the contract.

ABC will provide appropriate resources to undertake the training of employees and will be solely responsible for determining which ABC personnel and resources will be utilized in the implementation of the contract. ABC will provide monthly reports to the Committee and semi-annual reports to the governing body of the city. The Committee will be informed of funding goals, income projections, and budgetary changes.

The Committee retains the following powers in the contract, although it is understood that the final agreement may give the Committee somewhat expanded powers to

override certain ABC decisions. The Committee will receive timely reports from ABC in the implementation of the system. By majority vote, the Committee can require ABC to reconsider (1) the adoption of policies affecting the facilities as a whole, (2) the adoption and submission of the annual budget, (3) the adoption of employee collective bargaining agreements, and (4) new appointments of the administrative officers. ABC shall then reconsider its decision and report its decision after reconsideration, which will be final, except if it involves a matter subject to override.

By two-thirds vote, the Committee will have the power to override acts of ABC regarding the adoption of policies affecting the facilities as a whole; the adoption and submission of the annual budget; and the adoption of collective bargaining agreements. Thus, the Committee will be able to require reconsideration of new appointments but shall not be empowered to override ABC decisions on such matters.

Currently, the contract states that the Committee will indemnify and hold harmless ABC, its officers, trustees, employees and agents from and against all losses, damages, liabilities, costs and expenses. It is our understanding, however, that this clause is subject to change. The Contract as it now stands also provides that ABC employees will not be subject to, among other statutes, the conflict of interest law, G.L. c. 268A.

The parties acknowledge that improvement of the facilities is one of the highest priorities of the city and commit themselves to a good faith effort to increase the available financial resources. If either party believes that insufficient funds will be available in order to carry out the project, they will have the right to terminate the contract upon timely notice and the performance of certain conditions.

The contract will take effect upon its execution and upon adoption of local ordinances and revisions of the city charter. In addition, the General Court must enact enabling legislation.

No individual employed by ABC is specifically named in either the contract or the draft legislation. ABC is empowered to perform the wide variety of functions contemplated in the contract. It is expected that the entire program will be administered by an ad hoc committee. No ABC personnel will assume roles within the facilities. Each ABC employee who works on the project will receive compensation from ABC. Facility employees will receive their compensation fiom the city.

**QUESTION:**

On the basis of the foregoing facts, are ABC employees "municipal employees" or "special municipal employees" under G.L. c. 268A?

**ANSWER**

No.

## DISCUSSION:

We note at the outset that the arrangement envisioned by the contract and accompanying legislation is unique in that it delegates virtually all management powers of a municipal agency to a private entity. Because of that uniqueness, the consequent uncertainty as to how the contract will ultimately be performed, and the fact that contract provisions are still subject to change, we stress that this opinion is based solely upon the facts given to us in your recent letters and the contract.

"Municipal employee" is defined as "a person performing services for a municipal agency, whether by election, appointment, contract of hire or engagement, whether serving with or without compensation on a...consultant basis..." G.L. c. 268A, s.1(g). Thus, it will not necessary to be a paid, full-time, city worker in order to fall within the statutory definition of municipal employee." Even uncompensated consultants to city government are "municipal employees" under the conflict law. For example, an architect or engineer who renders professional services directly to a city or town agency would be a "municipal employee." Buss, The Massachusetts Conflict of Interest Law An Analysis, 45 B.U. Law Rev. 299,3ll (1965).

The Commission has long recognized that a consultant contract between a municipality and a corporation will not render the corporation a "municipal employee." In most instances, employees of such corporations will not come within the statutory definition of "municipal employee." See EC-COI-87-8 (most corporate employees are "too remote" from the municipality to be considered municipal employees); EC-COI-83-129 (employees of corporate consultants not generally considered "municipal employees"). in the municipality specifically targets a certain individual within the corporate structure to perform the services, however, that individual will be. considered a government employee under G.L. c. 268A. See, EC- COI-86-21 (state agency specifically requested corporate employee), 83-129 (state specifically contemplated corporate employee's services and had contractual right to approve replacement). In practical terms, specifically designated employees of a corporation are treated as if they are consultants to a governmental agency and therefore covered by G.L c. 268A.

The contract in this instance mentions no ABC personnel; however, that fact will not always operate to exempt from "municipal employee" status individuals who are nevertheless targeted by the municipality. See EC-COI-87-8 (individual not specified in agreement found to be "municipal employee" as city impliedly contracted for his specific services). Therefore, we must examine the following factors before determining whether a corporate employee not specifically designated in a municipal consulting contract can be considered a "municipal employee":

1. Whether the individual's services are expressly or impliedly contracted for;

2. The type and size of the corporation. For example, an individual who is president, treasurer and sole stockholder of a closely held corporation may be deemed a public employee if the corporation has made a contract with a public agency;

3. The degree of specialized knowledge or expertise required of the service. For example, an individual who performs highly specialized services for a corporation which contracts with a public agency to provide those services may be deemed to be performing services directly to the agency;

4. The extent to which the individual personally performs services under the contract, or controls and directs the terms of the contract or services provided thereunder and,

5. The extent to which the person has performed similar services for the public entity in the past.

EC-COI-87-19; 87-8.

Applying these criteria to the facts as outlined above, we conclude that ABC personnel working on the plan are not "municipal employees"[1]

ABC employs many individuals and operates on a substantial budget. Given the size of ABC and the variety of services which will be provided, there is little likelihood that ABC employees are attempting to hide behind corporate employee status in order to be exempt from the conflict law. Compare EC-COI-87. 8 (sole owner and officer of corporation employing three individuals held to be state employee as his services were impliedly contracted for by the state agency). As this is the first time that the city has contracted for the services contemplated in the agreement, there is no history of actual services rendered upon which the Committee can rely in order to target specific ABC personnel. Although Committee members have developed relationships with certain high- ranking ABC officials through the consultantship agreement, we do not find that the Committee has impliedly targeted the services of those particular individuals through the contract. The choice of ABC personnel is within the sole province of ABC; the Committee has no right to override those choices or to demand the services of any specific ABC personnel. Thus, the Committee has not impliedly contracted for the services of any ABC employee.

Although the facts here are unique, the Commission has previously decided one similar question which involved a public entity's delegation of management authority to an outside corporation. We examined the five factors listed above in finding that the facility manager was a governmental employee. EC-COI-87- 19. However, that finding was grounded on the fact that the manager had a history of previous service in the same position with the public enrnty, that he provided a high degree of specialized service, and that the government had specifically contracted for his services. Thus, we require the presence of a number of factors before asserting jurisdiction. The sole factor present in this instance is the high degree of specialized services which will be

performed by as yet undetermined personnel. We do not find that this fact alone will render those individuals "municipal employees."

With this opinion, we do not comment on the wisdom of the plan or its constitutional permissibility. We answer only your immediate question, and use our standard of the need for either an express or implied governmental request for services. Applying that standard to the facts in this case, we find that the Committee has not and cannot designate specific ABC employees for work on the plan. Rather, the Committee has delegated authority to ABC as a corporate entity. Therefore, we conclude that ABC personnel will not be considered municipal or special municipal employees under the conflict law. As stated, this opinion is based on the facts contained in the contract and your earlier letters. Should the performance of the contract lead to results materially different from those contemplated therein, we advise that you renew your request for an opinion based on those facts.[3]

DATE AUTHORIZED: February 8, 1989

[1] By extension, they cannot be considered "special municipal employees," as that term necessarily encompasses only "municipal employees." G.L. c. 268A, s.1(n).

[2] For example, if it has been the expectation of the parties that the plan will be administered by specific individuals, we would need to reconsider our result with respect to those individuals. In such or similar event, we will consider the present opinion as preliminary.



# Commonwealth of Massachusetts
# State Ethics Commission

One Ashburton Place, Room 619, Boston, MA, 02108
phone: 617-727-0060, fax: 617-723-5851



### CONFLICT OF INTEREST OPINION
### EC-COI-92-13

**FACTS:**

You are an officer of a private consulting corporation offering policy development and other management advisory services to government and health care providers. In particular, you have over ten years experience in mental health and hospital management. Your firm has had numerous contracts with various state agencies to provide expertise to the Commonwealth in the area of health and mental health planning and financial management.

Recently, the Commonwealth has received responses from acute general hospitals to a Request for Proposals (RFP) to provide psychiatric care as part of the Commonwealth's proposed privatization of mental health care. A new RFP has been released, seeking assistance in the evaluation of the hospital proposals and in the implementation of contracts with the hospitals. Your firm is one of the firms which has been selected to perform these services. The firm's responsibilities will include: formulating baseline data by reviewing the financial information provided by the hospitals and developing objective measures to judge the hospital's proposals; developing a risk analysis tool to assist the DMH in determining which of the hospital responses may present too much risk; and assisting DMH in its negotiations with the selected hospitals.

The executed contract expressly names you as the project director and names four other firm employees to be project managers. Each of these individuals' resumes is attached and incorporated by reference into the contract. Each of the named individual's qualifications in pertinent areas is diagramed in a chart in the response to the RFP. Each of the individuals is also noted on an organization chart for the program. According to your response to the RFP, which is incorporated into the contract, the project managers will: "manage the daily project tasks and administrative matters and act as liaison with the Commonwealth's designated contract persons; coordinate, direct, and supervise the conduct of work plan activities and tasks performed; manage the project budget, resource requirements, and work schedules; plan and monitor the execution of the project; manage the preparation of progress reports; and provide technical guidance." See Response, V-3. Your response notes that this project will require managers with expertise in health care and hospital financing, as well as expertise in the legal/regulatory and program policy aspects of the project. See Response V-4. Each of the named individuals has experience in each of these areas and most of the individuals have past experience working in other health policy projects involving the Commonwealth. Also, you agreed to obtain prior written approval from the Commonwealth prior to substituting management, supervisory, or key professional personnel named in the contract. Response I-3.

You state that all of the parties specifically seek your expertise in this project and that you will be considered a special state employee under G.L. c. 268A, but you question whether the other named individuals in your firm will also be considered state employees.

**QUESTION:**

Are the other four named individuals considered to be state employees under G.L. c.268A, §1(q), by virtue of the contract between the Commonwealth and the firm?

**ANSWER:**

Yes.

**DISCUSSION:**

In the enactment of G. L. c. 268A, the Legislature established an expansive definition of the term "state employee".[1] This definition covers not only individuals who hold full-time employment with a state agency, but also consultants who provide services on an intermittent basis, whether or not they receive any compensation. *See, e.g., EC-COI-89-35* (private consultants state employees where services expressly contracted and agency contemplating specific expertise); *86-21* (private artist is a state employee where specific services contracted for); *85-4* (president of consulting group is a state employee where services being provided are within his expertise); *83-129*. However, the fact that a corporation contracts with the state, without more, does not confer state employee status on all of the employees of the corporation. *See, e.g., EC-COI-92-6; 86-21* (project manager without more is not a state employee by virtue of employer's contract with state agency); *83-39* (contract calls for services of firm as a whole, not individuals); *85-4* (same). For example, in *EC-COI-86-21* a question arose whether an individual who was named in a contract to perform artwork and an individual who was not specifically named but who was the project director were state employees for purposes of G.L. c. 268A. In finding that the named individual was a state employee, but that the project manager was not, the Commission stated that "such an employee is covered by the definition if the terms of the contract indicate that his specific services are being contracted for." *EC-COI-86-21; see also, EC-COI-83-165* (consultant specifically named, contract also identified compensation and personnel schedule for work); *83-129* (named project leader and state required to consent to any change of leader); *80-84* (contract specifically contemplates all partners in firm will work on project).

The Commission has established certain factors it will weigh in determining whether an individual who is an employee or officer of a private corporation which

contracts with a public entity will be deemed to be a public employee. *EC-COI-87-19; 87-8*. These factors include:

1. whether the individual's services are expressly or impliedly contracted for;

2. the type and size of the corporation;

3. the degree of specialized knowledge or expertise required of the service. For example, an individual who performs highly specialized services for a corporation which contracts with a public agency to provide those services may be deemed to be performing services directly to that agency;

4. the extent to which the individual personally performs services under the contract, or controls and directs the terms of the contract or the services provided thereunder; and

5. the extent to which the person has performed similar services to the public entity in the past. *EC-COI-89-35; 86-21; 87-19*.

No one factor is dispositive; rather the Commission will balance all of the factors based on the totality of the circumstances. After weighing your circumstances, we conclude that the individuals in your firm who are named in the contract are state employees under the conflict of interest statute.[2] Of significance are the facts that each individual is expressly named in the contract, designated on the organization chart, and delegated specific tasks to perform under the contract. Additionally, you may not substitute other persons in these positions without notifying and, presumably, receiving permission from the Commonwealth. We also note that the contract emphasizes the expertise of the individuals in the area of healthcare financing and policy, which are the areas in which the Commonwealth is seeking assistance. *See, EC-COI-89-35* (where contract mentions references to health care management and consultant's prior experience in field, state agency could reasonably infer it was obtaining consultant's expertise in this area under contract).

. This is unlike the situation where the officers of a corporation enter a contract with the state and provide no further services other than general oversight of their employees, or where a contract specifies a generic program manager. *See, EC-COI-89-6*. Viewing the totality of the contract, it is apparent that the Commonwealth is seeking specific expertise in health care management and financing, and by the selection of your firm, the agencies could reasonably infer that the named individuals would provide that expertise. Finally, we see no evidence in the contract that the agencies intended to treat your status differently from the other individuals so

named or that the other individuals were not necessary to the performance of the contract.[3]

## Date Authorized: April 13, 1992

[1]"State employee," a person performing services for or holding an office, position, employment, or membership in a state agency, whether by election, appointment, contract of hire or engagement, whether serving with or without compensation, on a full, regular, part-time, intermittent or consultant basis, including members of the general court and executive council.

[2]We call your attention to the conflict of interest provision in the Commonwealth contract which you signed, which states "The Contractor understands that any person individually named in Attachment C (key personnel) ... to provide services under this Contract may become a special state employee subject to the provisions of Chapter 268A of the General Laws." Each of the individuals in question was individually named in Attachment C.

[3]While the parties may not, by contract, obviate the application of G.L. c.268A, they may amend or draft a contract based upon the firm's ability, rather than an individual's ability, to provide services. *See, EC-COI-86-21; 83-89* (contract calls for services of firm as a whole, not individuals); *82-134* (agency contracted for services of corporation, not individual).



# Commonwealth of Massachusetts
# State Ethics Commission

One Ashburton Place, Room 619, Boston, MA, 02108
phone: 617-727-0060, fax: 617-723-5851



### CONFLICT OF INTEREST OPINION
### EC-COI-92-6*

**FACTS:**

You are counsel for Nicholson Construction Company (Nicholson), a corporation specializing in underground construction and excavation support work.

As general contractor, Nicholson bid on, and was awarded, a contract with the Massachusetts Department of Public Works (DPW).[1] This contract, part of the Central Artery/Third Harbor Tunnel Project (CA/T Project), requires investigating the performance of tiedown anchors and anchor piles before construction of certain Central Artery tunnel segments begins.

The contract's bid documents did not require, and Nicholson did not provide to DPW, the names of any individual Nicholson employees who might help perform the contract. The contract did require Nicholson to submit to DPW for its approval, after the contract award, the names and "detailed experience records" of at least two supervisory personnel with sufficient experience, and of an "authorized person" with authority to act for Nicholson. Nicholson maintains a permanent staff of over 200 employees, of whom more than one-third are experienced supervisory personnel. After the contract award, Nicholson did submit several names and "records" to DPW at various times. DPW either routinely approved these submissions or took no action (which Nicholson took to be approval). To Nicholson's knowledge, no one at DPW knew any of the personnel whose names Nicholson submitted.

Nicholson wishes to perform work as a subcontractor on one or more CA/T contracts over the next year.

**QUESTIONS:**

1. Is Nicholson or any of its employees a "state employee" under G.L. c. 268A?

2. If neither Nicholson nor any of its employees is a "state employee," do the second and third sentences of G.L. c. 268A, §1(q) apply to any of them?

**ANSWERS:**

1. No.

2. No.

**DISCUSSION:**

### 1. Is Nicholson or any of its employees a "state employee"?

For the conflict law to apply here at all (except for the possible interpretation presented by your second question and discussed in part 2), Nicholson or one or more of its employees must be a "state employee," defined by G.L. c. 268A, §1(q) as:

a person performing services for or holding an office, position, employment, or membership in a state agency, whether by election, appointment, contract of hire or engagement, whether serving with or without compensation, on a full, regular, part-time, intermittent or consultant basis, including members of the general court and executive council. No construction contractor nor any of their personnel shall be deemed to be a state employee or special state employee under the provisions of paragraph (o)

or this paragraph as a result of participation in the engineering and environmental analysis for major construction projects either as a consultant or part of a consultant group for the commonwealth. Such contractor or personnel may be awarded construction contracts by the commonwealth and may continue with outstanding construction contracts with the commonwealth during the period of such participation; provided, that no such contractor or personnel shall directly or indirectly bid on or be awarded a contract for any construction project if they have participated in the engineering or environmental analysis thereof.

This question can be answered simply by considering the first sentence of this definition. As to Nicholson itself, "[t]he Commission has long recognized that a . . . contract between a [state or municipal government entity] and a corporation will not render the corporation a `[government] employee.'" *EC-COI-89-6. See EC-COI-84-5; 83-89*. The Commission has followed the Attorney General's previous view that "the provisions of the conflict of interest statute are primarily directed at the activities of individuals . . . ." *AG Conflict Opinion Nos. 852* (1978), *756* (1977). Therefore, Nicholson itself is not a "state employee."

When a corporation contracts with a state agency, the corporation's employees will also not be considered "state employees," unless the agency "specifically targets a certain individual within the corporate structure to perform the services . . . ." *EC-COI-89-6*. For this purpose, the Commission will examine the following five factors:

(a) are the individual's services expressly or impliedly contracted for?

(b) how large is the entity? how many employees?what types of services are provided by it?

(c) to what degree is specialized knowledge or expertise required in the performance of the services?

(d) to what extent does the individual personally perform the services under the contract, and to what extent does he or she control and direct the terms of the contract or the services provided thereunder?

(e) has the person performed similar services in the past to the public entity?

*EC-COI-89-35; 89-6; 87-19; 87-8.*

Here, DPW's contract did not specify or otherwise "target" any particular Nicholson employee. DPW's routine approval of (or non-action on) Nicholson's submissions after the contract award supports the view that it had no interest in any particular individual's services. Nicholson is a sizable corporation employing many different supervisory employees capable of performing the contract. Although some expertise might well be required, no particular Nicholson employee could be expected in any substantial way to control or direct the contract services, as shown by occasional changes in supervisory roles, all acquiesced in by DPW. Finally, there is no evidence that DPW knew or cared that any Nicholson employee had performed similar services for it in the past.

We conclude that neither Nicholson nor any of its employees is a "state employee" as defined by §1(q).

### 2.Do the second and third sentences of §1(q) apply to Nicholson or any of its employees, although none of them is a "state employee"?

The second and third sentences of the definition of "State employee" in G.L. c. 268A, §1(q) exempt from the first sentence's principal definition certain construction contractors and their personnel who participate as consultants in engineering and environmental analysis of major state construction projects. The third sentence's proviso then requires that "no such contractor or personnel" may bid on or be awarded a construction contract for the same project for which they participated in that analysis. Although the Commission has considered the scope of this exemption once before, *see EC-COI-83-165* (exhibit design was not "engineering and environmental analysis"), we have never had occasion to consider the scope of application of the third sentence's proviso.

Your question asks, in essence, whether this proviso should be read merely as a limitation on the exemption contained in the remainder of these two sentences (thus limiting its reach to persons, not including Nicholson or its employees, who would otherwise be "state employees" under the first sentence), or whether instead it was meant to bar all contractors (presumably including corporations like Nicholson) and their personnel from bidding

on state construction contracts if they participated as consultants in the engineering and environmental analysis of the same construction project. The statute's plain language, structure, and legislative history cause us to reject this sweeping second interpretation in favor of the narrower first construction.

We are conscious that a statute is to be interpreted "according to the intent of the Legislature ascertained from all its words construed by the ordinary and approved usage of the language, considered in connection with the cause of its enactment, the mischief or imperfection to be remedied and the main object to be accomplished, to the end that the purpose of its framers may be effectuated." *O'Brien v. Director of DES*, 393 Mass. 482, 487-88 (1984) (quotations and citations omitted). Here, the plain language of these second and third sentences is designed to address the concerns of construction contractors and their personnel, who might under some circumstances be considered "state employees" under the first sentence because of their prior consultant role in engineering and environmental analysis for major state construction projects. Such "state employees" might be barred from participating in other state construction contracts either by G.L. c. 268A, §5 (as former state employees) or by §7 (as present state employees). The second and third sentences allow such persons, who would otherwise be "state employees" under the first sentence, to participate in state construction contracts for projects other than those in which they participated in the engineering or environmental analysis.

The word "such," modifying "contractor or personnel" in the proviso, may be thought ambiguous: it could refer to all contractors or personnel who participate in the engineering and environmental analysis mentioned in the second sentence (thus supporting the broader second interpretation). Alternatively, it could refer only to contractors or personnel who participated in that analysis and who would be "state employees" under the first sentence but for this exemption (thus supporting the narrower first construction). This ambiguity is resolved by noticing that the same phrase, "[s]uch contractors or personnel," appears at the **beginning** of the third sentence. This phrase's use there, allowing award of state construction contracts and continuation of existing state construction contracts, makes sense only if the narrower meaning is intended, since the concern motivating this exemption applied only to "state employees" under the original first sentence. The same phrase must be given the same meaning when used later in this sentence. *See Beeler v. Downey*, 387 Mass. 609, 619 (1982).

The structure and location of the third sentence's proviso are noteworthy. First, the Legislature placed it in the conflict law's definition of "state employee," certainly an odd place to insert a substantive restriction on contractors who are, by the broader interpretation's hypothesis, **not** state employees otherwise subject to G.L. c. 268A; a more likely location if the broader interpretation were intended would be in another statute concerning construction contract bidding procedures, such as G.L. c. 30, c. 30B or c. 149. Second, it is phrased as a proviso that explicitly modifies the preceding exemption, a sentence structure that is sensible only if the narrower construction is intended. *See EC-COI-87-36; 82-106* (both concluding that provisos limiting "selectman's exemption" from G.L. c. 268A, §20 did not apply to selectmen who are special municipal employees and thus not in need of this exemption).

The legislative history of this statute is also helpful. When G.L. c. 268A was originally enacted, by St. 1962, c. 779, §1, the definition of "state employee" consisted solely of the present first sentence. The present second and third sentences were added by St. 1977, c. 245, entitled "An Act authorizing certain construction contractors to participate in state projects."[2] The Act resulted from a substantially identical bill, House No. 2843 (1977), sponsored by then-Representative William Q. MacLean, Jr., and originally entitled "An Act to expedite the employment of construction tradesmen on major construction projects." This original bill contained the following preamble explaining its purpose:

Whereas, the provisions of Chapter 268A restrict the participation of construction contractors as consultants or members of a consulting group in the engineering and environmental analysis for major construction projects, and

Whereas, the best interest of the Commonwealth require [sic] such participation, and

Whereas, such participation can be permitted without impairment of the legislative purpose in the enactment of General Laws Chapter 268A.

The only written comment on the bill in the Governor's legislative file was from the Executive Office of Administration and Finance. After urging the Governor to sign the bill, it briefly referred to the third sentence's

proviso as a "necessary safeguard" that was thought "satisfactory," an afterthought hardly describing a sweeping new restriction on bidding by construction contractors.

This unusually clear and consistent legislative history discloses no legislative purpose to impose further restrictions on any construction contractors. Rather, the clear intent was to carve out an exemption for certain contractors who had done engineering and environmental analysis, but to avoid "impairment of the legislative purpose" of G.L. c. 268A by limiting this exemption to those whose analysis was not for the same project.

Our duty is to "give the statute a workable meaning." *Graham v. McGrail*, 370 Mass. 133, 140 (1976). For the above reasons, we conclude that the 1977 amendment, adding the second and third sentences of §1(q), was intended solely to create an exception from the pre-existing first sentence, thus tempering the conflict law's application to construction contractor employees under the specified circumstances. It follows that the second and third sentences, and particularly the third sentence's proviso, cannot apply to a person or entity (including Nicholson and each of its employees) that is not a "state employee" as defined by the first sentence.[3]

**Date Authorized:** March 12, 1992

[*]Pursuant to G.L. c. 268B, §3(g), the requesting person has consented to the publication of this opinion with identifying information.

[1]As of April 8, 1992, the state DPW becomes known as the state Department of Highways. St. 1991, c. 552.

[2]Courts have looked to an act's title for aid in ascertaining legislative intent. *See Hemman v. Harvard Community Health Plan, Inc.*, 18 Mass. App. Ct. 70, 73 (1984).

[3]Since by answering your first and second questions we have concluded that G.L. c. 268A does not apply at all to Nicholson or any of its employees, it is unnecessary to answer your remaining questions.




Mass.*Gov* ▸Mass.Gov Home Page ▸State Government  ▸State Online Services  [                    ] [Search]



# STATE ETHICS COMMISSION

## COMMISSION ADVISORY NO. 94-01

### AGENCY

### PART B: STATE EMPLOYEES ACTING AS AGENT[1]

## INTRODUCTION

Massachusetts General Laws Chapter 268A §4(c) prohibits state employees, including elected officials, from acting as agent (or attorney) for anyone other than the Commonwealth on any matter in which the Commonwealth is a party or has a direct and substantial interest. This provision is intended to prevent divided loyalties which would result if state employees attempted to "serve two masters" -- i.e., the state and a second party -- with different or conflicting interests. Section 4 is based on the principle that "public employees should be loyal to the state, and where their loyalty to the state conflicts with their loyalty to a private party or employer, the state's interest must win out." *EC-COI-82-176.*

For instance, on matters involving the Commonwealth, state employees are prohibited from acting as agents for other individuals, corporations, municipal governments, advocacy groups, business partnerships, trusts, associations, charitable organizations, and the like. Types of activities prohibited by §4 include: submitting applications or supporting documentation; preparing documents that require a professional seal; contacting other people, groups or agencies; writing letters; serving as attorney; and serving as spokesperson.

Note that §4 not only prohibits state officials from representing private parties before their *own* board or agency, but also prohibits them from representing anyone

- before *other* state boards and agencies
- before municipal or federal agencies
- to private business or charitable organizations, or
- to private individuals
- in any instance where the Commonwealth is a party to, or has a direct and substantial interest in, the matter.

The purpose of this advisory is to assist state employees and officials to recognize those situations where they are prohibited from acting as the representative for another, and to enumerate exceptions to the law where they exist. Examples in this advisory are for the purposes of illustration only. Whether or not §4 is triggered will depend on the specific facts of the situation.

## MATTERS IN WHICH THE STATE HAS A "DIRECT AND SUBSTANTIAL INTEREST"

Before acting in a private capacity in connection with a particular matter, state employees should first determine if the Commonwealth is a party to or has a "direct and substantial interest" in the matter. Examples of these situations include:

- any matter pending before, under the official jurisdiction of, or involving action by a state agency, board, commission, authority or other body;
- any effort to change state regulations, policies or procedures;
- any contract, court case or other legal matter to which the Commonwealth is a party, or otherwise has a direct and substantial interest; or
- any ruling or other action by a federal, county, regional or municipal agency involving matters which are subject to regulation by the Commonwealth.

If the Commonwealth is *not* a party to and does *not* have a "direct and substantial interest" in the matter, the restrictions of §4 will not be triggered, and the state employee may act as agent, representative or attorney.

## PROHIBITION ON ACTING AS AGENT FOR ANOTHER

If the Commonwealth *does* have a "direct and substantial interest" in the matter, the state employee must also determine whether an activity would constitute "acting as agent". Section 4(c) prohibits a state employee from acting as agent in connection with such matters -- even if the employee is not paid for his or her actions.

An agent is anyone who represents another person or organization in their dealings with a third party. Almost any instance where the state employee is acting on behalf of someone else by:

- contacting or communicating with a third party;
- acting as a liaison with a third party;
- providing documents to a third party; or
- serving as spokesperson before a third party can be considered "acting as agent".

Note that the restrictions of §4(c) are not triggered if the state employee is not *representing* someone before a third party. A state employee may offer advice to others and may help plan strategies, as long as his or her activity does not reach the level of "acting as agent". (Note, however, that the state employee may violate §4(a) if he or she accepts pay or other compensation for such activities.)

For example, a state employee may *not* submit a grant application to a state agency on behalf of his neighbor because he is more familiar with the application procedures than she is; this action would constitute acting as an agent, even if it is done merely as a favor and for free. However, the employee *may* advise his neighbor on the application procedures and the content of the application.

A state employee may *not* sign and send letters on behalf of a grassroots organization advocating a change in state regulations, even if the letters are addressed to private individuals. The employee *may* participate in committee discussions to plan the mailing, as long as the letter is signed and sent by some other member of the organization.

A state employee may *not* attend a community meeting and speak on behalf of a private company, if the Commonwealth is a party to or has a direct and substantial interest in the matter being discussed at the meeting. However, the employee *may* help the company's officials develop a strategy to mitigate the community's concerns.

There are several specific exceptions to the general prohibition that state employees may not act as agent in matters of concern to the Commonwealth.

## PERMITTED CONSTITUENCY WORK

State employees may generally act as agents for others if their state jobs authorize it. This applies to both appointed and elected officials performing constituency work.

Certain state jobs authorize employees to act as the agent for private parties concerning matters of interest to the

state. For example, an Executive Office of Communities and Development employee's responsibility may include advocating on behalf of low-income citizens to increase the number of local affordable housing units. This kind of constituency work is not only expected but demanded in the employee's job description. Accordingly, it is permissible for the employee to act as the agent for the private party (in this case, the low-income citizen).

The following guidelines should be used to help determine what is permissible constituency work and what is a prohibited act of agency. Generally, a state employee who acts on behalf of a private citizen will be considered to be performing constituency work if:

- the actions are within the scope of the state employee's job responsibilities;
- the state employee receives no compensation beyond his or her regular salary;
- the state employee has no financial interest in the matter;
- the constituent is not a relative or a business associate, or a partner, trustee, officer or director of an organization with which the state employee is associated;
- the state employee is not taking action as the constituent's attorney; and
- the constituent lives or does business within the geographic region under the state employee's official jurisdiction (e.g., a legislative district or a service district).

On the other hand, if a state employee represents a relative, his or her employer or a business associate before state agencies, is paid a fee by the constituent for the action taken or has a personal financial stake in the matter, these actions will not be considered legitimate constituency work and are prohibited.

Remember that allowable constituency work includes *only* those activities "within the proper discharge of official duties." An economic development specialist would *not* be performing permissible constituency work if she called the Appellate Tax Board to lobby for her neighbor's tax abatement, since the tax abatement has nothing to do with the development specialist's official duties. Alternatively, if a Rate Setting Commissioner pursues a provider's complaint against a regulator, this *is* a permissible constituency service since the regulator is hired and ultimately supervised by the Rate Setting Commission.

The Ethics Commission has stated in a prior advisory opinion that a public employee's appointing authority has "some latitude ... to determine what constitute[s] the proper discharge of official duties ... " *EC-COI-83-137.* Therefore, if an employee's appointing authority makes a decision that a particular activity is "in the proper discharge of the [employee's] official duties," the Commission will ordinarily defer to this judgment. However, the Commission will review an appointing official's determination of what is in the proper discharge of official duties if that determination "far exceed[s] the customary job requirements for an employee [so] as to frustrate the purposes of the [conflict of interest law] ... " *Id.*

If the employee is unsure whether his or her action on behalf of a constituent is in "the proper discharge of official duties," the employee should seek legal advice from his or her agency's legal counsel or the Legal Division of the State Ethics Commission.

## SPECIAL STATE EMPLOYEES

"Special state employees" may generally act as agents before state agencies other than their own. A state employee is considered a "special state employee" if:

- he is not paid or otherwise compensated for his state position; or
- he holds an appointed position which, by terms of the employment contract or the position classification, permits personal or private employment during normal working hours (a disclosure of this permission or classification must be filed with the Ethics Commission before the employee begins such "outside" employment); or

- he holds an appointed position and has not been compensated by the state for more than 800 hours of work during the previous 365 days.

If a state employee holds a job that qualifies as a "special state employee" position, the employee may represent private parties on matters of direct and substantial interest to the state if:

- the employee has not participated at any time as a state employee or special state employee in the matter;
- the matter is not and has not been the subject of the employee's official responsibility; <u>and</u>
- the matter is not pending in the state agency or board for which the employee works.

There is one narrow instance where a special state employee may represent a private party before the board he or she works for -- the special state employee may not be a member of the board, must work fewer than 60 days in any 365-day period, and must have neither participated in the matter nor had official responsibility for it.

Also, "special state employees" may generally assist with work under a contract with the Commonwealth, if their appointing authority certifies in writing that the interest of the Commonwealth requires such aid or assistance (a copy of this certification must be filed with the Ethics Commission).

Note that the terms "participation" and "official responsibility" are broadly defined in the statute. "Participation" includes: giving advice or making recommendations; drafting or revising; approving or disapproving; declining to act; delegating; investigating; and otherwise personally affecting a matter. "Official responsibility" is defined as the ability or opportunity to approve, disapprove or otherwise direct an action, and includes: instances where the employee is an intermediate decision-maker instances where the employee is the final authority; and instances where the authority is not exercised personally, but rather through subordinates. A matter may be considered under an employee's "official responsibility" even if he or she abstains from participating in it.

For more information about this exemption, contact your agency's legal counsel or the Legal Division of the State Ethics Commission.

## STATE LEGISLATORS

State legislators are generally allowed to act as agents before state boards, provided that they are not paid for the representation.

Legislators *are* allowed to be paid to represent others in court proceedings, quasi-judicial proceedings, and any instance where the particular matter before the state agency is "ministerial" in nature.

## ASSISTING SUBJECTS OF DISCIPLINARY PROCEEDINGS

Section 4 also allows state employees to assist anyone who is the subject of disciplinary or other personnel proceedings, provided that they are not paid for the representation.

## ASSISTING IMMEDIATE FAMILY MEMBERS

In many instances, appointed state employees may act as agents for members of their immediate families, or for anyone with whom they have a "fiduciary" relationship, if they first get permission from their appointing authority. This exemption is *not* available to elected officials; nor is it available for matters in which the employees have participated, or which are under their official responsibility.

The conflict of interest law recognizes that Commonwealth employees may be asked to assist members of their immediate families in dealing with state matters. "Immediate family" includes the employee, the employee's spouse, and both of their parents, brothers, sisters and children. The conflict law permits an appointed state

employee to act as the paid or unpaid agent for members of his or her immediate family or for any person for whom the employee serves as guardian, executor, administrator or other personal fiduciary, as long as the employee has received prior permission from his or her appointing authority and does not participate in (nor have responsibility for) the matter involved.

A state employee must meet the following criteria to be allowed to represent an immediate family member (or one with whom the employee has a fiduciary relationship):

a. the state employee must be appointed (not elected);

b. the state employee must be representing a family member or one for whom the employee is a fiduciary on a matter in which the employee did not participate (as a state official), and for which the employee did not have official responsibility; and

c. the state employee must receive written permission from the official who appointed the employee to his or her position *before* the action occurs.

## TESTIMONY UNDER OATH

State employees are generally allowed to give testimony under oath; however, they should contact the Ethics Commission's Legal Division before serving as a *paid* witness.

## HOLDING MUNICIPAL POSITIONS

State employees may also hold elected and appointed municipal positions, but are prohibited from acting (in their municipal positions) on any matter within the official jurisdiction of their own state agency.

## STATE INCOME TAX RETURNS

State employees -- except for employees of the Department of Revenue -- may be paid for assisting in the preparation, filing or amendment of state income tax returns.

## MATTERS OF GENERAL LEGISLATION

State employees may represent others on matters of general legislation and certain home-rule petitions. For example, state employees may represent advocacy groups or other parties in order to draft, promote or oppose general legislation. Note that matters involving "special legislation", state regulations or administrative policies are *not* eligible for this exemption.

For more information about this exemption, or for a determination as to whether a bill is "general legislation" or "special legislation", contact your agency's legal counsel or the Legal Division of the State Ethics Commission.

## REPRESENTING ONE'S OWN INTERESTS AND PERSONAL POINTS OF VIEW

Since acting on one's *own* behalf is not considered acting as agent, a state employee may always represent his or her own interests or points of view. For instance, a state employee may file her own grant application, or represent himself before the Appellate Tax Board.

Note, however, that in matters involving the Commonwealth, a state employee may *not* act on behalf of his or her own business partnership; representing the partnership would, by definition, involve acting as an agent.

State employees may represent themselves before their own agencies, although they may *not* take any type of

official action on the matter that affects themselves. In this situation, the employees should make every effort to clarify that they are acting on their own behalf, including:

- stating, in all written correspondence, that they are acting on their own behalf, and in their personal capacities rather than their official role;
- sitting in the audience before speaking at a hearing or public meeting, rather than sitting with other officials or staff members;
- making a public declaration, to be included in the minutes of the meeting, that they are acting on their own behalf, and in their personal capacities rather than their official role; and
- leaving the room during any Executive Session deliberations on the matter.

State employees may also express their personal points of view concerning a matter pending before state agencies. However, in such a case, the employee should clarify the situation by explaining that his or her comments constitute a personal opinion, and are not made on behalf of any group, organization, business or other individual. Without such a clarifying statement, the circumstances surrounding the employee's comments could be interpreted to constitute acting as an agent.

Note that when representing themselves or expressing personal points of view, state employees must *also* observe §6 of the conflict law, which prohibits state employees from taking any type of official action on matters which affect their own financial interests, or the financial interests of their immediate families, businesses or other organizations with which they are closely associated.

## CONCLUSION

It is important to keep in mind that this advisory is general in nature and is not an exhaustive review of the conflict law. For specific questions, public officials and employees should contact their agency counsel or the Legal Division of the State Ethics Commission at (617) 371-9500.

**AUTHORIZED**: July 12, 1994

**FOOTNOTE**

1. Advisory No. 88-01 covers Municipal employees; Advisory No. 94-02 covers County employees.

---

Home    Educational Materials

---