UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| NEIGHBORHOOD ASSOCIATION OF | * | |
| THE BACK BAY, INC. and THE | * | |
| BOSTON PRESERVATION ALLIANCE | * | |
| INC., | * | |
| | * | |
| | * | |
| Plaintiffs, | * | Civil Action No. 05-11211-JLT |
| | * | |
| v. | * | |
| | * | |
| FEDERAL TRANSIT ADMINISTRATION and | * | |
| MASSACHUSETTS BAY TRANSPORTATION | * | |
| AUTHORITY, | * | |
| | * | |
| Defendants. | * | |

MEMORANDUM

December 28, 2005

TAURO, J.

Under Title II of the Americans With Disabilities Act ("ADA"),[1] public transportation

agencies are required to make certain identified stations handicap accessible. Copley Station,

which is located within the Back Bay Historic District, is one such identified station. Contrary to

that federal mandate, however, Copley Station is not currently ADA compliant. In order to

rectify that failure, Defendants initiated the "Copley Station Accessibility Improvement Project"

(the "Project"). That Project is the subject of the instant litigation.

The Neighborhood Association of the Back Bay, Inc. ("NABB")[2] and the Boston

---

[1] See 42 U.S.C. §§ 12131-12165 (2000).

[2] Plaintiff NABB, a charitable corporation concerned with preserving and protecting the
historical and architectural features of the Back Bay, is comprised of approximately 2,500

Preservation Alliance, Inc.[3] (collectively referred to as "Plaintiffs") filed the instant motion seeking

a preliminary and final injunction prohibiting Defendant Federal Transit Administration ("FTA")

from disbursing federal funds, and Defendant Massachusetts Bay Transportation Authority

("MBTA") from accepting or using such federal funds or to otherwise conduct any work in

connection with the proposed Copley Station Project. For the reasons set forth below, the

Plaintiffs' Motion for Preliminary and Final Injunction is DENIED.

### Background

Copley Station is one of the oldest subway stations in the nation.[4] It is nestled in the Back

Bay, an historic district listed in the National Register of Historic Places, and is surrounded by

several landmarks of historic significance, including the Boston Public Library (the "Library") and

the Old South Church (the "Church"). Both the Library and the Church are listed in the State and

National Registers of Historic Places, and both are National Historic Landmarks. The existing

inbound entrance headhouse[5] to Copley Station, constructed originally in 1915, is also listed on

the National Register.

To satisfy the ADA mandate, the MBTA has planned significant improvements for Copley

---

residents of the Back Bay. See Pl. Amend. Compl. at 1-2.

[3] Plaintiff Boston Preservation Alliance is a non-profit preservation organization made up of a mixture of organizations and individuals that are concerned with the cultivation and preservation of Boston's historic places. See Pl. Amend. Compl. at 3.

[4] The following background facts are taken from the Administrative Record, Pl.'s Amend. Compl., Pl.'s Mem. of Law in Supp. of Pl.'s Mot. for Prelim. and Final Inj., Def. FTA's Opp. to Pl.'s Mot. for Prelim. and Final Inj., and MBTA's Mem. of Law in Opp. to Pl. Mot. for Prelim. and Final Inj.

[5] A "headhouse" is an above-ground structure which encloses the entrance to the underground platforms. "Headhouse," as applied to the Copley Station improvements, refers to street-level, glass-enclosed structures which will house proposed elevators that are at the heart of this controversy.

Station.  These include: raising the boarding platforms to accommodate new "Low Level Vehicles," installing elevators and accompanying headhouses on each side of Boylston Street to permit handicap accessibility to the inbound and outbound platforms,[6] rehabilitating the existing historic inbound entrance headhouse, and reconstructing the existing outbound entrance located on the west side of Dartmouth Street.

The MBTA initiated the Project in 1989 when it first sought to make the Boston public transit system handicap accessible.  The MBTA first commissioned an analysis of each non-compliant station in order to determine what steps it would have to take to make each site wheelchair accessible.  The commission produced the 1995 "Schematic Design Report," that identified various options for the location of wheelchair accessible elevators and headhouses at certain MBTA stations.  In December 2001, the MBTA focused its attention on Copley Station. After careful consideration, it determined that the options presented in the 1995 Schematic Design Report were not feasible due to various engineering, economic, pedestrian passage, and ADA compliance issues.

The MBTA, thereafter, developed several additional options for the Copley Station improvements.  It conceived four options for the outbound platform renovations and two options for the inbound platform.  Option A located the new outbound elevator headhouse behind the current outbound entrance located on the sidewalk in front of the Church on the west side of Dartmouth Street.  Option B located the elevator behind the east outbound entrance's open stairway on the east side of Dartmouth Street.  The MBTA rejected Option B because of

---

[6]  The Copley Station renovation requires two elevators and the accompanying headhouses because the existing inbound and outbound boarding platforms do not connect.

significant construction and passenger access issues.  Option C proposed the incorporation of an elevator into the existing retail building on the east side of Dartmouth Street.  The MBTA rejected this option because of substantial construction costs and passenger access concerns. Option D sited the elevator on the east side of Dartmouth Street in front of the east entrance open stairway.  The MBTA eliminated this option because of engineering issues and its likely adverse impact on pedestrian traffic.

        The MBTA also considered two options for the Station's inbound platform, which is currently accessible through a single stairway enclosed by an historic wrought iron headhouse located on the south side of Boylston Street adjacent to the Library.  Option E placed the inbound headhouse on the west side of the existing headhouse, while Option F placed the inbound elevator headhouse in front of the new Library wing at the west end of the underground platform.  Option E required that the MBTA build on the Library's side steps.[7]  Option F, on the other hand, located the headhouse approximately 150 feet from the existing main station entrance.  The MBTA rejected Option F because of significant engineering issues, poor customer access, and the ADA requirements.

        After identifying the various options for the locations of the elevators and associated headhouses, the MBTA held several meetings to address issues with respect to the historic resources in the area.  In May 2002, the MBTA identified the Church and the Library as historic properties that the Project might impact.  On May 28, 2002 the MBTA held a meeting with representatives of the Church and the Library, to get their comments on the Project proposal and

---

        [7] These steps are not the Library's entrance steps, but merely a raised step that runs along the Boylston Street side of the Library structure.

the elevator headhouse location and design options.  The Library's President and Facilities Officer and the Church's Reverend attended this meeting.

After consulting with the representatives of the Library and the Church, the MBTA, on June 21, 2002, completed a schematic design for the Project which adopted a variation of Option A for the outbound elevator (west side of Dartmouth Street) and Option E for the inbound elevator (next to the existing inbound entrance headhouse).  The MBTA also proposed a rehabilitation of the existing historic inbound entrance headhouse.  The MBTA sent copies of the plan to the FTA, the Massachusetts Historic Commission ("MHC"),[8] and the Boston Landmarks Commission ("BLC") in October 2002.

On October 28, 2002, the MBTA presented the proposed design plans to the FTA and the MHC.[9]  Jane Carolan, a Preservation Consultant hired by the MBTA, discussed the possible impacts of the Project on the historical structures in the area and the MBTA's plans to minimize any impact of the proposed improvements.  At this meeting, the Library and the MHC requested that the MBTA explore alternative designs for the headhouse structures in order to reduce the potential visual impact on the area.

On December 3, 2002, the MBTA presented three alternative design options to the MHC and the Boston Landmarks Commission ("BLC").  Based on that presentation, the MBTA, MHC, and BLC jointly selected a design scheme, which was a further variation of the aforementioned Options A and E and which altered the originally proposed headhouse structural designs.

---

[8]  The Massachusetts Historic Commission is the "State Historical Preservation Officer" for the Commonwealth of Massachusetts.

[9]  The Boston Landmarks Commission was invited to this meeting, but did not attend.

On January 3, 2003, the MBTA once again met with the Library, the Church, the MHC, and the BLC, this time to explain the selected design scheme to the representatives of the Library and the Church. All parties agreed that the concept was "acceptable and moving in the right direction."[10] On May 22, 2003, the MBTA held an additional meeting with the Library to explain the design of the inbound elevator and headhouse located next to the Library. At that meeting, the Library representatives expressed concern over the proposed design scheme and indicated its preference for a slightly different concept that would set the inbound headhouse off of the Library's granite stone steps and that would alter the proposed framing of the headhouse. The MBTA took these suggestions under consideration.

On July 10, 2003, the MBTA presented its 75 percent completed design of the Copley Station Project to the Station's abutters. At the meeting, the MBTA also reviewed the Project's potential impact on the adjacent historical structures. Representatives from the Library and the Church attended the meeting. Eleven days later, on July 21, 2003, the MBTA held an open meeting to introduce the Project to the general public. There, the MBTA presented information regarding the Project's scope, its history, the potential impact on the adjacent historic structures, the overview of the design elements at the street and platform levels, issues of construction staging, and the restoration of headhouse structures, including locations, design goals, aesthetics, and materials.

On August 5, 2003, the MBTA met individually with Plaintiff NABB to discuss the Project and its potential impacts on the surrounding area. After the meeting, on August 22, 2003, NABB made various suggestions to the MBTA, which included relocating the proposed inbound

---

[10] Administrative Record, filed as Docket Nos. 9 and 10, at 303 (hereinafter "AR").

6

and outbound elevators.  Several of NABB's proposed alternatives had previously been rejected

by the MBTA as not feasible.  NABB expressed similar concerns in a December 2003 letter to the

FTA.  On March 3, 2004, the MBTA met again with Plaintiff NABB specifically to address those

issues.

In August 2003, Jane Carolan, the Preservation Consultant hired by the MBTA, prepared

a "Section 106 and 4F Review" ("Carolan Review") of the proposed Copley Station Project.  This

comprehensive review included (1) a detailed history of Boston's Transit System and of Copley

Square, (2) an explanation of the Project, (3) a description of the process through which the

MBTA chose the locations of the various elements of the Project (particularly the new elevator

locations), (4) a description of the new headhouses, and (5) a description of the impacts and

effects of the Project on the adjacent historic structures.  The Carolan Review concluded that,

with regard to the historic properties, "[t]he primary effect of [the Project] will be a visual one."[11]

On August 29, 2003, the MBTA submitted the Project plan, design scheme, and other

required documents, comments, and analyses to the FTA and requested that the FTA find that the

Project will have "no adverse effect" on any historic resources.  The documents submitted to the

FTA included (1) the Carolan Review, (2) an August 21, 2003 letter from MHC to the MBTA

indicating that the proposed Project designs were responsive to MHC's comments ("MHC

Letter"), and (3) a checklist of information required for Probable Categorical Exclusions (the "CE

Checklist").[12]  On the basis of that information, the MBTA itself concluded that the Project will

---

[11]  AR 412.

[12]  "Categorical exclusions" are actions which meet the definition contained in 40 C.F.R. § 1508.4 and, based on past experiences with similar actions, do not involve significant environmental impacts.

have "no adverse effect" on the Back Bay Historic District, the existing inbound headhouse, the Library, or the Church.

After reviewing the evidence provided by the MBTA, the FTA, on January 23, 2004, entered a "Finding of No Adverse Effect." In reaching its conclusion, the FTA relied upon the MBTA's finding of "No Adverse Effect," the MHC letter, the CE Checklist, maps of the Project location, the schematics of the Project, the MBTA's response to the FTA's concerns listed on the CE Checklist, and the Carolan Review. The FTA submitted its "Finding of No Adverse Effect" to MHC and requested that MHC concur in that finding. MHC, after reviewing the same evidence, concurred with the FTA's "Finding of No Adverse Effect" on January 29, 2004.

At some point during these proceedings, the FTA requested that the MBTA complete an Environmental Assessment (EA).[13] The MBTA conducted an environmental assessment and submitted the completed EA to the FTA, Plaintiffs, and other interested parties in June 2004. The MBTA then held a public meeting on July 15, 2004 to address the EA, after which the MBTA received eight formal comments, including one from Plaintiffs. The MBTA developed itemized responses to the formal comments, attached those responses to the final EA, and sent the final EA to the FTA.

After reviewing the CE, the EA, the Carolan Review, and other Project documents, the FTA made several findings. First, the FTA determined that the proposed inbound elevator and headhouse constituted a "use" of the Library's granite steps. Second, the FTA found that there

---

[13] Normally, renovations done to make public transit stations handicap accessible qualify as Categorical Exclusions that do not require an Environmental Assessment. 23 C.F.R. § 771.117 (c)(15) (2005). Due to historical sensitivities in this case, however, the FTA required the MBTA to conduct a detailed EA. AR 647, 655, 674.

were no prudent or feasible alternatives to the "use" of the Library's granite steps and that the MBTA utilized all possible measures to minimize harm to the Library in the Project planning. The FTA also found that neither the rehabilitation of the existing inbound headhouse or the construction of the new outbound elevator headhouse resulted in a "use" or adversely affected the historic qualities of the adjacent properties. As a result, the FTA issued a "Finding of No Significant Impact" ("FONSI") and determined that the Project complied with Section 106 of the National Historic Preservation Act ("NHPA") and Section 4(f) of the Department of Transportation Act ("DOTA"). On May 10, 2004, the Department of the Interior (DOI) concurred that, as regards to the "use" of the Library's steps, there are "no feasible alternatives to this proposed project."[14] The DOI, accordingly, concurred that the Project satisfied Section 4(f).

### Plaintiff's Claims

Plaintiffs allege that the FTA and the MBTA have violated Section 106 of the National Historic Preservation Act,[15] Section 110(f) of the National Historic Preservation Act,[16] and Section 4(f) of the Department of Transportation Act.[17] Plaintiffs further allege that the MBTA has violated Massachusetts General Laws Chapter 161A, Section 5(k). Plaintiffs' claims allege a mixture of arguments that challenge both the FTA and the MBTA's procedural actions and substantive decisions.

---

[14] AR 680.

[15] See 16 U.S.C. § 470f.

[16] See 16 U.S.C. § 470h-2(f).

[17] See 49 U.S.C. § 303(c).

Discussion

**Standard For Injunctive Relief**

A plaintiff who seeks a preliminary injunction must establish "(1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest."[18] As is often stated, "[l]ikelihood of success is the touchstone of the preliminary injunction inquiry."[19] The plaintiff who moves for injunctive relief bears the burden of demonstrating each factor necessary to justify such relief.[20] A preliminary injunction is an extraordinary remedy, which is not issued lightly or as a matter of course.[21]

1.    **Likelihood of Success on the Merits**

A.    Standard of Review for Federal Claims

The court's review of administrative agency action, under federal law, is determined by the provisions of the Administrative Procedure Act ("APA").[22] Under the APA, "agency action must be set aside [only] if the action was 'arbitrary, capricious, an abuse of discretion, or

---

[18] Nieves-Maquez v. Puerto Rico, 353 F.3d 108, 120 (1st Cir. 2003) (quoting McGuire v. Reilly, 260 F.3d 36, 42 (1st Cir. 2001)).

[19] See, e.g., Phillip Morris, Inc. v. Harshbarger, 159 F.3d 670, 674 (1st Cir. 1998).

[20] See Granny Goose Foods, Inc. v. Brotherhood of Teamsters and Auto Truck Drivers Local No. 70 of Alameda County, 415 U.S. 423, 442-43 (1974).

[21] Weinberger v. Romero-Barcelo, 456 U.S. 305, 312 (1982); see also 13 Moore's Fed. Prac. § 65.20, at 65-29 (3d ed. 1998) ("a preliminary injunction is an extraordinary remedy that may be granted only by a clear demonstration by a plaintiff of the merits of such a request." (internal footnotes omitted)).

[22] See 5 U.S.C. § 706.

otherwise not in accordance with the law' or if the action failed to meet statutory, procedural, or constitutional requirements."[23]  Specifically, "[t]he task of a court reviewing agency action under the APA's 'arbitrary and capricious' standard is to determine whether the agency has examined the pertinent evidence, considered the relevant factors, and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made."[24]  The court will not substitute its own judgment for that of the agency.[25]  Instead, the court defers heavily to the agency's decisions.[26]  The court, however, will not rubber stamp agency action and will, therefore, conduct a "searching and careful" inquiry into the Administrative Record.[27]  The party challenging an agency's decision "'bears the burden of establishing that the [a]gency acted arbitrarily or capriciously or otherwise abused its discretion.'"[28]  The court reviews Plaintiffs' first three claims, under Section 106 of the NHPA, Section 110(f) of the NHPA, and Section 4(f) of the DOTA.

---

[23] Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 413-14 (1971) (quoting 5 U.S.C. §§ 706(2)), overruled on unrelated grounds by Califano v. Sanders, 430 U.S. 99, 105 (1997).

[24] Airport Impact Relief, Inc. v. Wykle, 192 F.3d 197, 202 (1st Cir. 1999) (internal punctuation and citations omitted).

[25] Alliance to Protect Nantucket Sound, Inc. v. United States Dep't of the Army, 288 F. Supp. 2d 64, 71 (D. Mass. 2003).

[26] Airport Impact Relief, 192 F.3d at 203 (citing Citizens Awareness Network, Inc v. United States Nuclear Regulatory Comm'n, 59 F.3d 284, 290 (1st Cir. 1995)).

[27] Id. (citing Volpe, 401 U.S. at 415-16).

[28] Alliance to Protect Nantucket Sound, Inc., 288 F. Supp. 2d at 71 (quoting The M/V Cape Ann v. United States, 199 F.3d 61, 63 (1st Cir. 1999)).

B.    Section 106 of the National Historic Preservation Act

Plaintiffs claim that the FTA failed to follow the procedural requirements of Section 106 of the National Historic Preservation Act.  Plaintiffs also argue that the FTA's determination that the Project would have "no adverse effect" on the adjacent historic resources was arbitrary and capricious.

Section 106 of the NHPA requires federal agencies to "take into account the effect" a federal undertaking will have on "any district, site, building, structure, or object that is included in or eligible for inclusion in the National Register" and to "afford the Advisory Counsel on Historic Preservation . . . a reasonable opportunity to comment with regard to such undertaking."[29] "Section 106 is characterized aptly as a requirement that agency decisionmakers 'stop, look, and listen,' but not that they reach particular outcomes."[30]

The procedural requirements of Section 106 are given substance through the regulation adopted pursuant to the statute.[31]

> Under the NHPA, a federal agency must make a reasonable and good faith effort to identify historic properties, 36 C.F.R. § 800.4(b); determine whether identified properties are eligible for listing on the National Register based on criteria in 36 C.F.R. § 60.4; assess the effects of the undertaking on any eligible historic properties found, 36 C.F.R. §§ 800.4(c), 800.5, 800.9(a); determine whether the effect will be adverse,

---

[29] 16 U.S.C. 470(f); see also Neighborhood Ass'n of the Back Bay, 393 F. Supp. 2d at 73.

[30] Narragansett Indian Tribe v. Warwick Sewer Auth., 334 F.3d 161, 166 (1st Cir. 2003); see also Nat'l Mining Ass'n v. Fowler, 324 F.3d 752, 755 (D.C. Cir. 2003); Muckleshoot Indian Tribe v. U.S. Forest Serv., 177 F.3d 800, 805 (9th Cir. 1999); Connecticut Trust for Historic Pres. v. I.C.C., 841 F.2d 479, 483-84 (2d Cir. 1988) ("NEPA and NHPA require only that agencies acquire information before acting.").

[31] See Narraganset Indian Tribe, 324 F.3d at 73; see also 36 C.F.R. § 800.

12

36 C.F.R. §§ 800.5(c), 800.9(b); and avoid or mitigate any
adverse effects, 36 C.F.R. §§ 800.8(e), 800.9(c).[32]

Section 106 imposes an additional duty on the agency to consult with certain parties throughout the statutory process.[33] These parties are referred to as "consulting parties."[34] "Consulting parties" include the State Historic Preservation Officer ("SHPO"), representatives of local governments, applicants for Federal assistance or approval, and "additional consulting parties."[35] The SHPO in Massachusetts is the MHC.[36] "Additional consulting parties" are "[c]ertain individual and organizations with a demonstrated interest in the undertaking."[37]

The agency must, after considering the views of "consulting parties" and the public, determine whether the proposed project will have an adverse effect on the historic properties in the project area.[38] "An adverse effect is found when an undertaking may alter, directly or indirectly, any of the characteristics of a historic property . . . in a manner that would diminish the integrity of the property's location, design, setting, materials, workmanship, feeling, or association."[39] If the agency determines that a proposed project will have "no adverse effect" on

---

[32] Muckleshoot Indian Tribe, 177 F.3d at 805; see also Neighborhood Ass'n of the Back Bay, 393 F. Supp. 2d at 73-74.

[33] See 36 C.F.R. § 800.2(a)(4) (2004) ("The agency official shall involve the consulting parties . . . in findings and determinations made during the section 106 process.").

[34] See id.

[35] See 36 C.F.R. § 800.2(c).

[36] See Neighborhood Ass'n of the Back Bay, 393 F. Supp. 2d at 74.

[37] 36 C.F.R. § 800.2(c)(5).

[38] See 36 C.F.R. § 800.5.

[39] 36 C.F.R. § 800.5(a)(1).

an historic property, then the agency must notify all consulting parties of the finding and provide those parties with the required documentation under the regulations.[40]  The SHPO then has 30 days to review the agency's finding.[41]  "If the SHPO agrees with the finding of no adverse effects, then the agency may proceed with the undertaking and its duties under Section 106 are fulfilled."[42]

Plaintiffs first attack the FTA's Section 106 process.  Plaintiffs allege that the FTA did not properly document its finding of "no adverse effect," that the FTA did not conduct an independent review of the Project, and that it did not fully or properly consult with the requisite "consulting parties," including the MHC, the BLC, the Library, the Church, and Plaintiffs themselves.

Plaintiffs have failed to show a substantial likelihood of success on the merits of these claims.  The evidence in the Administrative Record demonstrates that the FTA complied with the initial "stop and look" step of Section 106.  The FTA properly invested the time to identify the historic properties adjacent to Copley Station.[43]  The FTA did so in close consultation with the MBTA, the MBTA's preservation consultant, and the MHC.  In fact, the FTA and the MBTA, as early as May 2002, determined that the Library and the Church had historic significance, were both in the Project's area of potential effects, and that both properties were listed on the National

---

[40]  See 36 C.F.R. § 800.11(e).

[41]  36 C.F.R. §800.5(c).

[42]  Neighborhood Ass'n of the Back Bay, 393 F. Supp. 2d at 74 (citing 36 C.F.R. §§ 800.4(d)(1), 800.5(c)(1)).

[43]  See 36 C.F.R. § 800.4(b) (requiring that the agency, in consultation with the SHPO, identify any historic properties within the area of potential effects of a proposed project).

Register of Historic Places and, thus, subject to Section 106's protections.[44]  Plaintiffs have

produced no evidence to suggest that the FTA failed to satisfy its initial Section 106 obligations.

 The Record also shows that the FTA satisfied the "listen" requirement of Section 106.

The "listen" prong requires an agency to assess, in consultation with the SHPO, the public, and

other "consulting parties," whether a proposed project will adversely affect historic properties in

the area.[45]  In other words, the regulation requires the agency to "listen" and "consider" the views

of the relevant SHPO, the public, and other "consulting parties" in assessing the potential effects

of the project.  The agency, however, need not accept or incorporate those views into the final

design plan.  "[C]onsultation is not the same thing as control over a project."[46]  The Record

shows that the MBTA and the FTA listened to, recorded, and carefully considered the views of

the Library, the Church, the MHC, the BLC, Plaintiffs, and the public before concluding that the

Project would have no adverse effect on the historic properties.[47]

 First, the FTA, both directly and through the MBTA, properly consulted with the

designated SHPO – the MHC – throughout the development of the Project.  As early as October

2002, the MBTA and the FTA began to discuss the proposed design plans with the MHC.

Between October 2002 and January of 2004, the MBTA met several times with the MHC to

---

[44]  See 36 C.F.R. § 800.4(c) (requiring that the agency, in consultation with the SHPO, determine whether any historic properties in the area of potential effects is eligible for the statute's protections).

[45]  See 36 C.F.R. § 800.5.

[46]  Narragansett Indian Tribe, 334 F.3d at 168.

[47]  Although the FTA did not attend every meeting between the MBTA and the other parties, the FTA did review the extensive meeting minutes, correspondence, and outside comments compiled by the MBTA before it concluded that the Project had "no adverse effect."

discuss the Project.  Not only did the MBTA listen to the MHC's suggestions at these meetings, but they also incorporated those suggestions into the ultimately selected plan for the Project.  In fact, on August 21, 2003, the MHC stated in a letter to the MBTA that the "proposed designs are responsive to the comments of the MHC."[48]  Finally, in January 2004, the FTA formally requested the MHC's concurrence in its "Finding of No Adverse Effect," to which the MHC concurred. The Record shows, through the myriad meetings, correspondence, and other consultations, that the FTA, both directly and through the MBTA, satisfied its obligation to consult with the SHPO under Section 106.

The Record similarly shows that the FTA properly considered the views of other "consulting parties," the Project's abutters, and the public before issuing its "Finding of No Adverse Effect."  The Record contains ample evidence that the MBTA and the FTA listened to, recorded, and considered the views and concerns of the BLC, the Library, and the Church. Between October 28, 2002 and January 23, 2004 (when the FTA issued its finding), the MBTA met several times with the MHC, the BLC, the Church, the Library, and even with Plaintiff NABB.  During this time period, the MBTA generated a mass of documents, including meeting minutes and correspondence, that expressed the various concerns of the interested parties and, in some cases, the appreciation of the parties' roles in the Project planning.[49]  Furthermore, the MHC, the BLC, the Library, and the Church all participated in the development of the ultimate Project locations and designs.  The FTA properly considered the views of the Project's abutters

---

[48]  AR 373.

[49]  For example, in a July 2003 letter, the Library, in addition to expressing certain concerns, noted the MBTA's "excellent work to include the Library staff in ongoing discussions." AR 368-69.

and consulting parties.

Plaintiffs were not "consulting parties" under the Section 106 regulations. The phrase "additional consulting parties" means "[c]ertain individuals and organizations with a demonstrated interest in the undertaking," which interest may include "concern with the undertaking's effect on historic properties."[50] Plaintiffs are organizations concerned with the Project's effect on historic properties. Such organizations, however, are not "consulting parties" as a matter of right.[51] Instead, an interested organizations' right to participate as a "consulting party" is permissive and requires a formal written request.[52] Even after receiving a written request, the relevant agency retains discretion as to whether to grant the request.[53] Neither of the Plaintiffs formally requested admission into the process as formal "consulting parties." Plaintiffs, therefore, were not "consulting parties." And so, Plaintiffs participation rights were comparable to those of the general public.

The FTA properly considered the views of the public. On July 21, 2003, the MBTA presented the Copley Station Project to the general public. At that meeting, the MBTA discussed the scope of the Project, its history, the potential impact on the adjacent historic structures, the overview of the design elements at the street and platform levels, issues of construction staging, and the restoration of the headhouse structures, including locations, design goals, aesthetics, and

---

[50] 36 C.F.R. § 800.2(c)(5).

[51] See id.; Mid States Coal. for Progress v. Surface Transp. Bd., 345 F.3d 520, 553 (8th Cir. 2003).

[52] 36 C.F.R. § 800.3(f)(3); see also Mid Sates Coal. for Progress, 345 F.3d at 553.

[53] 36 C.F.R. § 800.3(f)(3); see also Mid States Coal. for Progress, 345 F.3d at 553.

materials.  The MBTA design team took, recorded, and responded to specific questions posed by the public attendees.  The minutes of the public meeting, which include the questions asked and the answers presented, were included in the Record[54] and considered by the FTA.  The FTA, therefore, properly considered the views of the MHC, the BLC, the Library, the Church, and the public before making their final determination of "no adverse effect."

Plaintiffs have presented no evidence to support their claim that the FTA and the MBTA failed to provide Plaintiffs with a sufficient opportunity to comment on the proposed Project. First, Plaintiffs, as discussed above, were not Section 106 "consulting parties," but had participation rights comparable to those of the general public.  Second, Plaintiffs could have attended the public meeting on July 21, 2003.  Third, the MBTA actually met privately with Plaintiff NABB on August 5, 2003, presented the Project to Plaintiff NABB, and elicited its concerns, all before the FTA's final Section 106 determination.  The minutes from this meeting and Plaintiff NABB's comments were included in the Record considered by the FTA.  The MBTA also met a second time with Plaintiff NABB, on March 3, 2004, to further discuss NABB's concerns and suggestions.  The MBTA also received at least one letter and one formal comment from Plaintiffs voicing their concerns about the Project.  Plaintiffs, in short, had ample opportunity to comment on the proposed project.  The MBTA, as the Record shows, welcomed Plaintiffs participation and adequately considered Plaintiffs' views, despite the Plaintiffs' failure to request "consulting party" status.  Plaintiffs had sufficient opportunity to participate in the Project to satisfy Section 106.

The Record reveals that the FTA similarly satisfied the notification and documentation

---

[54] AR 359-63.

requirements of Section 106.  When an agency proposes a finding of "no adverse effect" it must "notify all consulting parties of the finding and provide them with the documentation specified in [36 C.F.R.] § 800.11(e)."[55]  The documentation of the finding must be sufficient "to enable any reviewing parties to understand its basis,"[56] and must specifically include a description of the project and its area of potential effects, a description of the steps taken to identify historic properties in that area, a description of the historic properties, a description of the effects, if any, on those historic properties, an explanation of why the agency found "no adverse effect," a description of conditions or actions planned to avoid, minimize or mitigate any adverse effects, and summaries of the views provided by consulting parties and the public.[57]

The FTA satisfied this requirement by providing sufficient information to the MHC, through which the MHC could understand and concur with the FTA's findings.  That information included the FTA's own summary, the MBTA's request for a finding of "no adverse effect," the MHC letter, the CE checklist, project site plans, photographs, the architectural designs for the Project improvements, and the Carolan Review.  The Carolan Review, alone, described in detail the Project's effects, primarily visual, on the Back Bay Historic District, the Church, the Library, and the existing inbound entrance headhouse.  These documents further illustrate the MBTA's careful consideration of the historic properties throughout its planning and the completeness of the record considered by both the FTA and the MHC.  The FTA provided the MHC with enough information to adequately understand and assess the FTA's finding of "no adverse effect."

---

[55]  36 C.F.R. § 800.5(c).

[56]  36 C.F.R. § 800.11(a).

[57]  36 C.F.R. § 800.11(e).

Plaintiffs have also failed to establish that the FTA's finding of "no adverse effect" was not based on an independent review of the evidence. The fact that the FTA relied on the information, comments, analyses, reports, and other documentation compiled by the MBTA does not make the FTA's review of those documents a violation of Section 106. Section 106 requires an agency to make an independent evaluation of the undertaking.[58] The term "independent," however, does not mean that the FTA had to conduct its own research, analysis, and plans.[59] Nor does it prohibit the FTA from relying on work conducted and reports prepared by other parties.[60] The regulations explicitly state that an agency "may use the services of applicants, consultants, or designees to prepare information, analysis and recommendations."[61] The federal agency ultimately remains responsible for all required findings and must ensure that any documents prepared by another party meet the standards set forth in the regulations.[62] In such cases, the primary issue is the extent of the agency's review of the consultant's/applicant's analysis and assessment.[63]

In this case, the FTA hired a consultant to monitor the Project's progress and to prepare monthly reports. The FTA also participated directly in the Project by attending the October 28, 2002 meeting with the MBTA and the MHC, at which the parties discussed the historic properties

---

[58] See 36 C.F.R. § 800.2(a)(3); see also Narragansett Indian Tribe, 334 F.3d at 168.

[59] See Narragansett Indian Tribe, 334 F.3d at 168.

[60] See 36 C.F.R. § 800.2(a)(3).

[61] See id.; see also Narragansett Indian Tribe, 334 F.3d at 168.

[62] 36 C.F.R. § 800.2(a)(3).

[63] See Save Our Wetlands, Inc. v. Sands, 711 F.2d 634, 643 (5th Cir. 1983) (discussing the role of consultants under analogous NEPA standards).

and the possible effects of the Project.  The bulk of the FTA's information, however, was collected, compiled, analyzed, and otherwise recorded by the MBTA.  The Record shows that the FTA carefully considered that information, which included the digital images and architectural site plans for the Project, the MBTA's CE Checklist, MBTA's request for a finding of "no adverse effect," the Carolan Review, and other MBTA analysis.  Plaintiffs offer no credible evidence indicating that the FTA did not conduct an independent review, or that it "rubber stamped" the MBTA's conclusion of "no adverse effects."

Plaintiffs also challenge the FTA's substantive finding of "no adverse effect."  The court will not overturn the FTA's finding unless that finding is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."[64]  In this case, the Administrative Record amply supports the FTA's decision.  The FTA independently considered and relied on extensive evidence detailing the Project and its possible effect on the adjacent historic properties.  That evidence included the Carolan Review, which identified the historic properties, discussed the impact of the Project on those properties, detailed the MBTA's plans to minimize all such impact, and concluded that the primary impact of the project on the historic properties would be visual.  The FTA, throughout the process, complied with the procedure requirements of Section 106 by identifying the historic properties, considering the impact of the project on those properties, and by consulting with the MHC, the BLC, the Library, the Church, the public, and Plaintiffs.  After reviewing the relevant information collected by the FTA and the MBTA, the FTA determined that the Project would have "no adverse effect" on the Church, the Library, the Back Bay Historic

---

[64] Overton Park, 401 U.S. at 413-14 (internal quotations omitted).

District, or the existing inbound entrance headhouse.[65]  "While the plaintiffs may disagree with the conclusion, they have no recourse under Section 106."[66]  The FTA's decision is rationally connected to the extensive evidence in the Record.  The FTA did not act arbitrarily or capriciously, nor did it abuse its discretion, or otherwise violate the law.

When the MHC concurred with the FTA's finding of "no adverse effect," the FTA satisfied its procedural duties under Section 106.  Plaintiffs, accordingly, have failed to establish a substantial likelihood of success on the merits on any of their claims under Section 106 of the NHPA.[67]

C.    Section 110(f) of the National Historic Preservation Act

Plaintiffs next claim that the FTA failed to comply with the procedural requirements of Section 110(f) of the NHPA and, again, that the FTA's determination that the Project does not adversely affect historic properties was arbitrary and capricious.  Section 110(f) requires that:

> Prior to the approval of any Federal undertaking which *may directly and adversely affect* any National Historic Landmark, the head of the responsible Federal Agency, shall, to the maximum extent possible, undertake such planning and actions as may be necessary to minimize

---

[65]  The rehabilitation of an historic property that is consistent with the Secretary of the Interior's standards for the treatment of historic properties, 36 C.F.R. § 68, is not an "adverse effect."  36 C.F.R. § 800.5(a)(2)(ii).  The MBTA's plans to rehabilitate the existing inbound entrance headhouse is compliant with the Secretary's standards and, thus, is not an "adverse effect" under the Section 106 regulations.

[66]  Neighborhood Ass'n of the Back Bay, 393 F. Supp. 2d at 76.

[67]  Plaintiffs also allege that "new information" requires the FTA to conduct further Section 106 review of the Project.  The court expresses no opinion on this argument.  Plaintiffs did not raise this argument in their First Amended Complaint nor are the issues adequately discussed in the Administrative Record before the court.  The decision of whether to reopen the Section 106 process belongs, in the first place, to the factual analysis and reasoned judgment of the FTA.  See Marsh v. Oregon Natural Resources Council, 490 U.S. 360, 378 (1989).

harm to such landmark, and shall afford the Advisory Council on Historic Preservation a reasonable opportunity to comment on the undertaking.[68]

Section 110(f) does not supercede Section 106.[69]  Instead, Section 110(f) compliments Section 106 by setting a higher standard for agency planning regarding the effects on National Historic Landmarks.[70]  Section 110(f), like Section 106, does not mandate specific substantive results and merely sets forth procedural requirements.[71]  The key procedures under Section 110(f) are for the agency to notify the Secretary of the Interior "of any consultation involving a National Historic Landmark and [to] invite the Secretary to participate in the consultation where there may be an adverse effect."[72]  "Congress intended [Section 110] to have a limited reach . . . aimed solely at discouraging federal agencies from ignoring preservation values in projects they initiate, approve funds for or otherwise control."[73]

The Library and the Church are National Historic Landmarks.  The FTA and the MBTA recognized the historic sensitivity of the area from the outset of the Project.  Both entities consulted frequently with representatives from the Library, the Church, the MHC, and the BLC.  As the Record shows, the FTA and the MBTA carefully considered and studied the possible

---

[68]  16 U.S.C. § 470h-2(f) (emphasis added).

[69]  See Nat'l Trust for Historic Pres. v. Blanck, 938 F. Supp. 908, 922 (D.C.C. 1996) (quoting House Report at 36-38, reprinted in 1980 U.S.C.C.A.N. at 6399-6401).

[70]  See id. (citing House Report at 36-38, reprinted in 1980 U.S.C.C.A.N. at 6399-6401).

[71]  See id. at 921-22.

[72]  36 C.F.R. § 800.10(c).

[73]  Lee v. Thornburgh, 877 F.2d 1053, 1056 (D.C. Cir. 1989).

effects of the Project on the surrounding historic landmarks and worked to mitigate any possible harm. After that careful consideration, the FTA, the MBTA, and the MHC all determined that the Project would not adversely affect those landmarks. That finding, as discussed above, was not arbitrary, capricious, or an abuse of discretion. To the contrary, the FTA, the MBTA, and the MHC relied on detailed reports, comments, and analyses, including the Carolan Review, that carefully evaluated those historical concerns. Section 110(f) applies only when a Federal undertaking "may directly and adversely affect" a National Historic Landmark. Because the FTA, the MBTA, and the MHC all properly determined that the Project would have "no adverse effect," the additional procedural requirements of Section 110(f) do not apply. Defendants, therefore, did not violate the procedural requirements of Section 110(f) of the NHPA. Plaintiffs have failed to establish a substantial likelihood of success on the merits of their Section 110(f) claim.[74]

        D.    <u>Section 4(f) of the Department of Transportation Act</u>

Plaintiffs also allege that Defendants violated Section 4(f) of the Department of Transportation Act.[75] Plaintiffs allege a violation of the procedural requirements of the statute and challenge the FTA's substantive findings.

Section 4(f) provides that the Secretary of Transportation may approve a transportation project "requiring the use of . . . land of an historic site of national, State, or local significance . . . only if: (1) there is no prudent and feasible alternative to using that land; and (2) the . . . project

---

[74] In addition, the DOI, in assessing the Project's compliance with Section 4(f) of the Department of Transportation Act, found that the FTA satisfied Section 110(f) through its Section 4(f) exchange with the DOI. AR 680-81.

[75] <u>See</u> 49 U.S.C. § 303(c).

includes all possible planning to minimize harm to the . . . historic site resulting from the use."[76]

Section 4(f) imposes a more stringent standard then the NHPA by requiring the elimination of all

other prudent, feasible alternatives, as well as a minimization of any harm.[77]

   The scope of Section 4(f) is limited.  Section 4(f) applies only to sites on or eligible for the

National Register of Historic Places.[78]  The Section 4(f) requirements are further limited in that

they apply only to historic sites that will be "used" in the course of a transportation project.[79]  In

order to comply with the procedural dictates of Section 4(f), the agency must first determine what

resources are protected and then must determine whether the proposed project constitutes a "use"

of the protected land.[80]  If the agency determines that the project does not "use" the historic site,

no further compliance with Section 4(f) is necessary.[81]  If the agency determines that the land is

"used," then the agency may not proceed unless it complies with Section 4(f).[82]

   A "use" of historic land can be direct or constructive.  A direct use occurs "[w]hen land is

permanently incorporated into a transportation facility."[83]  A constructive use occurs "when the

transportation project does not incorporate land from a section 4(f) resource, but the project's

---

[76]  Id.

[77]  Neighborhood Ass'n of the Back Bay, 393 F. Supp. 2d at 76.

[78]  23 C.F.R. § 771.135(e) (2005).

[79]  49 U.S.C. § 303(c).

[80]  See Neighborhood Ass'n of the Back Bay, 393 F. Supp. 2d at 76.

[81]  Id.

[82]  Id. (citing 49 U.S.C. § 303(c); 23 C.F.R. § 771.135(a)).

[83]  23 C.F.R. § 771.135(p)(1)(i).

proximity impacts are so severe that the protected activities, features or attributes that qualify a resource for protection under section 4(f) are substantially impaired."[84]  "Substantial impairment occurs only when the protected activities, features, or attributes of the resource are substantially diminished."[85]  "No 'use' will be deemed to have occurred where an action will have only an insignificant effect on the existing use of protected lands."[86]  A constructive use does not occur when "[c]ompliance with the requirements of section 106 of the National Historic Preservation Act and 36 C.F.R. [§] 800 for proximity impacts of the proposed action, on a site listed on or eligible for the National Register of Historic Places, results in an agreement of 'no effect' or 'no adverse effect.'"[87]

In this case, the Record shows that the FTA complied with the procedural dictates of Section 4(f).  The FTA, in consultation with the MBTA, the MHC, the BLC, the Library, and the Church, considered the possible impact of the Project on the historic properties from the beginning.  The FTA reviewed the various plans, drawings, and other documentation, including the Carolan Review, in assessing the Project's potential effects on the surrounding historical resources.

---

[84]  23 C.F.R. § 771.135(p)(2).

[85]  Id.

[86]  Allison v. Dep't of Transp., 908 F.2d 1024, 1028 (D.C. Cir. 1990); see also Town of Belmont v. Dole, 766 F.2d 28, 32 (1st Cir. 1985) ("[T]he word 'use' in the statute refers to a use that is adverse in terms of the statute's preservationist purpose, a 'use' that might 'harm' the resources the statute seeks to protect."); Adler v. Lewis, 675 F.2d 1085, 1092 (9th Cir. 1982) ("[T]he term 'use' is . . . not limited to the concept of physical taking, but includes areas that are significantly, adversely affected by the project.").

[87]  23 C.F.R. § 771.135(p)(5)(i).

26

After considering this evidence, the FTA determined that the proposed inbound elevator headhouse is a direct "use" of an historic resource because the proposed elevator would be placed on the Library's granite steps.[88]  The FTA, therefore, continued its Section 4(f) evaluation and determined that no feasible and prudent alternative to the selected location existed and that the Project included all possible planning to minimize harm to the "used" historic site.  In finding no feasible and prudent alternative, the FTA, the MBTA, and the MHC found that the only possible alternative location (next to the new wing of the library at the west end of the inbound platform) raised substantial engineering issues and ran afoul of the ADA requirements.  The FTA and the MBTA determined that placing the handicap accessible elevator entrance 150 feet from the main entrance would create a segregated handicapped entrance and, therefore, would pervert the Project's purpose of making Copley Station ADA compliant.  The ADA requires that handicap accessible entrances are located to "minimize the distance which wheelchair users and other persons who cannot negotiate steps may have to travel compared to the general public."[89]  An alternative "that does not effectuate the project's purposes is, by definition, unreasonable, and need not be evaluated in detail under § 4(f)."[90]  The MBTA similarly considered and rejected several other alternative locations as not feasible.  The FTA's decision that no feasible or prudent alternative existed is rationally connected to the facts contained in the Record and, thus, is not arbitrary or capricious, an abuse of discretion, or otherwise in violation of the law.

---

[88]  See 23 C.F.R. § 771.135(p)(1)(i) (defining a "direct use" of historic property).

[89]  49 C.F.R. § 37, App. A, § 10.3.1(1).  The ADA's stated purpose is to eradicate discrimination against handicapped men and women as well as to create reasonable accommodations for the handicapped.  See 42 U.S.C. § 12101.

[90]  City of Bridgeton v. FAA, 212 F.3d 448, 461 (8th Cir. 2000).

The Record similarly evidences that the FTA, in consultation with the MBTA, the MHC, the BLC, and the Library used all possible planning to minimize any impact on the Library. The MBTA continuously consulted with representatives from the Library, the MHC, and the BLC. The MBTA, on several occasions, expressly altered its design schemes to accommodate the Library's concerns of reducing the visual impact of the elevator headhouses. The Record, furthermore, shows that the MBTA and the FTA considered all the comments and alternatives available to minimize all possible harm, physically and aesthetically, to the Library. The FTA, therefore, considered all of the relevant factors and made a rational decision supported by the extensive evidence in the Record. The FTA's decision was not arbitrary or capricious, an abuse of discretion, or otherwise in violation of the law.

The FTA also conducted a "constructive use" analysis to evaluate the remaining portions of the Project, which included the proposed outbound elevator headhouse and the rehabilitation of the historic inbound entrance headhouse. The FTA concluded that these aspects of the Project did not permanently incorporate historic land into a transportation facility and, therefore, did not constitute direct uses of historic property.[91] The FTA again considered the extensive record, the design plans, and the consultations with, and between, the MBTA, the MHC, the BLC, the Library, the Church, and the public. In doing so, the FTA determined that these elements of the project were not "constructive uses" of historic property. The FTA determined that the Project's proximity impacts were not so severe as to "substantial impair" or "substantially diminish" the historic features and attributes of the Church, the Library, or the historic inbound entrance

---

[91] See 23 C.F.R. § 771.135(p)(1)(i).

28

headhouse.[92]  On those bases, the FTA issued a "Finding of No Significant Impact," to which the

Department of the Interior concurred.  The Record contains sufficient evidence to support the

FTA's finding.

The FTA's finding of no constructive use is further bolstered by the MHC's concurrence

with the FTA's determination of "no adverse effect" under Section 106.  A constructive use does

not occur when a project's compliance with Section 106 of the NHPA, and the regulations

thereunder, results in an agreement of "no adverse effect."[93]  The MBTA, the FTA, and the MHC

all agreed that the construction of the elevator headhouses and the rehabilitation of the existing

inbound headhouse would have "no adverse effect" on the historic properties.  These elements of

the Project, therefore, cannot constitute constructive uses.  The FTA's findings of no constructive

use are supported by the record, not arbitrary or capricious, not an abuse of discretion, nor in

violation of other law.  Plaintiffs have, thus, failed to establish a substantial likelihood of success

on the merits of their Section 4(f) claims.[94]

E.    Massachusetts General Laws Chapter 161A, Section 5(k)

Plaintiffs' final claim is that the MBTA, in the planning and development of the Copley

Station Project, violated Mass. Gen. Laws. Chapter 161A, Section 5(k).  This claim challenges

the discretionary decisions made by the MBTA under its enabling statute.  Plaintiffs' challenge,

---

[92]  See 23 C.F.R. § 771.135(p)(1)(i).

[93]  23 C.F.R. § 771.135(p)(5)(i).

[94]  Plaintiffs also raise the argument that any part of the Project that is within the Back Bay
Historic District necessarily "uses" an historic site.  This argument is unreasonable and, taken to
its logical conclusion, would prohibit any transportation related improvements in the entire Back
Bay section of Boston.  Section 4(f) does not mandate such a broad prohibition.  See
Neighborhood Ass'n of the Back Bay, 393 F. Supp. 2d at 77-78.

therefore, is in the nature of certiorari under Mass. Gen. Laws c. 249, § 4.[95] "Where . . . the plaintiffs contend that the agency abused its discretion in reaching its decision, the court reviews the record to determine whether the decision was arbitrary or capricious."[96] This standard is highly deferential.[97]

Mass. Gen. Laws Chapter 161A, Section 5(k) states that the MBTA shall afford certain parties a "timely opportunity" to participate in the development of "major transportation projects."[98] Such parties include, "state, regional and local agencies and authorities affected by said projects . . . [and] other public and private organizations, groups and persons who are affected by and who have provided the board with reasonable notice of their desire to participate in the development of the design of said project."[99] "Timely opportunity" means "sufficiently early in the design process so as to permit comments to be considered prior to the final development of or commitment to any specific design for such project."[100] Plaintiffs claim that the MBTA did not provide them with sufficient or timely opportunities to participate in the planning

---

[95] See Neighborhood Ass'n of the Back Bay v. Fed. Transit Admin., 393 F. Supp. 2d 66, 73 (D. Mass. 2005).

[96] See id. (citing Northboro Inn, LLC v. Treatment Plant Bd. of Westborough, 58 Mass. App. Ct. 670, 673, 792 N.E.2d 690, 693 (2003)); see also Chandler v. County Comm'rs of Nantucket County, 437 Mass. 430, 434, 772 N.E.2d 578, 581 (2002) ("Certiorari review of . . . discretionary action is generally not available except to determine whether the action was arbitrary and capricious.").

[97] See Chandler, 437 Mass. at 434, 772 N.E.2d at 581; Northboro Inn, 58 Mass. App. Ct. at 673, 792 N.E.2d at 693.

[98] Mass. Gen. Laws c. 161A, § 5(k).

[99] Id.

[100] Id.

of the project.

As discussed above, Plaintiffs were provided with sufficient opportunity to comment on and raise their concerns about the Project. Plaintiffs could have attended the July 21, 2003 public meeting. They did not. Plaintiff NABB did, in fact, meet privately with the MBTA on two occasions, on August 5, 2003 (when the design plans were only 75 percent complete) and March 3, 2004 (before the federal approval process ended). At those meeting, Plaintiff NABB expressed its concerns with the Project's impact on the adjacent historical properties and it raised certain alternative designs suggestions. Both meetings occurred before the federal review process ended and, consequently, before the final commitment to the Project plan. The MBTA also received and reviewed at least one letter and one formal comment from Plaintiff NABB again expressing its concerns for the effect of the Project on the historic properties. The MBTA adequately recorded and considered those comments and suggestions. The MBTA, on the basis of an extensive analysis of historical issues, rejected Plaintiff's suggestions. That decision was not arbitrary or capricious, an abuse of discretion, nor in violation of other law.

Plaintiffs, furthermore, never formally requested that the MBTA consider granting them a formal consulting role in the Project. Plaintiffs, at best, expressed an interest in the Project similar to that of any member of the general public. The MBTA's discretionary determination as to the scope of Plaintiffs participation in the Project, especially considering Plaintiffs lack of a formal request, was not arbitrary or capricious, an abuse of discretion, or otherwise in violation of the law. The MBTA, accordingly, provided a sufficient opportunity for Plaintiffs to participate in the Project.

Plaintiffs have presented no evidence to show that Plaintiffs opportunities to participate in

31

the process were not "timely."  Under Section 5(k), the MBTA has the discretion to determine

when to present its plans to the public and other interested parties.[101]  The only limitation on that

discretion is that those opportunities occur before the final development or commitment to any

specific project design.[102]  Here, the MBTA held its first public meeting on July 21, 2003.  The

MBTA then met with Plaintiff NABB on August 5, 2003.  Both of these meetings occurred

before the final determination of and commitment to the Project locations and designs.  The

MBTA's decision to first reveal the Project to the general public on July 21, 2003, with a 75

percent completed design plan, was not arbitrary or capricious, an abuse of discretion, or contrary

to the statutory provisions of Section 5(k).  The MBTA, furthermore, met with Plaintiffs again on

March 3, 2004 and received at least one letter and one formal comment on the Project from

Plaintiffs before the end of the formal federal approval process.  The MBTA's decision on when

to consult with Plaintiffs was not arbitrary or capricious, an abuse of discretion, or otherwise in

violation of law.  The Record shows that Plaintiffs had timely and sufficient opportunity to

participate in the planning of the Project.  Plaintiffs, accordingly, have failed to show a substantial

likelihood of success on the merits of their state law claim against the MBTA.

**2.      <u>Irreparable Harm</u>**

Plaintiffs bear the burden of establishing that they will suffer irreparable harm if the court

does not grant a preliminary injunction.[103]  Plaintiffs argue that without a preliminary injunction,

---

[101]   <u>See</u> Mass. Gen. Laws. c. 161A, § 5(k).

[102]   <u>Id.</u>

[103]   <u>See, e.g.,</u> <u>Nieves-Maquez</u>, 353 F.3d at 120.

the FTA and the MBTA will begin construction on the Project.[104]  If so, the Plaintiffs allege a

"great potential of harm" to the Library, the Church, the Back Bay Historic District, the existing

inbound entrance headhouse, and other historic sites.[105]  As the Record reflects, the FTA and the

MBTA carefully considered the possible effects of the Project on the historic structures near

Copley Station.  The MBTA, the MHC, the BLC, the Library, and the Church met repeatedly to

address these very issues.  The FTA, the MBTA, and the MHC all agreed that the proposed

Project will not adversely affect the historic properties.  The only actual effect noted in the

Carolan Review and the FTA "Finding of No Adverse Effect" was a visual impact on the area.

Plaintiffs have not presented any evidence that contradicts the FTA and the MBTA's reasoned

conclusion that the Project will not adversely affect any historically significant venues.  Plaintiffs

have, thus, failed to establish that without a preliminary injunction they will suffer irreparable

harm.

3.    **Public Interest**

       In order to justify the grant of a preliminary injunction, Plaintiffs must show that the

requested injunction fits, or at least does not conflict, with the public interest.[106]  They have failed

to do so.  Plaintiffs claim that an injunction in this case serves the public interest by ensuring that

federal and state officials comply with applicable laws and regulations before taking action that

may affect historically significant properties.[107]  Plaintiffs are correct that the public has an

---

[104]  Pl.'s Mem. of Law in Supp. of Mot. for Prelim. and Final Inj., at 33-34.

[105]  Id. at 33.

[106]  See, e.g., Nieves-Maquez, 353 F.3d at 120.

[107]  See Pl.'s Mem. of Law in Supp. of Mot. for Prelim. and Final Inj., at 34.

important interest in making sure government agencies follow the law. Plaintiffs are also correct in asserting that the public has an interest in preserving its national historic treasures. But, Plaintiffs have failed to show that the FTA or the MBTA neglected their legal duties or ignored the required procedures. In fact, the Record supports the conclusion that the MBTA and the FTA adhered to their statutory and regulatory duties, that they adequately considered how the Project would affect the historic sites, that they took steps to minimize the harm to those sites, and that historic concerns informed and guided the Project's designs throughout the process.

Injunctive relief, in this case, will harm the undeniably crucial public interest in ensuring that public transportation is accessible to the handicapped. Access to public transportation is critical, as many disabled people depend on public transportation to attend school, commute to jobs, travel to medical appointments, visit family, and perform other routine life activities.[108] The ADA explicitly declares that the eradication of discrimination against and the development of equal accommodations for disabled men and women is a national necessity.[109] As it stands, Copley Station is inaccessible to disabled men and women and, thus, is not in compliance with the mandates of the ADA. The Station has been non-compliant for more than twelve years. If the FTA and the MBTA are enjoined from going forward with the Project, Copley Station will continue to remain closed to disabled men and women. Further delay on the Copley Station Project is detrimental to the public interest.

---

[108] See 42 U.S.C. § 12101 (listing the purposes and findings that support the American With Disabilities Act).

[109] See id.

4.    **Balance of the Hardships**

The "balance of the hardships" similarly weighs against the grant of a preliminary injunction. As discussed above, Plaintiffs will not suffer irreparable harm if the Copley Station Project is allowed to go forward. The MBTA and the public, however, will suffer significant harm if a preliminary injunction is granted. First, as discussed in detail above, every delay in the Project means another day in which a key public transportation station remains inaccessible to handicapped men and women. The longer the Project is delayed, the longer a large segment of the population is denied a crucial public service.

The MBTA will likely also suffer harm if this court grants a preliminary injunction. That is because of the legal requirements and practical considerations that apply to the MBTA's bidding and contracting process. Further delay in the Project could cost the MBTA its current "low bidder," which would add substantial costs and time delay to the project. Further delay in the Copley Station Project could also separate the execution of the Copley Station Project from the planned improvements to Arlington Station,[110] which would eliminate "the economic and passenger-convenience advantages of the present [dual] project."[111] In other words, the potential harm of a preliminary injunction falls squarely on the shoulders of the MBTA and the public. A preliminary injunction is inappropriate in this case.

## Conclusion

Plaintiffs have failed to satisfy their burden of justifying the extraordinary remedy afforded by a preliminary injunction. Plaintiffs have failed to establish a substantial likelihood of success on

---

[110]   See generally Neighborhood Ass'n of the Back Bay, 393 F. Supp. 2d.

[111]   MBTA's Mem. of Law in Opp. to Mot. for Prelim. and Final Inj., at 13-15.

the merits of their claims under Section 106 of the NHPA, Section 110(f) of the NHPA, Section 4(f) of the Department of Transportation Act, and Mass. Gen. Laws Chapter 161A, Section 5(k). Plaintiffs have also failed to establish irreparable harm, a favorable balance of the hardships, and that the preliminary injunction serves the public interest.  Plaintiffs' motion for a preliminary and final injunction is DENIED.


AN ORDER (COPY ATTACHED) ISSUED ON NOVEMBER 8, 2005


     /s/ Joseph L. Tauro
United States District Judge

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


NEIGHBORHOOD ASSOCIATION OF          *
THE BACK BAY, INC., et al.,          *
                                     *
                                     *
        Plaintiffs,                  *        Civil Action No. 05-11211-JLT
                                     *
    v.                               *
                                     *
FEDERAL TRANSIT ADMINISTRATION,      *
MASSACHUSETTS BAY TRANSPORTATION     *
AUTHORITY,                           *
                                     *
        Defendants.                  *


ORDER

November 8, 2005

TAURO, J.

        The court hereby orders that:

        1.    Plaintiff's Motion for Preliminary and Permanent Injunction [#12] is

              DENIED.


A MEMORANDUM WILL ISSUE.

                                        _____/s/ Joseph L. Tauro_____
                                        United States District Judge